# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

**FILED**

MAY 2 7 2016

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY_____,DEPUTY

1. **THE UNITED STATES OF AMERICA AND THE STATE OF OKLAHOMA, AND**
2. **WAYNE ALLISON, RELATOR,**

       Plaintiffs,

       v.

1. **SOUTHWEST ORTHOPAEDIC SPECIALISTS, PLLC,**
2. **OKLAHOMA CENTER FOR ORTHOPAEDIC & MULTISPECIALTY SURGERY, LLC,**
3. **INTEGRIS AMBULATORY CARE CORPORATION,**
4. **INTEGRIS SOUTH OKLAHOMA CITY HOSPITAL CORPORATION,**
5. **USP OKLAHOMA, INC.**
6. **TENET HEALTHCARE CORPORATION,**
7. **ANTHONY L. CRUSE, D.O.,**
8. **R.J. LANGERMAN, JR., D.O.**
9. **DANIEL J. JONES, M.D.,**
10. **MEHDI ADHAM, M.D.,**
11. **DEREK WEST, D.O.,**
12. **BRIAN LEVINGS, D.O.,**
13. **SHANE HUME, D.O.,**
14. **BRAD REDDICK, D.O.,**
15. **KRISTOPHER AVANT, D.O.,**
16. **STEVE HENDLEY,**
17. **MICHAEL KIMZEY,**

       Defendants.

**ORIGINAL COMPLAINT AND JURY DEMAND FILED <u>IN CAMERA</u> AND SEALED PURSUANT TO 31 U.S.C. § 3730(b)(2)**

Case No. _CIV-16-569-W_

## <u>COMPLAINT PURSUANT TO 31 U.S.C. § 3730</u>

**HAYES LEGAL GROUP, P.C.**
Gaylon C. Hayes, OK Bar No. 14492
Texas Bar No. 24071384
6805 South Western, Suite 500
Oklahoma City, Oklahoma 73139
Tel:  (405) 616-5045
Fax:  (405) 616-5062
gaylon@hhhlawfirm.com
brooke@hhhlawfirm.com
**ATTORNEY FOR RELATOR**

## Table of Contents

I. JURISDICTION AND VENUE ........................................................................................ 5

II. INTRODUCTION .......................................................................................................... 5

III. PARTIES TO THIS LITIGATION ............................................................................... 7

IV. LEGAL FRAMEWORK .............................................................................................. 11

    A. Federal False Claims Act ...................................................................................... 11

    B. Anti-Kickback Statute ........................................................................................... 12

    C. Stark Law. ............................................................................................................. 14

    D. Oklahoma Medicaid False Claims Act ................................................................ 16

    E. Retaliation Under The Federal False Claims Act ................................................. 17

V. FACTUAL ALLEGATIONS ........................................................................................ 18

    A. Equity Scheme ...................................................................................................... 18

    B. Ultrasound Scheme ............................................................................................... 27

    C. Clinical Services Scheme: Unlicensed Personnel; Pre-Signed Prescriptions; False Records For Procedure Authorizations ........................................................................ 30

    D. Levings Surgery Scheme ...................................................................................... 31

    E. EHR Scheme ......................................................................................................... 33

    F. Preferential Treatment Scheme ............................................................................. 34

    G. ISMC ER Scheme ................................................................................................. 37

    H. False Certification Under the False Claims Act .................................................... 38

    I. Retaliation Under the False Claims Act ................................................................ 39

VI. CLAIMS ....................................................................................................................... 41

    Count 1: Stark Law Violations Under 42 U.S.C. § 1395nn ....................................... 41

    Count 2: AKS Violations Under 42 U.S.C. § 1320a-7b(b) ........................................ 42

    Count 3: FCA Violations Under 31 U.S.C. § 3729(a)(1)(A), (B), (G) ...................... 43

    Count 4: OKFCA Violations Under 63 O.S. § 5053.1 *et seq.* ................................. 43

    Count 5: False Certification Under 31 U.S.C. § 3729(a)(1)(B) ................................. 44

    Count 6: Reverse False Claims Under 31 U.S.C. § 3729(a)(1)(G) ............................ 44

    Count 7: Conspiracy Under 31 U.S.C. § 3729(a)(1)(C) ............................................ 45

    Count 8: Retaliation Under 31 U.S.C. § 3730(h) ...................................................... 45

    Count 9: Retaliation Under 63 O.S. § 5053.5 ............................................................ 46

VII. JURY TRIAL ............................................................................................................. 46

## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| 1. **THE UNITED STATES OF AMERICA AND THE STATE OF OKLAHOMA, AND** <br> 2. **WAYNE ALLISON, RELATOR,** <br><br>          **Plaintiffs,** <br><br>     **v.** <br><br> 1.  **SOUTHWEST ORTHOPAEDIC SPECIALISTS, PLLC,** <br> 2.  **OKLAHOMA CENTER FOR ORTHOPAEDIC & MULTISPECIALTY SURGERY, LLC,** <br> 3.  **INTEGRIS AMBULATORY CARE CORPORATION,** <br> 4.  **INTEGRIS SOUTH OKLAHOMA CITY HOSPITAL CORPORATION,** <br> 5.  **USP OKLAHOMA, INC.** <br> 6.  **TENET HEALTHCARE CORPORATION,** <br> 7.  **ANTHONY L. CRUSE, D.O.,** <br> 8.  **R.J. LANGERMAN, JR., D.O.** <br> 9.  **DANIEL J. JONES, M.D.,** <br> 10.  **MEHDI ADHAM, M.D.,** <br> 11. **DEREK WEST, D.O.,** <br> 12. **BRIAN LEVINGS, D.O.,** <br> 13. **SHANE HUME, D.O.,** <br> 14. **BRAD REDDICK, D.O.,** <br> 15. **KRISTOPHER AVANT, D.O.,** <br> 16. **STEVE HENDLEY,** <br> 17. **MICHAEL KIMZEY,** <br><br>          **Defendants.** | **ORIGINAL COMPLAINT AND JURY DEMAND FILE D <u>IN CAMERA</u> AND SEALED PURSUANT TO 31 U.S.C. § 3730(b)(2)** <br><br> Case No. _____ |

## COMPLAINT PURSUANT TO 31 U.S.C. § 3730

**COMES NOW**, the Relator, Wayne Allison, and for his Complaint file pursuant to the Federal Civil False Claims Act, 31 U.S.C §§ 3729, *et seq.*, and the Oklahoma Medicaid False Claims Act, 63 O.S. § 5053 *et seq.*, under seal, and states as follows:

## I.
## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, and 31 U.S.C. §§ 3730 and 3732.

2.      Venue is proper because a substantial portion of the acts relevant to this action occurred within the geographic boundaries of the United States District Court for the Western District of Oklahoma.

3.      In accordance with 31 U.S.C. § 3730(b)(2), this complaint was filed in camera, and a copy of the Complaint, along with required documents has been served on the U.S. pursuant to 31 U.S.C. § 3730(b)(2) and Rule (4)(i), Federal Rules of Civil Procedure

## II.
## INTRODUCTION

4.      The allegations set forth above are hereby incorporated as if fully set forth herein.

5.      This is an action to recover damages and civil penalties on behalf of the United States of America, the State of Oklahoma, and the Relator pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733 ("**FCA**"), the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("**AKS**"), the federal prohibition against self-referrals known as the Stark Law, 42 U.S.C. § 1395nn ("**Stark**"), and the Oklahoma Medicaid False Claims Act 63 O.S.

§ 5053 et seq. ("**OKFCA**"), and Regulations promulgated and associated therewith ("**Healthcare Laws**").

