## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

1. **THE UNITED STATES OF AMERICA AND THE STATE OF OKLAHOMA, AND**
2. **WAYNE ALLISON, RELATOR,**

       **Plaintiffs,**

       **v.**

1. **SOUTHWEST ORTHOPAEDIC SPECIALISTS, PLLC,**
2. **OKLAHOMA CENTER FOR ORTHOPAEDIC & MULTISPECIALTY SURGERY, LLC,**
3. **INTEGRIS AMBULATORY CARE CORPORATION,**
4. **INTEGRIS SOUTH OKLAHOMA CITY HOSPITAL CORPORATION,**
5. **USP OKLAHOMA, INC.**
6. **TENET HEALTHCARE CORPORATION,**
7. **ANESTHESIA PARTNERS OF OKLAHOMA, LLC**
8. **UAP OF OKLAHOMA, LLC,**
9. **ANTHONY L. CRUSE, D.O.,**
10. **R.J. LANGERMAN, JR., D.O.,**
11. **DANIEL J. JONES, M.D.,**
12. **MEHDI ADHAM, M.D.,**
13. **DEREK WEST, D.O.,**
14. **BRIAN LEVINGS, D.O.,**
15. **SHANE HUME, D.O.,**
16. **BRAD REDDICK, D.O.,**
17. **KRISTOPHER AVANT, D.O.,**
18. **STEVE HENDLEY,**
19. **MICHAEL KIMZEY,**

       **Defendants.**

**FIRST AMENDED COMPLAINT AND JURY DEMAND FILED <u>IN CAMERA</u> AND SEALED PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**Case No. CIV-16-569-F**
**Judge Stephen P. Friot**

<u>**FIRST AMENDED COMPLAINT PURSUANT TO 31 U.S.C. § 3730**</u>

**COMES NOW**, the Relator, Wayne Allison, and for his First Amended Complaint filed pursuant to the Federal Civil False Claims Act, 31 U.S.C §§ 3729, *et seq*., and the Oklahoma Medicaid False Claims Act, 63 O.S. § 5053 *et seq*., under seal, and states as follows:

## I.
## <u>JURISDICTION AND VENUE</u>

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, and 31 U.S.C. §§ 3730 and 3732.

2. Venue is proper because a substantial portion of the acts relevant to this action occurred within the geographic boundaries of the United States District Court for the Western District of Oklahoma.

3. In accordance with 31 U.S.C. § 3730(b)(2), this First Amended Complaint was filed in camera, and a copy of the First Amended Complaint, along with required documents have been served on the U.S. and the State of Oklahoma pursuant to 31 U.S.C. § 3730(b)(2), Rule (4)(i) of the Federal Rules of Civil Procedure, 63 O.S. § 5053.2(B)(2), and 12 O.S. § 2004.

## II.
## <u>INTRODUCTION</u>

4. The allegations set forth above are hereby incorporated as if fully set forth herein.

5. This is an action to recover damages and civil penalties on behalf of the United States of America, the State of Oklahoma, and the Relator pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733 ("**FCA**"), the federal Anti-Kickback Statute,

42 U.S.C. § 1320a-7b(b) ("**AKS**"), the federal prohibition against self-referrals known as the Stark Law, 42 U.S.C. § 1395nn ("**Stark**"), and the Oklahoma Medicaid False Claims Act 63 O.S. § 5053 et seq. ("**OKFCA**"), and Regulations promulgated and associated therewith ("**Healthcare Laws**").

6.     This action arises out a series of Defendants' actions and schemes violating AKS, Stark, FCA, and the OKFCA, involving the submission of claims to the government for payment of factually false clams, legally false claims, and false express and implied certifications with Healthcare Laws.

7.     The individual Defendants have throughout the relevant period held, directly and/or indirectly, ownership and/or operational control over one or more of the entity Defendants, and through this ownership and control have intentionally and knowingly conspired to and did, *inter alia*: (i) direct and structure various unlawful relationships designed to reward the Defendant physicians for referrals of government healthcare business ("**FHCP**")[1]; (ii) engage in unlawful schemes to be reimbursed by FHCP's for performing healthcare services without medical necessity or required documentation; and (iii) knowingly and intentionally disregard and/or circumvent Healthcare Laws' requirements regarding such services and reimbursements to increase revenues and profits.

---

[1]     Herein, "**FHCP**" means all healthcare programs under which medical providers are subject to the Healthcare Laws, including Medicare, Medicaid, TriCare/CHAMPUS, Blue Cross Blue Shield Federal, etc.

8.    Each of and all the named individual and corporate Defendants actively and knowingly participated in one or more of a variety of schemes as described herein and referenced as:

a.    **"Equity Scheme"**
b.    **"Ultrasound Scheme"**
c.    **"Clinical Services Scheme"**
d.    **"Levings Surgery Scheme"**
e.    **"EHR Scheme"**
f.    **"Preferential Treatment Scheme"**
g.    **"ISMC ER Scheme"**
h.    **"Anesthesiology Scheme"**
i.    **"Employment/Rental Scheme"**

9.    Certain of the Defendants also violated the FCA by retaliating against the Relator for Relator's refusal to ignore Defendants' violations of the Healthcare Laws, and refusal to risk being considered complicit in Defendants' violations of the Healthcare Laws.

10.    The Plaintiff/Relator has been Defendant SOS' Administrator/Business Manager. He gained direct and independent knowledge of the fraudulent practices used by the Defendants while employed in that capacity from April 2002 through the present.

11.    Plaintiff/Relator was personally involved in some of the actions and fraudulent practices of certain Defendants during the time of employment, and was given personal direction from Defendants SOS, SOS Doctors, Kimzey, and Hendley regarding these actions.

12.    The Plaintiff/Relator personally and/or through counsel voluntarily provided his personal knowledge of the Defendants' fraudulent practices to the United States before filing this action.

### III.
### PARTIES TO THIS LITIGATION

13.     The allegations set forth above are hereby incorporated as if fully set forth herein.

14.     Plaintiff/Relator, Wayne Allison ("**Relator**"), is an individual who at all times relevant to the events of this Complaint: (i) was a United States citizen and resident of and domiciled in the State of Oklahoma; (ii) served as Administrator of Defendant Southwest Orthopaedic Specialists, PLLC, in either a full time, part time, or contractual capacity; (iii) is an attorney licensed in the State of Oklahoma; and (iv) was not the attorney for Defendants in respect of the matters complained of herein or in his capacity as SOS' Administrator.

15.     Defendant, Southwest Orthopaedic Specialists, PLLC ("**SOS**"), is a professional limited liability company[2] organized in the State of Oklahoma, and is the healthcare entity under which the individual physician Defendants practice and perform medical services.  SOS' National Provider Identification[3] ("**NPI**") numbers are 1669559720 and 1598191371.  SOS operates as a partnership between the SOS Doctors in which each SOS Doctor receives monthly compensation in an amount proportional to the receipts each generated during that month.  Each Doctor is obligated to pay the same proportion of the month's operational costs.  The SOS

---

[2]     As used herein, "**LLC**" means a Limited Liability Company, "**PLLC**" means a Professional Limited Liability Company, and both are used interchangeably.

[3]     An NPI number is a unique 10-digit identification number issued to health care providers in the United States by the Centers for Medicare and Medicaid Services (CMS). Licensed medical providers use their unique NPI number to submit claims for payment to CMS and other FHCP's.

financial arrangement operates on the aggregate of operational costs without attributing each individual Doctor's actual overhead cost to that Doctor; thus, when a particular Doctor generates additional receipts, all SOS Doctors derive a financial benefit.

16.   Defendant, Oklahoma Center for Orthopaedic & Multispecialty Surgery, LLC ("OCOM"), is a LLC organized in the State of Oklahoma, and is a licensed hospital in the State of Oklahoma. OCOM's NPI number is 1063489485. OCOM is a single-member LLC, with its single member being Southwest Ambulatory Surgery Center, PLLC ("SASC"), the entity in which certain Defendants hold beneficial ownership and/or management control.[4]   OCOM provides Designated Health Services[5] ("DHS") including inpatient and outpatient services such as surgery, MRI, CT, Physical Therapy, and other DHS to beneficiaries of FHCP's, commercial-sponsored health insurance programs, and patients who are self-/un-insured.[6]

17.   Integris Ambulatory Care Corporation is an Oklahoma non-profit corporation operating as a subsidiary within the Integris healthcare system in Oklahoma, and

---

[4]   Defendants with ownership in "OCOM" have that ownership indirectly through their ownership in SASC.

[5]   DHS includes "inpatient and outpatient hospital services," "radiology and certain other imaging services," "physical therapy, occupational therapy, and outpatient speech-language pathology services," and "clinical laboratory services," and that are "payable, in whole or in part, by Medicare." 42 C.F.R. § 411.351.

[6]   Federal and State health insurance programs include Medicare, Medicaid, Tricare/Champus, Soonercare, InsureOklahoma, BCBS Federal, and other such programs paid for in full or part with Federal and/or State funds.

holds ownership interest in OCOM ("**Integris**"; via and/or through one or more affiliated entities). Integris' NPI numbers are 1900141935 and 1033320825.

18.    Integris South Oklahoma City Hospital Corporation is an Oklahoma non-profit corporation d/b/a Integris Southwest Medical Center, and a subsidiary within the Integris healthcare system in Oklahoma ("**ISMC**"). ISMC's NPI numbers are 1801819099, 1962576462, 1457372625, 1336155779, 1336252717, and 1538587464.

19.    USP Oklahoma, Inc. is a for-profit corporation operating under contract as the management company for OCOM, and which holds an ownership interest in OCOM ("**USP**"; via and/or through one or more affiliated entities). USP's Oklahoma Secretary of State Filing number is 1900688298.

20.    Tenet Healthcare Corporation is a corporation which, directly or via an affiliate or subsidiary, acquired ownership of USP, and through which has acquired ownership and management control of OCOM ("**Tenet**"; via and/or through one or more affiliated entities). Tenet is a public company traded on the New York Stock Exchange under the symbol "THC."

21.    Anesthesia Partners of Oklahoma, LLC ("**APO**"), is a limited liability company organized in the State of Oklahoma. APO's NPI number is 1174997753. APO was formed and owned by the SOS Doctors, UAP, and Kimzey.

22.    UAP of Oklahoma, Inc. ("**UAP**"), is a for-profit corporation which is a subsidiary of and owned by USP. UAP is a founder, owner and manager of APO.