6.     This action arises out a series of Defendants' actions and schemes violating AKS, Stark, FCA, and the OKFCA, involving the submission to the government for payment of factually false clams, legally false claims, and false certifications with Healthcare Laws.

7.     The individual Defendants have throughout the relevant period held ownership and/or operational control over one or more of the entity Defendants, and through this ownership and control have intentionally and knowingly conspired to: (i) direct and structure various unlawful relationships designed to reward the Defendant physicians for referrals of government healthcare business ("**FHCP**")[1]; (ii) engage in unlawful schemes to be reimbursed by the government for performing healthcare services without medical necessity or required documentation; and (iii) knowingly and intentionally disregard Healthcare Laws' requirements regarding such services and reimbursements to increase revenues and profits.

8.     Each of and all named individual and corporate Defendants actively and knowingly participated in one or more of a variety of schemes as described herein and referenced as:

    a.     "**Equity Scheme**"
    b.     "**Ultrasound Scheme**"
    c.     "**Clinical Services Scheme**"
    d.     "**Levings Surgery Scheme**"
    e.     "**EHR Scheme**"
    f.     "**Preferential Treatment Scheme**"

---

[1]     Herein, "**FHCP**" means all healthcare programs under which medical providers are subject to the Healthcare Laws, including Medicare, Medicaid, TriCare/CHAMPUS, Blue Cross Blue Shield Federal, etc.

g.    **"ISMC ER Scheme"**

9.     The Defendants also violated the FCA by retaliating against the Relator for Relator's refusal to ignore Defendants' violations of the Healthcare Laws.

10.    The Plaintiff/Relator was Defendant SOS Administrator/Business Manager.  He gained direct and independent knowledge of the fraudulent practices used by the Defendants while employed in that capacity from April 2002 through the present.

11.    Plaintiff/Relator was personally involved in some of the actions and fraudulent practices of the Defendant during the time of employment, and was given personal direction from Defendants SOS, SOS Doctors, Kimzey, and Hendley regarding these actions.

12.    The Plaintiff/Relator personally and/or through counsel voluntarily provided her personal knowledge of the Defendant's fraudulent practices to the United States before filing this action.

### III.
### PARTIES TO THIS LITIGATION

13.    The allegations set forth above are hereby incorporated as if fully set forth herein.

14.    Plaintiff/Relator, Wayne Allison (**"Relator"**), is an individual who at all times relevant to the events of this Complaint (i) was a United States citizen and resident of and domiciled in the State of Oklahoma; (ii) served as Administrator of Defendant Southwest Orthopaedic Specialists, PLLC, in either a full time, part time, or contractual capacity; (iii) is an attorney licensed in the State of Oklahoma; and (iv) was not the attorney for Defendants in respect of the matters complained of herein.

15.     Defendant, Southwest Orthopaedic Specialists, PLLC ("**SOS**"), is a professional limited liability company[2] organized in the State of Oklahoma, and is the healthcare entity under which the individual physician Defendants practice and perform medical services. SOS operates as a partnership between the SOS Doctors in which each SOS Doctor receives monthly compensation in an amount proportional to the receipts each generated during that month. Each Doctor is obligated to pay the same proportion of the month's operational costs. The SOS financial arrangement operates on the aggregate of operational costs without attributing each Doctor's actual overhead cost to that Doctor; thus, when a particular Doctor generates additional receipts, all SOS Doctors derive a financial benefit.

16.     Defendant, Oklahoma Center for Orthopaedic & Multispecialty Surgery, LLC ("**OCOM**"), is a LLC organized in the State of Oklahoma, and is a licensed hospital in the State of Oklahoma. OCOM is a single-member LLC, with its single member being Southwest Ambulatory Surgery Center, PLLC ("**SASC**"), the entity in which certain Defendant's hold beneficial ownership and/or management control.[3] OCOM provides Designated Health Services[4] ("**DHS**") including inpatient and outpatient surgical services including surgery, MRI, CT, Physical Therapy, and other designated health services to

---

[2]     As used herein, "**LLC**" means a Limited Liability Company, "**PLLC**" means a Professional Limited Liability Company, and both are used interchangeably.

[3]     Defendants with ownership in OCOM have that ownership indirectly through their ownership in SASC.

[4]     DHS includes "inpatient and outpatient hospital services," "radiology and certain other imaging services," "physical therapy, occupational therapy, and outpatient speech-language pathology services," and "clinical laboratory services," and that are "payable, in whole or in part, by Medicare." 42 C.F.R. § 411.351.

beneficiaries of FHCP's, commercial-sponsored health insurance programs, and patients who are self-/un-insured.[5]

**17.** Integris Ambulatory Care Corporation is an Oklahoma corporation operating as a subsidiary within the Integris healthcare system in Oklahoma, and holds ownership interest in OCOM ("**Integris**"; via and/or through one or more affiliated entities).

**18.** Integris South Oklahoma City Hospital Corporation is an Oklahoma corporation d/b/a Integris Southwest Medical Center, and a subsidiary within the Integris healthcare system in Oklahoma ("**ISMC**").

**19.** USP Oklahoma, Inc. is a corporation operating under contract as the management company for OCOM, and which holds an ownership interest in OCOM ("**USP**"; via and/or through one or more affiliated entities).

**20.** Tenet Healthcare Corporation is a corporation which acquired ownership of USP, and through which has acquired ownership and management control of OCOM ("**Tenet**"; via and/or through one or more affiliated entities).

**21.** Anthony L. Cruse, D.O., is an individual physician who practices at SOS, holds ownership in SOS, serves as a board member of SOS, holds ownership in OCOM, serves as a board member and Chairman Of The Board of Managers of OCOM, serves as Medical Director of OCOM, and throughout the relevant period referred FHCP patients to OCOM ("**Cruse**," an "SOS Doctor").

---

[5]     Federal and State health insurance programs include Medicare, Medicaid, Tricare/Champus, Soonercare, InsureOklahoma, BCBS Federal, and other such programs paid for in full or part with Federal and/or State funds.

22.    Richard James Langerman, Jr., D.O., is an individual physician who practices at SOS, holds ownership in SOS, serves as a board member of SOS, holds ownership in OCOM, serves as a board member of OCOM and throughout the relevant period referred FHCP patients to OCOM ("**Langerman**," an "SOS Doctor").

23.    Daniel J. Jones, M.D., is an individual physician who practices at SOS, holds ownership in SOS, holds ownership in OCOM, and throughout the relevant period referred FHCP patients to OCOM ("**Jones**," an "SOS Doctor").

24.    Mehdi Adham, M.D., is an individual physician who practices at SOS, holds ownership in SOS, holds ownership in OCOM, and throughout the relevant period referred FHCP patients to OCOM ("**Adham**," an "SOS Doctor").

25.    Derek West, D.O., is an individual physician who practices at SOS, holds ownership in SOS, serves as a board member of SOS, holds ownership in OCOM, and throughout the relevant period referred FHCP patients to OCOM ("**West**," an "SOS Doctor").

26.    Brian Levings, D.O., is an individual physician who practices at SOS, holds ownership in SOS, holds ownership in OCOM, and throughout the relevant period referred FHCP patients to OCOM ("**Levings**," an "SOS Doctor").

27.    Shane Hume, D.O., is an individual physician who formerly practiced at SOS, formerly held ownership in SOS, formerly held ownership in OCOM, and throughout the relevant period referred FHCP patients to OCOM ("**Hume**," an "SOS Doctor").

28.    Brad Reddick, D.O., is an individual physician who practices at SOS, holds ownership in SOS, serves as a board member of SOS, holds ownership in OCOM, and

throughout the relevant period referred FHCP patients to OCOM ("**Reddick**," an "SOS Doctor").