23.     Anthony L. Cruse, D.O., is an individual physician who practices at SOS[7], holds ownership in SOS, serves as a board member of SOS, holds ownership in OCOM, serves as a board member and Chairman of the Board of Managers of OCOM, serves as Medical Director of OCOM, and throughout the relevant period referred FHCP patients to OCOM (**"Cruse,"** an "SOS Doctor"). Cruse's NPI number is 1235139692.

24.     Richard James Langerman, Jr., D.O., is an individual physician who practices at SOS, holds ownership in SOS, serves as a board member of SOS, holds ownership in OCOM, serves as a board member of OCOM, and throughout the relevant period referred FHCP patients to OCOM (**"Langerman,"** an "SOS Doctor"). Langerman's NPI number is 1033119490.

25.     Daniel J. Jones, M.D., is an individual physician who practices at SOS, holds ownership in SOS, holds ownership in OCOM, and throughout the relevant period referred FHCP patients to OCOM (**"Jones,"** an "SOS Doctor"). Jones' NPI number is 1528169883.

26.     Mehdi Adham, M.D., is an individual physician who practices at SOS, holds ownership in SOS, holds ownership in OCOM, and throughout the relevant period referred FHCP patients to OCOM (**"Adham,"** an "SOS Doctor"). Adham's NPI number is 1205836491.

---

[7]     Cruse retired in May 2016 and no long conducts a medical practice or performs surgery.

27. Derek West, D.O., is an individual physician who practices at SOS, holds ownership in SOS, serves as a board member of SOS, holds ownership in OCOM, and throughout the relevant period referred FHCP patients to OCOM ("**West**," an "SOS Doctor"). West's NPI number is 1578511697.

28. Brian Levings, D.O., is an individual physician who practices at SOS, holds ownership in SOS, holds ownership in OCOM, and throughout the relevant period referred FHCP patients to OCOM ("**Levings**," an "SOS Doctor"). Levings' NPI number is 1891718433.

29. Shane Hume, D.O., is an individual physician who formerly practiced at SOS, formerly held ownership in SOS, formerly held ownership in OCOM, and throughout the relevant period referred FHCP patients to OCOM ("**Hume**," an "SOS Doctor"). Hume's NPI number is 1578665063.

30. Brad Reddick, D.O., is an individual physician who practices at SOS, holds ownership in SOS, serves as a board member of SOS, holds ownership in OCOM, and throughout the relevant period referred FHCP patients to OCOM ("**Reddick**," an "SOS Doctor"). Reddick's NPI number is 1932310596.

31. Kristopher Avant, D.O., is an individual physician who practices at SOS, holds ownership in SOS, serves as a board member of SOS, holds ownership in OCOM, and throughout the relevant period referred FHCP patients to OCOM ("**Avant**," an "SOS Doctor"). Avant's NPI number is 1386833408.

32. The **"SOS Doctors"** include Cruse, Langerman, Jones, Adham, West, Levings, Hume[8], Reddick, and Avant.

33. Steve Hendley is an executive manager at and employee of USP, is the former CEO of OCOM, and is a CPA (**"Hendley"**).

34. Michael Kimzey is a USP employee and the current Chief Executive Officer of OCOM (**"Kimzey"**).

## IV.
## LEGAL FRAMEWORK

35. The allegations set forth above are hereby incorporated as if fully set forth herein.

### A. Federal False Claims Act

36. The Federal False Claims Act[9] (31 U.S.C. § 3729 *et seq.*) provides, in pertinent part, that:

(a)(1) [a]ny person who (A) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); (D) has possession, custody, or control of property or money used, or to be used, by the Government and

---

[8] Hume left SOS on November 30, 2015, but was an SOS Physician at all times before that and was equally involved, participated in, and benefited from the unlawful schemes complained of herein.

[9] The FCA was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009. Given the nature of the claims at issue, Sections 3279(a)(1) and 3279(a)(7) of the prior statute, and Section 3729(a)(1)(A) and 3729(a)(1)(G) of the revised statute are all applicable here. Sections 3729(a)(1) and 3729(a)(7) apply to conduct that occurred before FERA was enacted, and sections 3729(a)(1)(A) and 3729(a)(1)(G) apply to conduct after FERA was enacted. Section 3729(a)(1)(B) is applicable to all claims in this case by virtue of Section 4(f) of FERA, which makes the new changes to that provision applicable to all claims for payment pending on or after June 7, 2008.

knowingly delivers, or causes to be delivered, less than all of that money or property ... or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government ...

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of that person.

* * *

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

### B.  Anti-Kickback Statute

37.  The AKS, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that remuneration provided to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or harmful to a vulnerable patient population. To protect the integrity of Federal Health Care Programs ("FHCP") from these harms, Congress enacted a prohibition against the payment of kickbacks in any form. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub.

13

L. No. 95-142: Medicare and Medicaid Patient and Program Protection Act of 1987,

Pub. L. No. 100-93.

38.     The AKS prohibits any person or entity from soliciting, receiving, offering, or

paying remuneration, in cash or in kind, directly or indirectly, to induce or reward

any person for purchasing, ordering, or recommending or arranging for the

purchasing or ordering of federally funded medical goods or services:

> [W]hoever knowingly and willfully solicits or receives any remuneration
> (including any kickback, bribe, or rebate) directly or indirectly, overtly or
> covertly, in cash or in kind--
>
> (A)     in return for referring an individual to a person for the furnishing or
> arranging for the furnishing of any item or service for which payment may
> be made in whole or in part under a Federal health care program, or
>
> (B)     in return for purchasing, leasing, ordering, or arranging for or
> recommending purchasing, leasing, or ordering any good, facility, service,
> or item for which payment may be made in whole or in part under a Federal
> health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not
> more than $25,000 or imprisoned for not more than five years, or both.  42
> U.S.C. § 1320a-7b(b).

Violation of the statute also can subject the perpetrator to exclusion from

participation in FHCP and, "a claim that includes items or services resulting from a

violation of this section constitutes a false or fraudulent claim for purposes of" the

FCA.  42 U.S.C. § 1320a-7(g).

39.     The AKS and the corresponding regulations establish a number of exceptions ("**Safe**

**Harbors**") for common business arrangements. 42 C.F.R. § 1001.952. These Safe

Harbors protect arrangements from creating liability under the statute.    An

14

arrangement must be squarely in a Safe Harbor to be protected. Safe Harbor protection requires strict compliance with all applicable conditions set out in the relevant regulation. Once the plaintiff proves that the AKS applies, the burden shifts to the defendant to prove that the conduct strictly satisfies one of the exceptions. Relator alleges that no Safe Harbor applies to the conduct alleged herein as violating the ASK.

40.    Violation of the AKS renders all claims for payment resulting from the unlawful referrals, submitted or caused to be submitted by parties involved to FHCP's, to be subject to the FCA and OKFCA.

41.    Falsely certifying compliance with the AKS is a material consideration of FHCP's for making payment.

### C. Stark Law.

42.    The Stark Law prohibits physicians from submitting claims to FHCP for services provided to patients referred by a physician with whom the referred-to provider has an impermissible "financial relationship." 42 U.S.C. § 1395nn(a)(1). Congress designed the Stark Law to remove monetary influences from physicians and their referral decisions, and thereby protect FHCP from paying for the cost of questionable utilization of services. The Stark Law establishes a presumptive, strict-liability rule that referred-to providers may not bill, and FHCP will not pay, for certain health care services generated by a referral from a physician with whom the referred-to provider has a financial relationship.

43.    In relevant part, the Stark Law states: (a) Prohibition of certain referrals

15

(1)    In general

Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then -

(A)    the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B)    the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third-party payor, or other entity for designated health services furnished pursuant to a referral prohibited under sub paragraph (A).

                    * * * * *

(g)    Sanctions

(1)    Denial of payment

No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(l) of this section.

(2)    Requiring refunds for certain claims

If a person collects any amounts that were billed in violation of subsection (a)(1) of this section, the person shall be liable to the individual for, and shall refund on a timely basis to the individual, any amount so collected.

42 U.S.C. § 1395nn(a), (g).

44.    The Stark Law broadly defines "financial relationship" to include any physician ownership or investment interest in the referred-to entity, or a "compensation arrangement" between the referred-to entity and the referring physician. 42 U.S.C. § 1395nn(a)(2).  "Compensation arrangement" is broadly defined to mean "**any** arrangement involving **any** remuneration between a physician . . . and an entity." "Remuneration" broadly means "**any** remuneration, directly or indirectly, overtly or

16

covertly, in cash or in-kind." 42 U.S.C. 1395nn(h)(l)(A), (B), 42 C.F.R. § 411.354 (emphasis added)

45.   Under the Stark Law, a physician "referral" includes establishing a plan of care or certifying a patient for healthcare services. 42 U.S.C. §1395nn(h)(5)(B). The Stark Law is a strict liability statute and promulgated regulations, with 42 C.F.R. § 411.353(a) stating that "a physician who has a direct or indirect financial relationship with an entity ... **may not make a referral** to that entity for the furnishing of [Designated Health Services ("**DHS**")] for which payment otherwise may be made under Medicare." 42 C.F.R. § 411.353(b) states that an "entity that furnishes DHS pursuant to a referral that is prohibited by paragraph (a) of this section **may not present or cause to be presented** a claim or bill to the Medicare program or to any individual, third party payer, or other entity for the DHS performed pursuant to the prohibited referral." (emphasis added)

46.   Similar to the AKS, there are statutory and regulatory exceptions to the Stark Law permitting certain financial relationships between health care providers and physicians. 42 U.S.C. §1395nn(b); 42 C.F.R. § 411.350 - § 411.389 ("**Safe Harbors**"). These Safe Harbors protect arrangements from creating liability under the statute. An arrangement must strictly satisfy all applicable conditions for protection. Once the plaintiff demonstrates that the Stark Law applies and establishes a *prima facie* case, the burden shifts to the defendant to prove that the conduct is within one of the Safe Harbor exceptions.

17

47.    Violation of the Stark Law renders all claims for payment resulting from the unlawful referrals, submitted or caused to be submitted by the referred-to entity to FHCP's, to be subject to the FCA and OKFCA.

48.    Falsely certifying compliance with the Stark Law is a material consideration of FHCP's for making payment.

### D.  Oklahoma Medicaid False Claims Act

49.    Medicaid was enacted by Congress on July 30, 1965, under Title XIX of the Social Security Act, as a health coverage program intended to provide medical benefits to those who could not afford necessary medical expenses.