29.    Kristopher Avant, D.O., is an individual physician who practices at SOS, holds ownership in SOS, serves as a board member of SOS, holds ownership in OCOM, and throughout the relevant period referred FHCP patients to OCOM ("**Avant**," an "SOS Doctor").

30.    The "**SOS Doctors**" include Cruse, Langerman, Jones, Adham, West, Levings, Hume[6], Reddick, and Avant.

31.    Steve Hendley is an executive manager at and employee of USP, is the former CEO of OCOM, and a CPA ("**Hendley**").

32.    Michael Kimzey is a USP employee and the current Chief Executive Officer of OCOM ("**Kimzey**").

## IV.
## LEGAL FRAMEWORK

33.    The allegations set forth above are hereby incorporated as if fully set forth herein.

### A.  Federal False Claims Act

34.    The Federal False Claims Act[7] (31 U.S.C. § 3729 *et seq.*) provides, in pertinent part, that:

---

[6]    Hume left SOS on November 30, 2015, but was an SOS Physician at all times before that and was equally involved, participated in, and benefited from the unlawful schemes complained of herein.

[7]    The FCA was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009. Given the nature of the claims at issue, Sections 3279(a)(1) and 3279(a)(7) of the prior statute, and Section 3729(a)(1)(A)

(a)(1) [a]ny person who (A) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property ... or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government ...

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of that person.

*  *  *

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

### B. Anti-Kickback Statute

35.    The AKS, 42 U.S.C. § 1320a-7b(b),  arose out of congressional concern that remuneration provided to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or

---

and 3729(a)(1)(G) of the revised statute are all applicable here. Sections 3729(a)(1) and 3729(a)(7) apply to conduct that occurred before FERA was enacted, and sections 3729(a)(1)(A) and 3729(a)(1)(G) apply to conduct after FERA was enacted. Section 3729(a)(1)(B) is applicable to all claims in this case by virtue of Section 4(f) of FERA, which makes the new changes to that provision applicable to all claims for payment pending on or after June 7, 2008.

harmful to a vulnerable patient population. To protect the integrity of Federal Health Care Programs ("FHCP") from these harms, Congress enacted a prohibition against the payment of kickbacks in any form. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142: Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

36.     The AKS prohibits any person or entity from offering, making, soliciting, or accepting remuneration, in cash or in kind, directly or indirectly, to induce or reward any person for purchasing, ordering, or recommending or arranging for the purchasing or ordering of federally funded medical goods or services:

> [W]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person-
>
> (A)     to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal healthcare program, or
>
> (B)     to purchase, lease, order, or arrange for or recommended purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a federal healthcare program, shall be guilty of a felony and upon conviction thereof, shall be tined not more than $25,000 or imprisoned for not more than 5 years, or both. 42 U.S.C. 1320a-7b(b).   Violation of the statute also can subject the perpetrator to exclusion from participation in federal healthcare programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and 3 times the amount of remuneration paid.

42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).   Violation of the statute also

can subject the perpetrator to exclusion from participation in FHCP and, effective 08/06/97,

civil monetary penalties of $50,000 per violation and three times the amount of

remuneration paid.  42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

37.     The AKS and the corresponding regulations establish a number of exceptions ("safe

harbors") for common business arrangements.  42 C.F.R. § 1001.952.  These safe harbors

protect arrangements from creating liability under the statute.  An arrangement must be

squarely in a safe harbor to be protected.  Safe harbor protection requires strict compliance

with all applicable conditions set out in the relevant regulation.  Once the plaintiff proves

that the AKS applies, the burden shifts to the defendant to prove that the conduct is within

one of the exceptions.  Relator alleges that no safe harbor applies to the conduct at issue.

## C.  Stark Law.

38.     The Stark Law prohibits medical providers from submitting claims to FHCP for

services provided to patients referred by a physician with whom the provider has an

impermissible "financial relationship."  42 U.S.C. § 1395nn(a)(1).  Congress designed the

Stark Law to remove monetary influences from physicians and their referral decisions, and

thereby protect FHCP from paying for the cost of questionable utilization of services.  The

Stark Law establishes a presumptive rule that providers may not bill, and FHCP will not

pay, for certain health care services generated by a referral from a physician with whom

the provider has a financial relationship.

39.     In relevant part, the Stark Law states: (a) Prohibition of certain referrals

         (1)     In general

14

Except as provided in subsection (B) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph 2, then -

(A)     the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B)     the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third-party payor, or other entity for designated health services furnished pursuant to a referral prohibited under sub paragraph (A).

* * * * *

(g)     Sanctions

(1)     Denial of payment

No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (A)(l) of this section.

(2)     Requiring refunds for certain claims

If a person collects any amounts that were billed in violation of subsection (A) (1) of this section, the person shall be liable to the individual for, and shall refund on a timely basis to the individual, any amount so collected.

42 U.S.C. § 1395nn(a), (g).

**40.**     The Stark Law broadly defines "financial relationship" to include any "compensation arrangement" between the provider and the referring physician. 42 U.S.C. § 1395nn(a)(2). "Compensation arrangement" is further defined to mean "any arrangement involving any remuneration between a physician . . . and an entity." "Remuneration" means "any remuneration, directly or indirectly, overtly or covertly, in cash or in-kind." 42 U.S.C. 1395nn(h)(l)(A), (B).

41.     Under the Stark Law, a physician "referral" includes establishing a plan of care or certifying a patient for healthcare services. 42 U.S.C. §1395nn(h)(5)(B). Stark regulations, 42 C.F.R. § 411.353(a) states that "a physician who has a direct or indirect financial relationship with an entity … may not make a referral to that entity for the furnishing of [Designated Health Services ("DHS")] for which payment otherwise may be made under Medicare." 42 C.F.R. § 411.353(b) states that an "entity that furnishes DHS pursuant to a referral that is prohibited by paragraph (a) of this section may not present or cause to be presented a claim or bill to the Medicare program or to any individual, third party payer, or other entity for the DHS performed pursuant to the prohibited referral."

42.     There are statutory and regulatory exceptions to the Stark Law permitting certain financial relationships between health care providers and physicians. 42 U.S.C. §1395nn(b); 42 C.F.R. § 411.350 - § 411.389 ("safe harbors"). These safe harbors protect arrangements from creating liability under the statute.  An arrangement must strictly meet all applicable conditions for protection.  Once the plaintiff proves that the Stark Law applies, the burden shifts to the defendant to prove that the conduct is within one of the exceptions.

### D.  Oklahoma Medicaid False Claims Act

43.     Medicaid was enacted by Congress on July 30, 1965, under Title XIX of the Social Security Act, as a health coverage program intended to provide medical benefits to those who could not afford necessary medical expenses.

44.     Oklahoma Medicaid is a jointly funded program by the federal and state government and is administered by the Oklahoma Health Care Authority ("OHCA"), an Oklahoma

State agency responsible for receiving, reviewing, and paying properly compliant Medicaid claims submitted by health care providers.

45.     The Oklahoma Medicaid False Claims Act ("OKFCA"; 63 O.S. § 5053 *et seq.*) provides, *inter alia*, that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or who knowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid is liable to the State of Oklahoma for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages the State sustains. 63 O.S. § 5053.1.

46.     "Knowing" and "knowingly" mean that a person, with respect to information, (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is necessary. 63 O.S. § 5053.1.

### E. Retaliation Under The Federal False Claims Act

47.     The FCA provides, *inter alia*, employees, contractors, and/or agents who are discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against because of lawful acts done in furtherance of an action under or to stop violations of the FCA are entitled to relief for such damages, including reinstatement, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. 31 U.S.C. § 3730(h).