50.    Oklahoma Medicaid is a jointly funded program by the federal and state government and is administered by the Oklahoma Health Care Authority ("OHCA"), an Oklahoma State agency responsible for receiving, reviewing, and paying properly compliant Medicaid claims submitted by health care providers who are properly qualified, credentialed, contracted and eligible to receive payment.

51.    The Oklahoma Medicaid False Claims Act ("OKFCA"; 63 O.S. § 5053 *et seq.*)[10] provides, *inter alia*, that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or who knowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid is liable to the State of Oklahoma for a civil penalty of not less than

---

[10]    The 2016 Oklahoma Legislature amended the OKFCA in effort to better conform the OKFCA to the FCA.  The amended OKFCA became effective on November 1, 2016. 63 O.S. § 5053 *et seq.*

18

$5,000 and not more than $10,000, plus three times the amount of damages the State sustains. 63 O.S. § 5053.1.

52. "Knowing" and "knowingly" mean that a person, with respect to information, (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and, no proof of specific intent to defraud is necessary. 63 O.S. § 5053.1.

53. Because Medicaid is funding in part by the Federal Government, a claim for payment made to Medicaid causes a claim to be made to the Federal Government.

54. Violating or falsely certifying compliance with the AKS, Stark, the FCA, or the OKFCA is a material consideration of FHCP's to making payment.

### E. Retaliation Under The Federal False Claims Act

55. The FCA provides, *inter alia*, employees, contractors, and/or agents who are discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against because of lawful acts done in furtherance of an action under or to stop violations of the FCA are entitled to relief for such damages, including reinstatement, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. 31 U.S.C. § 3730(h).

## V.
## FACTUAL ALLEGATIONS

56. The allegations set forth above are hereby incorporated as if fully set forth herein.

19

## A. Equity Scheme

57.    OCOM's Membership Interest (i.e., ownership; "**OCOM Equity**") is owned beneficially by approximately twenty-five (25) physicians and two non-physician corporate entities.[11]

58.    The physician owners of OCOM include eight (8) SOS Doctors who collectively own and control approximately 35% of the OCOM Equity; the SOS Doctors are each in a position to refer patients to OCOM and do so for DHS; and the SOS Doctors account for approximately two-thirds of OCOM's referrals and total revenue.

59.    The approximate seventeen (17) Non-SOS Doctors collectively own and control approximately 10% of the OCOM Equity; each of the Non-SOS Doctors are in a position to refer patients to OCOM, and do so for DHS; and together all of the Non-SOS Doctors account for a minority fraction of OCOM's referrals and total revenue.

60.    Two (2) non-physician corporate entities collectively own approximately 55% of OCOM Equity, with Integris owning approximately 20% and USP 35%.[12]

---

[11]    Description of OCOM Equity includes approximations based on OCOM-provided information regarding individual and corporate ownership on or about December 31, 2015. Individual ownership amounts change from time to time because of buy-in and/or buy-out transactions occurring without publication or disclosure to Relator. Actual OCOM Equity is required to be reported to the Government pursuant to 42 U.S.C. § 1395nn(f) and 42 C.F.R. § 411.361.

[12]    On or about August 2015, Tenet announced it was acquiring USP and USP's interest in OCOM Equity, thereby assuming beneficial ownership of OCOM and control of USP's role as OCOM's hospital management company. Herein, "USP" means both USP and the resulting USP/Tenet company(s)(and affiliated and subsidiary entities).

61.     Other physicians with no ownership or control of OCOM Equity are in a position to refer patients to OCOM for DHS and account for a minority fraction of OCOM's referrals and total revenue.

62.     A Board of Managers ("**BOM**") governs OCOM including one or more representatives from each of the SOS Doctors, USP, and Integris.[13]

63.     At all times relevant hereto, Cruse and Langerman were the senior members of the OCOM BOM, and directly and personally controlled all activities affecting OCOM Equity, including all buy-in's and buy-out's.

64.     The OCOM Operating Agreement[14] prescribes the process and procedure for allocating, reallocating, and redeeming OCOM Equity in the event of certain trigger events, including: a new physician member buy-in; an existing physician member buy-out; or, an existing physician member disassociation from OCOM for any other reason.  The OCOM Operating Agreement makes no distinction between an SOS Doctor and a Non-SOS Doctor, and makes no mention of or reference to SOS.  Upon the repurchase of a disassociated physician member's OCOM Equity, all existing

---

[13]     On December 31, 2015, Tenet requested SOS Physicians enter into a complex, multi-layer joint venture arrangement to provide Tenet with majority "control" of OCOM so that Tenet could include OCOM on its purported higher-paying hospital reimbursement agreements with commercial insurance carriers.   This arrangement and "control" notwithstanding, the Board of Managers controlling OCOM directly or indirectly includes participants from SOS Physicians, USP, and Integris.

[14]     The term OCOM Operating Agreement includes all related OCOM governance documents, including the USP Purchase Agreement from 2004, and various amendments and restatements of the OCOM Operating Agreement.

physician owners of OCOM have a first right of refusal to purchase a proportional amount of the disassociating physician member's OCOM Equity.

65.    Throughout the relevant period, portions of OCOM Equity would become available for repurchase as result of a triggering event, including, for example, a physician holding OCOM Equity who relinquishes that OCOM Equity upon retirement.

66.    When such OCOM Equity would become available for purchase because of a Doctor retiring or otherwise disassociating from OCOM, only SOS Doctors were offered the OCOM Equity purchase.  The SOS Doctors asserted sole entitlement to this OCOM Equity because they refer the majority of OCOM's business.  The OCOM BOM, including USP and Integris, were directed by Cruse and Langerman, and agreed, to offer this OCOM Equity to only the SOS Doctors as reward for their past referrals and as incentive and inducement for future referrals.  These transactions explicitly took into account the volume and value of the SOS Doctors' referrals to OCOM.

67.    When an SOS Doctor threatened to disassociate from SOS, the SOS Doctors threatened to take away that physician's OCOM Equity even if the disassociating SOS Doctor expressed that he only wanted to take his clinical business (i.e., not surgery business) to a Non-SOS clinic, and wanted to keep his OCOM Equity.

68.    In 2012, Dr. Nick Knutson ("**Knutson**") was a physician holding approximately 3.5% OCOM Equity.  Knutson retired at or near the end of 2012.  Knutson's OCOM Equity was supposed to be offered for sale to <u>all</u> physician owners of OCOM.  On or about November 27, 2012, Cruse explained to the SOS Doctors that *they alone*

should have the Knutson OCOM Equity because they "do the bulk of the work." Cruse also represented to the SOS Doctors that he knew this was improper and that OCOM's CEO, Hendley, was aware of this AKS- and Stark-violative plan. Cruse explained that Hendley said he "didn't hear that" as long as Cruse would tell Hendley the OCOM Equity was offered to all physicians. The SOS Doctors were then polled as to the amount of the Knutson OCOM Equity each wanted to purchase, and all participated. The only non-SOS Doctor to be offered OCOM Equity from the Knutson ownership was Dr. Greenway because, as Cruse stated, "I threw in Greenway because I think Greenway is going to be a big plus for us." Shortly thereafter, to be effective by December 31, 2012, Hendley administered the OCOM Equity sale transaction involving only the SOS Doctors and Greenway.

69.     In 2012, Dr. Beringer was a physician holding slightly under 1% of OCOM Equity. Dr. Beringer sought to redeem his OCOM Equity because he was moving his practice out of state. USP, via Hendley, coordinated the Beringer buy-out at an agreed value higher than was required pursuant to the OCOM Operating Agreement because of a deal struck by Cruse "in return for Beringer referring Dr. Hume appropriate spine patients from his practice." At the time, Hume was an OCOM employee pursuant to the Employee/Rental Scheme (*See infra*), so all referrals to Hume would inure to OCOM's benefit. Hendley later claimed the inflated price paid to Beringer was for Hume "assuming the appropriate portion of Dr. Beringer's practice." However, the buy-out assignment transaction documents associated with this OCOM Equity buy-out made no mention of any Beringer practice patient

23

records or other practice artifacts or components; all of the stated consideration paid was for only OCOM Equity.

70.   Cruse and Langerman both have special buyout arrangements for their OCOM Equity which contractually commits USP to pay each of them a 6.5 EBITDA[15] multiple upon their retirement; other physician owners of OCOM Equity have buy-out provisions at a 4.0 EBITDA multiple. The Cruse and Langerman special buyout arrangements also allow each to annually sell a limited amount of OCOM Equity to USP for a 6.5 EBITDA multiple; other physician owners of OCOM Equity do not have this staged buy-out benefit.

71.   Cruse and Langerman have, within the prior approximate two years, sold some of their OCOM Equity under these special buyout provisions, each selling to USP at a 6.5 EBITDA multiple.

72.   Upon learning of Cruse and Langerman's sales, the other SOS Doctors demanded they be allowed to purchase the Cruse and Langerman OCOM Equity sold to USP, but they refused to pay the 6.5 multiple price USP paid to Cruse and Langerman. On their behalf, Cruse negotiated with USP and informed the SOS Doctors that USP agreed to allow only the SOS Doctors to purchase this OCOM Equity as a reward and incentive because USP knew who brings in the most referrals, and USP wanted to take care of the SOS Doctors and keep them happy. Cruse stated that this special

---

[15]   EBITDA is a financial accounting term meaning "Earnings Before Interest, Taxes, Depreciation, and Amortization."

purchase arrangement is for <u>only</u> SOS Doctors; that this OCOM Equity will be offered annually over multiple years; that the SOS Doctors receiving this benefit must be practicing at SOS at the time of the prospective purchase; that the OCOM Equity will be sold to only the SOS Doctors at a fair market value price; and that USP will not require the SOS Doctors to pay the 6.5 EBITDA price USP paid when purchasing the OCOM Equity from Cruse and Langerman.

73.   During the few months prior to October 2015, Hume, a SOS Doctor at the time, announced he was considering leaving SOS to join another clinical practice competitive with SOS, and with which a relationship existed between the competitive practice and a hospital(s) competitive with OCOM. Hume expressed he wanted to leave SOS, but had no desire to disassociate from OCOM or stop referring patients to OCOM. In October 2015, the SOS Doctors learned that Hume had decided to leave SOS. Cruse, Langerman, Kimzey, Hendley, USP and Tenet began an effort to and did obtain a 75% OCOM vote to forcibly disassociate Hume from OCOM, and pay to Hume a discounted penalty price to redeem Hume's OCOM Equity. Cruse asked the SOS Doctors and USP for their affirmative vote for this action, stating that everyone knew that when Hume left SOS and joined a competitive group, Hume would significantly decrease or altogether stop his referrals to OCOM.