## V.
## FACTUAL ALLEGATIONS

**48.** The allegations set forth above are hereby incorporated as if fully set forth herein.

### A. Equity Scheme

**49.** OCOM's Membership Interest (i.e., ownership; **"OCOM Equity"**) is owned beneficially by approximately twenty-five (25) physicians and two non-physician corporate entities.[8]

**50.** The physician owners of OCOM include eight (8) SOS Doctors who collectively own and control approximately 35% of the OCOM Equity; the SOS Doctors are each in a position to refer patients to OCOM; and the SOS Doctors account for approximately two-thirds of OCOM's referrals and total revenue.

**51.** The approximate seventeen (17) Non-SOS Doctors collectively own and control approximately 10% of the OCOM Equity; each of the Non-SOS Doctors are in a position to refer patients to OCOM; and together all of the Non-SOS Doctors account for a minority fraction of OCOM's referrals and total revenue.

**52.** Two (2) non-physician corporate entities collectively own approximately 55% of OCOM Equity, with Integris owning approximately 20% and USP 35%.[9]

---

[8] Description of OCOM Equity includes approximations based on OCOM-provided information regarding individual and corporate ownership on or about December 31, 2015. Individual ownership amounts change from time to time because of buy-in and/or buy-out transactions occurring without publication or disclosure.

[9] On or about August 2015, Tenet announced it was acquiring USP and USP's interest in OCOM Equity, thereby assuming beneficial ownership and control of USP's role as OCOM's hospital management company. Herein, "USP" means both USP and the resulting USP/Tenet company(s)(and affiliated entities).

**53.** Other physicians with no ownership or control of OCOM Equity are in a position to refer patients to OCOM and account for a minority fraction of OCOM's referrals and total revenue.

**54.** A Board of Managers ("**BOM**") governs OCOM including one or more representatives from each of the SOS Doctors, USP, and Integris.[10]

**55.** At all times relevant hereto, Cruse and Langerman were the senior members of the OCOM BOM, and directly and personally controlled all activities affecting OCOM Equity, including all buy-in's and buy-out's.

**56.** The OCOM Operating Agreement[11] prescribes the process and procedure for allocating and reallocating OCOM Equity in the event of certain trigger events, including: a new physician member buy-in; an existing physician member buy-out; or, an existing physician member disassociation from OCOM for any other reason. The OCOM Operating Agreement makes no distinction between an SOS Doctor and a Non-SOS Doctor. Upon the repurchase of a disassociated physician member's OCOM Equity, all existing physician

---

[10]     On December 31, 2015, Tenet requested SOS Physicians to enter into a complex, multi-layer joint venture arrangement to provide Tenet with majority "control" of OCOM so that Tenet could include OCOM on its purported higher-paying hospital reimbursement agreements with commercial insurance carriers.     This arrangement and "control" notwithstanding, the Board of Managers controlling OCOM directly or indirectly includes participants from SOS Physicians, USP, and Integris.

[11]     The term OCOM Operating Agreement includes all related OCOM governance documents, including the USP Purchase Agreement from 2004, and various amendments and restatements of the OCOM Operating Agreement.

owners of OCOM have a first right of refusal to purchase a proportional amount of the disassociating physician member's OCOM Equity.

57.     Throughout the relevant period, portions of OCOM Equity would become available for repurchase as result of a triggering event, including, for example, a physician holding OCOM Equity who relinquishes their OCOM Equity upon retirement.

58.     When such OCOM Equity would become available for purchase because of a Doctor retiring or otherwise disassociating from OCOM, only SOS Doctors were offered the OCOM Equity purchase. The SOS Doctors asserted their entitlement to this OCOM Equity because they refer the majority of OCOM's business. The OCOM BOM, including USP and Integris, were guided by Cruse and Langerman to offer this OCOM Equity to only the SOS Doctors as reward for their past referrals and as incentive for future referrals.

59.     When an SOS Doctor would threaten to disassociate from SOS, the SOS Doctors would threaten to take away that physician's OCOM Equity even if the disassociating SOS Doctor was only planning to take his clinical business (i.e., not surgery business) to a Non-SOS clinic.

60.     In 2012, Dr. Nick Knutson ("**Knutson**") was a physician holding approximately 3.5% OCOM Equity. Knutson retired at or near the end of 2012 and his OCOM Equity was supposed to be offered for sale to all physician owners of OCOM. On or about November 27, 2012, Cruse explained to the SOS Doctors that they alone should have the Knutson OCOM Equity because they "do the bulk of the work." Cruse also represented to the SOS Doctors that he knew this was improper and that OCOM's CEO, Hendley, was aware of this AKS-violative plan. Cruse explained that Hendley said he "didn't hear that"

20

as long as Cruse told him the OCOM Equity was offered to all physicians by Cruse. The SOS Doctors were then polled as to the amount of the Knutson OCOM Equity each wanted to purchase, and all participated.

61.     Cruse and Langerman both have special buyout arrangements for their OCOM Equity which contractually commits USP to pay each of them a 6.5 EBITDA[12] multiple upon their retirement; other physician owners of OCOM Equity have buy-out provisions at a 4.0 EBITDA multiple. The Cruse and Langerman special buyout arrangements also allow each to annually sell a limited amount of OCOM Equity to USP for a 6.5 EBITDA multiple.

62.     Cruse and Langerman have within the prior two years sold some of their OCOM Equity under these special buyout provisions, each selling to USP at a 6.5 EBITDA multiple.

63.     Upon learning of Cruse and Langerman's sales, the SOS Doctors demanded they be allowed to purchase the Cruse and Langerman OCOM Equity sold to USP, but refused to pay the 6.5 multiple price USP paid to Cruse and Langerman. On their behalf, Cruse negotiated with USP and later informed the SOS Doctors that USP had agreed to allow only the SOS Doctors to purchase this OCOM Equity as a reward and incentive because USP knew who brings in the most referrals, and USP wanted to take care of the SOS Doctors and keep them happy. This special purchase arrangement is for only SOS Doctors;

---

[12]     EBITDA is a financial accounting term meaning "Earnings Before Interest, Taxes, Depreciation, and Amortization."

it is offered annually over multiple years so that the SOS Doctors remain at SOS; and it is offered at a fair market value price and at a financial loss to USP, not at the 6.5 EBITDA price at which USP purchased the OCOM Equity from Cruse and Langerman.

**64.** In early 2016, Dr. Greenway, a Non-SOS Doctor holding approximately 1% OCOM Equity, announced he was moving out of the Oklahoma City area and wished to sell his OCOM Equity. Greenway asked to sell his 1% OCOM Equity to his partner, Dr. Vavricka, another Non-SOS Doctor who also owned approximately 1% OCOM Equity. Cruse explained the proposed sale to the SOS Doctors and asked if Greenway's sale to Vavricka could be blocked. OCOM's CEO, Kimzey, explained that the proposed sale could be blocked. Cruse explained the reason they wanted to block the sale was because Vavricka "doesn't do shit over there [at OCOM], that's why we don't want him [Greenway] selling to Vavricka." Kimzey further explained OCOM and USP's desire to "get it to SOS and let these guys [SOS Doctors] buy it."

**65.** OCOM management, including Cruse, Langerman, CEO Hendley, and CEO Kimzey, routinely review, report and consider actions based on the SOS Doctors' performance and individual profitability of referrals to OCOM, including buying out of physician's interest if they are underperforming, allowing others to buy more or buy-in if they are referring a sufficient volume and profitability of patients to OCOM, and leveraging USP-affiliated resources for SOS' use without documentation, agreement, or consideration.