74.   In early 2016, Dr. Greenway, a Non-SOS Doctor holding approximately 1% OCOM Equity, announced he was moving out of the Oklahoma City area and wished to sell his OCOM Equity. Greenway asked to sell his 1% OCOM Equity to his partner,

Dr. Vavricka, another Non-SOS Doctor who also owned approximately 1% OCOM Equity.  On March 31, 2016, Cruse explained to the SOS Doctors the proposed Greenway sale to Vavricka, and asked if the sale to Vavricka could be blocked. OCOM's CEO, Kimzey, answered, saying "we can absolutely block that."  Cruse explained the reason they wanted to block the sale was because Vavricka "doesn't do shit over there [at OCOM], that's why we don't want him [Greenway] selling to Vavricka." Kimzey further explained that his "whole point is, let's get it to SOS … that's the whole point of this drill."

75.    OCOM management, including Cruse, Langerman, CEO Hendley, and CEO Kimzey, routinely review, report and consider OCOM Equity-related actions based on the SOS Doctors' performance and individual profitability of referrals to OCOM, including buying out of physician's interest if they are underperforming, allowing others to buy more or buy-in if they are referring a sufficient volume and profitability of patients to OCOM, and leveraging USP-affiliated resources for SOS' use without documentation, agreement, or consideration.

76.    SOS Doctor, Cruse, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity to reward himself and his fellow SOS Doctors with additional OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM.  Cruse participated, orchestrated, agreed and worked with OCOM, USP, Tenet, Integris, Kimzey, Hendley, and the other SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to violate Healthcare Laws.

77.   SOS Doctor, Langerman, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity to reward himself and his fellow SOS Doctors with additional OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM. Langerman participated, orchestrated, agreed and worked with OCOM, USP, Tenet, Integris, Kimzey, Hendley, and the other SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to violate Healthcare Laws.

78.   SOS Doctor, Jones, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity to reward himself and his fellow SOS Doctors with additional OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM. Jones participated, orchestrated, agreed and worked with OCOM, USP, Tenet, Integris, Kimzey, Hendley, and the other SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to violate Healthcare Laws.

79.   SOS Doctor, Adham, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity to reward himself and his fellow SOS Doctors with additional OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM. Adham participated, orchestrated, agreed and worked with OCOM, USP, Tenet, Integris, Kimzey, Hendley, and the other SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to violate Healthcare Laws.

80.   SOS Doctor, West, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity to reward himself and his fellow SOS Doctors with additional OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM.  West participated, orchestrated, agreed and worked with OCOM, USP, Tenet, Integris, Kimzey, Hendley, and the other SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to violate Healthcare Laws.

81.   SOS Doctor, Levings, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity to reward himself and his fellow SOS Doctors with additional OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM.  Levings participated, orchestrated, agreed and worked with OCOM, USP, Tenet, Integris, Kimzey, Hendley, and the other SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to violate Healthcare Laws.

82.   SOS Doctor, Reddick, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity to reward himself and his fellow SOS Doctors with additional OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM.  Reddick participated, orchestrated, agreed and worked with OCOM, USP, Tenet, Integris, Kimzey, Hendley, and the other SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to violate Healthcare Laws.

28

83.    SOS Doctor, Avant, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity to reward himself and his fellow SOS Doctors with additional OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM. Avant participated, orchestrated, agreed and worked with OCOM, USP, Tenet, Integris, Kimzey, Hendley, and the other SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to violate Healthcare Laws.

84.    Former SOS Doctor, Hume, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity to reward himself and his fellow SOS Doctors with additional OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM. Hume participated, orchestrated, agreed and worked with OCOM, USP, Tenet, Integris, Kimzey, Hendley, and the other SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to violate Healthcare Laws.

85.    OCOM executive and former OCOM CEO, Hendley, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM. Hendley participated, orchestrated, agreed and worked with OCOM, USP, Tenet, Integris, Kimzey, and the SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to violate Healthcare Laws.

29

86. OCOM executive and current CEO, Kimzey, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM. Kimzey participated, orchestrated, agreed and worked with OCOM, USP, Tenet, Integris, Hendly, and the SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to violate Healthcare Laws.

87. SOS, by and through the SOS Doctors, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM. SOS, by and through the SOS Doctors, participated, orchestrated, agreed and worked with OCOM, SOS, USP, Tenet, Integris, Kimzey, Hendley, and the SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to violate Healthcare Laws.

88. USP, and Tenet as USP's acquiring corporate parent, by and through its agents, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM. Through Kimzey and Hendley and other USP agents, USP and Tenet participated, orchestrated, agreed and worked with OCOM, SOS, Integris, Kimzey, Hendley, and the SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to violate Healthcare Laws.

89.     Integris Ambulatory Care Corporation, by and through its agents, directly and personally benefited from the OCOM Equity scheme by overtly acting and conspiring to control OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM.   Integris participated, orchestrated, agreed and worked with OCOM, SOS, USP, Tenet, Kimzey, Hendley, and the SOS Doctors, to control OCOM Equity as an act in furtherance of the conspiracy to defraud the government.

**B. Ultrasound Scheme**

90.     In mid-2012, Levings announced to the other SOS Doctors that they could receive additional reimbursement for clinic-based joint injections by using ultrasound guidance and CPT code 76942.[16]

91.     Levings explained to the SOS Doctors that they would not be required to actually use the ultrasound device for needle guidance, but that by merely "holding the device next to the joint," and then coding CPT 76942 and dictating "ultrasound guidance was used," they would receive additional significant reimbursement.[17]

---

[16]     CPT means Current Procedural Terminology and is a medical code set used to report medical, surgical, and diagnostic procedures and services to medical providers, insurance companies, and FHCP's.   CPT 76942 is a procedure for which FHCP's provide reimbursement, and is described as "ultrasonic guidance for needle placement (e.g., biopsy, aspiration, injection, localization device), imaging supervision and interpretation."

[17]     CPT 76942 has/had a Medicare Allowable reimbursement amount of $179.93. Source: *Ingenix Optum Customized Fee Analyzer*, 2013.

92. At no time did Levings or the other SOS Doctors discuss or even inquire into the required medical necessity, documentation, or supervision requirements for using CPT 76942.

93. From the second half of 2012 through February 2014, SOS Doctors acquired at least five ultrasound machines, including portable devices so the Ultrasound Scheme could be used in all locations, including rural operations in which an SOS Doctor would "pack-in and-pack-out" to conduct clinical operations sporadically, for example, one half day per week.

94. Throughout this period, the SOS Doctors directed their Physician Assistants ("PA") to use the ultrasound devices at every opportunity, regardless of whether the SOS Doctor was on-site and in the room to supervise its use as required.

95. Before Levings' promotion of the Ultrasound Scheme in 2012, SOS Doctors did not own an ultrasound machine and did not use ultrasound guidance on any patient injections. From December 2012 through February 2014, the SOS Doctors and their PA's employed the Ultrasound Scheme approximately 4,500 times, on over 1,500 FHCP patients, and submitted claims for and received over $750,000 in total reimbursement for CPT 76942, with over $250,000 of that from FHCP.

96. SOS' third-party billing company, ALN, recognized the spike in CPT 76942 claims. On January 24, 2014, ALN informed the SOS Doctors that each use of the ultrasound device was required to be medically necessary, properly documented, and supervised if administered by a PA; otherwise, use of the device risked each associated claim for payment being subject to the False Claims Act and/or payment

32

recoupment.  The SOS Doctors then abruptly decreased and stopped using the ultrasound devices for injections.

97.    The SOS Doctors had also been informed that a Physician Assistant using the ultrasound device was required to be supervised by the physician, with the supervision requiring the physician to be on-site and in the room (*Medicare Benefit Policy Manual*, Chapter 15, § 80, "means a physician must be in attendance in the room during the performance of the procedure").  Notwithstanding this requirement, the SOS Doctors regularly and routinely allowed and directed their Physician Assistants to use the ultrasound device for all injections, regardless of whether the physician was on-site or in the room.  Often, at least two-to-three days weekly, the SOS Doctor associated with any particular Physician Assistant was in surgery in another building, not on-site, not in the room, and not supervising the Physician Assistant.

98.    The SOS Doctors were told and knew the reimbursement received for the ultrasound procedures should be returned if its use was not medically necessary, not properly documented, or not supervised if administered by a PA.  They were told that if ever under review these amounts could be recouped or subject to the False Claims Act. The SOS Doctors deliberately ignored the subject; they never requested a review of the medical documents; they never inquired into the calculation of amounts they had received; they never inquired into the proper procedure for returning the money to the government as required by law; and they ignored Relator's comments that such proper compliance actions should be taken with respect to the Ultrasound Scheme.

33

99. SOS Doctor, Cruse, directly and personally benefited from the Ultrasound Scheme by unlawfully increasing revenues for himself and his fellow SOS Doctors.

100. SOS Doctor, Langerman, directly and personally benefited from the Ultrasound Scheme by unlawfully increasing revenues for himself and his fellow SOS Doctors.

101. SOS Doctor, Jones, directly and personally benefited from the Ultrasound Scheme by unlawfully increasing revenues for himself and his fellow SOS Doctors.

102. SOS Doctor, Adham, directly and personally benefited from the Ultrasound Scheme by unlawfully increasing revenues for himself and his fellow SOS Doctors.

103. SOS Doctor, West, directly and personally benefited from the Ultrasound Scheme by unlawfully increasing revenues for himself and his fellow SOS Doctors.

104. SOS Doctor, Levings, directly and personally benefited from the Ultrasound Scheme by unlawfully increasing revenues for himself and his fellow SOS Doctors.

105. SOS Doctor, Reddick, directly and personally benefited from the Ultrasound Scheme by unlawfully increasing revenues for himself and his fellow SOS Doctors.

106. SOS Doctor, Avant, directly and personally benefited from the Ultrasound Scheme by unlawfully increasing revenues for himself and his fellow SOS Doctors.

107. Former SOS Doctor, Hume, directly and personally benefited from the Ultrasound Scheme by unlawfully increasing revenues for himself and his fellow SOS Doctors.

**C. Clinical Services Scheme: Unlicensed Personnel; Pre-Signed Prescriptions; False Records For Procedure Authorizations**

108.   SOS Doctors have allowed unlicensed personnel to perform medical services, to create and submit medical orders for services for which claims for payment was made to FHCP's, and to fill-in pre-signed prescriptions for prescription medications.