**66.** SOS Doctor, Cruse, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity to reward himself and

22

his fellow SOS Doctors with additional OCOM Equity in return for the SOS Doctors'
continued high-volume referral of surgical cases and non-surgical orders to OCOM. He
participated, orchestrated, agreed and worked with OCOM, USP, Integris, and the other
SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to defraud
the government.

67.    SOS Doctor, Langerman, directly and personally benefited from the OCOM Equity
scheme by overtly acting and conspiring to control OCOM Equity to reward himself and
his fellow SOS Doctors with additional OCOM Equity in return for the SOS Doctors'
continued high-volume referral of surgical cases and non-surgical orders to OCOM. He
participated, orchestrated, agreed and worked with OCOM, USP, Integris, and the other
SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to defraud
the government.

68.    SOS Doctor, Jones, directly and personally benefited from the OCOM Equity
scheme by overtly acting and conspiring to control OCOM Equity to reward himself and
his fellow SOS Doctors with additional OCOM Equity in return for the SOS Doctors'
continued high-volume referral of surgical cases and non-surgical orders to OCOM. He
participated, orchestrated, agreed and worked with OCOM, USP, Integris, and the other
SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to defraud
the government.

69.    SOS Doctor, Adham, directly and personally benefited from the OCOM Equity
scheme by overtly acting and conspiring to control OCOM Equity to reward himself and
his fellow SOS Doctors with additional OCOM Equity in return for the SOS Doctors'

continued high-volume referral of surgical cases and non-surgical orders to OCOM. He participated, orchestrated, agreed and worked with OCOM, USP, Integris, and the other SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to defraud the government.

70.     SOS Doctor, West, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity to reward himself and his fellow SOS Doctors with additional OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM. He participated, orchestrated, agreed and worked with OCOM, USP, Integris, and the other SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to defraud the government.

71.     SOS Doctor, Levings, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity to reward himself and his fellow SOS Doctors with additional OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM. He participated, orchestrated, agreed and worked with OCOM, USP, Integris, and the other SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to defraud the government.

72.     SOS Doctor, Reddick, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity to reward himself and his fellow SOS Doctors with additional OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM. He

24

participated, orchestrated, agreed and worked with OCOM, USP, Integris, and the other SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to defraud the government.

73.     SOS Doctor, Avant, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity to reward himself and his fellow SOS Doctors with additional OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM.  He participated, orchestrated, agreed and worked with OCOM, USP, Integris, and the other SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to defraud the government.

74.     Former SOS Doctor, Hume, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity to reward himself and his fellow SOS Doctors with additional OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM.  He participated, orchestrated, agreed and worked with OCOM, USP, Integris, and the other SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to defraud the government.

75.     OCOM executive and former OCOM CEO, Hendley, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM.  He participated, orchestrated, agreed and worked

with OCOM, USP, Integris, and the SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to defraud the government.

76.     OCOM executive and current CEO, Kimzey, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM.  He participated, orchestrated, agreed and worked with OCOM, USP, Integris, and the SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to defraud the government.

77.     SOS, by and through the SOS Doctors, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM.  It participated, orchestrated, agreed and worked with OCOM, SOS, Integris Ambulatory Care Corporation, and the SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to defraud the government.

78.     USP, and Tenant as USP's acquiring corporate parent, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM.  Through Kimzey and Hendley, it participated, orchestrated, agreed and worked with OCOM, SOS, Integris Ambulatory Care Corporation, and the SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to defraud the government.

79.    Integris Ambulatory Care Corporation directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM. It participated, orchestrated, agreed and worked with OCOM, SOS, USP, and the SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to defraud the government.

## B. Ultrasound Scheme

80.    In mid-2012, Levings announced to the other SOS Doctors that they could receive additional reimbursement for clinic-based joint injections by using ultrasound guidance and CPT code 76942.[13]

81.    Levings explained to the SOS Doctors that they would not be required to actually use the ultrasound device for needle guidance, but that by merely "holding the device next to the joint," and then coding CPT 76942 and dictating "ultrasound guidance was used," they would receive additional significant reimbursement.

82.    At no time did Levings or the other SOS Doctors discuss or even inquire into the required medical necessity or documentation requirements for using CPT 76942.

83.    From the second half of 2012 through February 2014, SOS Doctors acquired at least five ultrasound machines, including portable devices so the Ultrasound Scheme could be

---

[13]    CPT means Current Procedural Terminology and is a medical code set used to report medical, surgical, and diagnostic procedures and services to medical providers, insurance companies, FHCP's. CPT 76942 is a procedure for which government health plans provide reimbursement, and is described as "ultrasonic guidance for needle placement (e.g., biopsy, aspiration, injection, localization device), imaging supervision and interpretation."

used in all locations, including rural operations in which an SOS Doctor would "pack-in and-pack-out" to conduct clinical operations sporadically, for example, one half day per week.

84. Throughout this period the SOS Doctors directed their Physician Assistants ("PA") to use the ultrasound devices at every opportunity.

85. Before Levings' promotion of the Ultrasound Scheme in 2012, SOS Doctors did not own an ultrasound machine and did not use ultrasound guidance on any patient injections. From December 2013 through February 2014, the SOS Doctors employed the Ultrasound Scheme approximately 4,500 times, on over 1,500 FHCP patients, and received over $750,000 in total reimbursement for CPT 76942, with over $250,000 of that from FHCP.

86. SOS third-party billing company, ALN, recognized a spike in CPT 76942 and informed the SOS Doctors that each use of the ultrasound device was required to be medically necessary and properly documented or risk that each such use could be subject to the False Claims Act; the SOS Doctors then abruptly decreased and stopped using the ultrasound devices for injections.

87. The SOS Doctors were told and knew the reimbursement received for the ultrasound procedures should be returned if it was not medically necessary or not properly documented, and that if ever under review these amounts could be recouped or subject to the False Claims Act. The SOS Doctors deliberately ignored the subject; they never requested a review of the medical documents; they never inquired into the calculation of amounts they had received; they never inquired into the proper procedure for returning the

money to the government as required by law; and they ignored Relator's comments that proper compliance actions should be taken with respect to the Ultrasound Scheme.

88. SOS Doctor, Cruse, directly and personally benefited from the Ultrasound Scheme by unlawfully increasing revenues for himself and his fellow SOS Doctors' at SOS.

89. SOS Doctor, Langerman, directly and personally benefited from the Ultrasound Scheme by unlawfully increasing revenues for himself and his fellow SOS Doctors' at SOS.

90. SOS Doctor, Jones, directly and personally benefited from the Ultrasound Scheme by unlawfully increasing revenues for himself and his fellow SOS Doctors' at SOS.

91. SOS Doctor, Adham, directly and personally benefited from the Ultrasound Scheme by unlawfully increasing revenues for himself and his fellow SOS Doctors' at SOS.

92. SOS Doctor, West, directly and personally benefited from the Ultrasound Scheme by unlawfully increasing revenues for himself and his fellow SOS Doctors' at SOS.

93. SOS Doctor, Levings, directly and personally benefited from the Ultrasound Scheme by unlawfully increasing revenues for himself and his fellow SOS Doctors' at SOS.

94. SOS Doctor, Reddick, directly and personally benefited from the Ultrasound Scheme by unlawfully increasing revenues for himself and his fellow SOS Doctors' at SOS.

95. SOS Doctor, Avant, directly and personally benefited from the Ultrasound Scheme by unlawfully increasing revenues for himself and his fellow SOS Doctors' at SOS.