109.   As example, Jones allowed an unlicensed medical assistant to use Jones' electronic userid/password and signature stamp to perform post-op medical evaluations, order radiology services, and write medication prescriptions on prescription forms pre-signed by Jones, while Jones was in another city.

110.   A number of SOS Doctors have pre-signed stacks of prescription forms, and have allowed and directed other, non-licensed or insufficiently-licensed personnel to complete the forms and give prescriptions to patients.

111.   SOS Doctors routinely request diagnostic services such as MRI's[18] or Physical Therapy ("**PT**") for their patients.  An MRI procedure or PT often requires pre-authorization from the patient's insurance carrier before scheduling.

112.   OCOM has three MRI machines and a PT department, and SOS Doctors prefer to send their patients to OCOM for these services.  SOS and OCOM each have staff that perform pre-authorization tasks for a variety of procedures.

113.   In or about mid-2015, without any formal or written agreement, OCOM began providing free pre-authorization services for SOS, for SOS patients needing MRI

---

[18]    "**MRI**" means Magnetic Resonance Imaging, a procedure that uses a magnetic field and radio waves to create detailed images of the organs and tissues within the body.

and PT services.  OCOM provided this service to SOS for free so that OCOM could direct SOS patients to OCOM for these services and to assist SOS in decreasing its overhead costs.  To perform this service for SOS, OCOM staff required certain SOS patient information that SOS was to provide to OCOM.

114.   Over the years, the SOS Doctors had trained SOS staff on what to tell insurance carriers to gain approval for an MRI or PT.  SOS staff had followed these directions for years as standard procedure.   SOS Staff provided this standard operating procedure information to OCOM staff in the form of a "cheat sheet."

115.   On August 25, 2015, OCOM staff reported via email to Kimzey that the SOS cheat sheet told OCOM staff "to be saying that the patient has had conservative treatment, such as physical therapy and medications for 6 weeks" and that "every patient has had an X-ray and the medications are always Ibuprofen and Mobic."  The OCOM staff reported that "this is not the case according to [the patient's] clinicals," and that "[i]f they want us to use this cheat [sic] to obtain authorizations it needs to be on the clinicals as well, otherwise we would be providing false information to the insurance companies."  After this email, the free OCOM service was stopped.

116.   For years, all of the Defendants have benefited by increasing revenues at OCOM for services such as MRI's and PT which were not properly documented, warranted, or necessary.

**D. Levings Surgery Scheme**

117.   On or about November 4, 2015, an SOS operations manager reported to Relator their concern that SOS Doctor, Levings, was fraudulently billing for his Physician Assistant's ("**PA**") services in surgery.

118.   The SOS operations manager informed Relator that it appeared that on certain days every week, Levings' PA conducted clinical operations in the SOS building, and was simultaneously being billed as Levings' surgical assistant in the OCOM hospital building.

119.   The surgical cases at issue were being performed at OCOM, located next door to SOS.

120.   On November 6, 2015, Relator informed Cruse and Langerman and gathered a sampling of data to verify that the potential fraudulent scheme was occurring. Throughout the course of gathering the sampling of data, OCOM's CEO, Kimzey, was informed of the situation and assisted Relator in gathering the data.

121.   The data indicated what the operations manager suspected, i.e., that Levings' PA was being documented and billed as providing surgical assistant services at the same time the PA was conducting clinical operations in a separate building.  In some instances the PA was recorded as being in the Operating Room ("**OR**") for a few minutes; in other instances longer; and in some instances none at all.  Claims for payment were being made to FHCP's and non-FHCP's for the PA's simultaneous service in the SOS clinic and the OCOM OR.

122.  The data also indicated that while the PA was recorded as actually being in the OR, he was also conducting clinical operations as recorded in the SOS Electronic Health Record ("EHR") computer system, including ordering services and writing prescriptions.  At the times when the PA was actually in the OR, it was suspected that Levings and his PA directed unlicensed staff to use the PA's userid and password in the clinic to transact SOS clinical orders and prescriptions.

123.  A third party was retained to investigate and advise SOS on the situation.

124.  Relator provided the results of the investigation to Langerman who said he would handle the situation and direct proper operational compliance requirements prospectively.

125.  Relator is not aware of Langerman, or anyone else, taking any action, and to Relator's knowledge the Levings Surgery Scheme continues to this day.

### E. EHR Scheme

126.  As licensed Medicare providers, the SOS Doctors have been subject to the federal government requirement to implement a certified Electronic Health Record ("EHR") system.[19]

---

[19]   "Beginning in 2011, the Electronic Health Records (EHR) Incentive Programs were developed to encourage eligible professionals and eligible hospitals to adopt, implement, upgrade (AIU), and demonstrate meaningful use of certified EHR technology. As of October 2015, more than 479,000 health care providers **received payment** for participating in the Medicare and Medicaid EHR Incentive Programs." (emphasis added) *See* https://www.cms.gov/regulations-and-guidance/legislation/ehrincentiveprograms/basics.html.

127.   Accompanying the federal EHR requirement are a large number of compliance requirements, attestations and certifications.

128.   The EHR program includes, *inter alia*, measurement and metrics prescribed by the federal government and known as Meaningful Use and Physician Quality Reporting System ("**MU/PQRS**").   Under the EHR program, Medicare-licensed physicians and entities adopt, implement, upgrade, and demonstrate meaningful use of Medicare-certified technology in return for financial incentives from the government.  A physician or entity's attestation to the EHR program requirements is a claim for payment to the federal government, it avoids a prospective reimbursement rate decrease, and it includes an affirmative certification that the physician or entity is in compliance with the Healthcare Laws.

129.   The federal government provided an incentive to implement an EHR, which for the SOS Doctors was over $300,000.  The federal government incentive additionally included an avoidance of a prospective decrease in federal reimbursement payment rates.

130.   The attestation of each SOS Doctor includes a notice that any attesting doctor that provides "false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties," and that the attesting doctor is "**submitting a claim for Federal funds**." (emphasis added)

131.   Each and all of the SOS Doctors made attestation and certification of their compliance in 2013, 2014, and 2015, and each and all have received the federal government incentive payments that in aggregate are over $300,000.

39

132.    OCOM, as a licensed Medicare hospital is also subject to the federal government requirement to implement EHR, and must make attestation and certification to receive federal government incentive payments and avoid a prospective reimbursement rate decrease.

133.    Kimzey reported to the SOS Doctors that OCOM successfully made attestation and certification, received the federal government incentive payments, and avoided the prospective reimbursement rate decrease; however, Relator is not privy to the amount or relevant years.

### F. Preferential Treatment Scheme

134.    Cruse is the beneficial owner of buildings leased by OCOM and in which OCOM operates.  Cruse is also the beneficial owner of the campus real property on which both OCOM and SOS reside, known as Crystal Park Plaza, LLC ("**CPP Campus**").

135.    Cruse is the beneficial owner of and operates one or more entities that own, manage and/or govern and oversee the CPP Campus.

136.    Cruse directs and/or employs one or more individuals who assist in the operation and management of the CPP Campus and who manage Cruse's personal business interests and personal affairs.

137.    Because of Cruse's influence over OCOM and over the SOS Doctors, OCOM has for years provided to Cruse free office space and equipment for operating and managing his personal business interests and personal affairs, with no written agreement and no consideration paid.

40

138. Langerman directs an individual who assists in Langerman's medical practice as a medical assistant and scrub tech ("**James**"). Early in Relator's tenure with SOS, approximately 2002-2004, James was an employee of SOS and paid by Langerman.

139. During Relator's tenure with SOS, in approximately 2004, Langerman sought to decrease the amount of money he personally paid to James for James' compensation. Langerman was at the time OCOM's highest volume referring Doctor, and directed OCOM to hire James as an OCOM employee for at least 50% of James' salary.

140. Because of Langerman's referrals to OCOM and influence over OCOM and SOS Doctors, OCOM agreed to create this special financial compensation relationship for James to benefit Langerman.

141. In or about 2005, Cruse sought to have a personal scrub tech using the same arrangement as Langerman. Cruse directed OCOM to hire a scrub tech ("**Wade**") using the same financial arrangement as between Langerman and OCOM for James.

142. OCOM hires and retains other scrub techs for all physicians' use, and has no other physician receiving a similar arrangement.

143. Because of Cruse and Langerman's referrals to OCOM and influence over OCOM and SOS Doctors, OCOM agreed to create these special financial compensation relationships for James to benefit Langerman, and for Wade to benefit Cruse.

144. While other SOS Doctors and Non-SOS Doctors also have personal scrub techs and others working for their individual practices and business interests, only Cruse and

41

Langerman have been provided ongoing special benefits from OCOM that lower their individual business costs.

145. During at least 2011, Cruse, as OCOM BOM Chairman and Medical Director, directed OCOM to use his personal credit card for purchases of surgical supplies and/or surgical implants so that Cruse could personally receive the credit card reward points for these high-dollar purchases, often tens of thousands of dollars monthly. OCOM would monthly reimburse Cruse for the credit card amount due for such purchases, and Cruse would then receive the financial benefit from the credit card rewards program. At the time, Hendley was OCOM's acting executive manager and agreed to and directed this arrangement be implemented through OCOM's accounting department.

146. Cruse and Langerman equally own real property located at 8125 S. Walker Ave., which includes a licensed Ambulatory Surgery Center ("ASC") known as Southwest Ambulatory Surgery Center, LLC ("SASC").[20] Cruse and Langerman's ownership of the real property is through their respective beneficial ownership of 50% each of Southwest Orthopaedic Center, LLC ("CENTER"). Throughout the relevant period, Cruse and/or Langerman had commercial loans payable for their respective interest in CENTER.

---

[20]   i.e., SASC is the single-member owner entity of OCOM. SASC is also an ASC licensed by the Oklahoma Department of Health; however, the license was reportedly limited in scope due to facility issues found upon inspection.

147. Since August 1, 1998, OCOM[21] has leased the ASC and office space from CENTER.

148. Until sometime in 2014, OCOM historically scheduled some surgical cases to be performed at SASC.

149. OCOM expanded its operating room capacity in or about 2014, at which time little to no surgical cases were thereafter performed at SASC. With no cases being scheduled or performed at SASC, OCOM stated its intention to allow the lease with CENTER to expire on December 31, 2013.

150. Cruse and Langerman wanted the lease income to continue. Cruse and Langerman sought to extend the lease and rental payments from OCOM to CENTER by using their influence over OCOM to enter into lease extension agreements on multiple occasions, from January 2014 through December 2014, via at least two separate lease extension agreements. All the while, OCOM was performing no cases at the SASC.