96.    Former SOS Doctor, Hume, directly and personally benefited from the Ultrasound Scheme by unlawfully increasing revenues for himself and his fellow SOS Doctors' at SOS.

## C. Clinical Services Scheme: Unlicensed Personnel; Pre-Signed Prescriptions; False Records For Procedure Authorizations

97.    SOS Doctors have allowed unlicensed personnel to perform medical services, to create and submit medical orders for services for which claims for payment was made, and to fill-in pre-signed prescriptions for prescription medications.

98.    As example, Jones allowed an unlicensed medical assistant to perform post-op medical evaluations, order radiology services, and write medication prescriptions on prescription forms pre-signed by Jones, while Jones was in another city.

99.    A number of SOS Doctors have pre-signed stacks of prescription forms, and allowed and directed other, non-licensed or insufficiently-licensed personnel to complete the forms and give prescriptions to patients.

100.    SOS Doctors routinely request diagnostic services such as MRI's[14] or Physical Therapy ("PT") for their patients.    An MRI procedure or PT often requires pre-authorization from the patient's insurance carrier before scheduling.

101.    OCOM has three MRI machines and a PT department, and SOS Doctors prefer to send their patients to OCOM for these services.   SOS and OCOM each have staff that perform pre-authorization tasks for a variety of procedures.

---

[14]    "MRI" means Magnetic Resonance Imaging, a procedure that uses a magnetic field and radio waves to create detailed images of the organs and tissues within the body.

102.    In or about mid-2015, OCOM began performing pre-authorization services for MRI and PT services for SOS.  To do so, OCOM staff required certain SOS patient information that SOS was to provide.

103.    The SOS Doctors had trained SOS staff to tell insurance carriers what was needed for approval of an MRI or PT, and SOS staff had followed these directions for years as standard procedure.  SOS Staff provided this standard operating procedure information to OCOM staff in the form of a "cheat sheet."

104.    OCOM staff reported to Kimzey that the SOS cheat sheet told OCOM staff to "to be saying that the patient has had conservative treatment, such as physical therapy and medications for 6 weeks" and that "every patient has had an X-ray and the medications are always Ibuprofen and Mobic."  The OCOM staff reported that "this is not the case according to [the patient's] clinicals," and that "[i]f they want us to use this cheat [sic] to obtain authorizations it needs to be on the clinicals as well, otherwise we would be providing false information to the insurance companies."

105.    All of the SOS Doctors benefited by increasing revenues at OCOM for third party services such as MRI's which were not properly documented, warranted, or necessary.

### D. Levings Surgery Scheme

106.    In the fourth quarter of 2015 an SOS operations manager reported to Relator their concern that SOS Doctor, Levings, was fraudulently billing for his PA's services in surgery.

107.   The SOS operations manager informed Relator that it appeared that on certain days every week, Levings' PA conducted clinical operations and was being billed as Levings' surgical assistant simultaneously.

108.   The surgical cases at issue were being performed at OCOM, located next door to SOS.

109.   Relator informed Cruse and Langerman and gathered a sampling of data in inquiry of the potential fraudulent scheme.

110.   The data indicated what the operations manager suspected, i.e., that Levings' PA was being documented and billed as providing surgical assistant services at the same time the PA was conducting clinical operations in a separate building.  In some instances the PA was recorded as being in the Operating Room ("**OR**") for a few minutes; in other instances longer; and in some instances none at all.

111.   The data also indicated that while the PA was recorded as actually being in the OR, he was also conducting clinical operations as recorded in the SOS Electronic Health Record ("**EHR**") computer system, including ordering services and writing prescriptions.  At the times when the PA was actually in the OR, it was suspected that Levings and his PA directed unlicensed staff to use the PA's userid and password to transact the orders and prescriptions.

112.   A third party was retained to investigate and advise SOS on the situation.

113.   Relator provided the results of the investigation to Langerman who said he would handle the situation and direct proper operational compliance requirements prospectively.

114. Relator is not aware of Langerman, or anyone else, taking any action, and to Relator's knowledge the Levings Surgery Scheme continues to this day.

### E. EHR Scheme

115. As licensed Medicare providers, the SOS Doctors have been subject to the federal government requirement to implement a certified Electronic Health Record ("**EHR**") system.[15]

116. Accompanying the federal EHR requirement are a large number of compliance requirements, attestations and certifications.

117. The EHR program includes, *inter alia*, measurement and metrics prescribed by the federal government and known as Meaningful Use and Physician Quality Reporting System ("MU/PQRS"). Under the EHR program physicians and entities adopt, implement, upgrade, and demonstrate meaningful use of Medicare-certified technology in return for financial incentive from the government. A physician or entity's attestation to the EHR program requirements is a claim for payment to the federal government, and includes certification that the physician or entity is in compliance with the Healthcare Laws.

118. The federal government provided an incentive to implement an EHR, which for the SOS Doctors was hundreds of thousands of dollars.

---

[15] "Beginning in 2011, the Electronic Health Records (EHR) Incentive Programs were developed to encourage eligible professionals and eligible hospitals to adopt, implement, upgrade (AIU), and demonstrate meaningful use of certified EHR technology. As of October 2015, more than 479,000 health care providers received payment for participating in the Medicare and Medicaid EHR Incentive Programs." *See* https://www.cms.gov/regulations-and-guidance/legislation/ehrincentiveprograms/basics.html.

119.   The attestation each SOS Doctor made includes notice that any attesting doctor that provides "false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties," and that the attesting doctor is "submitting a claim for Federal funds."

120.   Each and all of the SOS Doctors made attestation and certification of their compliance in 2013, 2014, and 2015, and each and all have received the federal government incentive payments that in aggregate are hundreds of thousands of dollars.

121.   OCOM, as a licensed Medicare hospital, also have been subject to the federal government requirement to implement EHR, and must make attestation and certification to receive federal government incentive payments.

122.   Kimzey has announced to the SOS Doctors that OCOM has successfully made attestation and certification, and received the federal government incentive payments; however, Relator is not aware of the amount or relevant years.

### F. Preferential Treatment Scheme

123.   Cruse is the beneficial owner of buildings leased by OCOM and in which OCOM operates, and Cruse is the beneficial owner of the campus real property on which OCOM and SOS reside, known as Crystal Park Plaza, LLC ("**CPP Campus**").

124.   Cruse is the beneficial owner of and operates one or more entities that own, manage and/or govern and oversee the CPP Campus.

125.   Cruse directs and/or employs one or more individuals who assist in the operation and management of the CPP Campus and who manage Cruse's business and personal affairs.

34

126.   Because of Cruse's influence over OCOM and over the SOS Doctors, OCOM has provided to Cruse years of free office space for operating and managing his personal businesses and personal affairs, with no written agreement.

127.   Langerman directs an individual who assists in Langerman's medical practice as a medical assistant and scrub tech ("**James**"). Early in Relator's tenure with SOS, James was an employee of SOS and paid by Langerman.

128.   During Relator's tenure with SOS, Langerman sought to decrease the amount of money he personally paid to James for James' compensation. Langerman was at the time OCOM's highest volume referring Doctor, and directed OCOM to hire James as an OCOM employee for at least 50% of James' salary.

129.   OCOM hires and retains other scrub techs for all physicians' use, and has no other physician receiving a similar arrangement.

130.   Because of Langerman's referrals to OCOM and influence over OCOM and SOS Doctors, OCOM agreed to create this special financial compensation relationship for James to benefit Langerman.

131.   While other SOS Doctors and Non-SOS Doctors also have personal scrub techs and others working for their individual practices and business interests, only Cruse and Langerman have been provided ongoing special benefits from OCOM that lower their individual business costs.