151. Cruse and Langerman conspired with Hendley and Kimzey to extend the lease arrangement and eventually located a sub-lessee to sublease SASC from OCOM.

152. Cruse and Langerman personally benefited by using their influence over OCOM to continue rental payments for SASC while OCOM was not using the facility.

---

[21] The lessee was formally SASC, the single-member owner of OCOM. For consistency and clarity purposes in explanation, "OCOM" is used here to designate the lesee.

43

### G. ISMC ER Scheme

153. On August 1, 2014, SOS entered into an agreement with Integris South Oklahoma City Hospital Corporation d/b/a Integris Southwest Medical Center ("ISMC"), whereby SOS would receive payment from ISMC for providing orthopaedic services to ISMC, including Emergency Room ("ER") call coverage.

154. The arrangement between SOS and ISMC held the potential of having all orthopaedic services occurring at or required by ISMC to be referred to SOS Doctors.  West was the primary focal point for negotiations between SOS and ISMC.

155. As an inducement and solicitation to enter the arrangement between SOS and ISMC, ISMC requested and the SOS Doctors agreed to increase the number of elective surgery cases they referred to and performed at ISMC.

156. On February 25, 2014, West told the SOS Doctors that he had told ISMC, "if we [SOS] do 80 cases a month right now orthopaedically, we are going to give you [ISMC] 110 cases a month.  We are going to, day one, we're going to increase your volume." Reddick added, "at no cost," to which West replied, "yea, we're just going to do more volume there for you [ISMC]."

157. Upon the agreement's annual renewal, the SOS Doctors discussed ISMC's demand that additional elective, non-trauma, non-ER surgeries needed to be performed at ISMC by SOS Doctors or the agreement would not be renewed.

158. During these discussions, on April 26, 2016, West told the SOS Doctors that ISMC was "happy with volume overall.  Without saying 'incentive' they want to look at a

44

way where they can look at case hours, or however you do it, [for] our group, and what they're doing there, and to kinda see if they can maximize that to get guys to do, instead of just the trauma stuff, some more elective stuff . . . . They want us to try to work on doing more elective stuff there, not just trauma stuff."

159.   An SOS Doctor, West, directed the negotiations and reviewed with ISMC the volume and value of orthopaedic surgical business conducted by SOS Doctors at ISMC before and after the agreement was made in August 2014. West informed the SOS Doctors that the agreement would be renewed but that the SOS Doctors needed to perform more elective surgery at ISMC in the future or the agreement would be terminated in 2016.

160.   For the period from August 2013 to July 2014 (prior to the ISMC agreement), all SOS Doctors referred an average of approximately 348 surgical charges monthly to ISMC; from August 2014 to July 2015 (after the ISMC agreement), 489; and from August 2015 through March 2016 (8 months), 662.

161.   Only five of the SOS Doctors actually performed the service and received the compensation paid by ISMC under the ISMC agreement: Avant, Diesselhorst, Levings, Reddick, and West. For the period from August 2013 to July 2014 (prior to the ISMC agreement), these five SOS Doctors referred an average of approximately 256 surgical charges to ISMC monthly; from August 2014 to July 2015 (after the ISMC agreement), 428; and from August 2015 through March 2016 (8 months), 578. The three other SOS Doctors not performing the ISMC services

referred only an average of approximately 92, 61, and 84 surgical charges to ISMC monthly during these periods, respectively.

162. All of the SOS Doctors benefited by the Integris orthopaedic services agreement by receiving patient referrals for orthopaedic services from ISMC in return for performing prescribed services at ISMC. Based on West's statements and the SOS Doctors' subsequent increasing referrals to ISMC, ISMC's agreement was clearly conditioned on SOS Doctors' performing a sufficient number of additional elective surgery cases at ISMC.

### H. Anesthesia Scheme

163. In the fourth quarter of 2015, Kimzey promoted the idea of the SOS Doctors owning an anesthesia company that would exclusively provide anesthesia services to OCOM. Kimzey stated that this type of arrangement was used throughout USP and Tenet facilities, and that OCOM was one of the few, if not the only, facilities not employing such an arrangement to capture more income from OCOM services.

164. USP and Tenet arranged for the company, Defendant APO, to be formed, with ownership including the SOS Doctors, USP (via a new USP subsidiary called UAP), and Kimzey individually. The new company, APO, was formed and obtained an NPI number so that it could submit claims to FHCP's.

165. APO then entered into an agreement with OCOM to provide anesthesia services; APO entered into contractor agreements with one or more anesthesiologists and Certified Registered Nurse Anesthetists ("CRNA"); and, APO entered into a management agreement with UAP.

46

166.  The arrangement constitutes a financial relationship between the SOS Doctors, OCOM, and UAP, and constitutes payment to the SOS Doctors in return for referral of FHCP-insured patients to OCOM.  This financial relationship and business plan for APO was based on and took into account the volume and value of SOS Doctors' referrals to OCOM, and the amount of remuneration provided to the SOS Doctors varies directly based on the volume and value of the SOS Doctors' referrals to OCOM.

167.  Within 2016, APO submitted or caused to be submitted claims for payment to FHCP's for DHS, and remuneration was paid to APO's owners from payments made by FHCP's.

### I. Employment/Rental Scheme

168.  For over ten years, SOS has recruited new orthopaedic surgeons using an Employment/Rental Scheme involving OCOM.

169.  When the SOS Doctors identified a new orthopaedic surgeon as a potential addition to SOS, Cruse, Langerman and the SOS Doctors directed OCOM to enter into an Employment Agreement with the new physician whereby the physician would work as an OCOM employee for two years.

170.  Simultaneously, OCOM was directed to enter into a Rental Agreement with SOS whereby OCOM would pay to SOS a monthly rental fee for SOS providing to the new physician a place to conduct clinical practice.  Under this Rental Agreement the new physician would appear as an SOS physician, be billed under the SOS Tax ID, be integrated into SOS' computer systems, have presence on SOS' website, and

47

for all intents and purposes be an SOS physician.  SOS paid monthly to OCOM all

receipts generated by the new physician from clinical and surgical services (i.e., not

facility fees, which were billed by OCOM).

171.  At the Employment Agreement expiration, or sooner if the new physician desired,

the new physician would stop being paid a salary by OCOM and would become an

SOS physician subject to the SOS' internal financial arrangement.[22]

172.  The Employment Agreement provided a bonus to the new physician upon

termination, based on the new physician's production if the new physician:

provides professional services on a full time basis through Southwest
Orthopaedic Specialists, PLLC ("SOS") on terms mutually satisfactory to
SOS and Physician for at least 18 months following the end of the term of
this Agreement. Employer believes that the terms to be offered by SOS at the
end of the Term will be that Physician will receive all income attributable to
his services, less a share of the overhead of SOS that will be agreed upon by
the parties with no capital contribution or other 'buy in' obligation.

### J.  False Certification Under the False Claims Act

173.  As a Medicare and Medicaid provider, OCOM attests to and expressly certifies its

compliance with the Healthcare Laws in, *inter alia*, Cost Reports.[23]  OCOM also

---

[22]   A proportional equation based on production, referred to internally as "eat what you kill."

[23]   Medicare-certified institutional providers are required to submit an annual Cost Ceport to a Medicare Administrative Contractor. The Cost Report contains provider information such as facility characteristics, utilization data, cost and charges by cost center (in total and for Medicare), Medicare settlement data, and financial statement data.  The Cost Report requires attestation to the following: "MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED

attests and expressly certifies its compliance with the Healthcare Laws in all claims for payment sent to FHCP's.[24]

174. As Medicare and Medicaid providers, SOS and the SOS Doctors expressly certify their compliance with the Healthcare Laws in, *inter alia*, each claim for payment made to FHCP's.[25]

175. From as least 2011, year after year in thousands of claims for payment from, and required reporting to FHCP's, Defendants directly and/or as an entity agent/official affirmatively attested to not violating, and expressly certified being in compliance with, the FCA, AKS, Stark Law, and the OKFCA. Throughout this period, Defendants' knew of the individual and continuous violations complained of herein, rendering each claim for payment by each Defendant to an FHCP, a false claim.

---

THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT." The Cost Report also requires affirmative attestation that the signatory officer is "familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."

[24] Hospital claims are sent electronically or on a Form UB-92. A claim for payment includes express certification as follows: "I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State Laws."

[25] Physician services claims for payment are sent electronically or on a Form 1500. A claim for payment includes express certification as follows: "NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine or imprisonment under applicable Federal laws."

49

### K. Retaliation Under the False Claims Act

176.    Relator has been employed as Administrator of SOS on a full time, part time, and/or contract basis since approximately April 2002.

177.    During Relator's tenure with SOS, Relator worked full time at SOS, personally financed and attended Oklahoma City School of Law at night, graduated *Summa Cum Laude* in December 2007, was admitted to the Oklahoma Bar in April 2008 (Bar No. 21933), and is a member in good standing of the Oklahoma Bar.

178.    In April 2008 Relator entered into a written employment agreement with SOS in which Relator served part time as SOS's Administrator, and was "expressly not hereunder engaged, employed, or retained as legal representation to or defense of SOS, its members, managers, employees, or agents, on any particular legal matter" and under which "no attorney-client relationship" was created.

179.    Throughout his tenure with SOS, Relator has continuously and repeatedly expressed to the SOS Doctors, Hendley and Kimzey, that the SOS organization was ill-formed, lacked governance, and that governance and compliance matters should be prioritized.

180.    Throughout Relator's tenure with SOS and markedly after April 2008, the SOS Doctors, Kimzey, and Hendley excluded Relator from all matters involving OCOM operations, OCOM Equity, and OCOM governance, with those matters handled directly by Cruse, Langerman, Kimzey, Hendley, USP, Tenet, Integris, and the SOS Doctors.

181. Relator primarily managed only the SOS clinical operation and in doing so repeatedly emphasized to the SOS Doctors that SOS operations, the SOS Doctors' practices, their coding, business practices and financial relationship were all highly regulated activities and ultimately their own individual responsibility with respect to statutory, regulatory, and contractual compliance.

182. In discussion regarding the Levings Scheme in late 2015, Cruse, Langerman, Avant, Reddick, and Kimzey overtly stated to Relator that he was their attorney and requested attorney-client privilege. Relator was concerned he could be accused of being complicit in potentially fraudulent activity and again informed each of them that he was not SOS' attorney and there was no attorney-client privilege. The SOS Doctors thereafter became significantly and aggressively unsettled at Relator's insistence, explaining to Relator that he "knew too much."