132.   During at least 2011, Cruse, as OCOM BOM Chairman and Medical Director, directed OCOM to use his personal credit card for purchases of surgical supplies and/or surgical implants so that Cruse could personally get the credit card reward points for these

purchases. OCOM would reimburse Cruse for the credit card amount due for such purchases, and Cruse would then get the financial benefit from the credit card rewards program. At the time, Hendley was OCOM's acting executive manager and agreed to and directed this arrangement be implemented.

133. Cruse and Langerman equally own real property located at 8125 S. Walker Ave., and which includes a licensed Ambulatory Surgery Center ("ASC") known as Southwest Ambulatory Surgery Center, LLC ("SASC").[16] Cruse and Langerman's ownership of the real property is through their respective beneficial ownership of 50% each of Southwest Orthopaedic Center, LLC ("Center"). Throughout the relevant period, Cruse and/or Langerman had commercial loans payable for their respective interest in SASC.

134. OCOM leases the ASC and office space from Center.

135. OCOM historically scheduled some surgical cases to be performed at SASC.

136. OCOM expanded its operating room capacity in or about 2014, at which time little to no surgical cases were thereafter performed at SASC.

137. Cruse and Langerman sought to extend the lease and rental payments from OCOM to SASC, and used their influence over OCOM to extend the lease arrangement on multiple occasions, all the while OCOM was performing no cases at the SASC.

138. Cruse and Langerman conspired with Hendley and Kimzey to extend the lease arrangement and eventually located a sub-lessee to sublease SASC.

---

[16] i.e., SASC is the single-member owner entity of OCOM. SASC is also an ASC licensed by the Oklahoma Department of Health; however, the license was reportedly limited in scope due to facility issues found upon inspection.

139.   Cruse and Langerman personally benefited by using their influence over OCOM to continue rental payments for SASC while OCOM was not using the facility.

## G.  ISMC ER Scheme

140.   On August 1, 2014, SOS entered into an agreement with Integris South Oklahoma City Hospital Corporation d/b/a Integris Southwest Medical Center ("ISMC"), whereby certain SOS Doctors would receive payment from ISMC for providing orthopaedic services to ISMC, including Emergency Room call coverage.

141.   The arrangement between SOS and ISMC held the potential of having all orthopaedic services occurring at or required by ISMC to be referred to SOS Doctors.

142.   As an inducement to enter the arrangement between SOS and ISMC, ISMC requested and the SOS Doctors agreed to increase the number of elective surgery cases they referred to and performed at ISMC.

143.   Upon the agreement's annual renewal, the SOS Doctors discussed ISMC's demand that additional elective surgeries needed to be performed at ISMC by SOS Doctors or the agreement would not be renewed.

144.   An SOS Doctor, West, directed the negotiations and reviewed with ISMC the volume and value of orthopaedic surgical business conducted by SOS Doctors at ISMC before and after the agreement was made in 2014.  West informed the SOS Doctors that the agreement would be renewed but that the SOS Doctors needed to perform more elective surgery at ISMC in the future or the agreement would be terminated in 2016.

145.   All of the SOS Doctors benefited by the Integris orthopaedic services agreement by receiving patient referrals for orthopaedic services from ISMC in return for performing

37

prescribed services at ISMC, as long as the SOS Doctors performed a sufficient number of elective surgery cases at ISMC.

### H. False Certification Under the False Claims Act

146.    As a Medicare and Medicaid provider, OCOM attests to and certifies its compliance with the Healthcare Laws in Cost Reports.[17]   OCOM also attests and certifies its compliance with the Healthcare Laws in all claims for payment sent to FHCP's.[18]

147.    As Medicare and Medicaid providers, SOS and the SOS Doctors certify their compliance with the Healthcare Laws in each claim for payment made to FHCP's.[19]

---

[17]    Medicare-certified institutional providers are required to submit an annual Cost Ceport to a Medicare Administrative Contractor. The Cost Report contains provider information such as facility characteristics, utilization data, cost and charges by cost center (in total and for Medicare), Medicare settlement data, and financial statement data. The Cost Report requires attestation to the following: "MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT." The Cost Report also requires affirmative attestation that the signatory officer is "familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."

[18]    Hospital claims are sent electronically or on a Form UB-92. A claim for payment includes express certification as follows: "I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State Laws."

[19]    Physician services claims for payment are sent electronically or on a Form 1500. A claim for payment includes express certification as follows: "NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds

148.    From as least 2011, year after year in thousands of claims for payment and required reporting, Defendants directly and/or as an entity agent/official affirmatively attested to and certified compliance with the FCA, AKS, Stark Law, and the OKFCA, while knowing of the individual and continuous violations complained of herein, rendering each claim for payment to an FHCP a false claim.

### I. Retaliation Under the False Claims Act

149.    Relator has been employed as Administrator of SOS on a full time, part time, and/or contract basis since approximately April 2002.

150.    During Relator's tenure with SOS, Relator worked full time at SOS, personally financed and attended Oklahoma City School of Law at night, graduated *Summa Cum Laude* in December 2007, was admitted to the Oklahoma Bar in April 2008 (Bar No. 21933), and is a member of the Oklahoma Bar in good standing.

151.    In April 2008 Relator entered into a written employment agreement with SOS in which Relator served part time as SOS's Administrator, and was "expressly not hereunder engaged, employed, or retained as legal representation to or defense of SOS, its members, managers, employees, or agents, on any particular legal matter" and under which "no attorney-client relationship" was created.

---

requested by this form may upon conviction be subject to fine or imprisonment under applicable Federal laws."

152.  Relator has since that time continuously and repeatedly expressed to the SOS Doctors, CEO Hendley and CEO Kimzey, that the SOS organization was ill-formed, lacked governance, and that governance and compliance matters should be prioritized.

153.  Throughout Relator's tenure with SOS and markedly after April 2008, the SOS Doctors, CEO Kimzey, and CEO Hendley excluded Relator from all matters involving OCOM operations, OCOM Equity, and OCOM governance, with those matters handled directly by Cruse, Langerman, CEO Kimzey, CEO Hendley, USP, Integris, and the SOS Doctors when such matters might involve them.

154.  Relator managed only the SOS clinical operation and in doing so repeatedly emphasized to the SOS Doctors that SOS operations, the SOS Doctors' practices, their coding, and operations were all ultimately their own individual responsibility with respect to statutory, regulatory, and contractual compliance.

155.  Facing the Levings Scheme in 2015, Cruse, Langerman, Avant, Reddick, and Kimzey overtly stated to Relator that he was their attorney and requested attorney-client privilege. Relator was concerned he could be complicit in potentially fraudulent activity and again informed each of them that he was not SOS's attorney and there was no attorney-client privilege.  The SOS Doctors thereafter became significantly and aggressively unsettled at Relator's insistence, explaining to Relator that he "knew too much."

156.  At that time Langerman and Cruse initiated conversations with Relator regarding a severance package in the event Relator was terminated without cause; provided, Relator would execute an agreement that would "lock up" Relator and deter him from "coming after them" because Relator "knew too much."

40

157.   Relator was thereafter constructively demoted, with significantly decreased job duties, hours and compensation from the type and amount of work Relator had performed since 2002.

158.   Led by Cruse, Langerman, Avant, Reddick, and West, the SOS Doctors embarked on a project to engage Kimzey and a USP subsidiary to conduct and manage SOS clinical operations.  Relator was then informed that his job duties, hours, and compensation would significantly decrease.