183. At that time Langerman and Cruse initiated conversations with Relator regarding a severance package in the event Relator was ever terminated without cause; provided, Relator would execute an agreement that would "lock up" Relator and deter him from "coming after them" because Relator "knew too much."

184. Relator was thereafter constructively demoted, with significantly decreased job duties, hours and compensation from the type and amount of work Relator had performed since 2002.

51

185. Led by Cruse, Langerman, Avant, Reddick, and West, the SOS Doctors embarked on a project to engage Kimzey and a USP subsidiary[26] to conduct and manage SOS clinical operations.   Relator was then informed that his job duties, hours, and compensation would significantly decrease.

## VI.
## CLAIMS

### Count 1:  Stark Law Violations Under 42 U.S.C. § 1395nn

186. The allegations set forth above are hereby incorporated as if fully set forth herein.

187. The SOS Doctors' OCOM Equity ownership does not violate the Stark Law if the Whole Hospital exception is strictly satisfied.  Their ownership, however, fails to strictly satisfy this Safe Harbor because it has been repeatedly controlled by, offered and provided to, SOS Doctors' inequitably via the Equity Scheme, which expressly takes into account the volume and value of the SOS Doctors' referrals to OCOM. The financial relationship created by the SOS Doctor's OCOM Equity therefore violates the Stark Law because the OCOM Equity Scheme expressly takes into account the volume and value of the SOS Doctors' referrals to OCOM.

188. The free services provided by OCOM and USP to SOS, such as the free pre-authorization services for MRI and PT, create a financial relationship between SOS and OCOM.  This financial relationship is not in writing.  It was provided only to SOS by OCOM because OCOM took into account the volume and value of SOS

---

[26]    The USP subsidiary company conducts business and holds itself out as "Physicians Strategy Group," a subsidiary of USP.

Doctors' referrals. OCOM's objective in so doing was to secure more referrals from SOS, and to assist SOS in lowering its overhead costs.

189. Since approximately 2004, Langerman had/has a financial relationship with OCOM by OCOM's employing Langerman's scrub tech, James. This financial relationship benefited Langerman because it lowered his personal cost for his personal scrub tech. Langerman has and does refer patients to OCOM for DHS. OCOM makes claims for payment to FHCP's for these patients. There is no Stark Law Safe Harbor allowing this remuneration. This financial arrangement between OCOM and Langerman took into account the volume and value of Langerman's referrals to OCOM because, but for Langerman's high volume of referrals and other influence over SOS and OCOM, this special financial arrangement would not have been created.

190. In or about 2004-2005, Cruse had a financial relationship with OCOM by OCOM's employing Cruse's scrub tech, Wade. This financial relationship benefited Cruse because it lowered his personal cost for his personal scrub tech. Cruse has and does refer patients to OCOM for DHS. OCOM makes claims for payment to FHCP's for these patients. There is no Stark Law Safe Harbor allowing this remuneration. This financial arrangement between OCOM and Cruse took into account the volume and value of Cruse's referrals to OCOM because, but for Cruse's high volume of referrals and other influence over SOS and OCOM, this special financial arrangement would not have been created.

191. For an unknown period before and after June 2011, Cruse had a financial relationship with OCOM whereby OCOM used Cruse's credit card to purchase surgical supplies, so that Cruse could receive remuneration in the form of credit card reward points. Cruse has referred patients to OCOM for DHS. OCOM makes claims for payment to FHCP's for these patients. There is no Stark Law Safe Harbor allowing this remuneration. This financial arrangement between OCOM and Cruse took into account the volume and value of Cruse's referrals to OCOM because, but for Cruse's high volume of referrals and other influence over SOS and OCOM, this special financial arrangement would not have been created.

192. Since at least 2010, Cruse had/has a financial relationship with OCOM by OCOM's providing to Cruse years of free office space for his personal employee(s) to manage his personal business interests and personal affairs. Cruse has and does refer patients to OCOM for DHS. OCOM makes claims for payment to FHCP's for these patients. There is no Stark Law Safe Harbor allowing this remuneration. This financial arrangement between OCOM and Cruse took into account the volume and value of Cruse's referrals to OCOM because, but for Cruse's high volume of referrals and other influence over SOS and OCOM, this special financial arrangement would not have been created.

193. SOS Doctors have a financial relationship with ISMC whereby certain of the SOS Doctors provide orthopaedic services to ISMC in return for compensation. An unwritten element of the agreement is that the SOS Doctors will schedule and perform elective surgical cases at ISMC in sufficient volume to satisfy ISMC so that

54

ISMC will maintain the relationship. SOS Doctors refer patients to ISMC for DHS. ISMC makes claims for payment to FHCP's for these patients. There is no Stark Law Safe Harbor allowing this remuneration. This financial arrangement between ISMC and the SOS Doctors took into account the volume and value of the SOS Doctors' referrals to ISMC because, but for the SOS Doctors' promise of high volume of referrals to ISMC, this special financial arrangement would not have been created.

194. SOS Doctors have a financial relationship with OCOM whereby, indirectly via APO, SOS Doctors receive remuneration from receipts generated from anesthesia services provided to patient referrals for DHS at OCOM. The SOS Doctors who own APO refer patients to OCOM knowing OCOM will exclusively use APO to provide anesthesia services to these patients, and thereby cause APO to make claims for payment to FHCP's for these services. APO made claims for payment to FHCP's for these services for patients referred by the SOS Doctors. There is no Stark Law Safe Harbor allowing this remuneration. This financial arrangement between OCOM, APO, and the SOS Doctors took into account the volume and value of the SOS Doctors' referrals to OCOM because, but for the SOS Doctors' high volume of referrals and influence over OCOM, this special financial arrangement would not have been created.

195. SOS and OCOM have had for over ten years a financial arrangement whereby OCOM compensates SOS for its recruitment of new physicians. Throughout this period SOS Doctors have referred FHCP-insured patients to OCOM, and OCOM

55

has made claims for payment to FHCP's for DHS provided because of these referrals. There is no Stark Law Safe Harbor allowing this remuneration. This financial arrangement between OCOM and the SOS Doctors took into account the volume and value of the SOS Doctors' referrals to OCOM because, but for the SOS Doctors' high volume of referrals and influence over OCOM, this special financial arrangement would not have been created.

196. From the time each of these financial relationships were implemented, all referrals from Cruse, Langerman, and the SOS Doctors to OCOM and ISMC violated the Stark Law. There is no Stark Law Safe Harbor allowing this remuneration.

197. From the time each of these financial relationships were implemented, all claims for payment made by OCOM and ISMC to FHCP's violated the Stark Law.

198. Violation of the Stark Law subjects all such claims for payment made to the government by OCOM and ISMC as a result of these referrals, to the FCA and OKFCA.

199. Violation of the Stark Law is a material consideration made by FHCP's of whether to make payment, and if FHCP's would have known of the violations described herein, the FHCP's would not have made payment.

200. Pursuant to the FCA and OKFCA, Defendants OCOM and ISMC (and their related/affiliated owners and operators) are liable to the United States and the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages, and reasonable costs and attorney fees.

**Count 2:  AKS Violations Under 42 U.S.C. § 1320a-7b(b)**

201.   The allegations set forth above are hereby incorporated as if fully set forth herein.

202.   Each of the SOS Doctors, Kimzey, Hendley, OCOM, USP, and Tenet violated the AKS by their implementation of the Equity Scheme.  The Equity Scheme involved these Defendants' knowingly soliciting, receiving, offering, and/or paying remuneration in the form of OCOM Equity in return for, and as reward for, patient referrals for FHCP- and non-FHCP-insured patients for DHS.

203.   Since 2004 and continuing today, OCOM and Langerman violated the AKS by knowingly soliciting, receiving, offering, and/or paying remuneration in the form of OCOM hiring and compensating Langerman's personal scrub tech in return for, and as reward for, patient referrals for FHCP- and non-FHCP-insured patients for DHS.

204.   In or about 2005, OCOM and Cruse violated the AKS by knowingly soliciting, receiving, offering, and/or paying remuneration in the form of OCOM hiring and compensating Cruse's personal scrub tech in return for, and as reward for, patient referrals for FHCP- and non-FHCP-insured patients for DHS.

205.   For some period before, during and after 2011, Cruse, OCOM, USP, and Hendley violated the AKS by knowingly soliciting, receiving, offering, and/or paying indirect remuneration in the form of credit card reward points for OCOM's purchase of surgical goods and supplies.  This remuneration was in return for, and as reward for, patient referrals for FHCP- and non-FHCP-insured patients for DHS.

206.   For approximately the last ten years, OCOM and Cruse violated the AKS by knowingly soliciting, receiving, offering, and/or paying remuneration in the form of

free office space provided by OCOM to Cruse for his personal business interests and personal affairs in return for, and as reward for, patient referrals for FHCP- and non-FHCP-insured patients for DHS.

207.  Since August 2014 and continuing today, ISMC and SOS by and through the SOS Doctors, violated the AKS by knowingly soliciting, receiving, offering, and/or paying remuneration in the form of ISMC providing an exclusive orthopaedic services contract to SOS in return for, and as reward for, patient referrals for FHCP- and non-FHCP-insured patients for DHS.

208.  SOS Doctors, Kimzey, and USP knowingly solicited, received, offered, and/or paid remuneration in the form of distributions from APO in return for, and as reward for, patient referrals for FHCP- and non-FHCP-insured patients for DHS, specifically, anesthesia services.  The SOS Doctors who own APO refer patients to OCOM knowing OCOM will exclusively use APO to provide anesthesia services to these patients, thereby causing APO to make claims for payment to FHCP's and non-FHCP's for these services.  APO made claims for payment to FHCP's and non-FHCP's for these services for patients referred by the SOS Doctors.

209.  SOS and OCOM have had for over ten years knowingly solicited, received, offered, and/or paid remuneration in the form of monthly rental payments, compensation and bonuses for SOS' recruitment of new physicians.  Throughout this period, SOS Doctors have referred FHCP- and non-FHCP-insured patients to OCOM, and OCOM has made claims for payment to FHCP's and non-FHCP's for DHS provided because of these referrals.

58

210.   Defendants USP, Integris and Tenet, in their roles as owners and/or operators of OCOM, violated the AKS by knowingly agreeing with the soliciting, receiving, offering, and/or paying remuneration in the various forms and unlawful arrangements described herein, in return for, and as reward for, referral of FHCP- and non-FHCP-insured patients for DHS.