## VI.
## CLAIMS

### Count 1:  Stark Law Violations Under 42 U.S.C. § 1395nn

159.   The allegations set forth above are hereby incorporated as if fully set forth herein.

160.   Langerman had/has a compensation arrangement with OCOM by OCOM's employing Langerman's scrub tech, James.  There is no Stark Law Safe Harbor allowing this remuneration.

161.   Cruse had a compensation arrangement with OCOM by OCOM's allowing Cruse to use his personal credit card for OCOM surgical supply orders.  There is no Stark Law Safe Harbor allowing this remuneration.  This remuneration was illegally solicited and received in violation of the AKS.

162.   Cruse had/has a compensation arrangement with OCOM by OCOM's allowing Cruse years of free office space for his personal employee(s) to manage his personal business(s).

163.    SOS has a compensation arrangement with ISMC for certain of the SOS Doctors to provide orthopaedic services to ISMC in return for compensation.  An unwritten element of the agreement is that the SOS Doctors will schedule and perform elective surgical cases at ISMC in sufficient volume to satisfy ISMC so that ISMC will maintain the relationship.

164.    From the time each of these compensation arrangements were implemented, all referrals from Cruse, Langerman, and the SOS Doctors to OCOM and ISMC were violative of the Stark Law and the AKS.

165.    From the time each of these compensation arrangements were implemented, all claims for payment made by SOS, SOS Doctors, and OCOM to FHCP's were violative of the Stark Law and the AKS.

166.    Violation of the Stark Law or the AKS subjects all such claims for payment to the government to the FCA and OKFCA.

167.    Pursuant to the FCA and OKFCA, Defendants are liable to the United States and the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages, and reasonable costs and attorney fees.

## Count 2:  AKS Violations Under 42 U.S.C. § 1320a-7b(b)

168.    The allegations set forth above are hereby incorporated as if fully set forth herein.

169.    Each of the SOS Doctors, Kimzey, Hendley, OCOM, and USP violated the AKS by their implementation of the Equity Scheme.

170.    Defendants violated the AKS by soliciting and/or receiving remuneration in their various schemes and unlawful arrangements for referral of patients for services to OCOM and ISMC.

171.   Violation of the AKS subjects all claims for payment to the government to the FCA and OKFCA.

172.   Pursuant to the FCA and OKFCA, Defendants are liable to the United States and the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages, and reasonable costs and attorney fees.

### Count 3:  FCA Violations Under 31 U.S.C. § 3729(a)(1)(A), (B), (G)

173.   The allegations set forth above are hereby incorporated as if fully set forth herein.

174.   By their violations of the AKS and Stark Law, all claims Defendants made to the FHCP's for payment are subject to the FCA and OKFCA as false claims.

175.   By their Ultrasound Scheme, Clinical Services Scheme, Levings Surgery Scheme, and EHR Scheme, Defendants made false statements, made false records, and used false statements and records to request payment from FHCP's, and therefore all claims by Defendants made to FHCP's for payment are subject to the FCA and OKFCA as false claims.

176.   Pursuant to the FCA and OKFCA, Defendants are liable to the United States and the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages, and reasonable costs and attorney fees.

### Count 4:  OKFCA Violations Under 63 O.S. § 5053.1 *et seq.*

177.   The allegations set forth above are hereby incorporated as if fully set forth herein.

178.   By its violations of the AKS, Stark Law, and FCA, all claims Defendants made to the OHCA for payment are subject to the OKFCA as false claims.

179.    Pursuant to the FCA and OKFCA, Defendants are liable to the United States and the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages, and reasonable costs and attorney fees.

### Count 5:  False Certification Under 31 U.S.C. § 3729(a)(1)(B)

180.    The allegations set forth above are hereby incorporated as if fully set forth herein.

181.    By its violations of the AKS, Stark Law, FCA, and OKFCA, and their affirmative attestation of full compliance without violations of each, Defendants falsely certified compliance in Cost Reports, claims for payments, and the EHR program, all of which are conditions of payment.

182.    Throughout the entire relevant period, Defendants would not have been paid by FHCP's but for Defendants' affirmative and false cost report certifications, attestations, and individual claims for payment.

183.    Pursuant to the FCA and OKFCA, Defendants are liable to the United States and the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages, and reasonable costs and attorney fees.

### Count 6:  Reverse False Claims Under 31 U.S.C. § 3729(a)(1)(G)

184.    The allegations set forth above are hereby incorporated as if fully set forth herein.

185.    Defendants knew that they have received reimbursement from the government for which they were not entitled because of their various schemes violating the Stark Law, the AKS, the FCA, and/or the OKFCA, including the Ultrasound Scheme and the Clinical Services Scheme.

186.    Defendants deliberately disregarded their duty to return the wrongly received reimbursement, and disregarded their duty to consider whether self-reporting was required under the Healthcare Laws.

187.    Pursuant to the FCA and OKFCA, Defendants are liable to the United States and the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages, and reasonable costs and attorney fees.

### Count 7:  Conspiracy Under 31 U.S.C. § 3729(a)(1)(C)

188.    The allegations set forth above are hereby incorporated as if fully set forth herein.

189.    Each of the Defendants and the Defendants' collectively conspired to orchestrate and conceal their schemes as described herein.

190.    By such conspiracy the Defendants violated the FCA and the OKFCA.

191.    Pursuant to the FCA and OKFCA, Defendants are liable to the United States and the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages, and reasonable costs and attorney fees.

### Count 8:  Retaliation Under 31 U.S.C. § 3730(h)

192.    The allegations set forth above are hereby incorporated as if fully set forth herein.

193.    When Relator refused to be SOS's attorney and reminded the SOS Doctors of their duties under the law, Defendant SOS attempted to intimidate Relator and thereafter decreased Relator's job duties, hours and compensation.

194.    Under the FCA Relator is entitled to relief for such damages, including reinstatement, two times the amount of back pay, interest on the back pay, and

compensation for any special damages sustained from the discrimination, including litigation costs and reasonable attorneys' fees.

### Count 9:  Retaliation Under 63 O.S. § 5053.5

195.   The allegations set forth above are hereby incorporated as if fully set forth herein.

196.   When Relator refused to be SOS's attorney and reminded the SOS Doctors of their duties under the law, Defendant SOS attempted to intimidate Relator and thereafter decreased Relator's job duties, hours and compensation.

197.   Under the OKFCA Relator is entitled to relief for such damages, including reinstatement, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained from the discrimination, including litigation costs and reasonable attorneys' fees.

### VII.
### JURY TRIAL

198.   The allegations set forth above are hereby incorporated as if fully set forth herein.

199.   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff/Relator hereby demands trial by jury.

   **WHEREFORE,** Relator, on behalf of himself, the United States, and the State of Oklahoma, prays that the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States and the State of Oklahoma have sustained because a Defendants' actions plus a civil penalty of between $5,500 and $11,000 for each violation; that Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be at least 15% and not more than

25% of the proceeds of the action or settlement of the claim if the United States and/or the State of Oklahoma intervenes, and not less than 25% nor more than 30% of the proceeds of the action or settlement of the claim if the United States and/or the State of Oklahoma does not intervene; that the Relator be awarded all costs and expenses incurred, including reasonable attorney's fees and costs; that Relator be awarded an amount equal to two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees; and that the Court order all such other relief as the Court may deem appropriate.

Respectfully submitted,

GAYLON C. HAYES, OBA #14492
6805 South Western Ave. Suite 500
Oklahoma City, OK 73139
Telephone: 405/616-5045
Facsimile: 405/616-5062
gaylon@hhhlawfirm.com
brooke@hhhlawfirm.com
*Attorney For Plaintiff/Relator*