211.   The free services provided by OCOM and USP to SOS, such as the free pre-authorization services for MRI and PT, constitutes the soliciting, receiving, offering, and/or paying remuneration between SOS and OCOM.  This financially beneficial relationship is not in writing.  OCOM provided it only to SOS because OCOM took into account the volume and value of SOS Doctors' referrals.  OCOM's objective in so doing was to secure more referrals from SOS, and to assist SOS in lowering its overhead costs.

212.   Throughout the relevant periods for each such arrangement, each of the Defendants have submitted or caused to be submitted claims for payment to FHCP's and non-FHCP's for DHS for FHCP- and non-FHCP-insured patients.

213.   Violation of the AKS renders all claims for payment made to FHCP's subject to the FCA and OKFCA.

214.   Violation of the AKS is a material consideration made by FHCP's of whether to make payment, and if FHCP's would have known of the violations described herein, the FHCP's would not have made payment.

215. Pursuant to the FCA and OKFCA, Defendants are liable to the United States and the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages, and reasonable costs and attorney fees.

**Count 3: FCA Violations Under 31 U.S.C. § 3729(a)(1)(A), (B), (G)**

216. The allegations set forth above are hereby incorporated as if fully set forth herein.

217. By their violations of the Stark Law, all claims OCOM made or caused to be made to the FHCP's for payment are subject to the FCA and OKFCA as false claims.

218. By their violations of the AKS, all claims Defendants made to the FHCP's for payment are subject to the FCA and OKFCA as false claims.

219. By the Ultrasound Scheme, SOS and the SOS Doctors made false statements, made false records, and used false statements and records to request payment from FHCP's and non-FHCP's, and therefore all claims by these Defendants made to FHCP's for payment are subject to the FCA and OKFCA as false claims.

220. By the Clinical Services Scheme, SOS and one or more of the SOS Doctors made false statements, made false records, and used false statements and records to request payment from FHCP's and non-FHCP's, and therefore all claims by these Defendants made to FHCP's for payment are subject to the FCA and OKFCA as false claims.

221. By the Levings Surgery Scheme, SOS, the SOS Doctors and OCOM made false statements, made false records, and used false statements and records to request payment from FHCP's and non-FHCP's, and therefore all claims by these

Defendants made to FHCP's for payment are subject to the FCA and OKFCA as false claims.

222. By the EHR Scheme, SOS, the SOS Doctors and OCOM made false statements, made false records, and used false statements and records to request payment from FHCP's and non-FHCP's, and therefore all claims by these Defendants made to FHCP's for payment are subject to the FCA and OKFCA as false claims.

223. Throughout the relevant periods for each such arrangement, each of these Defendants have submitted or caused to be submitted claims for payment to FHCP's and non-FHCP's for DHS for FHCP- and non-FHCP-insured patients.

224. Violation of 31 U.S.C. § 3729(a)(1)(A), (B), or (G), renders all claims for payment made to FHCP's subject to the FCA and OKFCA.

225. Violation of 31 U.S.C. § 3729(a)(1)(A), (B), or (G) is a material consideration made by FHCP's of whether to make payment, and if FHCP's would have known of the violations described herein, the FHCP's would not have made payment.

226. Pursuant to the FCA and OKFCA, Defendants are liable to the United States and the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages, and reasonable costs and attorney fees.

**Count 4:  OKFCA Violations Under 63 O.S. § 5053.1 *et seq.***

227. The allegations set forth above are hereby incorporated as if fully set forth herein.

228. By their violations of the AKS, Stark Law, the FCA, and the OKFCA, all claims Defendants made to the OHCA for payment are subject to the OKFCA as false claims.

61

229.  Throughout the relevant periods for each such arrangement, each of these Defendants have submitted or caused to be submitted claims for payment to Oklahoma State FHCP's for DHS for FHCP-insured patients.

230.  Violation of the AKS, Stark Law, FCA, and/or OKFCA renders all claims for payment made to FHCP's subject to the FCA and OKFCA.

231.  Violation of the AKS, Stark, the FCA, or the OKFCA is a material consideration made by FHCP's of whether to make payment, and if FHCP's would have known of the violations described herein, the FHCP's would not have made payment.

232.  Pursuant to the FCA and OKFCA, Defendants are liable to the United States and the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages, and reasonable costs and attorney fees.

**Count 5:  False Certification Under 31 U.S.C. § 3729(a)(1)(B)**

233.  The allegations set forth above are hereby incorporated as if fully set forth herein.

234.  By their violations of the AKS, Stark Law, FCA, and OKFCA, and their affirmative attestation of full compliance without violations of each, Defendants expressly falsely certified compliance in Cost Reports, claims for payments, and the EHR program, all of which are conditions of payment.

235.  Falsely certifying compliance when in knowing violation of the AKS, Stark Law, FCA, and/or OKFCA, is a material consideration of the FHCP in making payment for claims submitted to FHCP's.

236. FHCP's relied on the Defendants' certification as being truthful, honest, and accurately representing Defendants' assertion that they had not individually or collectively violated the AKS, Stark Law, FCA, or OKFCA.

237. Throughout the entire relevant period, Defendants would not have been paid by FHCP's but for Defendants' affirmative and express false certifications in Cost Reports, attestations, EHR certifications, and individual claims for payment.

238. Violation of the AKS, Stark Law, FCA, and/or OKFCA renders all claims for payment made to FHCP's subject to the FCA and OKFCA.

239. Violation of 31 U.S.C. § 3729(a)(1)(B) is a material consideration made by FHCP's of whether to make payment, and if FHCP's would have known of the violations described herein, the FHCP's would not have made payment.

240. Pursuant to the FCA and OKFCA, Defendants are liable to the United States and the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages, and reasonable costs and attorney fees.

### Count 6:  Reverse False Claims Under 31 U.S.C. § 3729(a)(1)(G)

241. The allegations set forth above are hereby incorporated as if fully set forth herein.

242. Defendants knew that they have/had received reimbursement from the government for which they were not entitled because of their various schemes violating the AKS, Stark Law, the FCA, and/or the OKFCA.

243. Defendants deliberately disregarded their duty to return wrongly received reimbursement, and disregarded their duty to even consider whether self-reporting was required under the Healthcare Laws.

244. Throughout the entire relevant period, Defendants would not have been paid by FHCP's but for Defendants' affirmative and express false certifications in Cost Reports, attestations, EHR certifications, and individual claims for payment, each repeatedly in deliberate disregard for their duty to return wrongly received reimbursement.

245. Violation of the AKS, Stark Law, FCA, and/or OKFCA renders all claims for payment made to FHCP's subject to the FCA and OKFCA.

246. Violation of 31 U.S.C. § 3729(a)(1)(G) is a material consideration made by FHCP's of whether to make payment, and if FHCP's would have known of the violations described herein, the FHCP's would not have made payment.

247. Pursuant to the FCA and OKFCA, Defendants are liable to the United States and the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages, and reasonable costs and attorney fees.

### Count 7:  Conspiracy Under 31 U.S.C. § 3729(a)(1)(C)

248. The allegations set forth above are hereby incorporated as if fully set forth herein.

249. Each of the individual Defendants acted overtly, both independently and collectively, to conspire to construct, orchestrate and conceal the various schemes described herein.

250. By such overt acts of conspiracy, the Defendants violated the FCA and the OKFCA.

251. Throughout the entire relevant period, Defendants would not have been paid by FHCP's but for Defendants' affirmative and express false certifications in cost reports, attestations, EHR certifications, and individual claims for payment, each

64

repeatedly in deliberate disregard for their duty to not engage in conspiracies to violate the AKS, Stark Law, FCA and OKFCA.

252. Conspiracy to violate AKS, Stark Law, FCA, and/or OKFCA renders all claims for payment made to FHCP's subject to the FCA and OKFCA.

253. Violation of 31 U.S.C. § 3729(a)(1)(C) is a material consideration made by FHCP's of whether to make payment, and if FHCP's would have known of the violations described herein, the FHCP's would not have made payment.

254. Pursuant to the FCA and OKFCA, Defendants are liable to the United States and the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages, and reasonable costs and attorney fees.

## Count 8:  Retaliation Under 31 U.S.C. § 3730(h)

255. The allegations set forth above are hereby incorporated as if fully set forth herein.

256. When Relator refused to be SOS's attorney and reminded the SOS Doctors of their duties under the law, Defendant SOS and the SOS Doctors attempted to intimidate Relator and thereafter decreased Relator's job duties, hours and compensation.

257. Under the FCA Relator is entitled to relief for such damages, including reinstatement, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained from the discrimination, including litigation costs and reasonable attorneys' fees.

## Count 9:  Retaliation Under 63 O.S. § 5053.5

258. The allegations set forth above are hereby incorporated as if fully set forth herein.

259.   When Relator refused to be SOS's attorney and reminded the SOS Doctors of their duties under the law, Defendant SOS and the SOS Doctors attempted to intimidate Relator and thereafter decreased Relator's job duties, hours and compensation.

260.   Under the OKFCA Relator is entitled to relief for such damages, including reinstatement, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained from the discrimination, including litigation costs and reasonable attorneys' fees.

## VII.
## JURY TRIAL

261.   The allegations set forth above are hereby incorporated as if fully set forth herein.

262.   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff/Relator hereby demands trial by jury.

WHEREFORE, Relator, on behalf of himself, the United States, and the State of Oklahoma, prays that the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States and the State of Oklahoma have sustained because a Defendants' actions plus a civil penalty of between $5,500 and $11,000 for each violation; that Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be at least 15% and not more than 25% of the proceeds of the action or settlement of the claim if the United States and/or the State of Oklahoma intervenes, and not less than 25% nor more than 30% of the proceeds of the action or settlement of the claim if the United States and/or the State of Oklahoma does not intervene; that the Relator be awarded all costs and expenses incurred, including

reasonable attorney's fees and costs; that Relator be awarded an amount equal to two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees; and that the Court order all such other relief as the Court may deem appropriate.

*[The Remainder of this Page Intentionally Left Blank]*

67

Respectfully submitted,

GAYLON C. HAYES, OBA #14492
6805 South Western Ave. Suite 500
Oklahoma City, OK 73139
Telephone: 405/616-5045
Facsimile: 405/616-5062
gaylon@hhhlawfirm.com
brooke@hhhlawfirm.com
*Attorney For Plaintiff/Relator*