## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA** <br> *ex rel.* Wayne Allison, Relator, and <br> **THE STATE OF OKLAHOMA** <br> *ex rel.* Wayne Allison, Relator, <br> ***Plaintiffs,*** <br><br> **v.** <br><br> 1. **SOUTHWEST ORTHOPAEDIC SPECIALISTS, PLLC,** <br> 2. **OKLAHOMA CENTER FOR ORTHOPAEDIC & MULTISPECIALTY SURGERY, LLC,** <br> 3. **USP OKLAHOMA, INC.,** <br> 4. **USPI HOLDING COMPANY, INC.,** <br> 5. **USP INTERNATIONAL, INC.,** <br> 6. **TENET HEALTHCARE CORPORATION,** <br> 7. **UAP OF OKLAHOMA, LLC,** <br> 8. **ANESTHESIA PARTNERS OF OKLAHOMA, LLC,** <br> 9. **INTEGRIS AMBULATORY CARE CORPORATION,** <br> 10. **INTEGRIS SOUTH OKLAHOMA CITY HOSPITAL CORPORATION,** <br> 11. **ANTHONY L. CRUSE, D.O.,** <br> 12. **R.J. LANGERMAN, JR., D.O.,** <br> 13. **DANIEL J. JONES, M.D.,** <br> 14. **MEHDI ADHAM, M.D.,** <br> 15. **DEREK WEST, D.O.,** <br> 16. **BRIAN LEVINGS, D.O.,** <br> 17. **SHANE HUME, D.O.,** <br> 18. **BRAD REDDICK, D.O.,** <br> 19. **KRISTOPHER AVANT, D.O.,** <br> 20. **STEVE HENDLEY,** and <br> 21. **MICHAEL KIMZEY,** <br>     ***Defendants.*** | **COMPLAINT FOR DAMAGES UNDER THE FEDERAL AND OKLAHOMA FALSE CLAIMS ACTS AND DEMAND FOR JURY TRIAL** <br><br>     **Case No. CIV-16-569-F** <br>     **Hon. Stephen P. Friot** |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................. 2

    A.   Overview of Defendants' Conduct ............................................. 2

    B.   Impact of Defendants' Violations of the Stark Law,
        AKS, FCA, and OKFCA ............................................................ 16

II.  PARTIES ........................................................................................... 19

    A.   Relator ...................................................................................... 19

    B.   Defendants ................................................................................ 20

        1.   Corporate Defendants .................................................... 21

        2.   SOS Doctor Defendants ................................................. 27

        3.   Non-SOS Individual Defendants .................................... 30

    C.   Identification of Defendant Groups .......................................... 31

III. JURISDICTION AND VENUE ......................................................... 32

IV.  LEGAL FRAMEWORK .................................................................... 33

    A.   The Federal False Claims Act ................................................... 34

    B.   The Stark Law .......................................................................... 35

    C.   The Anti-Kickback Statute ....................................................... 39

    D.   The Oklahoma Medicaid False Claims Act ............................... 41

    E.   Oklahoma Kickback Prohibitions ............................................. 43

    F.   Retaliation Under the Federal False Claims Act
        and the Oklahoma Medicaid False Claims Act .......................... 44

G.    Tenet's Non-Prosecution Agreement ........................................................ 45

V.    **FACTUAL ALLEGATIONS** ........................................................ 48

A.    Improper Financial Relationships and Kickbacks
      Between the SOS Defendants and the OCOM
      Defendants with Respect to Referrals to OCOM ..................................... 51

      1.    The Equity Scheme ........................................................ 51

            a.    OCOM's Structure and Governance Should
                  Control the Proper Flow of OCOM Equity ......................... 52

            b.    The SOS and OCOM Defendants Leveraged
                  OCOM Equity to Induce and Reward Referrals ................. 54

            c.    Specific Examples Show the Equity
                  Scheme in Action ................................................ 58

      2.    The Employment Contract Scheme ................................................ 63

            a.    Physicians Must Join SOS To
                  Receive Their Bonus ........................................... 64

            b.    OCOM Rented SOS Clinic Space Based on the
                  Volume and Value of New Physician's Services ................ 65

      3.    The SOS and OCOM Defendants' Additional Schemes ................ 67

            a.    The Surgical Scrub Scheme ................................. 68

            b.    The Sham Lease Scheme .................................... 70

            c.    The Office Space Scheme .................................... 71

            d.    The Credit Card Scheme .................................... 72

B.    Improper Financial Relationships and Kickbacks Between
      the SOS Defendants and the OCOM Defendants with
      Respect to the Formation of APO ........................................... 73

C.    Improper Financial Relationships and Kickbacks Between
      the SOS Defendants and the Integris Defendants with

Respect to Referrals of Federally-Reimbursed Healthcare
Services to Integris South Oklahoma City Hospital ................................. 80

D.    The SOS Defendants' Direct FCA Violations .......................................... 84

      1.    The Ultrasound Scheme ................................................ 85

      2.    The Levings P.A. Scheme .............................................. 88

E.    False Certification Under the False Claims Act and
      Oklahoma Medicaid False Claims Act .................................................... 89

      1.    Defendants Made Multiple False Certifications
            of Compliance with the Stark Law and AKS ................ 90

      2.    Defendants Falsely Certified Compliance with
            EHR Incentive Requirements ......................................... 91

      3.    The SOS Doctors Pre-Signed Prescription Pads in
            Violation of the Law ...................................................... 93

F.    Defendants' Unlawful Retaliation Against Relator .................................. 94

      1.    Relator Frequently and Repeatedly Warned Defendants
            of Their Noncompliance and Unlawful Conduct ............. 95

      2.    For the SOS Defendants, Relator "Knew Too Much" .................... 98

      3.    The SOS Defendants Terminated Relator in
            Violation of His Employment Agreement ...................... 99

      4.    Defendants Filed a SLAPP Action Against
            Relator Under State Law ............................................... 100

            a.    SOS's Attorney Admitted SOS Suspected
                  Relator Had Filed a Claim .................................. 101

            b.    Relator Filed an Anti-SLAPP Motion
                  Against SOS ....................................................... 102

G.    Tenet's Violation of Its Non-Prosecution Agreement ........................... 103

VI.   CLAIMS .......................................................................................................... 107

Count One:             Violations of the Stark Law,
42 U.S.C. §1395nn.................................................................... 107

Count Two:            Violations of the False Claims Act,
31 U.S.C. §3729, *et. seq.*, Predicated on Violations
of the Stark Law, 42 U.S.C. § 1395nn ................................... 114

Count Three:          Violations of the False Claims Act, 31 U.S.C. § 3729,
*et seq.*, Predicated on Violations of the
Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).................... 117

Count Four:            Violations of the False Claims Act,
31. U.S.C. § 3729(a)(1)(A) and (B)
"Factually False Claims"........................................................ 125

Count Five:            Violations of the False Claims Act,
31 U.S.C. § 3729(a)(1)(B) Predicated on
False Certification of Compliance .......................................... 127

Count Six:            Violations of the False Claims Act,
31 U.S.C. § 3729(a)(1)(G) "Reverse False Claims"............... 129

Count Seven:          Conspiracy to Violate the False Claims Act,
31 U.S.C. § 3729(a)(1)(C) ...................................................... 130

Count Eight:          Violation of the False Claims Act,
31 U.S.C. § 3729, *et. seq.*, Predicated on Violation
of Consent Decree and Non-Prosecution Agreement
Against Defendant Tenet Healthcare Corporation .................. 134

Count Nine:            Violations of the Oklahoma Medicaid False Claims Act,
63 Okla. Stat. § 5053.1 *et. seq.*, Predicated on Violations
of the Stark Law, 42 U.S.C. § 1395nn ................................... 135

Count Ten:            Violations of the Oklahoma Medicaid False Claims Act,
63 Okla. Stat. § 5053.1, *et. seq.*, Predicated on Violations
of the Anti-Kickback Statute,
42 U.S.C. § 1320a-7b(b) ........................................................ 139

Count Eleven:         Violations of the Oklahoma Medicaid False Claims Act,
63 Okla. Stat. § 5053, *et. seq.*, Predicated on Violations
of Oklahoma Anti-Kickback Prohibitions............................... 147

Count Twelve:    Violations of the Oklahoma Medicaid False Claims Act,
                 63 Okla. Stat. § 5053.1, *et. seq.*—"Factually False Claims" ... 155

Count Thirteen:  Violations of the False Claims Act,
                 Prohibition Against Retaliation, 31 U.S.C. § 3730(h) ............. 157

Count Fourteen:  Violation of the Oklahoma Medicaid False
                 Claims Act, Prohibition Against Retaliation,
                 63 Okla. Stat. § 5053.5 ........................................................ 158

**VII.   JURY TRIAL** ............................................................................................ **159**

Relator WAYNE ALLISON brings this suit on behalf of the United States of America and the State of Oklahoma against Defendants pursuant to the Federal Civil False Claims Act ("FCA"), 31 U.S.C §§ 3729, *et seq.*, and the Oklahoma Medicaid False Claims Act ("OKFCA"), 63 O.S. § 5053, *et seq.*, and states as follows:

## I. <u>INTRODUCTION</u>

### A. OVERVIEW OF DEFENDANTS' CONDUCT

1.      This case involves unlawful conduct by and a conspiracy among numerous Oklahoma orthopedic surgeons, their clinical practice group, the surgical hospital they created, and the corporate entities who purchased and/or control the surgical hospital.[1] Defendants conspired to defraud Medicare, Medicaid, TriCare, and other federal healthcare programs through multiple unlawful schemes. Defendants based years of medical decision-making, including their referral and provision of federally-reimbursed healthcare services, on greed by using illegal kickbacks, unlawful compensation, and unearned reimbursements. This wrongful profit came at the expense of the integrity of federally-reimbursed, tax payer-funded healthcare programs. In attempting to extract every dollar of potential revenue from their practice, Defendants violated the very healthcare laws designed to protect that integrity.

2.      Defendants' unlawful conduct and fraudulent schemes arise from their entangled history of using their patient referrals and various entities as a self-interested,

_____

[1] Relator provides a detailed description of each Defendant in Section II ("Parties"), *infra*.

profit-oriented, multi-million-dollar money-making machine. That history began in 1995, when Defendant Drs. Cruse and Langerman established Defendant Southwest Orthopedic Specialists, PLLC ("SOS"), an orthopedic surgery clinical practice. Cruse and Langerman recruited a group of surgeons to practice with them (collectively, the "SOS Doctors"). SOS hired Relator in 2002 as its administrator and business manager; Relator acquired the information he alleged herein during the course of his employment with SOS. Also in 2002, Cruse, Langerman, and the SOS Doctors built and opened Defendant Oklahoma Center for Orthopaedic and Multispecialty Surgery, LLC ("OCOM"), a surgical specialty hospital. In 2004, Cruse, Langerman, and the SOS Doctors partially sold OCOM to a national healthcare provider, Defendant USP Oklahoma, Inc., a subsidiary of Defendant United Surgical Partners International, Inc. ("USPI").[2] When USP purchased an equity interest in and took over management of OCOM, the SOS Doctors and OCOM (with USP's and later Tenet's consent and knowledge) entered into a series of financial relationships and kickbacks that plainly violate the FCA and OKFCA. For over a decade, OCOM annually derived tens of millions of dollars of revenue from tainted referrals from the SOS Doctors.

3.     The OCOM Defendants equally and enthusiastically matched the SOS Doctors' willingness to violate federal law.[3] OCOM and USP had the power to stop the

---

[2] At that time, United Surgical Partners, Inc. was a publicly traded company; it and its more than 700 subsidiaries are now majority owned by Tenet Healthcare Corp. and are therefore subsidiaries of Defendant Tenet Healthcare Corp.

[3] Relator provides a detailed description of each Defendant in Section II ("Parties"), *infra*. The OCOM Defendants include OCOM, USP, USPI, USPH, UAP, APO, Tenet, Kimzey and Hendley.

SOS Doctors, but instead enabled the Schemes. OCOM depends on SOS for approximately two-thirds of its revenue, so OCOM readily acquiesced to, and indeed promoted and facilitated, SOS's demands and abuses that violated federal and state law. Together, the SOS Doctors and OCOM contrived multiple schemes to pay unlawful kickbacks, compensation, perks, and benefits to those SOS Doctors who referred to OCOM the greatest volume and value of federally-reimbursed healthcare services. This blatantly illegal conduct subjects Defendants to liability under the Stark Law, AKS, FCA, and OKFCA for damages and civil penalties.

4.     Since USP purchased a portion of OCOM in July 2004, the relationship between SOS and OCOM has been illegally tainted by unlawful financial relationships and illegal kickbacks. As a result, healthcare reimbursement claims Defendants submitted to the federal government and the State of Oklahoma violate healthcare laws.

5.     Healthcare fraud is an urgent public matter.[4] The manipulation of federal healthcare reimbursements costs the American taxpayers billions of dollars each year. Congress expects its Medicare and Medicaid providers to use taxpayer funds appropriately—*i.e.*, to base their decisions about patient care on their patients' best interests, not their own profit. Congress provides detailed guidance as to what constitutes

---

[4] Since 2000, the detection and elimination of health care fraud and abuse has been a "top priority of federal law enforcement." The Department of Health and Human Services and the Department of Justice Health Care Fraud and Abuse Control Program, Annual Report of the Attorney General and the Secretary Detailing Expenditures and Revenues under the Healthcare Fraud and Abuse Control Program for Fiscal Year 1999 (Jan. 2000), available at: https://oig.hhs.gov/publications/docs/hcfac/HCFAC%20Annual%20Report%20FY%201999.htm (last visited March 23, 2018).

permissible (and impermissible) conduct. Further, it condemns those providers—like Defendants—who prioritize their own greed over patient care. As such, Congress has expressly prohibited and even criminalized conduct most likely to lead to improperly-motivated referrals of healthcare services. Congress enacted these prohibitions to protect the integrity of the federal healthcare programs. The severity of the remedies in these laws demonstrates how seriously the government takes the prohibited conduct. In lockstep with Congressional intent, the State of Oklahoma also combats healthcare fraud at the state level by prohibiting such conduct. That conduct—namely, the referral of services pursuant to improper relationships, the solicitation or receipt of kickbacks for referrals, and the submission of false claims for reimbursement to the government—is the conduct Defendants have perpetrated for years.

6.     Despite Defendants' awareness of the government's expectations and prohibitions, Defendants' conduct demonstrates they consistently and deliberately based their decision-making on profit and greed in knowing and reckless disregard of the law. Defendants' violations cost the federal government and the State of Oklahoma millions of dollars each year in tainted and/or unwarranted reimbursements for federal healthcare services.[5] Defendants' fraudulent conduct shares a common theme, which was fittingly expressed by OCOM's Chairman, Medical Director—SOS Doctor Cruse—who said, "we

---

[5] Defendants referred patients and services covered and reimbursed by all federally-funded healthcare programs under which medical providers are subject to the healthcare laws, including Medicare, Medicaid, TriCare/CHAMPUS, Blue Cross Blue Shield Federal, etc. Defendants submitted false claims for reimbursement to these entities.

do the bulk of the work, and therefore I think we need to get the bulk of [the OCOM Equity]," and OCOM's CEO, Kimzey (a USP employee), who said "my whole point is, let's get [the OCOM Equity] to SOS...it's the status quo. I mean this is how this place was built and it works pretty well."

7.     **Improper Financial Relationships and Kickbacks Between the SOS Defendants and OCOM Defendants**: Relator alleges two core financial relationships, or "Schemes," between SOS and the SOS Doctors ("SOS Defendants"), on one hand, and OCOM, USP, USPI, USPH, and Tenet ("OCOM Defendants"), on the other. These Schemes violate the Stark Law, AKS, FCA, and/or OKFCA. While temporally overlapping and cumulative to some extent, these Schemes taint all reimbursements OCOM received from the Government[6] resulting from referrals from SOS Doctors from at least 2007 under the Stark Law, AKS, FCA, and/or OKFCA.[7] The SOS Defendants and the OCOM Defendants employed these two core improper financial relationships—the Equity Scheme and the Employment Agreement Scheme—to reward SOS Doctors for past referrals and incentivize future referrals to OCOM.

a.     **The Equity Scheme—Using OCOM Equity to Reward and Incentivize SOS Doctors**: First, the SOS Defendants and OCOM Defendants used a series of transactions (the "Equity Scheme") to transfer OCOM Equity to SOS Doctors in clear

---

[6] As used in this Complaint, "Government" refers to the government of the United States, CMS, other federal healthcare authorities, government of the State of Oklahoma, and/or Oklahoma Medicaid authorities, as applicable.

[7] Relator details each of these schemes in detail in Section V ("Factual Allegations"), *infra*.

violation of both the OCOM Operating Agreement and the Stark Law and/or AKS. The Equity Scheme used highly valuable OCOM Equity—which should have been made available to all physician owners of OCOM (including approximately eighteen non-SOS physicians)—to reward and incentivize the SOS Doctors who referred to OCOM the majority of its business. Although the hospital's operating agreement requires the OCOM board to offer available equity to *all* OCOM owners, the SOS Doctors exploited their influence and control over the OCOM board to ensure that the SOS Doctors who referred the greatest volume and value of services to the hospital got the first opportunity to purchase shares that became available. OCOM's managers and corporate parents allowed this conduct because it fostered much-needed revenue for the hospital and kept its most profitable referrers—the SOS Doctors—happy. This conduct is illegal and fraudulent because the hospital submits claims for reimbursement to and receives reimbursement from federally-funded healthcare programs for services rendered pursuant to this improper relationship. The Equity Scheme involved a series of transactions that began in 2012 at the latest and continued at least until 2016.

b.    **The Employment Contract Scheme—OCOM Shouldered the Cost and Risk of Recruiting New SOS Doctors**: Second, the SOS Defendants and OCOM Defendants further exploited their muddied relationship through an improper physician employment contract and space rental arrangement, whereby OCOM bore all the cost, risk, and burden of recruiting new SOS Doctors while SOS enjoyed only the upside (the "Employment Contract Scheme"). For over ten years, this new physician employment agreement with OCOM provided a bonus at the end of the agreement, which the new

7

physician then earned only by joining SOS. This agreement offloaded a significant cost of SOS's medical practice—the recruitment of new physicians—to OCOM. OCOM undertook this costly burden to appease the SOS Doctors and ensure their continued high volume of high value referrals. The Employment Contract Scheme began in 2007 and ran until December 2016. The SOS and OCOM Defendants abruptly terminated the Employment Contract Scheme after Tenet executed its September 30, 2016 Non-Prosecution Agreement ("NPA").[8] Given how blatantly this scheme violated the law, the SOS and OCOM Defendants likely feared reprisal from Tenet for threatening its NPA compliance if the Tenet Monitor discovered the Scheme.

c.    **The Equity and Employment Contract Scheme—2007 to Present**: When considered together, the Equity and Employment Contract Schemes subject all Governmental reimbursements to OCOM from 2007 to the present resulting from SOS referrals to recovery and trebling under the Stark Law, AKS, FCA, and/or OKFCA, in addition to statutorily-prescribed per-claim penalties provided in each.

d.    **Additional Schemes Between the SOS Defendants and the OCOM Defendants**: The Equity and Employment Contract Schemes are sufficient to reach all Government reimbursements to OCOM resulting from SOS referrals beginning in 2007. However, the SOS Defendants and the OCOM Defendants entered into four additional financial relationships and kickbacks that also violate the Stark Law, AKS, FCA, and/or OKFCA. Although these four additional Schemes are cumulative (in the sense that they

---

[8] Relator details the Tenet Non-Prosecution Agreement in Sections IV.F. and V.G., *infra*.

reach the same Government reimbursements as the Equity and Employment Contract Schemes), the presence of these four additional Schemes (a) demonstrates that the entire relationship between the SOS Defendants and the OCOM Defendants is fraught with illegal and improper financial relationships and kickbacks; and (b) confirms that the SOS Defendants and OCOM Defendants acted with knowledge and intent (as broadly defined by the AKS, FCA, and/or OKFCA, as applicable), which gives rise to treble damages under the FCA and OKFCA. The four additional Schemes as between the SOS Defendants and OCOM Defendants are:

      i.      **The Surgical Scrub Scheme**: The OCOM Defendants paid the majority of the cost of personal medical assistants for Cruse and Langerman because Cruse and Langerman were the most profitable and influential referring physicians (the "Surgical Scrub Scheme"). OCOM offered this perk exclusively to Cruse and Langerman in consideration of their influence, control, and ability to pad the OCOM Defendants' pockets with profit.

      ii.      **The Sham Lease Scheme**: OCOM entered into a sham and commercially unreasonable lease of an empty building owned by Cruse and Langerman to appease Cruse and Langerman and reward them for their high volume of referrals (the "Sham Lease Scheme"). OCOM perpetuated the sham building lease long after its commercially-justifiable need for the leased space ceased. It perpetuated the lease solely as a means to pay off Cruse and Langerman in exchange for their high volume of high value referrals.

      iii.      **The Office Space Scheme**: OCOM provided Cruse free office

space in exchange for his referrals and influence (the "Office Space Scheme"). Cruse used this free office space to manage his personal affairs.

        iv.      **The Credit Card Scheme**: In a remarkably audacious concession, which reveals Cruse's influence over OCOM and OCOM's acquiescence to Cruse, OCOM allowed Cruse to use his *personal* credit card to purchase OCOM surgical equipment so that Cruse could rack up reward points (the "Credit Card Scheme"). Cruse then used the points to purchase *personal* flights to his many favorite vacation destinations.

        e.      Each of these four Schemes separately violates the Stark Law, AKS, FCA, and/or OKFCA and would allow the Government to recover all Government reimbursements to OCOM resulting from SOS Doctor referrals during the duration of the Scheme. When these four schemes are considered together, and in combination with the Equity and Employment Contract Schemes, the relationship between the SOS Defendants and the OCOM Defendants is so tainted with improper financial relationships and kickbacks that all OCOM reimbursements from the Government from at least 2007 to the present are reachable by the Stark Law, AKS, FCA, and OKFCA.

        8.      **The Anesthesia Company Scheme**: The SOS Defendants and the OCOM Defendants further violated the Stark Law, AKS, FCA, and/or OKFCA by forming and operating Anesthesia Partners of Oklahoma, LLC ("APO"), which they designed and used to refer designated health services to themselves (the "Anesthesia Company Scheme"). OCOM's CEO initiated the creation of APO as OCOM's exclusive anesthesia service provider. APO's ownership was a private club comprised of only the SOS Doctors, USP, and Kimzey (individually). APO's profit distribution to these owners depended directly on

the volume and value of the SOS Doctors' referrals to OCOM. The SOS Doctors, USP, and Kimzey formed the company to provide *exclusive* anesthesia services at OCOM, driving additional profits to themselves. In doing so, they created a textbook self-referring financial and kickback relationship. Referrals to OCOM constituted referrals to APO by virtue of the exclusive relationship. The owners of APO had full control over OCOM; even OCOM's CEO, Kimzey, owned part of APO. According to its most recent Form 10-K, Tenet owns through USPI/USPH twenty-two companies similar to UAP Oklahoma. As Kimzey stated to Relator, Tenet and USP perpetuated this scheme across the U.S., with each such company using a USP-supplied kit comprised of boilerplate corporate formation and governance documents.[9]

9.     USP has propagated their uniform anesthesia model in six states since at least 2012. Based on Relator's firsthand exposure to the Oklahoma model and Kimzey's representation to Relator that the Oklahoma model was set up and operated the same as other states', Relator alleges that all of the USP anesthesia companies (*i.e.,* the "UAP" companies) are engaged in identical unlawful activities. Because USP alone possesses and

---

[9] Tenet's SEC 10-K filing lists 22 subsidiaries named "…UAP…," including: Dreamland UAP Anesthesia, LLC (MO); Eye Center of Nashville UAP, LLC (TN); Franklin Endo UAP, LLC (TN); GLS UAP Sugarland, LLC (TX); JFP UAP Sugarland, LLC (TX); Lee's Summit Endo UAP, LLC (MO); Mid State Endo UAP, LLC (TN); SKV UAP Sugarland, LLC (TX); UAP Chattanooga Pain, LLC (TN); UAP Las Colinas Endo, LLC (TX); UAP Lebanon Endo, LLC (TN); UAP Nashville Endoscopy, LLC (TN); UAP of Arizona, Inc. (AZ); UAP of California, Inc. (CA); UAP of Missouri, Inc. (MO); UAP of New Jersey, Inc. (NJ); UAP of Oklahoma, Inc. (OK); UAP of Tennessee, Inc. (TN); UAP of Texas, Inc. (TX); UAP Sacramento, PC (CA); UAP San Antonio Endo, LLC (TX); UAP Scopes, LLC (TX).

controls all of the specific information on each states' corporations' structures, Relator does not know each states' specific anesthesia companies or their owners; however, because all such states' companies' operations and structures are designed using the USPH/USPI-provided corporate structure and documents used in Oklahoma, Relator alleges each operate virtually identically.

10.    Like Defendants' Employment Contract Scheme, USP ordered Kimzey to dismantle the anesthesia company expeditiously by selling its shares back to the SOS Doctors in fear of Tenet's reprisal after Tenet entered into its NPA. Because of the improper financial relationship and kickbacks between the SOS Defendants and the OCOM Defendants with respect to APO, all Government reimbursements to APO from referrals from SOS Doctors (as well as all government reimbursements to analogous USP-formed anesthesia companies nationwide) are subject to recovery under the Stark Law, AKS, FCA, and/or state analogue laws.

11.    **The E.R. Call Scheme**: The financial relationships and kickbacks between the SOS Defendants, on one hand, and Integris Ambulatory Care Corporation ("Integris") and Integris South Oklahoma City Hospital Corporation ("ISMC") (collectively "Integris Defendants"), on the other hand, also violate the Stark Law, AKS, FCA, and/or OKFCA. As a result, all Government reimbursements to Integris resulting from referrals from SOS Doctors from at least August 2014 to present were improper. Additionally, all Government reimbursements to the SOS Defendants resulting from ISMC Emergency Room ("E.R.") referrals were improper. Specifically, the SOS Defendants and the Integris Defendants entered into an unlawful contract for exclusive E.R. orthopedic call services (the "E.R. Call

Scheme"). While the contract may have been facially compliant, Integris imposed an unwritten but mutually-agreed condition before excluding other orthopedists and giving the SOS Doctors exclusivity: that the SOS Doctors were to "do more volume there." The SOS Doctors complied readily, resulting in a clear *quid pro quo* Stark and AKS violation. Defendants structured an unlawful contract for E.R. exclusivity whereby Integris offered the SOS doctors exclusive rights to perform E.R. services in an Integris facility, and in exchange, the SOS Doctors traded performing more non-trauma, elective surgeries at Integris.

12.     **The SOS Defendants' Direct Submission of False Claims**: Finally, the SOS Defendants used two additional Schemes to defraud the Government through the direct submission of false claims for reimbursement. While these direct fraudulent reimbursement Schemes likely resulted in fewer false claims than those outlined above, the existence of these independent Schemes in the milieu of the pervasive improper financial relationships and kickbacks between the SOS Defendants and the OCOM Defendants further confirms the SOS Doctors' knowing, greed-driven approach to medical practice and their blatant disregard for federal and Oklahoma law.

a.     **The Ultrasound Scheme**: Defendants submitted false claims for ultrasound needle guidance that was (1) performed when not medically necessary; (2) never actually performed; or (3) performed by a Physician Assistant ("P.A.") without the required supervision (the "Ultrasound Scheme");

b.     **The Levings P.A. Scheme**: The SOS Defendants fraudulently billed for Levings' P.A. services, which were never actually provided (the "Levings P.A.

Scheme").

13.     **The SOS Doctors' Other Wrongful Conduct**: Throughout the Complaint,

Relator describes additional wrongful conduct by the SOS Doctors related to the practice

of medicine and compliance with state and federal law. This misconduct both (a) supports

Relator's allegation that certain Defendants retaliated against him in reprisal for his attempt

to ensure compliance and proper claims protocol; and (b) provides an additional basis for

recovery under the FCA and OKFCA. For example, many of the SOS Doctors frequently

pre-signed their prescription pads in blatant violation of the law. They used "cheat sheets"

to coach their staff to circumvent preauthorization screenings and expedite high-value

reimbursements. Throughout his tenure, Relator cautioned Defendants about the potential

for fraud inherent to their bad acts. Ultimately, this earned him nothing less than an abrupt

termination without either a reason or payment of amounts due him at termination.

14.     **Defendants' Scienter**: Defendants had notice of the illegality of their

conduct for many years. CMS provided Defendants—as certified medical providers and

facilities—with countless regulatory and compliance advisories.[10] The Government

charged Defendants with knowledge of the relevant laws impacting their provision of

federally-reimbursed services. Defendants frequently certified their compliance with those

---

[10] The Center for Medicare and Medicaid Services ("CMS") is the federal agency within
the U.S. Department of Health and Human Services that administers the Medicare program
and partners with state governments to administer Medicaid, the Children's Health
Insurance Program, and health insurance portability standards. Examples of CMS
regulation and guidance are available at https://www.cms.gov/Regulations-and-
Guidance/Regulations-and-Guidance.html (last visited March 22, 2018).

laws, including when they sought partial reimbursement for the cost of implementing a certified electronic medical records system. Additionally, Relator, as SOS's business administrator, repeatedly informed SOS about the potential for fraud in their wrongful practices. In response to these warnings, the SOS and OCOM Defendants retaliated against Relator by harassing, demoting, and ultimately terminating him. SOS immediately replaced Relator with the former CEO of Integris, with whom the SOS Doctors previously orchestrated the exclusive orthopedic E.R. Call services agreement.[11]

15.    **Tenet's Non-Prosecution Agreement**: Defendant Tenet Healthcare Corporation ("Tenet") acquired significant ownership of the OCOM Defendants in mid-2015 (through its purchase of USPH). Shortly thereafter, on September 30, 2016, Tenet entered into a Consent Decree and NPA with the Department of Justice in response to unrelated, but similar, violations of the healthcare integrity laws.[12] The NPA obligates Tenet and its "affiliates and subsidiaries, or any of their present or former officers, directors, employees, agents, and consultants" to report promptly any "evidence or allegations of actual or potential" AKS violations to the U.S. Attorney's Office and/or its appointed compliance monitor. Further, the NPA obligates Tenet to a heightened diligence in acquiring and operating healthcare practices. All OCOM Defendants are subject to the

---

[11] The SOS Defendants further retaliated against Relator by filing a harassing lawsuit against him in state court under the suspicion that he had filed this FCA claim. As detailed in Section V.F., *infra*, Defendants have taken great steps to silence Relator and keep secret their many knowing violations. In doing so, these Defendants breached Relator's employment agreement and further violated the FCA and OKFCA.

[12] *See* Section IV ("Legal Framework"), *infra*.

terms of the NPA after Tenet's purchase of USPH. Tenet and the other OCOM Defendants

stand in violation of that NPA. As explained below, Tenet likely acquired full knowledge

of the fraud centered around the SOS Defendants and OCOM and subsequently either

failed to disclose it or actually took action to conceal it. This failure violated the NPA and

further violated the FCA and OKFCA.

**B.    IMPACT OF DEFENDANTS VIOLATIONS OF THE STARK LAW, AKS, FCA, AND OKFCA**

16.    The SOS Defendants stand at the center of the various improper financial

relationships and kickbacks that form the basis of Relator's Complaint. The following

Tables I summarizes the improper financial relationships and kickbacks that exist or

existed between the SOS Defendants and other Defendants:

| Table I: Improper Financial Relationships and Kickbacks that Violate the Stark Law, AKS, FCA, and/or OKFCA | | | | |
|---|---|---|---|---|
| **Defendants Involved** | **Improper Financial Relationship &/or Kickbacks** | **Applicable Years** | **Applicable Statutes** | **Relator's Damage Estimate** |
| The SOS & OCOM defendants; tainted referrals of federally-reimbursed healthcare services to OCOM | Equity Scheme | 2012 to Present | Stark, AKS, FCA, & OKFCA | Single damages of $100 to $150 million from 2007 through 2017. |
| | Employment Contract Scheme | 2007 to 2017 | Stark, AKS, FCA, & OKFCA | |
| | Surgery Scrub Scheme | 2004 to Present | Stark, AKS, FCA, & OKFCA | |
| | Sham Lease Scheme | 2015 | Stark, AKS, FCA, & OKFCA | |
| | Office Space Scheme | 2007 to Present | Stark, AKS, FCA, & OKFCA | |
| | Credit Card Scheme | At Least 2011 | Stark, AKS, FCA, & OKFCA | |

| Table I: Improper Financial Relationships and Kickbacks that Violate the Stark Law, AKS, FCA, and/or OKFCA (Continued) | | | | |
|---|---|---|---|---|
| **Defendants Involved** | **Improper Financial Relationship &/or Kickbacks** | **Applicable Years** | **Applicable Statutes** | **Relator's Damage Estimate** |
| The SOS & OCOM Defendants; formation, ownership of APO | Anesthesia Company Scheme | 2016 | Stark, AKS, FCA, & OKFCA | Single damages of $1.5 million from Gov. reimbursement to APO |
| USPI & USPH; formation, ownership of UAP entities nationally | National Anesthesia Company Scheme | From at least 2012 to 2016 | Stark, AKS, FCA, & OKFCA | Up to approx. $30 million per year for Gov. reimbursement to other USP formed & managed anesthesia companies. |
| The SOS & Integris Defendants; tainted referrals of federally-reimbursed healthcare services to Integris South Oklahoma City Hospital | E.R. Call Scheme | 2014 to Present | Stark, AKS, FCA, & OKFCA | Single damages of $5.05 million from Gov. reimbursement to Integris. |

17.     The SOS Defendants also engaged in separate healthcare fraud in violation of the FCA and OKFCA through the Ultrasound Scheme and the Levings P.A. Scheme. The following Table II summarizes the SOS Defendants' independently perpetrated Schemes:

| Table II: Independent Schemes that Violate the FCA and OKFCA | | | | |
|---|---|---|---|---|
| **Defendants Involved** | **Description of Scheme** | **Applicable Years** | **Applicable Statutes** | **Relator's Damages Estimate** |
| The SOS Defendants | Ultrasound Scheme | 2013 to 2014 | FCA & OKFCA | $250,000 in single damages attributable to the Ultrasound Scheme[13] |
| The SOS Defendants | Levings P.A. Scheme | 2014 to 2016 | FCA & OKFCA | $500,000 in single damages from Governmental reimbursements to SOS. |

18.     Relator estimates single damages of $100 to $150 million from tainted referrals pursuant to the Equity, Employment Contract, Surgical Scrub, Sham Lease, Office Space, and Credit Card Schemes from SOS Doctors to OCOM from 2007 through 2017 (recognizing that some of these schemes overlap chronologically and, therefore, are cumulative). Relator estimates $1.5 million *per year* in single damages from Governmental reimbursements to APO pursuant to the Anesthesia Scheme, and another estimated $30 million per year from the analogous anesthesia companies formed and managed by USPI and USPH in other states through one or more affiliates. Relator estimates $5.05 million in single damages from Governmental reimbursements to Integris pursuant to the E.R. Call Scheme. Relator estimates $250,000 in single damages attributable to the Ultrasound Scheme. Relator estimates $500,000 in single damages from Governmental

---

[13] From December 2012 through February 2014, the SOS Doctors and their PA's employed the Ultrasound Scheme approximately 4,500 times, on over 1,500 federal healthcare program patients, and submitted claims for and received over $750,000 in total reimbursement for CPT 76942, with over $250,000 of that from federal healthcare programs.

reimbursements to SOS pursuant to the Levings P.A. Scheme. In sum, Relator estimates that a conservative single damages estimate may be as high as $158,000,000, subject to FCA/OKFCA trebling and damages for knowing submission of false claims.

19.    Relator has made these allegations from his direct and independent knowledge of Defendants' fraud, which he acquired while employed as Defendant SOS's Administrator and Business Manager from April 2002 until his retaliatory termination in January 2017. Relator filed his original *qui tam* complaint against the Defendants while still in their employ in May 2016.

## II.    PARTIES

### A.    RELATOR

20.    Relator WAYNE ALLISON ("Relator") is citizen of the United States who resides in the State of Oklahoma. Relator served as Administrator of Defendant Southwest Orthopaedic Specialists, PLLC, from April 2002 until January 2017 in either a full time, part time, or contractual capacity.

21.    During Relator's tenure with SOS, Relator personally financed his legal education and attended Oklahoma City School of Law at night. He graduated *Summa Cum Laude* in December 2007 and was admitted to the Oklahoma Bar in April 2008. Relator is a member in good standing of the Oklahoma Bar.

22.    At no time has Relator undertaken legal representation of or entered into an attorney-client relationship with any of the corporate Defendants on matters relevant to this

Complaint.[14] To the extent Relator may have participated in any confidential conversations with outside counsel through his employment with SOS either before or after becoming a licensed attorney, Relator has not disclosed those conversations herein. Any legal representation Relator undertook for certain individual Defendants involved completely unrelated and discrete matters; Relator acquired no confidential information nor derived any part of the allegations and disclosures herein from such representation. However, even if Relator has disclosed confidential information herein, pursuant to Relator's employment agreement with SOS, Relator never had an attorney-client relationship with the SOS Defendants and/or the SOS Defendants disclaimed any attorney-client privilege which may have otherwise arisen. Finally, even if Relator has disclosed confidential information herein, he has done so permissibly to prevent, mitigate, and rectify Defendants' fraud upon the federal healthcare programs pursuant to Rule 1.6 of the Oklahoma Rules of Professional Conduct and as provided under 12 O.S § 2502(D).

23.     Through Relator's employment with Defendants and his personal investigation, Relator acquired direct personal knowledge of and non-public information about Defendants' fraud.

**B.    DEFENDANTS**

24.     Defendants to this action include healthcare corporations and the individuals

---

[14] As detailed in Section V.F., *infra*, Relator's employment agreement expressly acknowledged that he was not acting as attorney for SOS or the SOS Doctors' attorney, and SOS expressly disclaimed any attorney-client relationship or privilege by signing the employment agreement.

perpetuating fraud through them.

### 1.    Corporate Defendants

25.    The corporate defendants include the physicians group under which the individual physicians practice, the hospital that various individual and organizational defendants own, and the entities that own a portion of that hospital.

26.    Defendant SOUTHWEST ORTHOPAEDIC SPECIALISTS, PLLC ("SOS") is a professional limited liability company organized under the laws of Oklahoma. SOS is the physician's group under which the individual physician Defendants practice and perform medical services. SOS operates as a partnership between the SOS Doctors; each SOS Doctor receives monthly compensation in an amount proportional to the receipts each generated that month. Each Doctor is obligated to pay the same proportion of the month's operational costs as determined by each Doctor's proportional share of monthly receipts. The SOS financial relationship between the Doctors operates on the aggregate of operational costs without attributing each individual Doctor's actual overhead cost to that Doctor; thus, when a particular Doctor generates additional receipts, all SOS Doctors derive a financial benefit. SOS is a credentialed and contracted provider for federal healthcare programs and routinely submits claims for payment to those programs directly and/or on behalf of the SOS medical providers. According to data published by the U.S. Centers for Medicare & Medicaid Services ("CMS"), the SOS Doctors submitted at least 74,847 claims for payment for a subset of Medicare beneficiaries for the years from 2012-

2015.[15] SOS has appeared for all purposed through its counsel of record.

27.    Defendant    OKLAHOMA    CENTER    FOR    ORTHOPAEDIC    &

MULTISPECIALTY SURGERY, LLC ("OCOM") is a limited liability corporation

organized under the laws of Oklahoma. OCOM is a licensed hospital in Oklahoma. OCOM

is managed under contract by Defendant USP, a subsidiary of Defendant Tenet, and as such

is subject to the terms and obligations provided by the Tenet's NPA and Monitor. OCOM

is a single-member LLC, with its single member being Southwest Ambulatory Surgery

Center, PLLC ("SASC"), the entity in which certain Defendants hold beneficial ownership

and/or management control.[16] OCOM provides designated health services, which include

inpatient and outpatient services, surgery, imaging, and physical therapy to beneficiaries

of federal healthcare programs,[17] commercial-sponsored health insurance programs, and

patients who are self-insured or uninsured.[18]   OCOM is a credentialed and contracted

---

[15] CMS-produced data available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/index.html,   is limited in scope, may or does not include other government-paid programs (*e.g.*, Medicaid, Tricare, Medicare Advantage), and the numbers indicated herein include only SOS Doctors (*i.e.*, not SOS P.A.s).

[16] Defendants with ownership in "OCOM" have that ownership indirectly through their ownership in SASC.

[17] Designated Health Services ("DHS") include "inpatient and outpatient hospital services," "radiology and certain other imaging services," "physical therapy, occupational therapy, and outpatient speech-language pathology services," and "clinical laboratory services," and that are "payable, in whole or in part, by Medicare." 42 C.F.R. § 411.351.

[18] Federal and State health insurance programs include Medicare, Medicaid, Tricare/Champus, Soonercare, InsureOklahoma, BCBS Federal, and other such programs paid for in full or part with Federal and/or State funds.

provider for federal healthcare programs and routinely submits claims for payment to those programs. According to data published by CMS, OCOM submitted *at least* 11,370 claims for payment for Medicare beneficiaries for the years from 2011-2015.[19] OCOM may be served through its registered agent for service of process, The Corporation Company, at 1833 S. Morgan Road, Oklahoma City, Oklahoma 73128.

28.     Defendant USP OKLAHOMA, INC. ("USP") is a for-profit corporation organized under the laws of Oklahoma with its principal place of business in Oklahoma. USP operates under contract as the management company for OCOM and holds an ownership interest in OCOM through one or more affiliated entities. USP's Oklahoma Secretary of State Filing number is 1900688298. USP is a majority-owned subsidiary of Defendant Tenet. USP holds a seat on the OCOM board and provides management services to OCOM, subjecting it to the terms and obligations of the Tenet NPA and Monitor. USP may be served through its registered agent for service of process, The Corporation Company, at 1833 S. Morgan Road, Oklahoma City, Oklahoma 73128.

29.     Defendant USPI HOLDING COMPANY, INC. ("USPH") is a Delaware corporation with its principal place of business in Dallas, Texas. According to Defendant

---

[19] This data represents only a subset of Medicare beneficiaries and is limited in scope. CMS-produced data available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/index.html, is limited in scope, may or does not include other government-paid programs (e.g., Medicaid, Tricare, Medicare Advantage), and the numbers indicated herein include only that reported by CMS ("the data is limited to only a select number of APCs [Ambulatory Payment Classification Groups] and thus does not necessarily include all Medicare outpatient procedures from a given hospital.").

Tenet's 2017 SEC Form 10-k filing, Tenet owns 95% of USPI Holding Company, Inc. All other USP-related entities are subsidiaries of USP Holding Company, Inc. (including the following Defendants: APO, USP Oklahoma, UAP Oklahoma, and OCOM). USPH is listed as a subsidiary of Tenet in Tenet's SEC 10-K and as such is subject to the terms and obligations of the Tenet NPA and Monitor. USPH may be served through its registered agent for service of process, The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

30.     Defendant UNITED SURGICAL PARTNERS INTERNATIONAL, INC. ("USPI") is a Delaware corporation with its principal place of business at 15305 Dallas Parkway, Suite 1600 in Addison, Texas. USPI owns and operates short-stay surgical facilities which are licensed as either ambulatory surgery centers, specialty hospitals or hospitals. In April 2015, USPI and Defendant Tenet Healthcare entered into an agreement to create the nation's largest ambulatory surgery platform. The transaction was finalized in June 2015. USPI is listed as a subsidiary of Tenet in Tenet's SEC 10-K and as such is subject to the terms and obligations of the Tenet NPA and Monitor. USPI may be served through its registered agent for service of process, The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

31.     Defendant UAP OF OKLAHOMA, INC. ("UAP") is a for-profit corporation organized under the laws of Oklahoma with its principal place of business in Oklahoma. UAP is a subsidiary of and owned by USP. UAP is a founder, owner, and manager of APO. UAP is listed as a subsidiary of USP and Tenet in Tenet's SEC 10-K and as such is subject to the terms and obligations of the Tenet NPA and Monitor. UAP may be served through

its registered agent for service of process, The Corporation Company, at 1833 S. Morgan Road, Oklahoma City, Oklahoma 73128.

32.     Defendant ANESTHESIA PARTNERS OF OKLAHOMA, LLC ("APO"), the anesthesia company, is a limited liability company organized in the State of Oklahoma. APO was formed and owned by the SOS Doctors, UAP, and Defendant Kimzey. APO is a credentialed and contracted provider for federal healthcare programs and routinely submits claims for payment to those programs. APO is listed as a subsidiary of USP and Tenet in Tenet's SEC 10-K and as such is subject to the terms and obligations of the Tenet NPA and Monitor. APO may be served through its registered agent for service of process, The Corporation Company, at 1833 S. Morgan Road, Oklahoma City, Oklahoma 73128.

33.     Defendant TENET HEALTHCARE CORPORATION ("Tenet") is a Nevada corporation with its principal place of business in Dallas, Texas. Tenet, through its many subsidiaries, owns and operates hospitals throughout the United States and in Oklahoma.[20] Tenet directly or via an affiliate or subsidiary acquired ownership of USP, and thus acquired ownership and management control of OCOM via and/or through one or more affiliated entities. Tenet is a public company traded on the New York Stock Exchange under the symbol "THC." Tenet is presently subject to a NPA with the Government entered into on September 30, 2016, to resolve criminal investigation and civil litigation wherein Tenet paid to the Government over $500 million and committed to continue to enhance their compliance and ethics program and internal controls, including ensuring that their

_____

[20] As listed on Tenet's recent 10-K SEC filing dated Feb. 26, 2018.

compliance program is designed and implemented to prevent and detect violations of the AKS.[21] Pursuant to the NPA, Tenet and its subsidiaries have affirmative duties and obligations which are applicable to present or former officers, directors, employees, agents and consultants. The following Defendants are all subsidiaries and/or former officers, directors, employees, agents and consultants of Tenet, and therefore subject to the terms of the NPA: OCOM; USP, USPI, USP Holding Company, Inc., UAP, Kimzey and Hendley as the current and former OCOM CEO; Cruse and Langerman as OCOM Board Members; OCOM owners; and the SOS doctors as APO (anesthesia company) and OCOM owners and partners with USP in APO and OCOM. Tenet may be served through its registered agent for service of process, The Corporation Trust Company of Nevada, at 701 S. Carson Street Suite 200, Carson City, Nevada, 89701.

34.     Defendant INTEGRIS AMBULATORY CARE CORPORATION ("Integris") is a for-profit corporation organized under the laws of Oklahoma with its principal place of business in Oklahoma. Integris operates as a subsidiary within the Integris healthcare system in Oklahoma and holds ownership interest in OCOM via and/or through one or more affiliated entities. Integris holds a seat on the OCOM board and as such is subject to the terms and obligations provided by the Tenet NPA and Monitor. Integris is a credentialed and contracted provider for federal healthcare programs and routinely submits claims for payment to those programs. Integris may be served at 3366 NW Expressway Suite 800, Physicians Building D, Oklahoma City, OK 73112.

---

[21] Tenet U.S. Securities and Exchange Commission Filing Form 8-K, September 30, 2016.

35.     Defendant INTEGRIS SOUTH OKLAHOMA CITY HOSPITAL CORPORATION ("ISMC") is a non-profit corporation organized under the laws of Oklahoma with its principal place of business in Oklahoma. ISMC does business as Integris Southwest Medical Center and is a subsidiary within the Integris healthcare system in Oklahoma. ISMC is a credentialed and contracted provider for federal healthcare programs and routinely submits claims for reimbursement to those programs. ISMC may be served at 3366 NW Expressway Suite 800, Physicians Building D, Oklahoma City, OK 73112.

### 2.     SOS Doctor Defendants

36.     The following Defendants (collectively, "SOS Doctors") are the physician-members of the SOS Doctors group: Cruse, Langerman, Jones, Adham, West, Levings, Hume, Reddick, and Avant.[22] Each SOS Doctor is citizen of Oklahoma.

37.     Defendant ANTHONY L. CRUSE, D.O. ("Cruse," an "SOS Doctor") is an individual physician who practiced at SOS, held ownership in SOS, served as a board member of SOS, holds ownership in OCOM and APO, serves as a board member and Chairman of the Board of Managers of OCOM, serves as Medical Director of OCOM, and throughout the relevant period referred federal healthcare program patients to OCOM.[23] Cruse, as a Board Member, Chairman of the OCOM Board, and Medical Director, is an officer and agent of OCOM and as such is subject to the terms and obligations of the Tenet

---

[22] Hume left SOS on November 30, 2015, but was an SOS Physician at all times before that and was equally involved, participated in, and benefited from the unlawful schemes complained of herein.

[23] Cruse retired in May 2016 and no longer conducts a medical practice or performs surgery. Subsequent to his retirement, Cruse relinquished his ownership in SOS in 2016.

Non-Prosecution Agreement and Monitor. Cruse is a credentialed and contracted provider for federal healthcare programs and routinely submitted claims for payment to those programs. Cruse has appeared for all purposed through its counsel of record.

38.    Defendant RICHARD JAMES LANGERMAN, JR., D.O. ("Langerman," an "SOS Doctor") is an individual physician who practices at SOS, holds ownership in SOS, serves as a board member of SOS, holds ownership in OCOM and APO, serves as a board member of OCOM, and throughout the relevant period referred federal healthcare program patients to OCOM. Langerman, as a Board Member of the OCOM Board, is an officer and agent of OCOM and as such is subject to the terms and obligations of the Tenet Non-Prosecution Agreement and Monitor. Langerman is a credentialed and contracted provider for federal healthcare programs and routinely submits claims for payment to those programs. Langerman has appeared for all purposed through its counsel of record.

39.    Defendant DANIEL J. JONES, M.D. ("Jones," an "SOS Doctor") is an individual physician who practices at SOS, holds ownership in SOS, holds ownership in OCOM, and throughout the relevant period referred federal healthcare program patients to OCOM. Jones is a credentialed and contracted provider for federal healthcare programs and routinely submits claims for payment to those programs. Jones has appeared for all purposed through its counsel of record.

40.    Defendant MEHDI ADHAM, M.D. ("Adham," an "SOS Doctor") is an individual physician who practices at SOS, holds ownership in SOS, holds ownership in OCOM and APO, and throughout the relevant period referred federal healthcare program patients to OCOM. Adham is a credentialed and contracted provider for federal healthcare

programs and routinely submits claims for payment to those programs. Adham has appeared for all purposed through its counsel of record.

41.     Defendant DEREK WEST, D.O. ("West," an "SOS Doctor") is an individual physician who practices at SOS, holds ownership in SOS, serves as a board member of SOS, holds ownership in OCOM and APO, and throughout the relevant period referred federal healthcare program patients to OCOM. West is a credentialed and contracted provider for federal healthcare programs and routinely submits claims for payment to those programs. West has appeared for all purposed through its counsel of record.

42.     Defendant BRIAN LEVINGS, D.O. ("Levings," an "SOS Doctor") is an individual physician who practices at SOS, holds ownership in SOS, holds ownership in OCOM and APO, and throughout the relevant period referred federal healthcare program patients to OCOM. Levings is a credentialed and contracted provider for federal healthcare programs and routinely submits claims for payment to those programs. Levings has appeared for all purposed through its counsel of record.

43.     Defendant CHRISTOPHER SHANE HUME, D.O. ("Hume," an "SOS Doctor") is an individual physician who formerly practiced at SOS, was formerly an SOS Doctor, formerly held ownership in OCOM, and throughout the relevant period referred federal healthcare program patients to OCOM. Hume is a credentialed and contracted provider for federal healthcare programs and routinely submits claims for payment to those programs. Hume may be served at his place of business, 3115 S.W. 89th Street, Oklahoma City, Oklahoma 73159.

44.     Defendant BRAD REDDICK, D.O. ("Reddick," an "SOS Doctor") is an individual physician who practices at SOS, holds ownership in SOS, serves as a board member of SOS, holds ownership in OCOM and APO, and throughout the relevant period referred federal healthcare program patients to OCOM. Reddick is a credentialed and contracted provider for federal healthcare programs and routinely submits claims for payment to those programs. Reddick has appeared for all purposed through his counsel of record.

45.     Defendant KRISTOPHER AVANT, D.O. ("Avant," an "SOS Doctor") is an individual physician who practices at SOS, holds ownership in SOS, serves as a board member of SOS, holds ownership in OCOM and APO, and throughout the relevant period referred federal healthcare program patients to OCOM. Avant is a credentialed a contracted provider for federal healthcare programs and routinely submits claims for payment to those programs. Avant has appeared for all purposed through its counsel of record.

**3.      Non-SOS Individual Defendants**

46.     Defendant Steve Hendley ("Hendley") is an executive manager at and employee of USP. Hendley is the former CEO of OCOM, who left the position in 2014. He is Certified Public Accountant. Hendley, as an employee of USP and former CEO of OCOM, is subject to the terms and obligations of the Tenet NPA and Monitor. Hendley may be served at his residence, 6009 Chestnut Court, Edmond, Oklahoma 73025.

47.     Defendant Michael Kimzey ("Kimzey") is a USP employee and the current Chief Executive Officer of OCOM. Kimzey holds ownership in APO. Kimzey became the OCOM CEO in 2014. From 2004 until 2014, Kimzey was CEO of Southwest Oklahoma

30

MRI ("SWMRI"), a freestanding radiology diagnostic facility. Cruse and Langerman had significant ownership of SWMRI, along with nearly fifty other physicians. OCOM acquired SWMRI in 2014, made it a department of OCOM, and made Kimzey OCOM's new CEO. This purchase allowed OCOM's owning doctors to refer government patients to SWMRI. Kimzey, as an employee of USP and CEO of OCOM, is subject to the terms and obligations of the Tenet NPA and Monitor. Kimzey may be served at OCOM, his place of employment, at 8100 S. Walker Avenue, Oklahoma City, Oklahoma 73158.

## C.   IDENTIFICATION OF DEFENDANT GROUPS

48.   This Complaint organizes Defendants into the following groups:

a.   The "SOS Defendants" are SOS together with all the SOS Doctors.

b.   The "OCOM Defendants" are OCOM, USP, USPI, USPH, Tenet[24], Integris[25], UAP[26], APO[27], Hendley[28], and Kimzey[29].

c.   The "Integris Defendants" are Integris and ISMC.

---

[24] Tenet is an OCOM Defendant with respect to the time period approximately August 2015 to Present.

[25] Integris is an OCOM Defendant with respect to the Equity, Employment Contract, Surgical Scrub, Sham Lease, Office Space and Credit Card Schemes only.

[26] Defendant UAP is an OCOM Defendant with respect to the Anesthesia Company Scheme only.

[27] Defendant APO is an OCOM Defendant with respect to the Anesthesia Company Scheme only.

[28] Hendley is an OCOM Defendant with respect to the time period from 2002 to present.

[29] Kimzey is an OCOM Defendant with respect to the time period 2014 to present.

### III. JURISDICTION AND VENUE

49.     This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and (b), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

50.     Relator brings this action under the FCA, 31 U.S.C. § 3729, *et seq*., to recover treble damages, civil penalties, and costs of suit, including reasonable attorneys' fees and expenses. Relator has authority to bring this action and his claim on behalf of the United States pursuant to 31 U.S.C. §§ 3730(b) and 3730(e)(4). Relator satisfied all conditions precedent to his participation as Relator. Pursuant to 31 U.S.C. § 3730(e)(4)(A), the allegations contained herein have not been publicly disclosed as defined by the FCA, or alternatively, Relator qualifies as an "original source" within the meaning of 31 U.S.C. § 3730(e)(4)(A) and (B). Pursuant to 31 U.S.C. § 3730(e)(4)(B), Relator voluntarily provided in writing to the Attorney General of the United States and the United States Attorney for the Western District of Oklahoma substantially all material evidence and information in Relator's possession upon which these allegations are based. In accordance with 31 U.S.C. § 3730(b)(2), Relator served the United States pursuant to Federal Rule of Civil Procedure 4 and filed his original and first amended complaints *in camera*. Relator complied with all state law procedural requirements.

51.     This Court has jurisdiction over Relator's state law claims pursuant to 31 U.S.C. § 3732, as those claims arise from the same transaction or occurrence as Relator's claim under § 3729, *et seq*. Additionally, this Court has supplemental jurisdiction over Relator's state law claims pursuant to 28 U.S.C. § 1367(a), because those claims form part

of the same case or controversy under Article III of the United States Constitution as Relator's claims under the federal FCA.

52.     This Court may exercise personal jurisdiction over all Defendants. Upon information and belief, SOS, OCOM, Integris, ISMC, USP, AOP, and UAP were incorporated under the laws of Oklahoma and maintain their principal place of business within the State, thereby subjecting themselves to this Court's jurisdiction. USPH, USPI, and Tenet purposefully direct their services at the State of Oklahoma, thereby purposefully availing themselves of the privilege of conducting business within the State and invoking the benefits and protections of its laws. This action arises out of that conduct. This Court's exercise of jurisdiction over USPH, USPI, and Tenet does not offend traditional notions of fair play and substantial justice. Upon information and belief, the SOS Doctor Defendants and Individual Defendants are domiciled in Oklahoma, thereby subjecting themselves to this Court's jurisdiction.

53.     Venue is proper in the Western District of Oklahoma pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)-(c). One or more of the Defendants can be found, reside, and/or transact business within the geographic boundaries of this District. Additionally, one or more of the Defendants committed acts proscribed by 31 U.S.C. § 3729, *et seq.* in the judicial District by perpetrating the schemes described herein within this District.

## IV.     LEGAL FRAMEWORK

54.     The allegations set forth above are hereby incorporated as if fully set forth herein.

55.     Relator's claims rest on the interplay of the Federal False Claims Act, Stark Law, Anti-Kickback Statute, applicable Oklahoma state law analogues, and the special legal duties and obligations pursuant to Tenet's NPA. Together, these laws protect the integrity of Medicare, Medicaid, and the other federal healthcare programs. These laws ensure that physicians base their referrals of federally-reimbursed patients and services on the patients' best interests, not their own profit or enrichment. Defendants' conduct violated these laws, defrauded the federal and Oklahoma governments, and disrupted the integrity of the federal healthcare programs.

## A.     THE FEDERAL FALSE CLAIMS ACT

56.     The Federal False Claims Act (31 U.S.C. § 3729, *et seq.*) ("FCA") provides, in pertinent part:

> (a)(1) [a]ny person who (A) knowingly  presents, or causes to be presented a false or fraudulent claim for payment or approval; (B) knowingly  makes, uses, or causes to be made or used, a false record or statement  material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property … or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government ...

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of that person.

* * *

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.[30]

## B.   THE STARK LAW

57.     The Stark Law (42 U.S.C. § 1395nn(a)(1)) prohibits entities from submitting claims to federal healthcare programs for patient services referred by a physician with whom the referred-to provider has an impermissible "financial relationship." Congress designed the Stark Law to remove monetary influences from physicians and their referral decisions, and thereby protect federal healthcare programs from paying for the cost of questionable utilization of services. The Stark Law establishes a presumptive, strict-liability rule that referred-to providers may not bill, and federal healthcare programs will not reimburse, for certain health care services generated by a referral from a physician with whom the referred-to provider has a financial relationship.

58.     In relevant part, the Stark Law states: (a) Prohibition of certain referrals

(1)     In general
Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then -

---

[30] Congress amended the FCA pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009. Given the nature of the claims at issue, Sections 3279(a)(1) and 3279(a)(7) of the prior statute, and Section 3729(a)(1)(A) and 3729(a)(1)(G) of the revised statute are all applicable here. Sections 3729(a)(1) and 3729(a)(7) apply to conduct that occurred before FERA was enacted, and sections 3729(a)(1)(A) and 3729(a)(1)(G) apply to conduct after FERA was enacted. Section 3729(a)(1)(B) is applicable to all claims in this case by virtue of Section 4(f) of FERA, which makes the new changes to that provision applicable to all claims for payment pending on or after June 7, 2008.

(A)    the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B)    the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third-party payor, or other entity for designated health services furnished pursuant to a referral prohibited under sub paragraph (A).

* * * * *

(g)    Sanctions

(1)    Denial of payment
No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(l) of this section.

(2)    Requiring refunds for certain claims
If a person collects any amounts that were billed in violation of subsection (a)(1) of this section, the person shall be liable to the individual for, and shall refund on a timely basis to the individual, any amount so collected.

42 U.S.C. § 1395nn(a), (g).

59.    The Stark Law broadly defines "financial relationship" to include any physician ownership or investment interest in the referred-to entity, or a "compensation arrangement" between the referred-to entity and the referring physician. 42 U.S.C. § 1395nn(a)(2). "Compensation arrangement" is broadly defined to mean "**any** arrangement involving **any** remuneration between a physician . . . and an entity." "Remuneration" broadly means "**any** remuneration, directly or indirectly, overtly or covertly, in cash or in-kind." 42 U.S.C. 1395nn(h)(l)(A), (B), 42 C.F.R. § 411.354 (emphasis added).

60.    Under the Stark Law, a physician "referral" includes establishing a plan of care or certifying a patient for healthcare services. 42 U.S.C. §1395nn(h)(5)(B). The Stark Law is a strict liability statute and promulgated regulations, with 42 C.F.R. § 411.353(a)

stating that "a physician who has a direct or indirect financial relationship with an entity

… **may not make a referral** to that entity for the furnishing of [DHS] for which payment

otherwise may be made under Medicare." Section 411.353(b) states that an "entity that

furnishes DHS pursuant to a referral that is prohibited by paragraph (a) of this section **may**

**not present or cause to be presented** a claim or bill to the Medicare program or to any

individual, third party payer, or other entity for the DHS performed pursuant to the

prohibited referral" (emphasis added).

61.     Similar to the AKS, there are statutory and regulatory Safe Harbors to the

Stark Law permitting certain financial relationships between health care providers and

physicians. 42 U.S.C. §1395nn(b); 42 C.F.R. § 411.350 - § 411.389. These Safe Harbors

protect arrangements from creating liability under the statute. An arrangement must strictly

satisfy all applicable conditions for protection. Once the plaintiff demonstrates that the

Stark Law applies and establishes a *prima facie* case, the burden shifts to the defendant to

prove that the conduct is within one of the Safe Harbor exceptions.

62.     Falsely certifying compliance with the Stark Law is a material consideration

of federal healthcare program administration for reimbursing claims.

63.     Relator has standing to pursue Stark Law violations in this action.

Notwithstanding subsection (b), the Government may elect to pursue its
claim through any alternate remedy available to the Government, including
any administrative proceeding to determine a civil money penalty. If any
such alternate remedy is pursued in another proceeding, the person initiating
the action shall have the same rights in such proceeding as such person would
have had if the action had continued under this section. Any finding of fact
or conclusion of law made in such other proceeding that has become final
shall be conclusive on all parties to an action under this section. For purposes
of the preceding sentence, a finding or conclusion is final if it has been finally

> determined on appeal to the appropriate court of the United States, if all time
> for filing such an appeal with respect to the finding or conclusion has expired,
> or if the finding or conclusion is not subject to judicial review.

31 U.S.C. § 3730(c)(5). Violation of the Stark Law submits the defendant to strict liability for single damages and civil penalties for each and every reimbursement claim sent to the government pursuant to the tainted referral.

64. Reimbursement claims submitted pursuant to a knowing (as broadly defined in the FCA and OKFCA) violation of the Stark Law are false and/or fraudulent claims under the FCA and OKFCA. Defendants' continued participation in federal healthcare programs constitutes an express and implied certification that they will abide by and adhere to all statutes, rules, and regulations governing those programs. Defendants' submission of claims for reimbursement related to or derived from their knowing violation of the Stark Law violates this express and implied certification of continued adherence to the requirements for participation in the program.[31] Further, Medicare only pays for "covered services." 42 C.F.R. §424.5(a). A "covered service" includes, by definition, only services that were furnished by a supplier "that was, at the time it furnished the services, qualified to have payment made to them." 42 C.F.R. §424.5(a)(2).[32] When the defendants violated

---

[32] Similarly, the Medicaid Statute, 42 U.S.C. § 1396b(s), titled "Limitations on certain physician referrals," provides that "no payment shall be made to a State under this section for expenditures for medical assistance under the State plan consisting of a designated health service (as defined in [the Stark Law]) furnished to an individual on the basis of a referral that would result in the denial of payment for the service under subchapter XVIII of this chapter if such subchapter provided for coverage of such service to the same extent and under the same terms and conditions as under the State plan." 42 U.S.C. § 1396b(s).

anti-kickback and anti-referral laws, they became ineligible to receive payment. Because the defendants were not eligible for payment at the time they rendered the services, Medicare regulation §424.5 prescribes that those services are noncovered. Claims for noncovered services are in and of themselves false.

65.     The Oklahoma Medicaid ("Soonercare") General Provider Agreement requires that providers under the State Medicaid plan "comply with and certify compliance with […] Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq*.[33] Section 1396b(s) prohibits, *inter alia*, payments to the State for claims submitted in violation of the Stark Law.[34]

## C.     THE ANTI-KICKBACK STATUTE

66.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), arose out of congressional concern that remuneration provided to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or harmful to a vulnerable patient population. To protect the integrity of federal healthcare programs from these harms, Congress enacted a prohibition against the payment of kickbacks in any form in 1972. Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.[35]

---

[33] Soonercare General Provider Agreement § 5.2.

[34] *See* Note 30, *supra*.

[35] *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No.

67.     The AKS prohibits any person or entity from soliciting, receiving, offering, or paying remuneration, in cash or in kind, directly or indirectly, to induce or reward any person for purchasing, ordering, or recommending or arranging for the purchasing or ordering of federally funded medical goods or services:

> [W]hoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--
>
> (A)     in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B)     in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.  42 U.S.C. § 1320a-7b(b).

Violation of the statute also can subject the perpetrator to exclusion from participation in federal healthcare programs and, "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of" the FCA. 42 U.S.C. § 1320a-7(g).[36]

---

95-142: Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

[36] The AKS and the corresponding regulations establish a number of exceptions ("Safe Harbors") for common business arrangements. 42 C.F.R. § 1001.952. These Safe Harbors protect arrangements from AKS liability. An arrangement must fall squarely in a Safe Harbor to receive its protection (*i.e.*, Safe Harbor protection requires strict compliance with all applicable conditions set out in the relevant regulation). Once the plaintiff proves that the AKS applies, the burden shifts to the defendant to prove that the conduct strictly

68.     The AKS is a criminal statute without its own private cause of action. However, violations of the AKS trigger FCA and OKFCA liability. Defendants who submit, cause to be submitted, or conspire to submit claims for reimbursement resulting from unlawful referrals violate the FCA and OKFCA. Defendants' false certification of compliance with the AKS is a material consideration of federal healthcare program administration in reimbursing claims.

**D.     THE OKLAHOMA MEDICAID FALSE CLAIMS ACT**

69.     Medicaid was enacted by Congress on July 30, 1965, under Title XIX of the Social Security Act, as a health coverage program intended to provide medical benefits to those who could not afford necessary medical expenses.

70.     Oklahoma Medicaid is a jointly funded program by the federal and state government and is administered by the Oklahoma Health Care Authority, an Oklahoma State agency responsible for receiving, reviewing, and paying properly compliant Medicaid claims submitted by health care providers who are properly qualified, credentialed, contracted and eligible to receive payment.

71.     The Oklahoma Medicaid False Claims Act ("OKFCA"; 63 O.S. § 5053, *et seq*.)[37] provides, *inter alia*, that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or who knowingly makes,

---

satisfies one of the exceptions. While unnecessary at this stage, Relator alleges that no Safe Harbor applies to the conduct alleged herein as violating the AKS.

[37] The 2016 Oklahoma Legislature amended the OKFCA in effort to better conform the OKFCA to the FCA.  The amended OKFCA became effective on November 1, 2016.  63 O.S. § 5053, *et seq*.

uses, or causes to be made or used, a false record or statement to get a false claim paid is liable to the State of Oklahoma for civil penalties per claim consistent with the federal FCA, plus three times the amount of damages the State sustains. 63 O.S. § 5053.1.

72.     The OKFCA broadly defines "knowing" and "knowingly" to mean that a person, with respect to information, (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and, no proof of specific intent to defraud is necessary. 63 O.S. § 5053.1.

73.     Because of the Federal Government's partial funding of Medicaid, false claims for reimbursement to Medicaid are false claims to the Federal Government. The false claims, which Defendants submitted to the State of Oklahoma under Medicaid, which the State then passed on to the United States for consideration in determining federal financial participation ("FFP"), are false claims, as those claims arose under improper financial relationships with Defendants in violation of the Stark Law and/or AKS.[38]

74.     The law prohibits CMS from paying FFP for services provided under Medicaid if the payment would be prohibited under Medicare due to an illegal referral in violation of the Stark Law. The Oklahoma Healthcare Authority relies on the Medicaid Provider's certification of compliance with the Stark Law; false certifications of

---

[38] Under the Medicaid program, the federal government does not pay Medicaid providers directly. Rather, Medicaid providers submit claims for payment to the States, which pay the claims and then seek partial reimbursement from the federal government. The federal payment to the State is often referred to as "federal financial participation" or "FFP."

compliance with the Stark Law jeopardize the State's receipt of FFP for Medicaid claims. Therefore, claims for reimbursement to Medicaid based on false certifications of compliance with the Stark Law violate the FCA and OKFCA in the same manner as certifying compliance for full reimbursement under Medicare.

75.    Violating or falsely certifying compliance with the Stark Law, AKS, FCA, or OKFCA is a material consideration of federal healthcare program administration to reimbursing claims.

**E.    OKLAHOMA KICKBACK PROHIBITIONS**

76.    Under the Oklahoma Medicaid Program Integrity Act ("OMPIA"), 56 Okla. Stat. § 1005, the Oklahoma legislature outlawed kickbacks in connection with the Oklahoma Medicaid Program. It is a crime to "willfully and knowingly […] [s]olicit or accept a benefit, pecuniary benefit, or kickback in connection with goods or services paid or claimed by a provider to be payable by the Oklahoma Medicaid Program[.]" 56 Okla. Stat. §1005(A)(6). "For the purposes of this section, a person shall be deemed to have known that a claim, statement, or representation was false if the person knew, or by virtue of the person's position, authority or responsibility, had reason to know, of the falsity of the claim, statement or representation." 56 Okla. Stat. § 1005(D). Violations of this section exceeding $2,500.00 constitute a felony. 56 Okla. Stat. § 1006(A) and (B)(1). This section incorporates by reference the Safe Harbors of the federal AKS. 56 Okla. Stat. § 1006(C).

77.    The Oklahoma Legislature provided further kickback prohibitions:

> Any person who intentionally or knowingly pays to or accepts anything of value from any person, firm, association of persons, partnership or corporation for securing or soliciting

> patients for any health care professional, health care provider
> or other entity providing health care services in this state, upon
> conviction, shall be guilty of a misdemeanor and shall be
> punished by a fine of not less than Five Hundred Dollars
> ($500.00) and not more than Two Thousand Dollars
> ($2,000.00).

63 Okla. Stat § 1-742(A)(1). This section incorporates by reference the Safe Harbors of the

federal AKS. 63 Okla. Stat. § 1-742(B)(3).

## F.   RETALIATION UNDER THE FEDERAL FALSE CLAIMS ACT AND THE OKLAHOMA MEDICAID FALSE CLAIMS ACT

78.     The FCA provides, *inter alia*, employees, contractors, and/or agents who are

discharged, demoted, suspended, threatened, harassed, or in any other manner

discriminated against because of lawful acts done in furtherance of an action under or to

stop violations of the FCA are entitled to relief for such damages, including reinstatement,

two times the amount of back pay, interest on the back pay, and compensation for any

special damages sustained as a result of the discrimination, including litigation costs and

reasonable attorneys' fees. 31 U.S.C. § 3730(h).

79.     Oklahoma enacted its own retaliation prohibition, which provides

> Any employee who is discharged, demoted, suspended, threatened,
> harassed, or in any other manner discriminated against in the terms
> and conditions of employment by his or her employer because of
> lawful acts done by the employee on behalf of the employee or others
> in furtherance of an action under this act, including investigation for,
> initiation of, testimony for, or assistance in an action filed or to be
> filed, shall be entitled to all relief necessary to make the employee
> whole. Such relief shall include reinstatement with the same seniority
> status such employee would have had but for the discrimination, two
> times the amount of back pay, interest on the back pay, and
> compensation for any special damages sustained as a result of the
> discrimination, including litigation costs and reasonable attorney fees.

63 O.S. § 5053.5(F)(enacted 2009; re-labeled 63 O.S. § 5053.5(E) in 2016).

80.     In 2017, the legislature amended that section to provide:

> 1. All relief necessary to make the employee, contractor or agent whole, if the employee, contractor or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this act, or other efforts to stop one or more violations of the Oklahoma Medicaid False Claims Act.
>
> 2. Relief which shall include reinstatement with the same seniority status the employee, contractor or agent would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney fees.

63 O.S. § 5053.5(E).

## G.     TENET'S NON-PROSECUTION AGREEMENT

81.     Tenet HealthSystem Medical, Inc. (on its behalf and on behalf of its subsidiaries) entered into a Consent Decree and Non-Prosecution Agreement ("NPA") with the U.S. Department of Justice, Criminal Division, Fraud Section on September 30, 2016. This NPA has a three-year term. The NPA is calibrated to the nature and seriousness of Tenet's offense, wherein senior executives and employees of a Tenet Subsidiary engaged in at least a 10-year scheme to pay over $12 million to the owners and operators of a chain of prenatal care clinics designed to induce unlawful referrals. Tenet's fraud resulted in the hospitals receiving over $146 million from the Medicaid and Medicare programs for illegally referred patients.

82.     Tenet's failure to comply fully with the material terms of the NPA or the attached civil Settlement Agreement constitutes a breach of the NPA. If, during the Term of the NPA, Tenet:

- commits a felony related to the AKS;

- provides in connection with the NPA deliberately false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability;

- fails to cooperate as set forth in the NPA;

- fails to continue to implement and maintain a compliance and ethics program as set forth in the NPA; or

- fails specifically to perform or to fulfill completely each obligation under the NPA

—regardless of whether the DOJ becomes aware of such a breach before or after the Term of the NPA is complete—Tenet, and Tenet's subsidiaries and affiliates shall thereafter be subject to prosecution for any federal criminal violation of which the DOJ has knowledge.

83.     The NPA obligates Tenet to add new policies and amend existing policies for contracts with referral sources, make improvements to its corporate auditing and monitoring of hospital contracts with referral sources, and ensure that its compliance program is designed and implemented to prevent and detect violations of the AKS and the Stark Law.

84.     On February 1, 2017, Tenet retained two partners with the national law firm of Wilmer Hale to serve as independent compliance co-monitors. The Monitors assess,

oversee, and monitor Tenet's compliance with its obligations under the NPA, so as to specifically address and reduce the risk of any recurrence of violations of the AKS and Stark Law by any entity owned, in whole or in part, by Tenet.

85.     Tenet (on its behalf and through its subsidiaries and affiliates) agreed to continue to cooperate with any ongoing investigation of Tenet's conduct or that of its subsidiaries and affiliates and their officers, directors, employees, agents, business partners, and consultants relating to violations of the AKS, or additional conduct.

86.     During the Term of the Agreement, should Tenet learn of evidence or allegations of actual or potential violations of the AKS, it must promptly report such evidence or allegations to the DOJ.

87.     The NPA does not foreclose future monetary penalties in a future prosecution in the event of breach of the NPA; it does not preclude the DOJ from arguing in any potential future prosecution that the Court should impose a penalty and the amount of such penalty. The NPA does not provide any protection against prosecution for any past or future conduct by Tenet, or any of its present or former parents, affiliates, or subsidiaries. In addition, the NPA does not provide any protection against prosecution of any individuals, regardless of their affiliation with Tenet. The NPA does not close or preclude the investigation or prosecution of any natural persons, including any of Tenet's officers, directors, employees, agents, or consultants or its parent companies, direct or indirect affiliates, subsidiaries, or joint ventures, who may have been involved in any of the matters set forth in the NPA. Tenet's disclosure to the Monitor concerning fraudulent or criminal

conduct related to the AKS or Stark Law shall not relieve Tenet of any otherwise applicable obligation to truthfully disclose such matters to the DOJ, pursuant to the NPA.

88. With respect to all entities in which Tenet or an affiliate of Tenet owns a direct or indirect equity interest of 50% or less *and* does not manage or control the day-to-day operations, the Monitor's access to such entities shall be co-extensive with Tenet's access or control and for the purpose of reviewing Tenet's conduct. Therefore, the NPA applies fully to OCOM; USP, USPI, USP Holding Company, Inc., UAP, Kimzey and Hendley as the current and former OCOM CEO; Cruse and Langerman as OCOM Board Members; OCOM owners; and the SOS doctors as APO (anesthesia company) and OCOM owners and partners with USP in APO and OCOM.

## V.   FACTUAL ALLEGATIONS

89. The allegations set forth above are hereby incorporated as if fully set forth herein.

90. Defendants violated the law by entering into a series of improper financial relationships and kickbacks, or Schemes. The SOS Defendants are a party to each and every improper financial relationship, but the counter-party varies depending on the Scheme. Each improper financial relationship has resulted in certain Defendants submitting unlawful claims for reimbursements to, and receiving unlawful reimbursements from, federal healthcare programs. Relator alleges those improper financial relationships and kickbacks while detailing Defendants' unlawful conduct pursuant to them as follows:

  a. In subsection A, Relator details the improper relationships between the SOS Defendants and the OCOM Defendants with respect to referrals to OCOM. These

improper relationships and kickbacks consist of two core Schemes—the Equity Scheme and the Employment Contract Scheme. All claims for reimbursement OCOM submitted to federal healthcare programs—which resulted from SOS referrals from at least 2007—violated the Stark Law, AKS, the FCA, and/or the OKFCA.[39] Additionally, this improper relationship includes four additional schemes—the Surgery Scrub Scheme, Sham Lease Scheme, Office Space Scheme, and Credit Card Scheme.

       b.     In subsection B, Relator details the improper financial relationships and kickbacks between the SOS Defendants and the OCOM Defendants with respect to referrals to APO. Through the Anesthesia Company Scheme, the SOS Defendants and the OCOM Defendants formed, owned, and used APO—an anesthesia company—to refer designated health services to themselves in violation of the Stark Law, AKS, FCA, and OKFCA. USPI/USPH also perpetrated the Anesthesia Scheme in at least six other states.

       c.     In subsection C, Relator details the improper financial relationships and kickbacks between the SOS Defendants and the Integris Defendants. Through the E.R. Call Scheme, the SOS Defendants and the Integris Defendants entered into an unlawful contract for E.R. orthopedic call services exclusivity. The improper financial relationship that underlies the E.R. Call Scheme taints (1) all Government reimbursements to Integris resulting from referrals from SOS Doctors and (2) all Government reimbursements to SOS for referrals from the ISMC E.R. from at least August 2014 to present. These referrals violate the Stark Law, AKS, FCA, and OKFCA.

---

[39] *See* Section V.E, *infra*.

91.     In subsection D, Relator details two additional Schemes, which the SOS Defendants alone used to defraud the Government through the direct submission of false claims for reimbursement. While these direct fraudulent reimbursement Schemes likely resulted in fewer false claims than those outlined above, the existence of these independent Schemes confirms the SOS Doctors' knowing greed-driven approach to medical practice and blatant disregard for federal and Oklahoma law. First, Defendants submitted false claims for ultrasound needle guidance that was (1) not medically necessary; (2) never actually performed; and/or (3) performed by a P.A. without the required supervisions (the "Ultrasound Scheme"). Second, the SOS Defendants fraudulently billed for Levings' P.A. services, which were never actually performed (the "Levings P.A. Scheme"). The Ultrasound Scheme and Levings P.A. Scheme violated the FCA and OKFCA.

92.     In subsection E, Relator alleges additional wrongful conduct on Defendants part that confirms that Defendants have little regard for the state and federal law governing the practice of medicine or the reimbursement of federal healthcare claims.

93.     In subsection F, Relator describes the extent to which the SOS Defendants retaliated against him for his focus on compliance and fraud prevention. This retaliation violated the FCA, the OKFCA, and state common law.

94.     Finally, in subsection G, Relator alleges that Tenet stands in violation of its Non-Prosecution Agreement with the DOJ and, thus, the FCA and OKFCA.

A.   **IMPROPER FINANCIAL RELATIONSHIPS AND KICKBACKS BETWEEN THE SOS DEFENDANTS AND THE OCOM DEFENDANTS WITH RESPECT TO REFERRALS TO OCOM**

95.   The SOS Defendants and the OCOM Defendants employed two core improper financial relationships, or Schemes, to reward SOS Doctors for past referrals and incentivize future referrals of patient services under federal healthcare programs to OCOM. These two core schemes—the Equity Scheme and the Employment Contract Scheme— funneled unlawful referrals of federally-reimbursed healthcare patient services to OCOM.

96.   When considered together, the Equity and Employment Contract Schemes subject *all* Governmental reimbursements to OCOM from 2007 to the present that resulted from SOS referrals to recovery and trebling under the Stark Law, AKS, FCA, and/or OKFCA, in addition to statutorily-prescribed per-claim penalties provided in each.

1.   **The Equity Scheme: the SOS and OCOM Defendants Used OCOM Equity as Remuneration to Incentivize and Reward Referrals of Patients and Services from the SOS Doctors to OCOM.**

97.   The SOS and OCOM Defendants used OCOM hospital equity as remuneration to incentivize and reward referrals of patients and services from the SOS Doctors to OCOM (the "Equity Scheme"). Defendants repeatedly prioritized their own profit and greed at the expense of federal healthcare program integrity.

98.   On several occasions, Cruse and Langerman directed the OCOM Board to offer OCOM Equity only to SOS Doctors ***as a reward for their past referrals and as an incentive and inducement for future referrals***. The SOS and OCOM Defendants repeatedly restricted the purchase of OCOM Equity to SOS Doctors alone, despite being required by the OCOM Operating Agreement to offer it on a proportional basis to both

SOS and non-SOS physicians.[40] Further, the SOS and OCOM Defendants continually based their decision about which doctors they would allow to purchase OCOM Equity on the volume and value of the that doctor's referrals of Designated Health Services ("DHS") to OCOM.

99.    Defendants' improper equity transactions and their unlawful referrals pursuant to those transactions constitute violations of the Stark Law and AKS. Defendants' claims for reimbursement to federal and Oklahoma healthcare program administrators constitute violations of the FCA and OKFCA. The following subsections detail (i) OCOM's structure and governance vis-à-vis equity transactions; (ii) the financial relationship through which Defendants use OCOM Equity as remuneration to incentivize and reward referrals; and (iii) specific examples of the Scheme in action.

> **a.    OCOM's Structure and Governance Should Control the Proper Flow of OCOM Equity.**

100.    OCOM's structure and governance, as defined in its Operating Agreement and the USP Purchase Agreement, should control the proper sale and purchase of OCOM Equity. The SOS and OCOM Defendants repeatedly defied OCOM governing documents for their own illegal benefit.

101.    At all relevant times, approximately twenty-five physicians and two corporate entities owned OCOM.[41] Of the twenty-five physicians, eight are SOS Doctors.

---

[40] Proportional based on the current equity percentages held by each physician.

[41] Description of OCOM Equity includes approximations based on OCOM-provided information regarding individual and corporate ownership on or about December 31, 2015. Individual ownership amounts change from time to time because of buy-in and/or buy-out

Those SOS Doctors collectively owned and controlled approximately 35% of OCOM Equity. These SOS Doctors referred patients to OCOM for DHS. SOS Doctors account for approximately *two-thirds of OCOM's referrals and total revenue*.

102.   The remaining OCOM physician owners collectively owned and controlled approximately 10% of OCOM Equity. Each of these non-SOS physicians refer patients to OCOM for DHS. These non-SOS physicians collectively account for a small fraction of OCOM's referrals and total revenue.

103.   At all relevant times, two non-physician corporate entities collectively owned approximately 55% of OCOM Equity, with Integris owning approximately 20% and USP 35%.[42]

104.   At all relevant times, other physicians with no ownership or control of OCOM Equity were in a position to refer patients to OCOM for DHS, and only account for a small percentage of OCOM's referrals and total revenue.

105.   A Board of Managers governs OCOM. The Board includes one or more representatives from each of the SOS Doctors, USP, and Integris.[43] At all relevant times,

---

transactions occurring without publication or disclosure to Relator. Actual OCOM Equity is required to be reported to the Government pursuant to 42 U.S.C. § 1395nn(f) and 42 C.F.R. § 411.361.

[42] Although USP owned a minority interest OCOM, at all relevant times, USP managed OCOM as its hospital management company pursuant to a 2004 Management Agreement. On or about August 2015, Tenet announced it was acquiring USP and USP's interest in OCOM Equity, thereby assuming beneficial ownership of OCOM and control of USP's role as OCOM's hospital management company.

[43] On December 31, 2015, Tenet requested SOS Doctors enter into a complex, multi-layer joint venture arrangement to provide Tenet with majority "control" of OCOM so that Tenet

Cruse and Langerman were the senior members of the OCOM Board. They directly and personally exerted control and influence over activities affecting OCOM, including the purchasing and sale of OCOM Equity.

106.    The OCOM Operating Agreement prescribes the process and procedure for allocating, reallocating, and redeeming OCOM Equity in the event of certain trigger events, including: a new physician member buy-in; an existing physician member buy-out; or, an existing physician member disassociation from OCOM for any other reason.[44] The OCOM Operating Agreement makes no distinction between an SOS Doctor and a non-SOS physician, and makes no mention of or reference to SOS. Per the terms of the OCOM Operating Agreement, *all* existing physician owners (both SOS Doctors and non-SOS physicians) of OCOM should receive a first right of refusal to purchase their proportional share of a disassociating physician member's OCOM Equity.

### b.    The SOS and OCOM Defendants Leveraged OCOM Equity to Induce and Reward Referrals.

107.    Defendants repeatedly breached the OCOM Operating Agreement to concentrate OCOM Equity with certain SOS Doctors. Cruse and Langerman wielded their influence and control over the OCOM referral revenue stream to ensure that only the SOS

---

could include OCOM on its purported higher-paying hospital reimbursement agreements with commercial insurance carriers.  This arrangement and "control" notwithstanding, the Board of Managers controlling OCOM directly or indirectly includes participants from SOS Doctors, USP, and Integris.

[44]  The term OCOM Operating Agreement includes all related OCOM governance documents, including the USP Purchase Agreement from 2004, and various amendments and restatements of the OCOM Operating Agreement.

Doctors received the opportunity to purchase newly-available OCOM Equity. The SOS Doctors, who frequently asserted how deserving they were of such benefits because they referred the majority of OCOM's business, asserted sole entitlement to that available OCOM Equity. OCOM readily acquiesced and even facilitated this practice to appease and placate its most profitable referral sources, despite the conduct being counter to the terms of the OCOM Operating Agreement.

108.   Whenever portions of OCOM Equity would become available for repurchase as result of a triggering event, Cruse and Langerman lobbied USP as OCOM's managing/governing organization and the OCOM Board, which included representatives from USP and Integris, to offer that equity only to SOS Doctors. In Cruse's words, "...we've never let anyone get more than us" and "we haven't let anybody get more than 1% other than SOS guys. That was kind of the icing on the cake: you come join us, you get to get more, gold standard,..."

109.   Ignoring federal and state law and the OCOM Operating Agreement, the SOS Doctors claimed the right to the additional Equity as reward for their past referrals and as incentive and inducement for future referrals because, as Cruse stated, "we do the bulk of the work, so we should get the bulk of" the equity. When non-SOS physicians asked for an additional portion of OCOM Equity, Cruse and Langerman would ensure the OCOM Board denied their request if those non-SOS physicians, as Cruse crudely stated, "doesn't do shit over there [at OCOM]."[45]

---

[45] *See* Dr. Greenway Example, Section V.A.1.iii., *infra.*

110.    The SOS Doctors' willingness to violate federal and state law was matched with equal enthusiasm by the OCOM Defendants. OCOM's CEO (formerly Hendley, currently Kimzey) and the OCOM Board readily complied as part of their continued ingratiation of the SOS Doctors to secure the continued high volume of high-value referrals to OCOM. Indeed, OCOM furthered and encouraged this exploitation in light of the unlawful revenue it produced.

111.    If an SOS Doctor threatened to disassociate from SOS, the SOS Doctors threatened to take away that physician's OCOM Equity even if the disassociating SOS Doctor expressed that he only wanted to take his clinical business (*i.e.*, not surgery business) to a non-SOS clinic, and wanted to keep his OCOM Equity.[46]

112.    When a non-SOS physician requested the opportunity to obtain additional OCOM Equity, OCOM's CEO would seek Cruse and the SOS Doctors' permission to offer additional OCOM Equity. The SOS Doctors then decided whether the non-SOS physician would receive the offer. The SOS Doctors would base these decisions on the non-SOS physician's profitability (based on the volume and value of his referrals to OCOM). Cruse and Langerman quickly vetoed any Equity purchase by a non-SOS physician they deemed unprofitable from a referral standpoint. OCOM's management, under the leadership of former CEO Hendley and/or current CEO Kimzey, readily followed those directives.

113.    OCOM management, including Cruse, Langerman, former CEO Hendley, and CEO Kimzey, routinely review, report, and consider OCOM Equity-related actions

---

[46] *See* Hume Example, Section V.A.1.iii., *infra*.

based on the SOS Doctors' performance and individual profitability of referrals to OCOM. This includes buying out a physician's interest if they are underperforming, allowing others to buy more or buy-in if they are referring a sufficient volume and profitability of patients to OCOM, and leveraging USP-affiliated resources for SOS's use without documentation, agreement, or consideration.

114.   The SOS Doctors each individually, directly, and personally benefited from this exploitation of OCOM Equity, as did SOS.[47] So, too, have OCOM/USP executives and OCOM's CEO—formerly Hendley and currently Kimzey—benefitted. Defendants overtly acted and conspired to control OCOM Equity to reward the SOS Doctors for their continued high-volume referral of surgical cases and non-surgical orders to OCOM. They each individually participated, orchestrated, agreed, and worked with OCOM, Integris, USP, USPI, USPH, and Tenet to control OCOM Equity as an act in furtherance of the conspiracy to violate healthcare laws.

115.   Integris, USP, USPI, USPH, and Tenet as USP's acquiring corporate parent, as OCOM Owners and Board Members, by and through their agents, directly and personally benefited from this exploitation of OCOM Equity by overtly acting and conspiring to control OCOM Equity in return for the SOS Doctors' continued high-volume referral of surgical cases and non-surgical orders to OCOM. Integris, USP, USPI, and Tenet

---

[47] As Cruse said, joining SOS is the "gold standard." *See* ¶108, *supra*. SOS benefited by consolidating those surgeons producing the highest volume and profit. This produced more income for all SOS Doctors in their "eat-what-you-kill" proportional financial arrangement.

participated, orchestrated, agreed, and worked with each other, OCOM, SOS, Kimzey, Hendley, and the SOS Doctors, to control OCOM Equity as remuneration as an act in furtherance of the conspiracy to violate healthcare laws.

### c.   Specific Examples Show the Equity Scheme in Action.

116.   Cruse, Langerman, and the SOS Doctors frequently met with Kimzey to make decisions about distributing OCOM Equity. The following examples demonstrate the control and influence Defendants' used to pad their own pockets and OCOM's repeated attempts to curry favor with its most profitable referring physicians.[48]

117.   Dr. Nick Knutson, a non-SOS physician, owned approximately 3.5% OCOM Equity. Knutson retired at or near the end of 2012. Per the OCOM Operating Agreement, USP had first right of refusal to purchase Knutson's OCOM Equity; otherwise, the OCOM Board was obligated to offer it for sale to <u>all</u> physician owners of OCOM (which includes approximately seventeen non-SOS physician owners). On or about November 27, 2012, Cruse explained to the SOS Doctors that *they alone* (and not the non-SOS physicians) should have the Knutson OCOM Equity because they "do the bulk of the work." Cruse also told the SOS Doctors that he knew this was improper. OCOM's CEO, Hendley, was clearly aware that this plan was improper; he feigned ignorance by saying "I didn't hear

---

[48] While Relator alleges the following examples of improper equity transactions, other transactions likely occurred. The examples are provided simply to illustrate the SOS and OCOM Defendants manipulation of OCOM Equity in violation of federal and state law. The examples provided here are based on discussions and information available to Relator; however, Relator was SOS' employee and did not have control of or responsibility for managing OCOM Equity transactions.

that," where "that" was Cruse's statement that the Equity should only be given to SOS Doctors based on their referrals to OCOM. For the sake of plausible deniability, Hendley wanted Cruse to tell him, even untruthfully, that the OCOM Board would offer the Equity to all owners. Cruse and Hendley knew that the Equity was supposed to be offered to all physician owners, but Cruse said he "didn't want to do that." Cruse and Langerman then polled the SOS Doctors as to the amount of the Knutson OCOM Equity each wanted to purchase, and all participated. The purchase transaction included only one non-SOS physician—Dr. Greenway—in this offer because, as Cruse explained, "I threw in Greenway because I think Greenway is going to be a big plus for us." Shortly thereafter, to be effective by December 31, 2012, Hendley administered the OCOM Equity sale transaction involving only the SOS Doctors and Greenway; each purchasing SOS Doctor paid Knutson directly (contrary to the transactional process the Operating Agreement prescribed).

118.   Dr. Beringer, another non-SOS physician, owned slightly under 1% of OCOM Equity. Dr. Beringer sought to redeem his OCOM Equity because he was moving his practice out of state. USP, via Hendley, coordinated the Beringer OCOM Equity buy-out at an agreed value higher than the OCOM Operating Agreement required. Cruse had struck a deal with Beringer, who agreed to continue referring spine patients to SOS Dr. Hume in exchange for the higher buy-out price.

119.   Dr. Tupper, a non-SOS physician, owned approximately 1% of OCOM Equity. Tupper requested the OCOM Board offer him additional OCOM Equity. OCOM's CEO, Kimzey, brought the question not to the OCOM Board, but first to the SOS Doctors.

The SOS Doctors asserted, and OCOM's CEO agreed, that the considerations were whether Tupper was "busy" enough, would "do more cases" at OCOM, would be "bringing the business" and was "profitable" enough. The SOS Doctors stated it didn't matter "how busy [Tupper is], he isn't doing half of what we're [the SOS Doctors] doing." OCOM's CEO, Kimzey, recognized this *quid pro quo* consideration of OCOM Equity in return for volume and value of business as "the status quo…this is how this place was built and it works pretty well." Based on the SOS Doctor's determination that Tupper was not sufficiently profitable, Relator believes the SOS Doctors killed the transaction and barred Tupper from purchasing additional equity.

120.    Cruse and Langerman both have special buyout arrangements for their OCOM Equity. These arrangements contractually commit USP to pay each of them a 6.5 EBITDA multiple upon their retirement.[49] The Cruse and Langerman special buyout arrangements allow each to sell a limited amount of OCOM Equity annually to USP for a 6.5 EBITDA multiple. Other physician owners of OCOM Equity do not have this staged buy-out benefit and receive only a 4.0 EBITDA multiple paid in lump sum. Cruse and Langerman have, between approximately 2014 and 2017, sold some of their OCOM Equity under these special buyout provisions, each selling to USP at a 6.5 EBITDA multiple. Upon learning of Cruse and Langerman's OCOM Equity sales to USP, the other SOS Doctors demanded they, not USP, be offered that equity. However, the SOS Doctors refused to pay

---

[49] The other physician owners of OCOM Equity have buy-out provisions at a 4.0 EBITDA multiple. EBITDA, in financial accounting, meaning "earnings before interest, taxes, depreciation, and amortization."

the 6.5 multiple price. Cruse negotiated with USP on behalf of the SOS Doctors, and USP agreed to allow <u>only</u> the SOS Doctors to purchase this OCOM Equity as a reward and incentive at a 4.0 EBITDA (despite USP having just paid 6.5 EBITDA to purchase the shares from Cruse and Langerman). Cruse explained:

- USP knew which providers bring in the most referrals;

- USP wanted to reward those providers—the SOS Doctors—and keep them happy;

- USP created this special purchase arrangement for <u>only</u> SOS Doctors;

- the arrangement provided for annual OCOM Equity offerings over multiple years;

- the SOS Doctors receiving this benefit must be practicing at SOS at the time of the prospective purchase; and

- USP would not require the SOS Doctors to pay the 6.5 EBITDA price USP paid when purchasing Cruse and Langerman's equity.

Cruse and Langerman effectively received a built-in incentive—a 62.5% premium over fair market value and what other physicians would receive. This anchored Cruse and Langerman as committed referrers to OCOM, while anchoring the other SOS Doctors with the reduced share price.

121.   In the months leading to October 2015, Hume, a SOS Doctor at the time, announced he was considering leaving SOS to join another clinical practice that competed with SOS. This other clinical practice had a relationship with hospitals that competed with OCOM. Hume expressed he wanted to leave the SOS *clinic* but had no desire to disassociate from OCOM *hospital* or stop referring patients to OCOM. In October 2015,

the SOS Doctors learned that Hume had decided to leave SOS. As punishment, Cruse, Langerman, Kimzey, Hendley, USP, and Tenet secured the 75% OCOM vote per OCOM's Operating Agreement to forcibly disassociate Hume from OCOM and pay Hume a discounted penalty price in redemption of his OCOM Equity. Cruse asked the SOS Doctors and USP for their affirmative vote for this action, stating that everyone knew that when Hume left SOS and joined a competitive group, Hume would significantly decrease or altogether stop his referrals to OCOM. This demonstrates the inherent threat of penalty in the SOS Doctors' control over OCOM Equity—that failure to drive high volume and value of referrals to OCOM will result in forcible disassociation.

122.    Dr. Greenway, a non-SOS physician holding approximately 1% of OCOM Equity, announced he was moving out of the Oklahoma City area and wished to sell his OCOM Equity to his partner, Dr. Vavricka (another non-SOS physician who also owned approximately 1% of OCOM Equity). On March 31, 2016, Cruse advised the SOS Doctors of the proposed sale to Vavricka and asked if the sale could be blocked. Cruse explained that Vavricka "doesn't do shit over there [at OCOM], that's why we don't want him [Greenway] selling to Vavricka." OCOM's CEO, Kimzey, answered, saying "we can absolutely block that" because the "whole point is, let's get it to SOS … that's the whole point of this drill." OCOM then purchased the equity and sold it to only the SOS Doctors, once again in violation of the OCOM Operating Agreement.

123.    At the same meeting, Langerman summarized Defendants' scheme succinctly: "…remember we always talked about saying if you don't own SOS, you can only own so much [of OCOM]." Kimzey acknowledged that such an arrangement could

never be memorialized in the Operating Agreement and that he could not *formally* treat SOS Doctors any differently than anybody else, saying "I don't know that you can put that in an operating agreement. I don't know that they're going to allow me to treat you any different than anybody else." Langerman commented on the volume of business Greenway and Vavricka provided to OCOM, stating "Greenway and him [Vavricka] ought to only have one percent ownership." Reddick agreed that it should remain "an unwritten rule." That unwritten rule—OCOM offers available equity to SOS Doctors only—constitutes an impermissible financial relationship based on the volume and value of referrals. It further constitutes impermissible remuneration to induce and reward referrals.

### 2. The Employment Contract Scheme: the OCOM Defendants Shouldered the Coast of SOS's Recruitment of New Physicians.

124. For over ten years, the SOS Defendants and the OCOM Defendants perpetrated a similarly egregious and improper compensation relationship—the Employment Contract Scheme—wherein OCOM shouldered the financial responsibility of SOS's recruitment of new physicians and thereby funded SOS's growth. OCOM's employment agreement with new physicians promised a sizeable bonus if, upon leaving OCOM, the new physician joined SOS as an equal partner for at least eighteen months. Defendants' improper relationship and their unlawful referrals pursuant to that relationship constitute violations of the Stark Law's strict liability and the AKS. Defendants' claims for reimbursement to federal and Oklahoma healthcare program constitute violations of the FCA and OKFCA.

### a. Physicians Must Join SOS to Receive their Bonus.

125. When the SOS Doctors identified a new orthopedic surgeon as a potential addition to SOS, Cruse, Langerman, and the SOS Doctors directed OCOM to enter into an Employment Agreement with the new surgeon (the "Physician") whereby the Physician would work as an OCOM employee for two years. This agreement provided that OCOM employs the Physician, and the Physician thereby agreed to purchase a Membership Interest in OCOM of 1%. The agreement was effective for twenty-four months.

126. The Employment Agreement provided an opportunity for a bonus. The Physician earned this bonus *only* if he

> provides professional services on a full-time basis through Southwest Orthopaedic Specialists, PLLC ("SOS") on terms mutually satisfactory to SOS and Physician for *at least 18 months* following the end of the term of this Agreement. [OCOM] believes that the terms to be offered by SOS at the end of the Term will be that Physician will receive all income attributable to his services, less a share of the overhead of SOS that will be agreed upon by the parties with no capital contribution or other "buy in" obligation. (emphasis added).[50]

*If* the Physician completed his eighteen months with SOS,

> [OCOM] shall pay to Physician, as a bonus compensation for the professional services provided during the Term, an amount equal to the lesser of (i) 75% of [OCOM's] collections…for Physician's services rendered during the Term of this Agreement that are in excess of the applicable Target Amount set forth in Exhibit A or (ii) $500,000.[51]

---

[50] *See, e.g.*, Hume Agreement at pp. 2-5.

[51] *Id.*

### b.   OCOM Rented SOS Clinic Space Based on the Volume and Value of New Physicians' Services.

127.   Simultaneously with each new Physician's employment agreement, OCOM entered into a separate Rental Agreement with SOS, whereby OCOM would pay to SOS a monthly rental fee for SOS providing the Physician a place to conduct clinical practice. Under this Rental Agreement the Physician would appear as an SOS Doctor, be billed under the SOS Tax ID, be integrated into SOS' computer systems, have presence on SOS' website, and for all outward appearances be an SOS Doctor. SOS paid monthly to OCOM all receipts generated by the Physician from clinical and surgical services (*i.e.*, not facility fees, which OCOM billed directly).

128.   The rental amounts OCOM paid to SOS increased monthly during the term of the Physician's employment with OCOM to reflect the increasing volume and value of business referred and performed by the Physician. For example, the Rental Agreement for Hume provided the following ramp up:



These escalating rental payments account for the increased volume and value of the Physician's services, which increase over time as the Physician establishes his practice.

129.    Once the Physician established himself—*i.e.*, produced enough income such that he would earn more as an SOS Doctor than an OCOM employee—the Physician would terminate the Employment Agreement. OCOM would stop paying the Physician's salary, and the Physician would become an SOS Doctor subject to SOS's internal financial relationship.[52]



130.    Once the Physician transitioned to SOS, Cruse would then orchestrate an improper equity transaction described in Section V.A.1., *supra*, allowing the surgeon to purchase additional OCOM Equity.

131.    This relationship is plainly unlawful. The plain language of the Employment and Rental Agreements, and the circumstances under which these transactions occurred since 2007 are plainly violative of the strict liability Stark Law and demonstrate the intent to induce and reward referrals in violation of the AKS.

132.    In the wake of Tenet's September 30, 2016 Consent Decree and NPA with the Department of Justice, USP recognized that this continued unlawful employment

---

[52] A proportional equation based on production, which the SOS Doctors referred to as "eat what you kill." The SOS Doctors eventually formalized this in the 2016 SOS Operating Agreement.

scheme threatened Tenet's compliance with the NPA. USP ordered Kimzey to dismantle the arrangement immediately, and Kimzey anxiously informed the SOS Doctors that the arrangement must immediately stop. On October 25, 2016, Kimzey hurriedly ordered Relator to immediately wipe Dr. Disselhorst, the OCOM-employed Physician under the scheme at the time, from the SOS system and website to hide the offense. Despite this, Dr. Disselhorst continued to operate within the SOS system under the terms of the employment agreement until joining SOS as a partner on January 1, 2017.

133.   Since 2007, Defendants hired West, Hume, Levings, Reddick, Avant, and Disselhorst pursuant to this unlawful arrangement. This arrangement constitutes a strict liability Stark law violation. Further, it consists of a litany of unlawful kickbacks in violation of the AKS. As such, all claims for reimbursement OCOM submitted to federal healthcare programs since 2007, which a SOS Doctor referred to OCOM, are subject to liability under the FCA and OKFCA.

### 3.   THE SOS AND OCOM DEFENDANTS' ADDITIONAL SCHEMES

134.   The Equity and Employment Contract Schemes detailed in Sections V.A.1. and V.A.2., respectively, *infra*, are sufficient to reach all referrals of DHS from the SOS Defendants to OCOM from at least 2007. However, the SOS Defendants and the OCOM Defendants entered into four additional financial relationships and kickbacks that violate the Stark Law, AKS, FCA, and/or OKFCA. Although these four additional Schemes are cumulative in the sense that they reach the same Government reimbursements as the Equity and Employment Contract Schemes, the presence of these four additional Schemes (a) demonstrates that the entire relationship between the SOS Defendants and the OCOM

Defendants is fraught with illegal and improper financial relationships and kickbacks; and (b) confirms that the SOS Defendants and OCOM Defendants acted with knowledge and intent, which gives rise to civil penalties and treble damages under the FCA and OKFCA.

135.    These four additional Schemes as between the SOS Defendants and OCOM Defendants are the following: (i) the "Surgical Scrub Scheme"; (ii) the "Sham Lease Scheme"; (iii) the "Office Space Scheme"; and (iv) the "Credit Card Scheme." Each of these four schemes separately violates the Stark Law, AKS, FCA, and/or OKFCA and would allow the Government to recover all Government reimbursements to OCOM from SOS Doctors during the duration of the Scheme. When these four schemes are considered together, and in combination with the Equity and Employment Contract Schemes, the relationship between the SOS Defendants and the OCOM Defendants is so tainted with improper financial relationships and kickbacks that all OCOM reimbursements from the Government for DHS from at least 2007 are reachable by the Stark Law, AKS, FCA, and/or OKFCA.

      **a.**    **The OCOM Defendants Covered the Cost of Medical Assistants for Cruse and Langerman Because Cruse and Langerman Were the Most Profitable and Influential Referring Physicians (the "Surgical Scrub Scheme").**

136.    The OCOM Defendants provided compensation for Langerman and Cruse's medical assistants in exchange for and to incentivize and reward continued high volume of referrals.

137.    Langerman used a medical assistant called a "scrub tech." In approximately 2002-2004, SOS employed Langerman's scrub tech while Langerman personally compensated him.

138.    During Relator's tenure with SOS, in approximately 2004, Langerman sought to decrease the amount of money he personally paid for his personal scrub tech's compensation. Langerman was OCOM's highest volume referring doctor at the time. He used that influence to direct OCOM to hire his scrub tech as an OCOM employee for at least 50% of the scrub tech's current salary. Because of Langerman's referrals to OCOM and influence over OCOM and SOS Doctors, OCOM agreed to create this unwritten special financial compensation relationship for Langerman's benefit.

139.    In or about 2005, Cruse followed suit. He directed OCOM to hire a scrub tech using the same financial relationship as between Langerman and OCOM.

140.    The OCOM Defendants have hired and retained other scrub techs for general use by all physicians. However, the OCOM Defendants have not provided the personal beneficial arrangement alleged herein to any physicians other than Langerman and Cruse.[53]

141.    Because of Cruse and Langerman's referrals to OCOM and influence over OCOM and SOS Doctors, OCOM agreed to create these special financial compensation relationships to benefit Cruse and Langerman individually.

---

[53] Other SOS Doctors and non-SOS physicians employ personal scrub techs and other assistants.

b.    **The OCOM Defendants Entered into a Sham and Commercially Unreasonable Lease of an Empty Building Owned by Cruse And Langerman to Appease Cruse and Langerman and Reward Them for Their High Volume Of Referrals (the "Sham Lease Scheme").**

142.    Cruse and Langerman conspired with Hendley and Kimzey to extend OCOM's lease of property Cruse and Langerman own. Despite having no continuing need for the facility and losing money on the deal, the OCOM Defendants readily agreed to extend the lease, embracing yet another opportunity to appease and placate its most influential referrers.

143.    Cruse and Langerman equally own real property located at 8125 S. Walker Ave., which includes a licensed Ambulatory Surgery Center known as Southwest Ambulatory Surgery Center, LLC ("SASC") located directly across the street from OCOM.[54] Cruse and Langerman own the property through their respective beneficial ownership of 50% each of Southwest Orthopaedic Center, LLC (the "Center"). Throughout the relevant period, Cruse and/or Langerman had commercial loans payable for their respective interest in the Center.

144.    Since August 1, 1998, OCOM has leased the SASC and office space from the Center.[55] Until sometime in 2013-2014, OCOM historically scheduled some surgical cases to be performed at SASC. OCOM then expanded its operating room capacity,

---

[54] SASC is the single-member owner entity of OCOM. SASC is also an ambulatory surgical center licensed by the Oklahoma Department of Health; however, the license was reportedly limited in scope due to facility issues found upon inspection.

[55] The lessee was formally SASC, the single-member owner of OCOM. For consistency and clarity purposes in explanation, "OCOM" is used here to designate the lessee.

completely eliminating the need for the SASC operating room space. Accordingly, OCOM stated its intention to allow the lease with the Center to expire on December 31, 2013.

145.   Cruse and Langerman wanted the lease income to continue, so they used their influence over OCOM to secure extended lease and rental payments from OCOM to the Center. As thinly-veiled justification a fair market value study was obtained for the value of the business OCOM conducted and for storage space at SASC, to which the SOS CFO retorted in an email that the "FMV for an entity that loses $ should not be hard to determine." Regardless of the lack of value, OCOM acquiesced and on at least two separate occasions from January 2014 through December 2014 executed lease extension agreements. All the while, as OCOM lacked a proper business justification for the space, the payments were clearly gratuitous. Relator estimates that Cruse and Langerman were paid approximately $17,000 per month, or $204,000 in total, by OCOM under the sham lease. These payments constitute illegal kickbacks.

146.   Cruse and Langerman personally benefited by using their influence over OCOM to continue rental payments for SASC under a sham lease. OCOM benefitted by continuing to appease its most influential and highest volume referrers.

     **c.**     **The OCOM Defendants Provided Cruse Free Office Space in Exchange for His Referrals and Influence (the "Office Space Scheme").**

147.   Because of Cruse's influence over OCOM and over the other SOS Doctors, the OCOM Defendants have for years provided to Cruse free office space and equipment for operating and managing his personal business interests and personal affairs, with no written agreement and no consideration paid.

148.    Cruse was the beneficial owner of buildings leased by OCOM and in which OCOM operates.[56] Cruse is also the beneficial owner of the campus real property on which both OCOM and SOS reside, known as Crystal Park Plaza, LLC ("CPP Campus"). Cruse is the beneficial owner of and operates one or more entities that own, manage and/or govern and oversee the CPP Campus.

149.    Cruse directs and/or employs one or more individuals who assist in the operation and management of the CPP Campus and who manage Cruse's personal business interests and personal affairs. This employee maintained an office at OCOM, which OCOM provided at no cost and for no additional consideration.

        **d.**      **The OCOM Defendants Allowed Cruse to Use His Personal Credit Card to Purchase OCOM Surgical Equipment so that Cruse Could Rack Up Reward Points (the "Credit Card Scheme").**

150.    During at least 2011, Cruse, as OCOM Board Chairman and Medical Director, conspired with the OCOM Defendants to channel OCOM's purchases of surgical supplies through Cruse's personal credit card. This allowed Cruse to earn credit card reward points for these high-dollar purchases, which amounted to tens of thousands of dollars monthly. OCOM would reimburse Cruse monthly for the credit card amount due for such purchases, and Cruse would then keep the financial benefit from the accumulated credit card reward points. At the time, Hendley was OCOM's acting executive manager

---

[56] In April 2017, Cruse sold his real property interest in the OCOM buildings for $44.4 million. http://newsok.com/article/5547303 (last visited March 22, 2018).

and agreed to and directed this arrangement be implemented through OCOM's accounting department.

B.    **IMPROPER FINANCIAL RELATIONSHIPS AND KICKBACKS BETWEEN THE SOS DEFENDANTS AND THE OCOM DEFENDANTS WITH RESPECT TO THE FORMATION OF APO**

151.    The SOS Defendants and the OCOM Defendants further violated the Stark, AKS, FCA, and/or OKFCA by forming and operating Anesthesia Partners of Oklahoma, LLC, ("APO"). They designed and used APO to refer designated health services to themselves (the "Anesthesia Company Scheme"). Based on a USPI/USPH model used across the nation, OCOM's CEO initiated the creation of APO as OCOM's exclusive anesthesia service provider. Using the USPI/USPH supplied structure and pattern for such entities, APO's ownership was a private club comprised of only the SOS Doctors, USP, and Kimzey (individually). APO's profit distributions to these owners varied directly with the volume and value of the SOS Doctors' referrals to OCOM. The SOS Doctors, USPI, and Kimzey formed the company using USPI/USPH-provided boilerplate corporate documents to provide exclusive anesthesia services at OCOM, driving additional profits to themselves. In doing so, Defendants created a textbook self-referring financial relationship and kickback Scheme. Since 2012, USP formed at least twenty-two similar companies in six states, where USPI/USPH has facilities and physician-partnerships similar to OCOM, to perpetuate the same fraudulent scheme. Like Defendants' employment scheme, USP urgently ordered Kimzey to dismantle the anesthesia company expeditiously by selling its shares back to the SOS Doctors in fear of Tenet's reprisal after entering into its Non-Prosecution Agreement. Through this abrupt restructuring of APO, USP and Kimzey attempted to conceal their

involvement in this unlawful agreement from the forthcoming NPA monitor. Because of the improper financial relationship between the SOS Defendants and the OCOM Defendants with respect to APO, all Government reimbursements to OCOM and APO from referrals from SOS Doctors are subject to recovery under the Stark Law and the FCA.

152.    In late 2015, Kimzey convinced the SOS Doctors that they were "leaving money on the table" by allowing independent anesthesiologists to bill and collect for anesthesia services for surgeries performed at OCOM. He encouraged them to follow a nationally-employed USP model to create and own their own anesthesia company, which would then be the exclusive anesthesia provider to OCOM. Kimzey told the SOS Doctors that USP and Tenet used this type of arrangement throughout their facilities nationally for years, and OCOM was perhaps the only facility failing to capture such revenue. The thought of these lost profits was more than the SOS Doctors could bear; they quickly authorized Kimzey to get the USPI/USPH-provided documents and form their own anesthesia company under USP's guidance.

153.    Using the USPI/USPH-provided boilerplate corporate documents, USP and Tenet arranged for the formation of the anesthesia company, Defendant APO. The SOS Doctors, USP (via a new USP subsidiary called UAP Oklahoma), and Kimzey each individually owned a portion, with each member contributing $49,000 for 10% (except USP, who contributed only $1.00 for 10% because it provided the corporate documents and architecture). APO obtained an NPI number so that it could submit claims for reimbursement to federal healthcare programs.

154.    Following the USPI/USPH model and under Kimzey's coordination, APO then (i) entered into an exclusive agreement with OCOM to provide anesthesia services; (ii) entered into contractor and/or employment agreements with one or more anesthesiologists and Certified Registered Nurse Anesthetists ("CRNAs"); and (iii) entered into a management agreement with UAP. When the SOS Doctors referred a patient to OCOM, they were referring a patient for hospital services, including anesthesia. As explained throughout this Complaint, the SOS Doctors had effective control over OCOM Equity *and* its operations: Cruse was OCOM's Chairman, a board member and Medical Director; Langerman was a board member; another SOS Doctor was a rotating board member; and Kimzey brought all OCOM matters (regarding equity and operations) to the SOS Doctors and even regularly attended SOS Doctor meetings. And because the SOS Doctors, in coordination with Kimzey and USP, could direct OCOM to enter into an exclusive arrangement with APO, the SOS Doctors knew that a surgical referral to OCOM was an anesthesia service referral to their company, APO—a two-for-one deal.

155.    The arrangement constitutes an improper financial relationship between the SOS Doctors, OCOM, and UAP that facilitates unlawful self-referrals of DHS. Further, the venture constitutes blatant solicitation and payment of kickbacks to the SOS Doctors in return for referral of federally-insured patients to OCOM. This financial relationship (and business plan) for APO was based on and took into account the volume and value of SOS Doctors' referrals to OCOM, and the amount of remuneration provided to the SOS Doctors depended directly on the volume and value of the SOS Doctors' referrals to OCOM. The Scheme involved little to no financial risk to the SOS Doctors because they alone

controlled the amount of business they referred to OCOM and, thus, to APO. The initial

member contributions were to pay for the hiring of anesthesiologists and CRNAs until

APO's billings could be collected. During the initial setup, the SOS Doctors had little to

no involvement with APO because Kimzey handled all the necessary management tasks as

directed by USP (*e.g.*, the APO NPI number initially listed Kimzey as the primary contact,

and that continues today). Thereafter, the SOS Doctors were not involved in APO's

operations beyond collecting their monthly distribution. Within months, it was reported to

Relator that each member received an initial monthly distribution of approximately

$20,000.

156.   This relationship is nearly identical to a Physician-Owned Distributorship

("POD") or Physician-Owned Entity ("POE"), which are textbook violations of the AKS.[57]

Here, Defendants capture unlawful revenue for anesthesia services, where the traditional

POD involves capture of revenue from medical implants (*e.g.*, surgical implants). This

relationship is also considered a highly suspect joint venture by the OIG, and as such was

termed the "company model" in OIG Advisory Opinion 12-06, which outlined the

"common elements of a suspect joint venture arrangement":

> [A] health care provider in one line of business (hereafter referred to as the "Owner") expands into a related health care business by contracting with an existing provider of a related item or service (hereafter referred to as the

---

[57] "PODs are inherently suspect under the anti-kickback statute," with the parties' intent "evidenced by a POD's characteristics, including the details of its legal structure; its operational safeguards; and the actual conduct of its investors, management entities, suppliers, and customers during the implantation phase and ongoing operations," Dept. of Health and Human Services, Office of Inspector General, *Special Fraud Alert: Physician Owned Entities*, March 26, 2013.

"Manager/Supplier") to provide the new item or service to the Owner's existing patient population, including [F]ederal health care program patients. The Manager/Supplier not only manages the new line of business, but may also supply it with inventory, employees, space, billing, and other services. In other words, the Owner contracts out substantially the entire operation of the related line of business to the Manager/Supplier—otherwise a potential competitor—receiving in return the profits of the business as remuneration for its [F]ederal program referrals.

The Scheme allowed the SOS Doctors "to do indirectly what they cannot do directly; that is, to receive compensation, in the form of a portion of the Requestor's anesthesia services revenues, in return for their referrals to the Requestor."[58] And, notwithstanding each member (except USP) contributing $49,000.00 to the APO venture, the OIG considers this model to "present more than a minimal risk of fraud and abuse regardless of the level of the [entity's] physician-owners' contributions."

157.    This arrangement, based on USP's model used nationally, was so blatantly illegal that, following the execution of Tenet's NPA, USP ordered Kimzey to immediately sell USP and Kimzey's interest to the SOS Doctors. USP needed to avoid potential review by the forthcoming NPA Monitor, who would review Tenet's (and its subsidiaries') relationships with referring physicians. USP realized that this unlawful practice could compromise Tenet's continued compliance with the NPA. Tenet's NPA provides

The Monitor's work plan for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement. In developing such understanding the Monitor is to rely to the extent possible

_____

[58] OIG Advisory Opinion No. 12-06, May 25, 2012 ("Requestor"—an anesthesiologist— made a request to OIG for Advisory Opinion No. 12-06).

on available information and documents provided by Tenet. It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.[59]

158.    Fearing reprisal from Tenet for threatening that compliance, and in order to afford USP plausible deniability as to the improper relationships and resultant referrals and kickbacks, USP hurriedly ordered Kimzey to dismantle the relationship before Tenet's compliance monitor could uncover it. That day, the SOS Doctors voted to buy out USP and Kimzey, and Kimzey then coordinated the purchase of USP and Kimzey's APO shares. The SOS Doctors continued to own APO.

159.    Within 2016, APO submitted or caused to be submitted claims for payment to federal healthcare programs for designated healthcare services, and remuneration was paid to APO's owners from reimbursements from federal healthcare programs. Because USP manages APO—as USPI/USPH does with all the other anesthesia companies set up nationally in this Scheme—USPI/USPH is submitting claims for payment for DHS on behalf of APO and all the others nationally.

160.    According to its most recent Form 10-K, Tenet owns twenty-two companies similar to UAP Oklahoma through USPI/USPH. As Kimzey stated to Relator, Tenet and USP perpetuated this scheme across six states in the U.S., with each such company using a USP-supplied "kit"— boilerplate corporate formation and governance documents.[60]

---

[59] Tenet Non-Prosecution Agreement at 75, ¶12.

[60] Tenet's SEC 10-K filing lists twenty-two subsidiaries named "…UAP…," including: Dreamland UAP Anesthesia, LLC (MO); Eye Center of Nashville UAP, LLC (TN); Franklin Endo UAP, LLC (TN); GLS UAP Sugarland, LLC (TX); JFP UAP Sugarland, LLC (TX); Lee's Summit Endo UAP, LLC (MO); Mid State Endo UAP, LLC (TN); SKV

161.    USP propagated their uniform anesthesia model in six states since at least 2012. Based on Relator's firsthand exposure to the Oklahoma model and Kimzey's representation to Relator that the Oklahoma model was set up and operated the same as those in the other states, Relator alleges that all USP anesthesia companies (*i.e.,* the "UAP" companies) are engaged in the identical unlawful activities. Because USP alone possesses and controls all of the specific information on each states' corporations' structures, Relator does not know each states' specific anesthesia companies or their owners; however, because the USP Defendants designed all such states' companies' operations and structures using the USPH/USPI-provided corporate structure and documents used in Oklahoma, Relator alleges each operate virtually identically.

162.    The USP Defendants' organized and perpetrated their uniform National Anesthesia Scheme in six states to provide kickbacks to their physician partners for their patient referrals to the USP Defendants' wholly or partially owned and/or managed facilities.[61]

---

UAP Sugarland, LLC (TX); UAP Chattanooga Pain, LLC (TN); UAP Las Colinas Endo, LLC (TX); UAP Lebanon Endo, LLC (TN); UAP Nashville Endoscopy, LLC (TN); UAP of Arizona, Inc. (AZ); UAP of California, Inc. (CA); UAP of Missouri, Inc. (MO); UAP of New Jersey, Inc. (NJ); UAP of Oklahoma, Inc. (OK); UAP of Tennessee, Inc. (TN); UAP of Texas, Inc. (TX); UAP Sacramento, PC (CA); UAP San Antonio Endo, LLC (TX); UAP Scopes, LLC (TX).

[61] Had the USP Defendants simply desired to control and manage the anesthesia services at their facilities, they could have directly hired anesthesiologists and CRNAs at those facilities. The profitability of the anesthesia services would have accrued up to USPI/USPH, and through to Tenet, their corporate parent, as accreditive to Tenet's earnings per share. Instead, the USP Defendants chose to create an elaborate and illegal

163.    Relator witnessed firsthand Kimzey's demand to the SOS Doctors that they purchase Kimzey and USP's membership interest in APO immediately after learning of the Tenet NPA and soon-to-be-appointed Monitor. Kimzey stated the immediate repurchase was necessary because Tenet had entered a NPA, a Monitor was coming, and that either USP could own all of APO or the SOS Doctors could, but not both. Based on the fact that the overall corporate scheme was orchestrated by the USP Defendants, the hurried manner in which it was restructured after the NPA and before the Monitor's appointment, and the fact that the Monitor would be reviewing all of Tenet's (and its subsidiaries') relationships with referring providers, Relator alleges that the USP Defendants knew the Scheme was unlawful for not only APO, but for all twenty-two comparable entities nationally, and that USP Defendants directed APO and the others be restructured before the Monitor was appointed. Although the SOS Doctors' purchase of Kimzey and USP's APO membership interest was reportedly effectuated, APO's NPI number listing still indicates Kimzey as the primary contact and manager.

## C.    IMPROPER FINANCIAL RELATIONSHIPS AND KICKBACKS BETWEEN THE SOS DEFENDANTS AND THE INTEGRIS DEFENDANTS WITH RESPECT TO REFERRALS OF FEDERALLY-REIMBURSED HEALTHCARE SERVICES TO INTEGRIS SOUTH OKLAHOMA CITY HOSPITAL

164.    The financial relationships between the SOS Defendants, on one hand, and Integris Ambulatory Care Corporation ("Integris") and Integris South Oklahoma City Hospital Corporation ("ISMC") (collectively "Integris Defendants"), on the other hand,

---

corporate Scheme to reward and incentivize its facilities' referring physicians with profit from anesthesia services.

also violate the Stark Law, AKS, FCA, and/or OKFCA. As a result, all Government reimbursements to Integris resulting from referrals of DHS from SOS Doctors from at least August 2014 to present were improper. Additionally, all Government reimbursements to SOS resulting from referrals of DHS from the ISMC E.R. were improper.[62]

165.    The SOS Defendants and the Integris Defendants entered into an unlawful financial agreement and kickback Scheme, wherein SOS agreed to provide exclusive emergency room ("E.R.") coverage and perform additional non-trauma elective surgeries at ISMC. In exchange, Integris provided SOS an exclusive E.R. coverage contract and payment, and referrals from the ISMC E.R. (the "E.R. Call Scheme"). This agreement violated the Stark Law and AKS. The SOS Defendants' and the Integris Defendants' submission of claims for reimbursement pursuant to the agreement violated the FCA and OKFCA.

166.    While the contract for E.R. orthopedic call services exclusivity may have seemed facially compliant, Integris CEO James Moore imposed an unwritten condition on SOS before excluding other orthopedists and giving the SOS Doctors exclusivity: the SOS Doctors were to "do more volume there." And that they did, which resulted in a clear *quid pro quo* Stark Law and AKS violation.

167.    On August 1, 2014, SOS entered into an agreement with ISMC, whereby SOS would receive payment from ISMC for providing orthopedic services to ISMC,

---

[62] The SOS claims for payment derived from referrals from ISMC to SOS referrals. This includes clinic and surgery charges, but not facility charges.

including highly lucrative E.R. call coverage. Under the arrangement, SOS received $434,500.00 annually and had the potential to receive all referrals of orthopedic services occurring at or required by ISMC. As noted above, this allowed SOS to increase volume and revenue for its younger physicians.

168.   As an inducement and solicitation to enter the arrangement, ISMC's then CEO, James Moore, requested and the SOS Doctors agreed to increase the number of elective surgery cases they referred to and performed at ISMC.[63]

169.   SOS Doctor West negotiated the deal with Moore. On February 25, 2014, West told the SOS Doctors that he had told ISMC, "if we [(SOS)] do 80 cases a month right now orthopedically, we are going to give you [(ISMC)] 110 cases a month.  We are going to, day one, we're going to increase your volume." Reddick added, "at no cost," to which West replied, "yea, we're just going to do more volume there for you [(ISMC)]."

170.   Upon the agreement's annual renewal, the SOS Doctors discussed ISMC's demand that additional elective, non-trauma, non-E.R. surgeries needed to be performed at ISMC by SOS Doctors or the agreement would not be renewed. During these discussions, on April 26, 2016, West told the SOS Doctors that ISMC was "happy with volume overall. Without saying 'incentive' they want to look at a way where they can look at case hours, or however you do it, [for] our group, and what they're doing there, and to kinda see if they can maximize that to get guys to do, instead of just the trauma stuff, some more elective

---

[63] James Moore retired from ISMC, and then SOS hired him to replace Relator as SOS Administrator upon Relator's termination.

stuff . . . . They want us to try to work on doing more elective stuff there, not just trauma stuff."

171. For the period from August 2013 to July 2014 (prior to the ISMC agreement), all SOS Doctors referred an average of approximately 348 surgical charges monthly to ISMC; from August 2014 to July 2015 (after the ISMC agreement), 489; and from August 2015 through March 2016 (eight months), 662. These patient referrals and surgical charges included referrals for DHS to federal healthcare program patients.

172. Only five of the SOS Doctors actually performed the service and received the compensation paid by ISMC under the ISMC agreement: Avant, Diesselhorst, Levings, Reddick, and West. For the period from August 2013 to July 2014 (prior to the ISMC agreement), these five SOS Doctors referred an average of 256 surgical charges to ISMC monthly; from August 2014 to July 2015 (after the ISMC agreement), 428; and from August 2015 through March 2016 (eight months), 578. The three other SOS Doctors not performing the ISMC services referred only an average of ninety-two, sixty-one, and eighty-four surgical charges to ISMC monthly during these periods, respectively. These patient referrals and surgical charges included referrals for DHS to federal healthcare program patients.

173. While SOS's referrals to ISMC cannibalized revenue from SOS's primary improper financial relationship with OCOM, the SOS Doctors recognized the tradeoff as an overall benefit to SOS. ISMC has an ICU and an extended inpatient physical therapy department, where OCOM has neither. The SOS Doctors refer to ISMC cases that are more medically appropriate for ISMC than OCOM. In exchange, they secured valuable E.R. call

time payment, which allowed newer SOS Doctors to build their practices. This, in turn, increased referrals from the ISMC E.R. back to SOS. The relationship also allowed the SOS Doctors to leverage against Kimzey and OCOM so they could continue to negotiate the most favorable deals possible with respect to OCOM.

174.    All of the SOS Doctors benefited from the Integris orthopaedic services agreement by receiving patient referrals for orthopaedic services from ISMC in return for performing prescribed services at ISMC. Based on West's statements and the SOS Doctors' subsequent increasing referrals to ISMC, ISMC's agreement was clearly conditioned on SOS Doctors' referring and performing a sufficient volume and value of additional elective surgery cases at ISMC, including federal healthcare program patients.

D.    **THE SOS DEFENDANTS' DIRECT FCA VIOLATIONS**

175.    In addition to the preceding FCA and OKFCA violations predicated on violations of the Stark Law and AKS, the SOS Defendants defrauded the federal healthcare programs by directly submitting, causing to be submitted, or conspiring to submit false or fraudulent claims for reimbursement for procedures that were not medically necessary or not actually performed. The SOS Defendants' submission of these "factually false" claims violated the FCA and OKFCA.

176.    First, the SOS Defendants trumped up unearned reimbursements by deploying ultrasound machines throughout their practices and billing for unnecessary, unused, or unsupervised ultrasonic guidance for injections. Second, Defendants fraudulently billed for Levings' P.A. services that were never actually performed.

1.   **Defendants Submitted False Claims for Ultrasound Guidance That Was Not Medically Necessary or Never Actually Performed (the "Ultrasound Scheme").**

177.   The SOS Defendants manufactured unearned reimbursements by deploying ultrasound machines throughout their practices and billing for unnecessary, unused, or unsupervised ultrasonic guidance for injections (the "Ultrasound Scheme").

178.   Levings pitched the idea for the Ultrasound Scheme to the other SOS Doctors in mid-2012. Before this, SOS Doctors and P.A.s performed thousands of joint injections without ultrasound, as SOS did not own an ultrasound machine or employ ultrasound guidance. Levings proposed that SOS could receive additional reimbursement for clinic-based joint injections by using ultrasound guidance and seeking reimbursement for CPT code 76942.[64] He explained that SOS Doctors and P.A.'s would not need to actually use an ultrasound device for needle guidance, but that by merely "holding the device next to the joint," and then coding CPT 76942 and dictating "ultrasound guidance was used," they would receive a significantly higher reimbursement.[65]

---

[64] Providers use Current Procedural Terminology ("CPT") codes to report, bill, and seek reimbursement for medical, surgical, and diagnostic procedures and services. CPT 76942 indicates "ultrasonic guidance for needle placement (*e.g.*, biopsy, aspiration, injection, localization device), imaging supervision and interpretation." Federal healthcare programs reimburse for this procedure if (1) medically necessary, (2) properly documented, and (3) the provider produces a retains an ultrasound image from the procedure.

[65] In 2013, CPT 76942 had a Medicare Allowable reimbursement amount of $179.93. Source: *Ingenix Optum Customized Fee Analyzer*, 2013.

179.    From the second half of 2012 through February 2014, SOS Doctors instructed Relator to acquire at least five ultrasound machines, including portable devices for rural, "pack-in-and-pack-out" operations.

180.    At no time did Levings or the other SOS Doctors discuss or inquire into the required medical necessity, documentation, or supervision requirements for using CPT 76942. Relator informed the SOS Doctors of billing requirements for using the ultrasound machines. For operational efficiency with SOS's electronic medical record system, the SOS Doctors authorized Relator to acquire technologically advanced ultrasound machines that could be configured to automatically record the required image in the patient electronic medical record, but never inquired as to what constituted medical necessity for use of the machine.

181.    Throughout this period, the SOS Doctors regularly and routinely directed their P.A.s to use the ultrasound devices at every opportunity, regardless of whether the SOS Doctor was on-site and in the room to supervise its use as required.[66] Often, at least two-to-three days weekly, P.A.s would employ an ultrasound machine while their supervising physician was in surgery in another building (*i.e.*, not on-site, not in the room, and not supervising the P.A.).

182.    From December 2012 through February 2014, the SOS Doctors and their P.A.s employed the Ultrasound Scheme approximately 4,500 times on over 1,500 federal

---

[66] Medicare guidelines require physician supervision for PAs using the ultrasound device. The physician must be on-site and in the room during the procedure. *Medicare Benefit Policy Manual*, Chapter 15, § 80.

healthcare program patients. They submitted claims for and received over $750,000 in total reimbursement for CPT 76942, with over $250,000 of that from federal healthcare programs.

183.    SOS's third-party billing company, ALN, recognized the spike in CPT 76942 claims. On January 24, 2014, ALN informed the SOS Doctors that CMS mandated that each use of the ultrasound device be medically necessary, properly documented, and supervised if administered by a P.A. ALN warned that the SOS Defendants risked False Claims Act and other legal liability by misusing the device. ALN told the SOS Doctors that payment for ultrasound services that were not medically necessary or that were performed by P.A.s without supervision should be returned. The SOS Doctors then abruptly decreased and eventually stopped using the ultrasound devices for injections.

184.    The SOS Doctors then deliberately ignored the fact that they had wrongfully profited from almost two years of improper reimbursements. They never requested a review of the medical documents; they never inquired into the calculation of amounts they had received; they never inquired into the proper procedure for returning the money to the government as required by law; and they ignored Relator's warnings that they should consider such proper compliance actions.

185.    The SOS Doctors, individually, directly and personally benefited from the Ultrasound Scheme by unlawfully increasing revenues for themselves and their fellow SOS Doctors.

2.   **Defendants Fraudulently Billed for Physician Assistant Services (the "Levings P.A. Scheme").**

186.   SOS and Levings routinely defrauded federal healthcare programs by seeking reimbursement for P.A. services that were never performed (the "Levings P.A. Scheme").

187.   On or about November 4, 2015, an SOS operations manager reported to Relator their concern that Levings was fraudulently billing for P.A. services in surgery. Relator investigated, and discovered that on certain days every week, Levings's P.A. conducted and billed for clinical operations in the SOS building **while simultaneously being billed as Levings's surgical assistant in the OCOM building next door.**[67]

188.   On November 6, 2015, Relator informed Cruse and Langerman of Levings' acts. Relator then gathered a sampling of data to verify the potentially fraudulent scheme. Throughout the course of gathering the sampling of data, OCOM's CEO, Kimzey, was informed of the situation and assisted Relator in gathering the data, which indicated what the operations manager suspected—that Levings was documenting and billing for his P.A. as providing surgical assistant services at the same time the P.A. was conducting and billing for clinical operations in a separate building. In some instances, the P.A. was recorded as being in the Operating Room ("O.R.") for only a few minutes; in other instances, longer; and in some instances, none at all. Claims for payment were being made to federal

---

[67] Relator emphasizes the *physical impossibility* apparent in the timing signatures for these bills. Given the distance between the two physical locations, there simply was no possible way to explain the concurrent bills.

healthcare programs for the P.A.'s simultaneous service in the SOS clinic and the OCOM O.R.

189. The data also indicated that while the P.A. was recorded as being in the O.R., he was also (impossibly) simultaneously conducting clinical operations as recorded in the SOS Electronic Health Record ("EHR") computer system, including ordering services and writing prescriptions. At the times when the P.A. was actually in the O.R., it was suspected that Levings and his P.A. directed unlicensed staff to use the P.A.'s user ID and password in the clinic to transact SOS clinical orders and prescriptions.

E.   **FALSE CERTIFICATION UNDER THE FALSE CLAIMS ACT AND OKLAHOMA MEDICAID FALSE CLAIMS ACT**

190. Several of Relator's claims alleged herein turn on the fact that Defendants lied to federal healthcare program administration about their compliance with relevant and material laws. Simply, while Defendants may have provided the healthcare service in question, they did so while engaged in an unlawful financial relationship or kickback arrangement. As explained in Sections V.A. through V.D., *supra*, such relationships and arrangements violate federal and state healthcare laws, which are material to the government's reimbursement decision—*i.e.*, the government would not pay for the service, even if correctly provided and billed, if it was rendered pursuant to such relationships or arrangements. Therefore, Defendants' claims for reimbursement for those services are false and fraudulent under the FCA and OKFCA.

1.     **Defendants Made Multiple False Certifications of Compliance with the Stark Law and AKS.**

191.    As a Medicare and Medicaid provider, OCOM attests to and expressly certifies its compliance with the healthcare laws in, *inter alia*, Cost Reports.[68] OCOM also attests and expressly certifies its compliance with the healthcare laws in all claims for payment sent to federal healthcare programs.[69]

192.    As Medicare and Medicaid providers, SOS and the SOS Doctors expressly certify their compliance with the healthcare laws in, *inter alia*, each claim for payment made to federal healthcare programs.[70]

---

[68] Medicare-certified institutional providers are required to submit an annual Cost Report to a Medicare Administrative Contractor. The Cost Report contains provider information such as facility characteristics, utilization data, cost and charges by cost center (in total and for Medicare), Medicare settlement data, and financial statement data.  The Cost Report requires attestation to the following: "MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT."  The Cost Report also requires affirmative attestation that the signatory officer is "familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."

[69] Hospital claims are sent electronically or on a Form UB-92. A claim for payment includes express certification as follows: "I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State Laws."

[70] Physician services claims for payment are sent electronically or on a Form 1500. A claim for payment includes express certification as follows: "NOTICE: Anyone who misrepresents or falsifies essential information to receive payment from Federal funds

193.   Defendants directly and/or (as an entity agent/official) affirmatively attested to not violating, and expressly certified being in compliance with, the Stark Law, AKS, Oklahoma kickback prohibitions, FCA, and the OKFCA. Defendants' knew of the individual and continuous violations complained of herein. Defendants knew that these violations rendered each claim for payment by each Defendant to a federal healthcare programs a false and/or fraudulent claim under the FCA and OKFCA. Despite this, from 2011 at the latest, year after year, in thousands of claims for payment and required reporting to federal healthcare programs, Defendants attested to and certified their compliance with material healthcare laws.

## 2.   Defendants Falsely Certified Compliance with EHR Incentive Requirements.

194.   Defendants made a separate set of false claims to the government for payments designed to incentivize the implementation of an Electronic Health Record ("EHR") system.[71] Defendants' lack of compliance with the healthcare laws, and their certification of compliance in their submission of claims for the incentive funds, rendered those claims false and fraudulent under the FCA and OKFCA. These lies fraudulently

---

requested by this form may upon conviction be subject to fine or imprisonment under applicable Federal laws."

[71] "Beginning in 2011, the Electronic Health Records ("EHR") Incentive Programs were developed to encourage eligible professionals and eligible hospitals to adopt, implement, upgrade (AIU), and demonstrate meaningful use of certified EHR technology. As of October 2015, more than 479,000 health care providers received payment for participating in the Medicare and Medicaid EHR Incentive Programs." (emphasis added) *See* https://www.cms.gov/regulations-and-guidance/legislation/ehrincentiveprograms/basics.html.

garnered over $300,000 in incentives for the SOS Doctors and an unknown amount for OCOM.

195.    Licensed Medicare providers—including Defendants—have been subject to the federal government requirement to implement a certified EHR system. To encourage providers to implement an EHR system, the government provided incentives in the form of direct payments and avoidance of prospective decreases in reimbursement rates.

196.    The government paired the EHR requirement with significant compliance requirements, attestations, and certifications. These include providers' affirmative attestation of compliance with the Stark Law, AKS, FCA, and the OKFCA.

197.    The EHR program includes, *inter alia*, measurement and metrics prescribed by the federal government and known as Meaningful Use and Physician Quality Reporting System ("MU/PQRS"). Under the EHR program, Medicare-licensed physicians and entities adopt, implement, upgrade, and demonstrate meaningful use of Medicare-certified technology in return for financial incentives from the government. A physician or entity's attestation to the EHR program requirements is a claim for payment to the federal government, it avoids a prospective reimbursement rate decrease, and it includes an affirmative certification that the physician or entity is in compliance with the Healthcare Laws.

198.    The attestation of each SOS Doctor includes a notice that any attesting doctor that provides "false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties," and that the attesting doctor is "*submitting a claim for Federal funds.*" (emphasis added)

199.    Each and all of the SOS Doctors attested to and certified their compliance with the EHR requirement in 2013, 2014, and 2015. Each and all received the federal government incentive payments that in aggregate are over $300,000, and avoided a penalty reimbursement percentage decrease.

200.    OCOM, as a licensed Medicare hospital, is also subject to the federal government requirement to implement EHR and must make attestation and certification to receive federal government incentive payments and avoid a prospective reimbursement rate decrease. The incentive for SOS to implement an EHR system was over $300,000 without including the value of SOS's avoidance of an ongoing prospective decrease in federal reimbursement payment rates for non-compliance.

201.    OCOM CEO Kimzey reported to the SOS Doctors that OCOM successfully made attestation and certification, received the federal government incentive payments, and avoided the ongoing prospective reimbursement rate decrease in 2013, 2014, and 2015.

**3.      The SOS Doctors Pre-Signed Prescription Pads in Violation of the Law.**

202.    Defendants routinely rendered healthcare services to patients while committing violations of Drug Enforcement Agency and Oklahoma licensure laws.

203.    A number of SOS Doctors routinely pre-signed stacks of prescription forms, and allowed and directed other, non-licensed or insufficiently-licensed personnel to complete the forms and give prescriptions to patients in violation of 21 C.F.R. § 1306.05

and 63 O.S. § 2-304(A)(4).[72] On numerous occasions, Relator warned Defendants that this conduct was illegal, would likely constitute healthcare fraud, and was especially reckless and dangerous given the growing opioid crisis and unlawful demand for prescription opioids.

204.   The Oklahoma's Bureau of Narcotics and Dangerous Drugs, and Oklahoma's medical licensure boards consider the pre-signing of prescription pads a material violation of the law. As such, Defendants' violation is material to the government's decision to reimburse for services provided pursuant to that violation.

## F.   DEFENDANTS' UNLAWFUL RETALIATION AGAINST RELATOR

205.   The SOS Defendants unlawfully retaliated against Relator in violation of the FCA and OKFCA. Throughout his employment, the SOS Defendants harassed, demoted, and ultimately terminated Relator in response to his lawful attempts to stop Defendants' violations of the FCA and OKFCA. Defendants breached Relator's employment agreement by not paying monies owed him unless he would enter into an arguably unlawful agreement. Then, Defendants filed a harassing lawsuit against Relator in response to his

---

[72] 21 C.F.R. § 1306.06: "Manner of issuance of prescriptions. (a) All prescriptions for controlled substances shall be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner."

63 O.S. § 2-304(A)(4): "Denial, Revocation or Suspension of Registration. A. A registration, pursuant to Section 2-303 of this title, to manufacture, distribute, dispense, prescribe, administer or use for scientific purposes a controlled dangerous substance shall be limited, conditioned, denied, suspended or revoked by the Director upon a finding that the registrant: … 4. Has failed to maintain effective controls against the diversion of controlled dangerous substances to unauthorized persons or entities."

lawful attempts to curb Defendants' fraud. The SOS Defendants' actions against Relator

constitute unlawful retaliation in violation of the FCA, OKFCA, and Oklahoma State and

common law.

### 1. Relator Frequently and Repeatedly Warned Defendants of Their Noncompliance and Unlawful Conduct.

206.   SOS employed Relator as its Administrator on a full time, part time, and/or

contract basis from approximately April 2002 until January 2017.[73] Throughout his tenure

with SOS, Relator continuously and repeatedly expressed to the SOS Doctors, Hendley,

and Kimzey that the SOS organization lacked proper governance and needed to prioritize

compliance with healthcare laws.

207.   Cruse and Langerman executed the original SOS Operating Agreement after

SOS's inception on December 7, 1995. Cruse, Langerman, and the SOS Doctors effectively

abandoned that agreement even before Relator ever began working for SOS in 2002. On

September 27, 2016, the SOS Doctors finally entered into a formal Operating Agreement.

SOS lacked a formal governing body or governing terms for substantially all of Relator's

tenure there.

208.   Throughout Relator's tenure with SOS beginning in 2002, Relator attended

---

[73] In April 2008, following Relator's graduation from law school and admission to the Oklahoma State Bar, Relator entered into a written employment agreement with SOS in which Relator served part time as SOS's Administrator, and would "from time to time provide to SOS general suggestion, instruction, or information in regards to legal matters," SOS acknowledged that Allison was "expressly not hereunder engaged, employed, or retained as legal representation to or defense of SOS, its members, managers, employees, or agents, on any particular legal matter" and under which "no attorney-client relationship" was created. *See* Exhibit D.

SOS Doctor meetings. At those meetings, the SOS Doctors occasionally discussed OCOM-related matters (often with OCOM's CEO Kimzey in attendance). However, the SOS Doctors and Kimzey expressly excluded Relator from direct management of OCOM-related matters, including OCOM operations, equity transactions, and governance. Indeed, Relator was an employee of SOS and a distinct third-party to OCOM. In Relator's fifteen-year tenure, he was never invited to nor attended an OCOM Board Meeting.

209.    Cruse, Langerman, Kimzey, Hendley, USP, Tenet, Integris, and the SOS Doctors handled those OCOM board matters directly. Notwithstanding Relator was an SOS employee (with no responsibilities to or relationship with OCOM), Kimzey and the SOS Doctors regularly discussed OCOM Equity matters at the SOS Doctors' monthly business meetings in Relator's presence.

210.    Relator primarily managed only the SOS clinical operation. In doing so, he repeatedly emphasized to the SOS Doctors that SOS operations, the SOS Doctors' practices, their coding, business practices and financial relationship were all highly regulated activities. Long before he was licensed as an attorney, Relator, in his role as Business Administrator, repeatedly impressed upon Defendants their own individual responsibility with respect to statutory, regulatory, and contractual compliance. Of course, after being licensed as an attorney, Relator continued to provide this same feedback to the SOS Defendants in his continuing role as Business Administrator. On numerous occasions, Relator warned Defendants that their conduct may violate healthcare laws.

- Relator warned the SOS Defendants that pre-signing their prescription pads violated the law;

- Relator warned the SOS Defendants that their improper billing of ultrasound guidance was fraudulent;

- Relator repeatedly warned the SOS Defendants that improper billing of Levings' P.A. services was fraudulent;

- Relator repeatedly warned the SOS Defendants that their use of a "Cheat Sheet" to bypass preauthorization requirements was fraudulent;[74] and

- Relator attempted to hold the SOS Defendants generally accountable to healthcare laws.

211.   After Relator disclosed the Levings P.A. Scheme, in late 2016, Physicians Strategy Group ("PSG") recommended that the SOS Doctors enter the highly-profitable orthotics business.[75] Relator confronted the SOS Doctors with the many steps, requirements, time required, and difficulties involved in providing orthotics in compliance with healthcare laws. The orthotics project required completing and signing CMS Form

---

[74] In or about mid-2015, to increase the volume of MRIs and physical therapy at OCOM, Kimzey announced that OCOM would provide free pre-authorization services for SOS patients needing MRI and PT services. This allowed OCOM to increase its patient volume and SOS to decrease its overhead costs. Years earlier, SOS staff developed a "cheat sheet," which provided key answers to insurers' common questions that would likely lead to preauthorization. Relator discovered that SOS Doctors had instructed staff to use this cheat sheet to bypass the screening function of the preauthorization process and thereby bill federal healthcare programs for undocumented, unwarranted, or unnecessary services. Relator cautioned Defendants that the cheat sheet could lead to fraud. Despite these warnings, SOS continued to use the cheat sheet and provided it to OCOM for its use. This use ended when an OCOM employee reported to Kimzey via email that continued use of the cheat sheet "would be providing false information to the insurance companies."

[75] SOS hired PSG, a subsidiary of USP and Tenet, to manage SOS clinical operations in approximately the end of 2015.

855-S, which required identifying management and making specific attestations—including compliance with the Stark Law, AKS, and false claims prohibitions.

212.    Relator presented the form to Kimzey and PSG for signatures in December 2016. PSG encouraged the SOS Doctors to ignore Relator and adopt a more expedient, noncompliant process. Relator's commitment to compliance obviously frustrated Defendants, who seemed unwilling to diminish revenue from the new potential business segment with the cost and time require to obey the law. As explained below, Kimzey terminated Relator on behalf of SOS approximately thirty days after Relator sent him the Form-855s for signature.

## 2.    For the SOS Defendants, Relator "Knew Too Much."

213.    Defendants, perfectly cognizant of their unlawful conduct and afraid of potential whistleblowers, attempted to hogtie Relator with an unduly burdensome severance agreement. In late 2015, Langerman and Cruse initiated conversations with Relator regarding a severance package in the event Relator was ever terminated without cause. This severance required Relator to execute an agreement that would "lock up" Relator and deter him from "coming after them" because Relator "knew too much." Relator refused to sign this agreement.

214.    To distance Relator from their fraud, Defendants thereafter constructively demoted Relator. They significantly decreased his job duties, hours, and compensation from the type and amount of work Relator had performed since 2002. In approximately the end of 2015, the SOS Doctors engaged Kimzey and a USP subsidiary management

company to conduct and manage SOS clinical operations.[76] Kimzey expressly barred Relator from management meetings and conference calls which Relator had previously managed and conducted.

### 3.   The SOS Defendants Terminated Relator in Violation of His Employment Agreement.

215.   Defendants grew increasingly weary of Relator's calls for compliance. In response, approximately thirty days after Relator sent Kimzey and PSG the CMS Form 855s for signature, Kimzey terminated Relator on behalf of SOS. Their actions violated Realtor's employment agreement and the FCA and OKFCA prohibitions against whistleblower retaliation

216.   On January 31, 2017, OCOM CEO Kimzey attended an SOS board meeting which Relator was expressly told not to attend. Immediately following this meeting, Kimzey terminated Relator without stating any reason and directed Relator to leave the premises immediately.

217.   SOS had employed Relator for fifteen years. Despite that, the SOS Doctors had Kimzey—OCOM's CEO, with no relationship to Relator—carry out Relator's termination and remove him from the SOS building. The fact that Kimzey regularly attended SOS Doctor meetings and carried out their bidding vis-à-vis SOS employees shows the extent of the inappropriate relationship between the SOS Defendants and the

---

[76] The USP subsidiary company conducts business and holds itself out as "Physicians Strategy Group" ("PSG"), a subsidiary of USP. PSG is listed as a Tenet subsidiary in Tenet's SEC 10-K filing dated Feb. 2, 2018, and is subject to the terms and obligations provided in Tenet's Non-Prosecution Agreement and Monitor.

OCOM Defendants. It evidences their knowledge of the impropriety of their conduct pursuant to their relationship. It evidences Kimzey's need to involve himself in the SOS Defendants' business. Kimzey knew Relator posed a threat to the SOS and OCOM Defendants' continued unlawful profit, and Kimzey's role in Relator's termination shows the extent to which he and the SOS Defendants were willing to go to silence Relator.

218.   Relator's employment provided for payment of accrued paid time off at severance. Over the next two days Relator unsuccessfully attempted to negotiate a different severance agreement, rejecting two SOS-proposed agreements containing arguably unlawful, against-public-policy provisions. SOS never paid Relator even the amounts due him as an SOS employee.

**4.     Defendants Filed a SLAPP Action Against Relator Under State Law.**

219.   Based on Defendant SOS's counsel's statement in open court that an FBI agent had approached an SOS employee for questioning, Defendants "suspected that [Relator] had taken this to the government" and had filed a claim against them. They continued their retaliatory campaign against Relator by filing a strategic lawsuit against public participation ("SLAPP") against him, ostensibly for various State claims related to SOS's purported concern over a possible HIPAA violation or trade secrets being used by competitors. In attempting to censor, intimidate, and silence Relator with the burden of his legal defense in response to his lawful attempts to compel their compliance, Defendants further violated the FCA and OKFCA prohibitions against whistleblower retaliation, and state and common law.

### a.    SOS's Attorney Admitted SOS Suspected Relator Had Filed a Claim.

220.    SOS's Counsel admitted SOS suspected Relator had filed a claim in response to his termination.[77]

221.    Apparently[78], in February or March 2017, the Federal Bureau of Investigation approached an SOS employee as part of an investigation into Defendants' conduct.

222.    SOS's counsel later admitted that SOS retained McAffee-Taft white-collar criminal attorneys as corporate defense counsel after the FBI approached them "because of an investigation." On March 24, 2017, Relator received a text message from an SOS employee stating "McAfee-Taft is here to talk to me. They said you filed a claim. ls that true?" Pursuant to the sealing order on this matter, Relator did not respond. That day, Relator received a letter from McAfee-Taft requesting return of materials in Relator's possession within ten days. Relator complied.

223.    On May 2, 2017, SOS filed its State-law-based claim against Relator (Oklahoma County, CJ-2017-2531) ("State Case"), which included an *ex parte* "urgent" request for an injunction and hearing. In support of this "urgent" request, SOS told the State-court judge they could not file tax returns without access to copies of documents allegedly in Relator's possession. Relator attested under oath to no longer having those

---

[77] As detailed above, Relator filed his first complaint and served disclosure upon the government in this matter while he was still employed with SOS.

[78] Based on Defendant SOS's counsel's statement in open court in the State Case described below.

documents, which would have consisted of electronic copies of documents already in SOS's possession. Relator had no role in the production or filing of SOS tax returns at any time during his employment.

224. At the hearing, the State Case Judge began by announcing her receipt of correspondence from the DOJ and asked, "what does plaintiff [SOS] know about the documents that have been produced to the Department of Justice and the Oklahoma Attorney General's office?" McAfee stated in response, "we don't know anything about it, your Honor, nor are we trying to find out anything about that. That's what I would represent." Relator's counsel then provided the aforementioned text message to the Court from March 24. Only then did McAfee reveal to the State Court what they really knew: (i) an SOS employee had been "contacted by an FBI agent for questioning…based on my experience, that it may be related to [Relator]"; (ii) McAfee was "hired because of an investigation"; and (iii) ***"we suspected that [Relator] had gone to the government."***

**b.    Relator Filed an Anti-SLAPP Motion Against SOS.**

225. One day after the state court hearing, Relator filed an anti-SLAPP Motion to Dismiss under 12 O.S. § 1430, *et seq*. Relator alleged SOS was misusing a State Court procedure to harass, intimidate, and retaliate against Relator. Relator further alleged that SOS was using the State Court procedure to confirm their suspicions of and learn about Relator's disclosure to the Government (*i.e.*, details of this *qui tam* case, which had been on file under seal since May 2016). The State Court sustained and denied in part the anti-SLAPP Motion to Dismiss. Relator appealed on September 5, 2017 to the Oklahoma Supreme Court (assigned to the Oklahoma Court of Civil Appeals, SD-116348). As of the

date of filing of this Second Amended Complaint, the Oklahoma Court of Civil Appeals has not issued an opinion, and the State Case has continued to be stayed by the State Case Judge by agreement of the parties. Notwithstanding the pending status of the State Case, SOS's State Case action against Relator accomplished their plainly unlawful and improper purpose of confirming Relator had made a report and disclosure to the government regarding SOS and its affiliates' business practices.

226.    Relator continues to incur the cost of defense for the State Case and must deal with the defamatory statements SOS made against him in public pleadings.

## G.    TENET'S VIOLATION OF ITS NON-PROSECUTION AGREEMENT

227.    Tenet stands in violation of its Consent Decree and NPA with the U.S. Department of Justice.

228.    Tenet purchased 51% of USPH in mid 2015. Subsequently, Tenet made additional incremental purchases and now owns approximately 95% of USPH equity.

229.    Tenet entered into a Consent Decree and NPA with the U.S. Department of Justice on September 30, 2016.[79] Tenant admitted it had "engaged in at least a ten-year scheme to pay over $12 million to the owners and operators of a chain of prenatal care clinics designed to induce the owners and operators to" refer government beneficiary patients to Tenet facilities that received "over $146 million from the Medicaid and Medicare program for the illegally referred patients." Tenet settled the matter in exchange

---

[79] *See* Section IV ("Legal Framework"), *supra*.

for $514 million and its execution of the NPA. The NPA is set to expire on November 1, 2020.[80]

230.    Pursuant to the NPA, Tenet owes an affirmative obligation to promptly report "any evidence or allegations of actual or potential violations of the Anti-kickback Statute."[81] This obligation extends to Tenet, its subsidiaries, and its affiliates, which includes USPI. It extends to entities that Tenet partially owns, which includes OCOM, and Tenet employees, officers and agents, such as Kimzey and Hendley as USP employees, and Cruse and Langerman as OCOM Board Members. As such, the violations alleged herein are clearly subject to the NPA monitor reporting obligations. The NPA "is designed and implemented to prevent and detect violations of the Anti-Kickback Statute and Stark Law," and does "not relieve Tenet of any otherwise applicable obligation to truthfully disclose such matters to the [DOJ]."

231.    The NPA provides no protection to Tenet against prosecution for future or past conduct by its subsidiaries, present or former parents, affiliates, or itself.

232.    The NPA further obligates Tenet to retain an independent compliance monitor. Disclosure to the monitor does not relieve Tenet of any otherwise applicable obligation to truthfully disclose such matters to the DOJ.

233.    As described above, Defendants abruptly dismantled their Employment

---

[80] In response to Tenet's breach of reporting obligations under the NPA (unrelated to the violations Relator alleged in this Complaint), the DOJ extended Tenet's penalty period under the NPA from its original expiration date on February 1, 2020 to November 1, 2020.

[81] Tenet Healthcare Corporation, Form 10-K (2017), at 35.

Agreement and Employee Rental scheme at the end of 2016, immediately after Tenet entered into its NPA and before the Monitor was appointed.[82] Kimzey told the SOS Doctors emphatically that a Monitor was coming pursuant to the NPA, and the ten-year arrangement must cease immediately and ordered Relator to wipe all record of Dr. Disseldorst from SOS.

234.   As described above, Defendants abruptly dismantled their Anesthesia Company at the end of 2016. Kimzey told the SOS Doctors emphatically that a Monitor was coming pursuant to the NPA, and the ownership in the Company must change immediately; either USPI and Kimzey could not own it, or SOS Doctors could not own it.

235.   On information and belief, Tenet failed to report these violations to the monitor as required by the NPA. In fact, the Tenet SEC Form 10-K filed on February 26, 2018 reports only one monitor-involved scenario. That scenario occurred in Detroit in a Tenet subsidiary and has nothing to do with the Defendants' Employment Agreement and Employee Rental Scheme or the Anesthesia Company.

236.   The following slide, produced by Tenet's largest Shareholder, Glenview Capital Management, in a February 2, 2018 Proxy Statement characterizes accurately Tenet's long history of bad behavior.[83]

---

[82] *See* Section V.B., *supra*.

[83] Tenet Healthcare Corporation, Schedule 14A Proxy Statement, Filed Feb. 2, 2018, at 13.



237.    SOS filed the retaliatory state law claim against Relator in 2017, and given

the timing of the reported Detroit matter (4Q17-1Q18), it is reasonable to conclude Tenet

has not reported anything to the Monitor regarding the SOS and OCOM Defendants

notwithstanding that Relator pleaded in the State Case that Tenet and its subsidiaries were

active and involved business partners of SOS and therefore had imputed knowledge of

"actual or potential" violations through its agents Kimzey, Cruse, and Langerman, who

were/are subject to Tenet's NPA.[84]

---

[84] Kimzey, OCOM CEO and a USP/Tenet employee, personally terminated Relator,
although Relator did not work for Kimzey or OCOM. Cruse and Langerman were OCOM
Board Members and thus subject to Tenet's NPA.

# VI.   CLAIMS

## Count One:
## Violations of the Stark Law, 42 U.S.C. § 1395nn

238.   The allegations set forth above are hereby incorporated as if fully set forth herein.[85]

239.   The Stark Law provides

> if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then (A)  the physician  may  not  make  a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third-party payor, or other entity for designated health services furnished pursuant to a referral prohibited under sub paragraph (A).

42 U.S.C.S. § 1395nn(a).

240.   **The Equity Scheme (paragraphs 107 through 123, *supra*)[86]**: The SOS Defendants and the OCOM Defendants violated the Stark Law through their Equity Scheme. The OCOM Defendants entered into a prohibited financial relationship with each

---

[85] While unnecessary at this pleading stage, Relator alleges that Defendants' conduct fails to satisfy any Safe Harbor or exception. Defendants' violative financial relationships expressly take into account the volume and value of referrals of federally-reimbursed DHS.

[86] While Relator provides paragraph references through this Section, these references are non-exhaustive. Relator incorporates by reference all allegations set forth above as if fully set out in each paragraph below.

of the SOS Doctors[87] wherein OCOM, through its board, offered and sold OCOM Equity to the SOS Doctors to reward their high volume of high value referrals and to incentivize continued high volume of referrals. The SOS Doctors referred patients to OCOM for Designated Health Services ("DHS") pursuant to this prohibited financial relationship. OCOM submitted claims for reimbursement to federal healthcare programs for DHS rendered pursuant to these prohibited referrals.

241.   **The Employment Contract Scheme (paragraphs 124 through 133,** *supra*): The SOS Defendants and the OCOM Defendants violated the Stark Law through the Employment Contract Scheme. The SOS Defendants and the OCOM Defendants entered into a prohibited financial relationship for over ten years whereby OCOM compensated SOS for its recruitment of new physicians. OCOM did this to reward the SOS Doctors for their high volume of high value referrals and to incentivize continued high volume of referrals to OCOM. Throughout this period, the SOS Doctors referred patients to OCOM for DHS pursuant to this prohibited financial relationship. OCOM submitted claims for reimbursement to federal healthcare programs for DHS rendered pursuant to these prohibited referrals.

242.   **The Surgical Scrub Scheme (paragraphs 136 through 141, *supra*)**: SOS, Cruse, Langerman, and the OCOM Defendants violated the Stark Law through the Surgical Scrub Scheme. Langerman and Cruse entered into a financial relationship with OCOM in

---

[87] The SOS Doctors are Defendants Cruse, Langerman, Jones, Adham, West, Levings, Hume, Reddick, and Avant. *See* Section II, *supra*.

approximately 2004 whereby OCOM employed their scrub techs. This financial relationship benefited Langerman and Cruse because it lowered their personal cost for their personal scrub tech. OCOM did this to reward their high volume of high value referrals and to incentivize continued high volume of referrals. Langerman and Cruse referred patients to OCOM for DHS pursuant to this prohibited financial relationship. OCOM submitted claims for reimbursement to federal healthcare programs for DHS rendered pursuant to these prohibited referrals.

243.   **The Sham Lease Scheme (paragraphs 142 through 146, *supra*)**: SOS, Cruse, Langerman, and the OCOM Defendants violated the Stark Law through the Sham Lease Scheme. Since at least 2010, Cruse and Langerman had a financial relationship with OCOM by OCOM's leasing from them a building containing an ambulatory surgery center, and extending that lease during a period in which OCOM performed no cases at the facility. Langerman and Cruse referred patients to OCOM for DHS pursuant to this prohibited financial relationship. OCOM submitted claims for reimbursement to federal healthcare programs for DHS rendered pursuant to these prohibited referrals.

244.   **The Office Space Scheme (paragraphs 147 through 149, *supra*)**: Cruse and the OCOM Defendants violated the Stark Law through the Office Space Scheme. Since 2004, Cruse entered into a prohibited financial relationship with OCOM whereby OCOM provided Cruse free office and storage space. Cruse referred patients to OCOM for DHS pursuant to this prohibited financial relationship. OCOM submitted claims for reimbursement to federal healthcare programs for DHS rendered pursuant to these prohibited referrals.

245.    **The Credit Card Scheme (paragraph 150, *supra*)**: Cruse and the OCOM Defendant violated the Stark Law through the Credit Card Scheme. For an unknown period before and after June 2011, Cruse entered into a prohibited financial relationship with OCOM whereby OCOM used Cruse's credit card to purchase surgical supplies. This allowed Cruse to receive compensation in the form of credit card reward points. Cruse referred patients to OCOM for DHS pursuant to this prohibited financial relationship. OCOM submitted claims for reimbursement to federal healthcare programs for DHS rendered pursuant to these prohibited referrals.

246.    **The Anesthesia Company Scheme (paragraphs 151 through 163, *supra*)**: The SOS Defendants and the OCOM Defendants violated the Stark Law through the Anesthesia Company Scheme. The SOS Doctors entered into a prohibited financial relationship with OCOM whereby, indirectly via APO, SOS Doctors receive remuneration from receipts generated from anesthesia services provided to patient referrals for DHS at OCOM. The SOS Doctors who own APO referred patients to OCOM knowing they could direct OCOM to, and OCOM would, use APO exclusively to provide anesthesia services to these patients, and thereby cause APO to make claims for payment to federal healthcare programs for these services. By and through their formation and ownership of APO and APO's exclusive relationship with OCOM, the SOS Doctors knew that a referral to OCOM for DHS requiring anesthesia was a referral to APO. APO made claims for payment to federal healthcare programs for these services for patients referred by the SOS Doctors.

247.    **The National Anesthesia Company Scheme (paragraphs 151 through 163, *supra*)**: By and through their National Anesthesia Company Scheme, USPI and UPSH

violated the Stark Law. USPI and USPH entered into a prohibited financial relationship with at least twenty-two facilities owned at least in part and/or managed by USPI, USPH and their affiliates. These financial arrangements were structured the same as the APO model (*supra*) to allow referring physicians to receive remuneration from receipts generated from anesthesia services provided to patient referrals for DHS. The Doctors who own these anesthesia companies referred patients to the affiliated facilities knowing they could direct the affiliated facility to, and it would, use the local anesthesia company exclusively to provide anesthesia services to these patients, thereby causing claims for payment to federal healthcare programs for these anesthesia services. By and through their formation and ownership of UAP anesthesia companies, USPI and UPSH knew that referrals for DHS requiring anesthesia would constitute a referral to the UAP entity. Those UAP entities made claims for payment to federal healthcare programs for anesthesia services for patients referred by their owners.

248.   **The E.R. Call Scheme (paragraphs 164 through 174, *supra*)**: The SOS Defendants and the Integris Defendants violated the Stark Law through the E.R. Call Scheme. The SOS Defendants entered into a prohibited financial relationship with ISMC whereby certain SOS Doctors provided orthopedic services to ISMC in return for compensation. As an unwritten but implicit condition of the agreement, the SOS Doctors scheduled and performed elective surgical cases at ISMC in sufficient volume to satisfy ISMC so that ISMC would maintain the relationship. SOS Doctors referred patients to ISMC for DHS pursuant to this prohibited financial relationship. ISMC referred patients to SOS for DHS pursuant to this prohibited financial relationship. ISMC and SOS submitted

claims for reimbursement to federal healthcare programs for DHS rendered pursuant to these prohibited referrals.

249.   **Additional Prohibited Financial Relationships**: The SOS Defendants and the OCOM Defendants entered into additional prohibited financial relationships which violated the Stark Law. OCOM and USP provided free services to SOS, such as the free pre-authorization services for MRI and PT (paragraph 210 "Cheat sheet"), create a financial relationship between SOS and OCOM. This financial relationship was not in writing. It was provided only to SOS by OCOM because OCOM took into account the volume and value of SOS Doctors' referrals. OCOM's objective in so doing was to secure more referrals from SOS, and to assist SOS in lowering SOS's overhead costs.

250.   Each of the aforementioned prohibited financial relationships took into account the volume and value of the referring Defendants' referrals of DHS. But for the referring Defendants' high volume of referrals, the value of these referrals, and the leverage and influence Cruse, Langerman, and the other SOS Doctors wield, the financial relationship would not have been created.

251.   From the time Defendants implemented each of these financial relationships, all referrals from the SOS Defendants to OCOM and/or ISMC violated the Stark Law. From the time Defendants implemented each of these financial relationships, all referrals from ISMC to SOS violated the Stark Law.

252.   From the time each of these financial relationships were implemented, all claims for payment made by SOS, OCOM, and ISMC to federal healthcare programs violated the Stark Law.

253.    Violation of the Stark Law is a material consideration made by federal healthcare programs of whether to make payment, and if federal healthcare programs would have known of the violations described herein, the federal healthcare programs would not have made payment.

254.    Because of each of the aforementioned prohibited financial relationships, the SOS Defendants were prohibited from making referral to OCOM, APO, or ISMC for the furnishing of DHS for which payment otherwise may be made by federal healthcare programs. All referrals the SOS Defendants made to OCOM, APO, or ISMC during the pendency of the aforementioned prohibited financial relationships violated the Stark Law.

255.    Because of each of the aforementioned prohibited referrals of DHS, OCOM, APO, and ISMC were prohibited from presenting or causing to be presented a claim to federal healthcare programs, all claims OCOM, APO, and ISMC submitted to federal healthcare programs pursuant to the aforementioned prohibited referrals violated the Stark Law.

256.    Pursuant to the Stark Law, the SOS Defendants and OCOM Defendants are liable to the United States and the State of Oklahoma for damages in at least the amount of all federally-funded reimbursements to OCOM resulting from SOS referrals from 2007 through 2017.

257.    Pursuant to the Stark Law, the SOS Defendants and Integris Defendants are liable to the United States and the State of Oklahoma for damages in at least the amount of all federally-funded reimbursements to Integis resulting from SOS referrals and to SOS resulting from Integris referrals from 2014 to present.

**Count Two:**
**Violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.***
**Predicated on Violations of the Stark Law, 42 U.S.C. § 1395nn**

258.   The allegations set forth above are hereby incorporated as if fully set forth herein.

259.   A knowing violation of the Stark Law subjects all such claims for payment made to the government by OCOM and ISMC as a result of these referrals, to the FCA. Defendants' submission of reimbursement claims to the government for services rendered while the Defendant was in violation renders these claims false or fraudulent under the FCA.

260.   **The Equity Scheme (paragraphs 107 through 123, *supra*)**: By and through their Equity Scheme, the SOS Defendants and the OCOM Defendants violated the Stark Law. Pursuant to this Stark Law violation, the SOS Defendants and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government.[88]

261.   **The Employment Contract Scheme (paragraphs 124 through 133, *supra*)**: By and through their Employment Contract Scheme, the SOS Defendants and the OCOM Defendants violated the Stark Law. Pursuant to this Stark Law violation, the SOS Defendants and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government.

---

[88] As used in this Section (Section VI "Counts"), "Government" refers to the United States Government, the Government of the State of Oklahoma, and the relevant agencies administering federal or state healthcare programs under each, as applicable.

262.   **The Surgical Scrub Scheme (paragraphs 136 through 141, *supra*)**: By and through their Surgical Scrub Scheme, Cruse, Langerman, and the OCOM Defendants violated the Stark Law. Pursuant to this Stark Law violation, the SOS Defendants and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government.

263.   **The Sham Lease Scheme (paragraphs 142 through 146, *supra*)**: By and through their Sham Lease Scheme, Cruse, Langerman, and the OCOM Defendants violated the Stark Law. Pursuant to this Stark Law violation, Cruse, Langerman, and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government.

264.   **The Office Space Scheme (paragraphs 147 through 149, *supra*)**: By and through their Office Space Scheme, Cruse and the OCOM Defendants violated the Stark Law. Pursuant to this Stark Law violation, Cruse and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government.

265.   **The Credit Card Scheme (paragraph 150, *supra*)**: By and through their Credit Card Scheme, Cruse and the OCOM Defendants violated the Stark Law. Pursuant to this Stark Law violation, Cruse and the OCOM Defendants knowingly presented, or caused to be presented a false and/or fraudulent claim for payment or approval to the Government.

266.   **The Anesthesia Company Scheme (paragraphs 151 through 163, *supra*)**: By and through their Anesthesia Company Scheme, the SOS Defendants and the OCOM

Defendants violated the Stark Law. Pursuant to this Stark Law violation, the SOS Defendants and the OCOM Defendants knowingly presented, or caused to be presented false and/or fraudulent claims for payment or approval to the Government.

267.   **The National Anesthesia Company Scheme (paragraphs 151 through 163, *supra*)**: By and through their National Anesthesia Scheme, USPI and UPSH violated the Stark Law. Pursuant to this Stark Law violation, USPI and USPH knowingly presented, or caused to be presented false and/or fraudulent claims for payment or approval to the Government.

268.   **The E.R. Call Scheme (paragraphs 164 through 174, *supra*)**: By and through their E.R. Call Scheme, the SOS Defendants and the Integris Defendants violated the Stark Law. Pursuant to this Stark Law violation, the SOS Defendants and the Integris Defendants knowingly presented, or caused to be presented false and/or fraudulent claims for payment or approval to the Government.

269.   **Certification (paragraphs 190 through 204, *supra*)**: By and through their affirmative attestation of full compliance without violations of the Stark Law, The SOS Defendants, the OCOM Defendants, and the Integris Defendants expressly falsely certified compliance in Cost Reports, provider agreements, claims for payments, and the EHR program. Each of the aforementioned violations of the Stark Law rendered the claims submitted during the pendency of the respective violation a false and/or fraudulent claim under the FCA and OKFCA.

270.   At all relevant times and for each of Defendants' Schemes—the Equity, Employment Contract, Surgical Scrub, Sham Lease, Office Space, Credit Card, Anesthesia

Company, and E.R. Call Schemes—Defendants had actual knowledge, acted in deliberate ignorance, or acted in reckless disregard of the false and/or fraudulent nature of the claims for reimbursement they submitted or caused to be submitted.

271.    Violation of the Stark Law is material to federal healthcare programs' consideration of whether to reimburse a claim; if federal healthcare programs had known of the violations described herein, the federal healthcare programs would not have made payment.

272.    Pursuant to the FCA, the SOS Defendants and the OCOM Defendants (and their related/affiliated owners and operators) are liable to the United States for civil penalties as set forth therein, plus three (3) times the amount of damages—which is at least the amount of all federally-funded reimbursements to OCOM resulting from SOS referrals from 2007 to 2017—and reasonable costs and attorney fees.

273.    Pursuant to the FCA, the SOS Defendants and the Integris Defendants (and their related/affiliated owners and operators) are liable to the United States for civil penalties as set forth therein, plus three (3) times the amount of damages—which is at least the amount of all federally-funded reimbursements to ISMC resulting from SOS referrals and to SOS resulting from ISMC referrals from 2014 to Present—and reasonable costs and attorney fees.

**Count Three:**
**Violations of the False Claims Act, 31 U.S.C. § 3729, *et seq*.**
**Predicated on Violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)**

274.    The allegations set forth above are hereby incorporated as if fully set forth herein.

275.    Violation of the Anti-Kickback Statute ("AKS") subjects all such claims for payment made to the government by OCOM and ISMC as a result of these referrals, to the FCA. Defendants' submission of reimbursement claims to the government for services rendered while the Defendant was in violation renders that claim false or fraudulent under the FCA.

276.    **The Equity Scheme (paragraphs 107 through 123, *supra*)**: Through the Equity Scheme, the SOS Defendants and the OCOM Defendants violated the AKS. The SOS Defendants knowingly solicited and received remuneration in the form of OCOM Equity in return for, and as reward for, referrals to OCOM of services for which payment may be made in whole or in part under a federal health care program. The OCOM Defendants knowingly offered and/or paid remuneration to the SOS Defendants in the form of OCOM Equity in return for, and as reward for, referrals to OCOM of services for which payment may be made in whole or in part under a federal health care program. Pursuant to these AKS violations, the SOS Defendants and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government. The SOS Doctors referred federal healthcare program patients to OCOM for DHS on account of these kickbacks. OCOM submitted claims for reimbursement to federal healthcare programs for the DHS it provided pursuant to these unlawful referrals.

277.    **The Employment Contract Scheme (paragraphs 124 through 133, *supra*)**: By and through their Employment Contract Scheme, the SOS Defendants and the OCOM Defendants violated the AKS. For over ten years, the SOS Defendants knowingly solicited and received remuneration in the form of monthly rental payments, compensation,

and bonuses for SOS's recruitment of new physicians. For over ten years, the OCOM Defendants knowingly offered and/or paid remuneration in the form of monthly rental payments, compensation, and bonuses for SOS's recruitment of new physicians. Pursuant to these AKS violations, the SOS Defendants and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government. The SOS Doctors referred federal healthcare program patients to OCOM for DHS on account of these kickbacks. OCOM submitted claims for reimbursement to federal healthcare programs for the DHS it provided pursuant to these unlawful referrals.

278.   **The Surgical Scrub Scheme (paragraphs 136 through 141, *supra*)**: By and through their Surgical Scrub Scheme, Langerman, Cruse, and the OCOM Defendants violated the AKS. Langerman and Cruse knowingly solicited and received remuneration in the form of OCOM hiring and compensating Langerman and Cruse's personal scrub techs in return for, and as reward for, referrals of federally-insured patients for services at OCOM. The OCOM Defendants knowingly offered and paid remuneration in the form of OCOM hiring and compensating Langerman and Cruse's personal scrub techs in return for, and as reward for, referrals of federally-insured patients for services at OCOM. Pursuant to these AKS violations, Cruse, Langerman, and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government. Cruse and Langerman referred federal healthcare program patients to OCOM for DHS on account of these kickbacks. OCOM submitted claims for reimbursement to federal healthcare programs for the DHS it provided pursuant to these unlawful referrals.

119

279.   **The Sham Lease Scheme (paragraphs 142 through 146, *supra*)**: By and through their Sham Lease Scheme, Cruse, Langerman, and the OCOM Defendants violated the AKS. Cruse and Langerman knowingly solicited and received remuneration in the form of OCOM continuing lease payments for a facility it did not use in return for, and as reward for, referrals of federally-insured patients for services at OCOM. The OCOM Defendants knowingly offered and paid remuneration in the form of OCOM continuing lease payments for a facility it did not use in return for, and as reward for, referrals of federally-insured patients for services at OCOM. Pursuant to these AKS violations, Cruse, Langerman, and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government. Cruse and Langerman referred federal healthcare program patients to OCOM for DHS on account of these kickbacks. OCOM submitted claims for reimbursement to federal healthcare programs for the DHS it provided pursuant to these unlawful referrals.

280.   **The Office Space Scheme (paragraphs 147 through 149, *supra*)**: By and through their Office Space Scheme, Cruse and the OCOM Defendants violated the AKS. For approximately the last ten years, Cruse knowingly solicited and received remuneration in the form of free office space provided by OCOM to Cruse for his personal business interests and personal affairs in return for, and as reward for, patient referrals for federally-insured patients for services at OCOM. The OCOM Defendants knowingly offered and paid remuneration in the form of free office space provided by OCOM to Cruse for his personal business interests and personal affairs in return for, and as reward for, patient referrals for federally-insured patients for services at OCOM. Pursuant to these AKS

violations, Cruse and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government. Cruse referred federal healthcare program patients to OCOM for DHS on account of these kickbacks. OCOM submitted claims for reimbursement to federal healthcare programs for the DHS it provided pursuant to these unlawful referrals.

281. **The Credit Card Scheme (paragraph 150,** *supra***)**: By and through their Credit Card Scheme, Cruse and the OCOM Defendants violated the AKS. Cruse knowingly solicited and/or received indirect remuneration in the form of credit card reward points for OCOM's purchase of surgical goods and supplies in return for, and as reward for, patient referrals for federally-insured patients for services at OCOM. The OCOM Defendants knowingly offered and/or paid indirect remuneration in the form of credit card reward points for OCOM's purchase of surgical goods and supplies in return for, and as reward for, patient referrals for federally-insured patients for services at OCOM. Pursuant to these AKS violations, Cruse and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government. Cruse referred federal healthcare program patients to OCOM for DHS on account of these kickbacks. OCOM submitted claims for reimbursement to federal healthcare programs for the DHS it provided pursuant to these unlawful referrals.

282. **The Anesthesia Company Scheme (paragraphs 151 through 163,** *supra***)**: By and through their Anesthesia Company Scheme, the SOS Doctors, Kimzey, and USP violated the AKS. These Defendants knowingly solicited, received, offered, and/or paid remuneration in the form of distributions from APO in return for, and as reward for, patient

referrals for federally-insured patients for DHS, specifically, anesthesia services. The SOS

Doctors who own APO refer patients to OCOM knowing OCOM will exclusively use APO

to provide anesthesia services to these patients, thereby causing APO to make claims for

reimbursement to federal healthcare programs for these services. APO made claims for

payment to federal healthcare programs for these services for patients referred by the SOS

Doctors. By and through their Anesthesia Company Scheme, the SOS Defendants and the

OCOM Defendants knowingly presented, or caused to be presented false or fraudulent

claims for payment or approval to the United States Government.

283.   **The National Anesthesia Company Scheme (paragraphs 151 through**

**163, *supra*)**: By and through their National Anesthesia Company Scheme, USPI and UPSH

violated the AKS. USPI and USPH entered into a prohibited financial relationship with at

least twenty-two facilities owned at least in part and/or managed by USPI, USPH and their

affiliates. These financial arrangements were structured the same as the APO model (*supra*)

to allow referring physicians to receive remuneration from receipts generated from

anesthesia services provided to patient referrals for DHS. The Doctors who own these

anesthesia companies referred patients to the affiliated facilities knowing they could direct

the affiliated facility to, and it would, use the local anesthesia company exclusively to

provide anesthesia services to these patients, thereby causing claims for payment to federal

healthcare programs for these anesthesia services. By and through their formation and

ownership of UAP anesthesia companies, USPI and UPSH knew that referrals for DHS

requiring anesthesia would constitute a referral to the UAP entity. Those UAP entities

made claims for payment to federal healthcare programs for anesthesia services for patients

referred by their owners. By and through their National Anesthesia Company Scheme, USPI and USPH knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government.

284.    **The E.R. Call Scheme (paragraphs 164 through 174, *supra*)**: By and through their E.R. Call Scheme, the SOS Defendants and the Integris Defendants violated the AKS. Since August 2014 and continuing today, the SOS Defendants knowingly solicited and/or received remuneration in the form of ISMC providing an exclusive orthopaedic services contract to SOS in return for, and as reward for, patient referrals for federally-insured patients for services at ISMC. The Integris Defendants knowingly offered and/or paid remuneration in the form of ISMC providing an exclusive orthopaedic services contract to SOS in return for, and as reward for, patient referrals for federally-insured patients for services at ISMC. Pursuant to these AKS violations, the SOS Defendants and the Integris Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government. The SOS Defendants referred federal healthcare program patients to OCOM for services on account of these kickbacks. The Integris Defendants submitted claims for reimbursement to federal healthcare programs for the DHS it provided pursuant to these unlawful referrals.

285.    Defendants USP, USPI, USP Holding Company, Inc., Integris, and Tenet, in their roles as owners and/or operators of OCOM, violated the AKS by knowingly agreeing with the soliciting, receiving, offering, and/or paying remuneration in the various forms and unlawful arrangements described herein, in return for, and as reward for, referral of federally-insured patients for DHS.

286.   The free services provided by OCOM and USP to SOS, such as the free pre-authorization services for MRI and PT, constitutes the soliciting, receiving, offering, and/or paying remuneration between SOS and OCOM. This financially beneficial relationship is not in writing. OCOM provided it only to SOS because OCOM took into account the volume and value of SOS Doctors' referrals.  OCOM's objective in so doing was to secure more referrals from SOS, and to assist SOS in lowering its overhead costs.

287.   By and through their affirmative attestation of full compliance without violations of the AKS, the SOS Defendants, the OCOM Defendants, and the Integris Defendants expressly falsely certified compliance in Cost Reports, provider agreements, claims for payments, and the EHR program. Each of the aforementioned violations of the AKS rendered the claims submitted during the pendency of the respective violation a false and/or fraudulent claim under the FCA and OKFCA.

288.   At all relevant times and for each of Defendants' Schemes—the Equity, Employment Contract, Surgical Scrub, Sham Lease, Office Space, Credit Card, Anesthesia Company, and E.R. Call Schemes—Defendants had actual knowledge, acted in deliberate ignorance, or acted in reckless disregard of the false and/or fraudulent nature of the claims for reimbursement they submitted or caused to be submitted.

289.   Violation of the AKS is material to federal healthcare programs' consideration of whether to reimburse a claim; if federal healthcare programs had known of the violations described herein, the federal healthcare programs would not have made payment.

290.    Pursuant to the FCA, the SOS Defendants and the OCOM Defendants (and their related/affiliated owners and operators) are liable to the United States for civil penalties as set forth therein, plus three (3) times the amount of damages—which is at least the amount of all federally-funded reimbursements to OCOM resulting from SOS referrals from 2007 to 2017—and reasonable costs and attorney fees.

291.    Pursuant to the FCA, the SOS Defendants and the Integris Defendants (and their related/affiliated owners and operators) are liable to the United States for civil penalties as set forth therein, plus three (3) times the amount of damages—which is at least the amount of all federally-funded reimbursements to ISMC resulting from SOS referrals and to SOS resulting from ISMC referrals from 2014 to Present—and reasonable costs and attorney fees.

### Count Four:
### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and (B)
### "Factually False Claims"

292.    The allegations set forth above are hereby incorporated as if fully set forth herein.

293.    Section 3729(a)(1) of the False Claims Act creates liability for "[a]ny person who(A) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;" or "(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to false or fraudulent claim…"

294.    **The Ultrasound Scheme (paragraphs 177 through 185, *supra*)**: By and through their Ultrasound Scheme, the SOS Defendants presented and/or caused to be presented false or fraudulent claims for payment or approval to the federal healthcare

programs. The SOS Defendants made, used, and/or caused to be made and/or used false records and/or statements to request payment from federal healthcare programs. These claims sought reimbursement for ultrasound guidance for injections when (1) that ultrasound guidance was not medically necessary; (2) that ultrasound guidance was not actually used; or (3) a P.A. used the ultrasound guidance without the required level of supervision. All claims the SOS Defendants submitted to federal healthcare programs for reimbursement are subject to the FCA and OKFCA as false claims. The SOS Defendants knew these claims were false or fraudulent. The SOS Defendants' misrepresentations to the federal healthcare programs were material to the Governments' payment decision.

295.   **The Levings P.A. Scheme (paragraphs 186 through 189, *supra*)**: By and through their Levings P.A. Scheme, the SOS Defendants submitted and/or caused to be submitted false or fraudulent claims for payment or approval to the federal healthcare programs. The SOS Defendants made, used, and/or caused to be made and/or used false records and/or statements to request payment from federal healthcare programs for Levings's improperly billed P.A. service. Therefore, all claims by these Defendants made to those programs for reimbursement are subject to the FCA and OKFCA as false claims. The SOS Defendants knew these claims were false or fraudulent. The SOS Defendants' misrepresentations to the federal healthcare programs was material to the Governments' payment decision.

296.   **Defendants' False Claims of EHR Compliance (paragraphs 194 through 201, *supra*)**: The SOS Defendants and the OCOM Defendants submitted and/or caused to be submitted false or fraudulent claims for payment or approval to the federal healthcare

programs. The SOS Defendants and the OCOM Defendants made, used, and/or caused to be made and/or used false records and/or statements to request payment from federal healthcare programs. Therefore, all claims by these Defendants made to those programs for reimbursement are subject to the FCA and OKFCA as false claims. The SOS Defendants and the OCOM Defendants knew these claims were false or fraudulent. The SOS Defendants' and the OCOM Defendants' misrepresentations to the federal healthcare programs was material to the Governments' payment decision.

297.    Violation of 31 U.S.C. § 3729(a) is a material consideration made by federal healthcare program administration of whether to make payment. If the reimbursing administration would have known of the violations described herein, it would not have made payment.

298.    Pursuant to the FCA, the SOS Defendants are liable to the United States for civil penalties as set forth therein, plus three (3) times the amount of damages, and reasonable costs and attorney fees.

299.    Pursuant to the FCA, the OCOM Defendants are liable to the United States for civil penalties as set forth therein, plus three (3) times the amount of damages, and reasonable costs and attorney fees.

**Count Five:**
**Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**Predicated on False Certification of Compliance**

300.    The allegations set forth above are hereby incorporated as if fully set forth herein.

301.   By their violations of the AKS, Stark Law, FCA, and OKFCA, and their affirmative attestation of full compliance without violations of each, Defendants expressly falsely certified compliance in Cost Reports, claims for payments, and the EHR program, all of which are material to the Government's decision to pay claims for reimbursement under federal healthcare programs.

302.   Falsely certifying compliance when in knowing violation of the AKS, Stark Law, FCA, and/or OKFCA, is a material consideration of federal healthcare programs in reimbursing claims submitted to the program.

303.   Federal healthcare programs relied on the Defendants' certification as being truthful, honest, and accurately representing Defendants' assertion that they had not individually or collectively violated the Stark Law, AKS, FCA, and/or OKFCA.

304.   Throughout the entire relevant period, Defendants would not have been paid by federal healthcare programs but for Defendants' affirmative and express false certifications in Cost Reports, attestations, EHR certifications, and individual claims for payment.

305.   Violation of the Stark Law, AKS, FCA, and/or OKFCA renders all claims for reimbursement made to federal healthcare programs subject to the FCA and OKFCA.

306.   Violation of 31 U.S.C. § 3729(a)(1)(B) is a material consideration made by federal healthcare programs of whether to reimburse. If the programs' administrations would have known of the violations described herein, they would not have made payment.

307.   Pursuant to the FCA and the OKFCA, the SOS Defendants and the OCOM Defendants (and their related/affiliated owners and operators) are liable to the United States

and the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages—which is at least the amount of all federally-funded reimbursements to OCOM resulting from SOS referrals from 2007 until present—and reasonable costs and attorney fees.

308.    Pursuant to the FCA and the OKFCA, the SOS Defendants and Integris Defendants (and their related/affiliated owners and operators) are liable to the United States and the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages—which is at least the amount of all federally-funded reimbursements to ISMC resulting from SOS referrals and to SOS resulting from ISMC referrals from 2014 until present—and reasonable costs and attorney fees.

**Count Six:**
**Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G)**
**"Reverse False Claims"**

309.    The allegations set forth above are hereby incorporated as if fully set forth herein.

310.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(G), creates liability for "[a]ny person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government…"

311.    Defendants knew that they have/had received reimbursement from the government for which they were not entitled because of their various schemes violating the Stark Law, AKS, FCA, and/or the OKFCA.

312.     Defendants deliberately disregarded their duty to return wrongly received reimbursement and disregarded their duty to even consider whether self-reporting was required under the Healthcare Laws.

313.     Throughout the entire relevant period, Defendants would not have been paid by federal healthcare programs but for Defendants' affirmative and express false certifications in Cost Reports, attestations, EHR certifications, and individual claims for payment, each repeatedly in deliberate disregard for their duty to return wrongly received reimbursement.

314.     Violation of the Stark Law, AKS, FCA, and/or OKFCA renders all claims for payment made to federal healthcare programs subject to the FCA and OKFCA.

315.     Violation of 31 U.S.C. § 3729(a)(1)(G) is a material consideration made by federal healthcare program administration of whether to make payment. If federal healthcare program administration would have known of the violations described herein, it would not have made payment.

316.     Pursuant to the FCA and OKFCA, Defendants are liable to the United States and the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages, and reasonable costs and attorney fees.

**Count Seven:**
**Conspiracy to Violate the False Claims Act, 31 U.S.C. § 3729(a)(1)(C)**

317.     The allegations set forth above are hereby incorporated as if fully set forth herein.

318.   The False Claims Act, 31 U.S.C. § 3729(a)(1)(C), creates liability for "[a]ny person who…conspires to commit a violation of [the FCA]…"

319.   Through the Schemes alleged above—the Equity, Employment Contract, Surgical Scrub, Sham Lease, Office Space, Credit Card, Anesthesia Company, E.R. Call, Ultrasound, and Levings P.A. Schemes—Defendants conspired to violate the FCA.

320.   **The Equity Scheme (paragraphs 107 through 123, *supra*)**: The SOS Defendants and the OCOM Defendants agreed as part of a single plan to use OCOM Equity transactions to induce and reward the SOS Doctors' high volume of high value referrals to OCOM. The SOS Defendants and OCOM Defendants acted in furtherance of this conspiracy on several occasions by orchestrating improper OCOM Equity transactions.

321.   **The Employment Contract Scheme (paragraphs 124 through 133, *supra*)**: For over ten years, the SOS Defendants and the OCOM Defendants agreed as part of a single plan to assume the cost of SOS's recruitment of new physicians. For over ten years, the SOS Defendants and OCOM Defendants acted in furtherance of this conspiracy by hiring and employing West, Hume, Levings, Reddick, Avant, and Disselhorst pursuant to this unlawful arrangement.

322.   **The Surgical Scrub Scheme (paragraphs 136 through 141, *supra*)**: Langerman, Cruse, and the OCOM Defendants entered into an agreement and single plan wherein OCOM hired and compensated Langerman and Cruse's personal scrub techs in return for, and as reward for, referrals of federally-insured patients for services at OCOM. Langerman, Cruse, and the OCOM Defendants acted in furtherance of this conspiracy.

131

323.   **The Sham Lease Scheme (paragraphs 142 through 146, *supra*)**: Cruse, Langerman, and the OCOM Defendants agreed as part of a single plan to extend the lease for a facility it did not use in return for, and as reward for, referrals of federally-insured patients for services at OCOM. Cruse, Langerman, and the OCOM Defendants acted in furtherance of this conspiracy, as evidenced by the payment and receipt of rent payments and continued referrals.

324.   **The Office Space Scheme (paragraphs 147 through 149, *supra*)**: For approximately the last ten years, Cruse and the OCOM Defendants agreed as part of a single plan to provide Cruse free office space for his personal business interests and personal affairs in return for, and as reward for, patient referrals for federally-insured patients for services at OCOM. Cruse and the OCOM Defendants acted in furtherance of this conspiracy, as evidenced by OCOM's provision and Cruse's use of that office space for approximately ten years.

325.   **The Credit Card Scheme (paragraph 105, *supra*)**: Cruse and the OCOM Defendants agreed as part of a single plan permit Cruse to use his personal credit card for OCOM surgical supply purchases in order to accrue reward points. Cruse and the OCOM Defendants acted in furtherance of this conspiracy, as evidenced by OCOM's use of Cruse's personal credit card for such purchases.

326.   **The Anesthesia Company Scheme (paragraphs 151 through 163, *supra*)**: The SOS Defendants and the OCOM Defendants agreed as part of a single plan to form and own and anesthesia company, which OCOM would use exclusively for anesthesia

services. The SOS Defendants and OCOM Defendants acted in furtherance of this conspiracy by forming, owning, and operating APO.

327.   **The National Anesthesia Company Scheme (paragraphs 151 through 163,** *supra*): USPI and USPH agreed as part of a single plan to form and own at least twenty-two "UAP" anesthesia companies in six states, which local hospitals would use exclusively for anesthesia services. USPI and USPH acted in furtherance of this conspiracy by designing, forming or assisting in the formation of, owning, and operating or assisting in the operation of these UAP entities to induce and reward referring physicians.

328.   **The E.R. Call Scheme (paragraphs 164 through 174,** *supra*): The SOS Defendants and the Integris Defendants agreed as part of a single plan that SOS would provide exclusive orthopaedic services at ISMC in return for, and as reward for, patient referrals for federally-insured patients for services at ISMC. The SOS Defendants and the Integris Defendants have acted in furtherance of this conspiracy since August 2014 and continue to act in furtherance of it today.

329.   Each of the individual Defendants acted overtly, both independently and collectively, to conspire to construct, orchestrate, and conceal the various Schemes described herein.

330.   By such overt acts of conspiracy, the Defendants violated the FCA and the OKFCA. Conspiracy to violate AKS, Stark Law, FCA, and/or OKFCA renders all claims for payment made to federal healthcare programs subject to the FCA and OKFCA.

331.   Throughout the entire relevant period, Defendants would not have been paid by federal healthcare programs but for Defendants' affirmative and express false

certifications in cost reports, attestations, EHR certifications, and individual claims for payment, each repeatedly in deliberate disregard for their duty to not engage in conspiracies to violate the AKS, Stark Law, FCA, and OKFCA.

332.    Violation of 31 U.S.C. § 3729(a)(1)(C) is a material consideration made by federal healthcare program administration of whether to make payment. If federal healthcare program administrations would have known of the violations described herein, the federal healthcare program administrations would not have made payment.

333.    Pursuant to the FCA and OKFCA, Defendants are liable to the United States and the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages, and reasonable costs and attorney fees.

**Count Eight:**
**Violation of the False Claims Act, 31 U.S.C. § 3729, *et seq*.**
**Predicated on Violation of Consent Decree and Non-Prosecution Agreement**
**Against Defendant Tenet Healthcare System**

334.    The allegations set forth above are hereby incorporated as if fully set forth herein.

335.    Tenet failed to exercise that level of diligence it was obligated to exercise by the NPA in managing and monitoring USP and its subsidiaries (paragraphs 227 through 237, *supra*).

336.    Tenet failed to report to the DOJ or its compliance monitor its knowledge of "actual or potential" violations.

337.    As such, Tenet stands in violation of its NPA.

338.    Tenet's violation of its NPA constitutes a violation of the FCA. Relator has standing to bring such a claim on behalf of the government despite the fact that he was not party to the NPA.

### Count Nine:
### Violations of the Oklahoma Medicaid False Claims Act, 63 Okla. Stat. § 5053.1 *et seq*., Predicated on Violations of the Stark Law, 42 U.S.C. § 1395nn

339.    The allegations set forth above are hereby incorporated as if fully set forth herein.[89]

340.    Knowing violation of the Stark Law subjects all such claims for payment made to the government by OCOM and ISMC as a result of these referrals, to the OKFCA. Defendants' submission of reimbursement claims to the government for services rendered while the Defendant was in violation renders that claim false or fraudulent under the OKFCA.

341.    **The Equity Scheme (paragraphs 107 through 123, *supra*)**: By and through their Equity Scheme, the SOS Defendants and the OCOM Defendants violated the Stark Law. Pursuant to this Stark Law violation, the SOS Defendants and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or

---

[89] While unnecessary at this pleading stage, Relator alleges that Defendants' conduct fails to satisfy any Safe Harbor or exception as it has been repeatedly controlled by, offered, and provided to the SOS Doctors' inequitably. Defendants' violative financial relationships expressly take into account the volume and value of the SOS Doctors' referrals of federally-reimbursed DHS to OCOM.

approval to the Government.[90]

342.   **The Employment Contract Scheme (paragraphs 124 through 133,** *supra*): By and through their Employment Contract Scheme, the SOS Defendants and the OCOM Defendants violated the Stark Law. Pursuant to this Stark Law violation, the SOS Defendants and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government.

343.   **The Surgical Scrub Scheme (paragraphs 136 through 141,** *supra*): By and through their Surgical Scrub Scheme, Cruse, Langerman, and the OCOM Defendants violated the Stark Law. Pursuant to this Stark Law violation, the SOS Defendants and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government.

344.   **The Sham Lease Scheme (paragraphs 142 through 146,** *supra*): By and through their Sham Lease Scheme, Cruse, Langerman, and the OCOM Defendants violated the Stark Law. Pursuant to this Stark Law violation, Cruse, Langerman, and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government.

345.   **The Office Space Scheme (paragraphs 147 through 149,** *supra*): By and through their Office Space Scheme, Cruse and the OCOM Defendants violated the Stark Law. Pursuant to this Stark Law violation, Cruse and the OCOM Defendants knowingly

---

[90] As used in this Section (Section VI "Counts"), "Government" refers to the United States Government, the Government of the State of Oklahoma, and the relevant agencies administering federal or state healthcare programs under each, as applicable.

presented, or caused to be presented false or fraudulent claims for payment or approval to the Government.

346.   **The Credit Card Scheme (paragraph 150, *supra*)**: By and through their Credit Card Scheme, Cruse and the OCOM Defendants violated the Stark Law. Pursuant to this Stark Law violation, Cruse and the OCOM Defendants knowingly presented, or caused to be presented a false and/or fraudulent claim for payment or approval to the Government.

347.   **The Anesthesia Company Scheme (paragraphs 151 through 163, *supra*)**: By and through their Anesthesia Company Scheme, the SOS Defendants and the OCOM Defendants violated the Stark Law. Pursuant to this Stark Law violation, the SOS Defendants and the OCOM Defendants knowingly presented, or caused to be presented false and/or fraudulent claims for payment or approval to the Government.

348.   **The National Anesthesia Company Scheme (paragraphs 151 through 163, *supra*)**: USPI and UPSH violated the Stark Law through the national Anesthesia Scheme. Pursuant to this Stark Law violation, the USPI and USPH Defendants knowingly presented, or caused to be presented false and/or fraudulent claims for payment or approval to the Government.

349.   **The E.R. Call Scheme (paragraphs 164 through 174, *supra*)**: By and through their E.R. Call Scheme, the SOS Defendants and the Integris Defendants violated the Stark Law. Pursuant to this Stark Law violation, the SOS Defendants and the Integris Defendants knowingly presented, or caused to be presented false and/or fraudulent claims for payment or approval to the Government.

350.   **Certification (paragraphs 190 through 204,** *supra***)**: By and through their affirmative attestation of full compliance without violations of the Stark Law, The SOS Defendants, the OCOM Defendants, and the Integris Defendants expressly falsely certified compliance in Cost Reports, provider agreements, claims for payments, and the EHR program. Each of the aforementioned violations of the Stark Law rendered the claims submitted during the pendency of the respective violation a false and/or fraudulent claim under the FCA and OKFCA.

351.   At all relevant times and for each of Defendants' Schemes—the Equity, Employment Contract, Surgical Scrub, Sham Lease, Office Space, Credit Card, Anesthesia Company, National Anesthesia, and E.R. Call Schemes—Defendants had actual knowledge, acted in deliberate ignorance, or acted in reckless disregard of the false and/or fraudulent nature of the claims for reimbursement they submitted or caused to be submitted.

352.   Violation of the Stark Law is material to federal healthcare programs' consideration of whether to reimburse a claim; if federal healthcare programs had known of the violations described herein, the federal healthcare programs would not have made payment.

353.   Pursuant to the OKFCA, the SOS Defendants and the OCOM Defendants (and their related/affiliated owners and operators) are liable to the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages—which is at lease the amount of all Medicaid-funded reimbursements to OCOM resulting from SOS referrals from 2007 to 2017—and reasonable costs and attorney fees.

354.   Pursuant to the OKFCA, the SOS Defendants and the Integris Defendants (and their related/affiliated owners and operators) are liable to the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages—which is at lease the amount of all Medicaid-funded reimbursements to ISMC resulting from SOS referrals and to SOS resulting from ISMC referrals from 2014 to Present—and reasonable costs and attorney fees.

**Count Ten:**
**Violations of the Oklahoma Medicaid False Claims Act, 63 Okla. Stat. § 5053.1 *et seq*. Predicated on Violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)**

355.   The allegations set forth above are hereby incorporated as if fully set forth herein.

356.   Violation of the Anti-Kickback Statute ("AKS") subjects all such claims for payment made to the government by OCOM and ISMC as a result of these referrals, to the OKFCA. Defendants' submission of reimbursement claims to the government for services rendered while the Defendant was in violation renders that claim false or fraudulent under the OKFCA.

357.   **The Equity Scheme (paragraphs 107 through 123, *supra*)**: Through the Equity Scheme, the SOS Defendants and the OCOM Defendants violated the AKS. The SOS Defendants knowingly solicited and received remuneration in the form of OCOM Equity in return for, and as reward for, referrals to OCOM of services for which payment may be made in whole or in part under a federal health care program. The OCOM Defendants knowingly offered and/or paid remuneration to the SOS Defendants in the form of OCOM Equity in return for, and as reward for, referrals to OCOM of services for which

139

payment may be made in whole or in part under a federal health care program. Pursuant to these AKS violations, the SOS Defendants and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government. The SOS Doctors referred federal healthcare program patients to OCOM for DHS on account of these kickbacks. OCOM submitted claims for reimbursement to federal healthcare programs for the DHS it provided pursuant to these unlawful referrals.

358. **The Employment Contract Scheme (paragraphs 124 through 133,** *supra***)**: By and through their Employment Contract Scheme, the SOS Defendants and the OCOM Defendants violated the AKS. For over ten years, the SOS Defendants knowingly solicited and received remuneration in the form of monthly rental payments, compensation, and bonuses for SOS's recruitment of new physicians. For over ten years, the OCOM Defendants knowingly offered and/or paid remuneration in the form of monthly rental payments, compensation, and bonuses for SOS's recruitment of new physicians. Pursuant to these AKS violations, the SOS Defendants and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government. The SOS Doctors referred federal healthcare program patients to OCOM for DHS on account of these kickbacks. OCOM submitted claims for reimbursement to federal healthcare programs for the DHS it provided pursuant to these unlawful referrals.

359. **The Surgical Scrub Scheme (paragraphs 136 through 141,** *supra***)**: By and through their Surgical Scrub Scheme, Langerman, Cruse, and the OCOM Defendants violated the AKS. Langerman and Cruse knowingly solicited and received remuneration in the form of OCOM hiring and compensating Langerman and Cruse's personal scrub

techs in return for, and as reward for, referrals of federally-insured patients for services at OCOM. The OCOM Defendants knowingly offered and paid remuneration in the form of OCOM hiring and compensating Langerman and Cruse's personal scrub techs in return for, and as reward for, referrals of federally-insured patients for services at OCOM. Pursuant to these AKS violations, Cruse, Langerman, and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government. Cruse and Langerman referred federal healthcare program patients to OCOM for DHS on account of these kickbacks. OCOM submitted claims for reimbursement to federal healthcare programs for the DHS it provided pursuant to these unlawful referrals.

360. **The Sham Lease Scheme (paragraphs 142 through 146,** *supra***)**: By and through their Sham Lease Scheme, Cruse, Langerman, and the OCOM Defendants violated the AKS. Cruse and Langerman knowingly solicited and received remuneration in the form of OCOM continuing lease payments for a facility it did not use in return for, and as reward for, referrals of federally-insured patients for services at OCOM. The OCOM Defendants knowingly offered and paid remuneration in the form of OCOM continuing lease payments for a facility it did not use in return for, and as reward for, referrals of federally-insured patients for services at OCOM. Pursuant to these AKS violations, Cruse, Langerman, and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government. Cruse and Langerman referred federal healthcare program patients to OCOM for DHS on account of these kickbacks. OCOM

submitted claims for reimbursement to federal healthcare programs for the DHS it provided pursuant to these unlawful referrals.

361.   **The Office Space Scheme (paragraphs 147 through 149, *supra*)**: By and through their Office Space Scheme, Cruse and the OCOM Defendants violated the AKS. For approximately the last ten years, Cruse knowingly solicited and received remuneration in the form of free office space provided by OCOM to Cruse for his personal business interests and personal affairs in return for, and as reward for, patient referrals for federally-insured patients for services at OCOM. The OCOM Defendants knowingly offered and paid remuneration in the form of free office space provided by OCOM to Cruse for his personal business interests and personal affairs in return for, and as reward for, patient referrals for federally-insured patients for services at OCOM. Pursuant to these AKS violations, Cruse and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government. Cruse referred federal healthcare program patients to OCOM for DHS on account of these kickbacks. OCOM submitted claims for reimbursement to federal healthcare programs for the DHS it provided pursuant to these unlawful referrals.

362.   **The Credit Card Scheme (paragraph 150, *supra*)**: By and through their Credit Card Scheme, Cruse and the OCOM Defendants violated the AKS. Cruse knowingly solicited and/or received indirect remuneration in the form of credit card reward points for OCOM's purchase of surgical goods and supplies in return for, and as reward for, patient referrals for federally-insured patients for services at OCOM. The OCOM Defendants knowingly offered and/or paid indirect remuneration in the form of credit card reward

142

points for OCOM's purchase of surgical goods and supplies in return for, and as reward for, patient referrals for federally-insured patients for services at OCOM. Pursuant to these AKS violations, Cruse and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government. Cruse referred federal healthcare program patients to OCOM for DHS on account of these kickbacks. OCOM submitted claims for reimbursement to federal healthcare programs for the DHS it provided pursuant to these unlawful referrals.

363.    **The Anesthesia Company Scheme (paragraphs 151 through 163, *supra*)**: By and through their Anesthesia Company Scheme, the SOS Doctors, Kimzey, and USP violated the AKS.  knowingly solicited, received, offered, and/or paid remuneration in the form of distributions from APO in return for, and as reward for, patient referrals for federally-insured patients for DHS, specifically, anesthesia services. The SOS Doctors who own APO refer patients to OCOM knowing OCOM will exclusively use APO to provide anesthesia services to these patients, thereby causing APO to make claims for reimbursement to federal healthcare programs for these services. APO made claims for payment to federal healthcare programs for these services for patients referred by the SOS Doctors. By and through their Anesthesia Company Scheme, the SOS Defendants and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government.

364.    **The National Anesthesia Company Scheme (paragraphs 151 through 163, *supra*)**: By and through their National Anesthesia Company Scheme, USPI and UPSH violated the AKS. USPI and USPH entered into a prohibited financial relationship with at

least twenty-two facilities owned at least in part and/or managed by USPI, USPH and their affiliates. These financial arrangements were structured the same as the APO model (*supra*) to allow referring physicians to receive remuneration from receipts generated from anesthesia services provided to patient referrals for DHS. The Doctors who own these anesthesia companies referred patients to the affiliated facilities knowing they could direct the affiliated facility to, and it would, use the local anesthesia company exclusively to provide anesthesia services to these patients, thereby causing claims for payment to federal healthcare programs for these anesthesia services. By and through their formation and ownership of UAP anesthesia companies, USPI and UPSH knew that referrals for DHS requiring anesthesia would constitute a referral to the UAP entity. Those UAP entities made claims for payment to federal healthcare programs for anesthesia services for patients referred by their owners. By and through their National Anesthesia Company Scheme, USPI and USPH knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government.

365.   **The E.R. Call Scheme (paragraphs 164 through 174, *supra*)**: By and through their E.R. Call Scheme, the SOS Defendants and the Integris Defendants violated the AKS. Since August 2014 and continuing today, the SOS Defendants knowingly solicited and/or received remuneration in the form of ISMC providing an exclusive orthopaedic services contract to SOS in return for, and as reward for, patient referrals for federally-insured patients for services at ISMC. The Integris Defendants knowingly offered and/or paid remuneration in the form of ISMC providing an exclusive orthopaedic services contract to SOS in return for, and as reward for, patient referrals for federally-insured

patients for services at ISMC. Pursuant to these AKS violations, the SOS Defendants and the Integris Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government. The SOS Defendants referred federal healthcare program patients to OCOM for services on account of these kickbacks. The Integris Defendants submitted claims for reimbursement to federal healthcare programs for the DHSs it provided pursuant to these unlawful referrals.

366.    Defendants USP, USPI, USP Holding Company, Inc., Integris, and Tenet, in their roles as owners and/or operators of OCOM, violated the AKS by knowingly agreeing with the soliciting, receiving, offering, and/or paying remuneration in the various forms and unlawful arrangements described herein, in return for, and as reward for, referral of federally-insured patients for DHS.

367.    The free services provided by OCOM and USP to SOS, such as the free pre-authorization services for MRI and PT, constitutes the soliciting, receiving, offering, and/or paying remuneration between SOS and OCOM.  This financially beneficial relationship is not in writing. OCOM provided it only to SOS because OCOM took into account the volume and value of SOS Doctors' referrals.  OCOM's objective in so doing was to secure more referrals from SOS, and to assist SOS in lowering its overhead costs.

368.    By and through their affirmative attestation of full compliance without violations of the AKS, the SOS Defendants, the OCOM Defendants, and the Integris Defendants expressly falsely certified compliance in Cost Reports, provider agreements, claims for payments, and the EHR program. Each of the aforementioned violations of the

AKS rendered the claims submitted during the pendency of the respective violation a false and/or fraudulent claim under the FCA and OKFCA.

369.   At all relevant times and for each of Defendants' Schemes—the Equity, Employment Contract, Surgical Scrub, Sham Lease, Office Space, Credit Card, Anesthesia Company, and E.R. Call Schemes—Defendants had actual knowledge, acted in deliberate ignorance, or acted in reckless disregard of the false and/or fraudulent nature of the claims for reimbursement they submitted or caused to be submitted.

370.   Violation of the AKS is material to federal healthcare programs' consideration of whether to reimburse a claim; if federal healthcare programs had known of the violations described herein, the federal healthcare programs would not have made payment.

371.   Pursuant to the OKFCA, the SOS Defendants and the OCOM Defendants (and their related/affiliated owners and operators) are liable to the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages—which is at lease the amount of all Medicaid-funded reimbursements to OCOM resulting from SOS referrals from 2007 to 2017—and reasonable costs and attorney fees.

372.   Pursuant to the OKFCA, the SOS Defendants and the Integris Defendants (and their related/affiliated owners and operators) are liable to the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages—which is at lease the amount of all Medicaid-funded reimbursements to ISMC resulting from SOS referrals and to SOS resulting from ISMC referrals from 2014 to Present—and reasonable costs and attorney fees.

**Count Eleven:**
**Violations of the Oklahoma Medicaid False Claims Act, 63 Okla. Stat. § 5053.1 *et***
***seq*., Predicated on Violations of Oklahoma Anti-Kickback Prohibitions**

373.    The allegations set forth above are hereby incorporated as if fully set forth herein.

374.    The Oklahoma Medicaid Program Integrity Act ("OMPIA"), 56 Okla. Stat. § 1005, outlaws kickbacks in connection with the Oklahoma Medicaid Program.

375.    Violation of the OMPIA subjects all such claims for payment made to the government by OCOM and ISMC as a result of these referrals, to the OKFCA. Defendants' submission of reimbursement claims to the government for services rendered while the Defendant was in violation renders that claim false or fraudulent under the OKFCA.

376.    **The Equity Scheme (paragraphs 107 through 123, *supra*)**: Through the Equity Scheme, the SOS Defendants and the OCOM Defendants violated the OMPIA. The SOS Defendants knowingly solicited and received remuneration in the form of OCOM Equity in return for, and as reward for, referrals to OCOM of services for which payment may be made in whole or in part under a federal health care program. The OCOM Defendants knowingly offered and/or paid remuneration to the SOS Defendants in the form of OCOM Equity in return for, and as reward for, referrals to OCOM of services for which payment may be made in whole or in part under a federal health care program. Pursuant to these OMPIA violations, the SOS Defendants and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government. The SOS Doctors referred federal healthcare program patients to OCOM

for DHS on account of these kickbacks. OCOM submitted claims for reimbursement to federal healthcare programs for the DHS it provided pursuant to these unlawful referrals.

377.   **The Employment Contract Scheme (paragraphs 124 through 133,** *supra*): By and through their Employment Contract Scheme, the SOS Defendants and the OCOM Defendants violated the OMPIA. For over ten years, the SOS Defendants knowingly solicited and received remuneration in the form of monthly rental payments, compensation, and bonuses for SOS's recruitment of new physicians. For over ten years, the OCOM Defendants knowingly offered and/or paid remuneration in the form of monthly rental payments, compensation, and bonuses for SOS's recruitment of new physicians. Pursuant to these OMPIA violations, the SOS Defendants and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government. The SOS Doctors referred federal healthcare program patients to OCOM for DHS on account of these kickbacks. OCOM submitted claims for reimbursement to federal healthcare programs for the DHS it provided pursuant to these unlawful referrals.

378.   **The Surgical Scrub Scheme (paragraphs 136 through 141,** *supra*): By and through their Surgical Scrub Scheme, Langerman, Cruse, and the OCOM Defendants violated the OMPIA. Langerman and Cruse knowingly solicited and received remuneration in the form of OCOM hiring and compensating Langerman and Cruse's personal scrub techs in return for, and as reward for, referrals of federally-insured patients for services at OCOM. The OCOM Defendants knowingly offered and paid remuneration in the form of OCOM hiring and compensating Langerman and Cruse's personal scrub techs in return

148

for, and as reward for, referrals of federally-insured patients for services at OCOM. Pursuant to these OMPIA violations, Cruse, Langerman, and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government. Cruse and Langerman referred federal healthcare program patients to OCOM for DHS on account of these kickbacks. OCOM submitted claims for reimbursement to federal healthcare programs for the DHS it provided pursuant to these unlawful referrals.

379.   **The Sham Lease Scheme (paragraphs 142 through 146, *supra*)**: By and through their Sham Lease Scheme, Cruse, Langerman, and the OCOM Defendants violated the OMPIA. Cruse and Langerman knowingly solicited and received remuneration in the form of OCOM continuing lease payments for a facility it did not use in return for, and as reward for, referrals of federally-insured patients for services at OCOM. The OCOM Defendants knowingly offered and paid remuneration in the form of OCOM continuing lease payments for a facility it did not use in return for, and as reward for, referrals of federally-insured patients for services at OCOM. Pursuant to these OMPIA violations, Cruse, Langerman, and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government. Cruse and Langerman referred federal healthcare program patients to OCOM for DHS on account of these kickbacks. OCOM submitted claims for reimbursement to federal healthcare programs for the DHS it provided pursuant to these unlawful referrals.

380.   **The Office Space Scheme (paragraphs 147 through 149, *supra*)**: By and through their Office Space Scheme, Cruse and the OCOM Defendants violated the

OMPIA. For approximately the last ten years, Cruse knowingly solicited and received remuneration in the form of free office space provided by OCOM to Cruse for his personal business interests and personal affairs in return for, and as reward for, patient referrals for federally-insured patients for services at OCOM. The OCOM Defendants knowingly offered and paid remuneration in the form of free office space provided by OCOM to Cruse for his personal business interests and personal affairs in return for, and as reward for, patient referrals for federally-insured patients for services at OCOM. Pursuant to these OMPIA violations, Cruse and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government. Cruse referred federal healthcare program patients to OCOM for DHS on account of these kickbacks. OCOM submitted claims for reimbursement to federal healthcare programs for the DHS it provided pursuant to these unlawful referrals.

381. **The Credit Card Scheme (paragraph 150, *supra*)**: By and through their Credit Card Scheme, Cruse and the OCOM Defendants violated the OMPIA. Cruse knowingly solicited and/or received indirect remuneration in the form of credit card reward points for OCOM's purchase of surgical goods and supplies in return for, and as reward for, patient referrals for federally-insured patients for services at OCOM. The OCOM Defendants knowingly offered and/or paid indirect remuneration in the form of credit card reward points for OCOM's purchase of surgical goods and supplies in return for, and as reward for, patient referrals for federally-insured patients for services at OCOM. Pursuant to these OMPIA violations, Cruse and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the

Government. Cruse referred federal healthcare program patients to OCOM for DHS on account of these kickbacks. OCOM submitted claims for reimbursement to federal healthcare programs for the DHS it provided pursuant to these unlawful referrals.

382.   **The Anesthesia Company Scheme (paragraphs 151 through 163, *supra*)**: By and through their Anesthesia Company Scheme, the SOS Doctors, Kimzey, and USP violated the OMPIA.  These Defendants knowingly solicited, received, offered, and/or paid remuneration in the form of distributions from APO in return for, and as reward for, patient referrals for federally-insured patients for DHS, specifically, anesthesia services. The SOS Doctors who own APO refer patients to OCOM knowing OCOM will exclusively use APO to provide anesthesia services to these patients, thereby causing APO to make claims for reimbursement to federal healthcare programs for these services. APO made claims for payment to federal healthcare programs for these services for patients referred by the SOS Doctors. By and through their Anesthesia Company Scheme, the SOS Defendants and the OCOM Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government.

383.   **The National Anesthesia Company Scheme (paragraphs 151 through 163, *supra*)**: By and through their National Anesthesia Company Scheme, USPI and UPSH violated the OMPIA. USPI and USPH entered into a prohibited financial relationship with at least twenty-two facilities owned at least in part and/or managed by USPI, USPH and their affiliates. These financial arrangements were structured the same as the APO model (*supra*) to allow referring physicians to receive remuneration from receipts generated from anesthesia services provided to patient referrals for DHS. The Doctors who own these

anesthesia companies referred patients to the affiliated facilities knowing they could direct the affiliated facility to, and it would, use the local anesthesia company exclusively to provide anesthesia services to these patients, thereby causing claims for payment to federal healthcare programs for these anesthesia services. By and through their formation and ownership of UAP anesthesia companies, USPI and UPSH knew that referrals for DHS requiring anesthesia would constitute a referral to the UAP entity. Those UAP entities made claims for payment to federal healthcare programs for anesthesia services for patients referred by their owners. By and through their National Anesthesia Company Scheme, USPI and USPH knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government.

384.   **The E.R. Call Scheme (paragraphs 164 through 174, *supra*)**: By and through their E.R. Call Scheme, the SOS Defendants and the Integris Defendants violated the OMPIA. Since August 2014 and continuing today, the SOS Defendants knowingly solicited and/or received remuneration in the form of ISMC providing an exclusive orthopaedic services contract to SOS in return for, and as reward for, patient referrals for federally-insured patients for services at ISMC. The Integris Defendants knowingly offered and/or paid remuneration in the form of ISMC providing an exclusive orthopaedic services contract to SOS in return for, and as reward for, patient referrals for federally-insured patients for services at ISMC. Pursuant to these OMPIA violations, the SOS Defendants and the Integris Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Government. The SOS Defendants referred federal healthcare program patients to ISMC for services on account of these

kickbacks. ISMC referred federal healthcare program patients to SOS for services on account of these kickbacks. The SOS and Integris Defendants submitted claims for reimbursement to federal healthcare programs for the DHSs it provided pursuant to these unlawful referrals.

385.    Defendants USP, USPI, USP Holding Company, Inc., Integris, and Tenet, in their roles as owners and/or operators of OCOM, violated the OMPIA by knowingly agreeing with the soliciting, receiving, offering, and/or paying remuneration in the various forms and unlawful arrangements described herein, in return for, and as reward for, referral of federally-insured patients for DHS.

386.    The free services provided by OCOM and USP to SOS, such as the free pre-authorization services for MRI and PT, constitutes the soliciting, receiving, offering, and/or paying remuneration between SOS and OCOM.  This financially beneficial relationship is not in writing. OCOM provided it only to SOS because OCOM took into account the volume and value of SOS Doctors' referrals.  OCOM's objective in so doing was to secure more referrals from SOS, and to assist SOS in lowering its overhead costs.

387.    By and through their affirmative attestation of full compliance without violations of the OMPIA, The SOS Defendants, the OCOM Defendants, and the Integris Defendants expressly falsely certified compliance in Cost Reports, provider agreements, claims for payments, and the EHR program. Each of the aforementioned violations of the OMPIA rendered the claims submitted during the pendency of the respective violation a false and/or fraudulent claim under the OKFCA.

388.    At all relevant times and for each of Defendants' Schemes—the Equity,

Employment Contract, Surgical Scrub, Sham Lease, Office Space, Credit Card, Anesthesia Company, and E.R. Call Schemes—Defendants had actual knowledge, acted in deliberate ignorance, or acted in reckless disregard of the false and/or fraudulent nature of the claims for reimbursement they submitted or caused to be submitted.

389.   Violation of the OMPIA is material to federal healthcare programs' consideration of whether to reimburse a claim; if federal healthcare programs had known of the violations described herein, the federal healthcare programs would not have made payment.

390.   Pursuant to the OKFCA, the SOS Defendants and the OCOM Defendants (and their related/affiliated owners and operators) are liable to the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages—which is at lease the amount of all Medicaid-funded reimbursements to OCOM resulting from SOS referrals from 2007 to 2017—and reasonable costs and attorney fees.

391.   Pursuant to the OKFCA, the SOS Defendants and the Integris Defendants (and their related/affiliated owners and operators) are liable to the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages—which is at lease the amount of all Medicaid-funded reimbursements to ISMC resulting from SOS referrals and to SOS resulting from ISMC referrals from 2014 to Present—and reasonable costs and attorney fees.

**Count Twelve:**
**Violations of the Oklahoma Medicaid False Claims Act, 63 Okla. Stat. § 5053.1 *et seq.*—"Factually False Claims"**

392.    The allegations set forth above are hereby incorporated as if fully set forth herein.

393.    **The Ultrasound Scheme (paragraphs 177 through 185, *supra*)**: By and through their Ultrasound Scheme, the SOS Defendants presented and/or caused to be presented false or fraudulent claims for payment or approval to the federal healthcare programs. The SOS Defendants made, used, and/or caused to be made and/or used false records and/or statements to request payment from federal healthcare programs. These claims sought reimbursement for ultrasound guidance for injections when (1) that ultrasound guidance was not medically necessary; (2) that ultrasound guidance was not actually used; or (3) a P.A. used the ultrasound guidance without the required level of supervision. All claims the SOS Defendants submitted to federal healthcare programs for reimbursement are subject to the FCA and OKFCA as false claims. The SOS Defendants knew these claims were false or fraudulent. The SOS Defendants' misrepresentations to the federal healthcare programs were material to the Governments' payment decision.

394.    **The Levings P.A. Scheme (paragraphs 186 through 189, *supra*)**: By and through their Levings P.A. Scheme, the SOS Defendants submitted and/or caused to be submitted false or fraudulent claims for payment or approval to the federal healthcare programs. The SOS Defendants made, used, and/or caused to be made and/or used false records and/or statements to request payment from federal healthcare programs for Levings's improperly billed P.A. service. Therefore, all claims by these Defendants made

to those programs for reimbursement are subject to the FCA and OKFCA as false claims. The SOS Defendants knew these claims were false or fraudulent. The SOS Defendants' misrepresentations to the federal healthcare programs was material to the Governments' payment decision.

395.   **Defendants' False Claims of EHR Compliance (paragraphs 194 through 201, *supra*)**: The SOS Defendants and the OCOM Defendants submitted and/or caused to be submitted false or fraudulent claims for payment or approval to the federal healthcare programs. The SOS Defendants and the OCOM Defendants made, used, and/or caused to be made and/or used false records and/or statements to request payment from federal healthcare programs. Therefore, all claims by these Defendants made to those programs for reimbursement are subject to the FCA and OKFCA as false claims. The SOS Defendants and the OCOM Defendants knew these claims were false or fraudulent. The SOS Defendants' and the OCOM Defendants' misrepresentations to the federal healthcare programs was material to the Governments' payment decision.

396.   By their violations of the FCA, and the OKFCA, all claims Defendants made to the OHCA for payment are subject to the OKFCA as false claims.

397.   Throughout the relevant periods for each such arrangement, each of these Defendants have submitted or caused to be submitted claims for payment to Oklahoma Medicaid and other State healthcare programs for DHS for federally-insured patients.

398.   Violation of the FCA, and/or OKFCA renders all claims for payment made to a federal healthcare program administration subject to the FCA and OKFCA.

399.    Violation of 63 Okla. Stat. § 5053.1 is a material consideration made by federal healthcare program administration of whether to make payment. If the reimbursing administration would have known of the violations described herein, it would not have made payment.

400.    Pursuant to the OKFCA, the SOS Defendants and the OCOM Defendants are liable to the State of Oklahoma for civil penalties as set forth therein, plus three (3) times the amount of damages, and reasonable costs and attorney fees.

**Count Thirteen:**
**Violations of the False Claims Act**
**Prohibition Against Retaliation, 31 U.S.C. § 3730(h)**

401.    The allegations set forth above are hereby incorporated as if fully set forth herein.

402.    The SOS Defendants retaliated against Relator in violation of the FCA (paragraphs 205 through 226, supra). Relator disclosed the Levings P.A. Scheme to SOS Doctors, refused to be SOS's attorney, and reminded the SOS Doctors of their duties under the law. Defendant SOS and the SOS Doctors attempted to intimidate Relator and thereafter decreased Relator's job duties, hours and compensation.

403.    Relator warned the SOS Defendants about their pre-signing of prescription pads, the Ultrasound Scheme, the use of cheat sheets to circumvent preauthorization, and compliance related to their orthotic endeavors. The SOS Defendants ignored these warnings and ultimately retaliated against Relator for making them.

404.    SOS, via OCOM CEO Kimzey, terminated Relator on January 31, 2017, without cause, and thereafter failed to make payment of the amounts owed Relator as an SOS employee.

405.    When SOS learned of a government investigation and suspected Relator had made a disclosure, SOS hired McAfee white-collar criminal defense attorneys and brought suit against Relator in State Court.

406.    Under the FCA Relator is entitled to relief for such damages, including reinstatement, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained from the discrimination, including litigation costs and reasonable attorneys' fees.

**Count Fourteen:**
**Violation of the Oklahoma Medicaid False Claims Act**
**Prohibition Against Retaliation, 63 Okla. Stat. § 5053.5**

407.    The allegations set forth above are hereby incorporated as if fully set forth herein.

408.    The SOS Defendants retaliated against Relator in violation of the OKFCA (paragraphs 205 through 226, supra). When Relator disclosed the Levings P.A. Scheme to SOS Doctors, refused to be SOS's attorney, and reminded the SOS Doctors of their duties under the law, Defendant SOS and the SOS Doctors attempted to intimidate Relator and thereafter decreased Relator's job duties, hours and compensation.

409.    Relator warned the SOS Defendants about their pre-signing of prescription pads, the Ultrasound Scheme, the use of cheat sheets to circumvent preauthorization

requirements, and compliance related to their orthotic endeavors. The SOS Defendants ignored these warnings and ultimately retaliated against relator for making them.

410.   SOS, via OCOM CEO Kimzey, terminated Relator on January 31, 2017, without cause, and thereafter failed to make payment of amounts due Relator as an SOS employee.

411.   When SOS learned of a government investigation and suspected Relator had made a disclosure, SOS hired white-collar criminal defense attorneys from the lawfirm of McAfee-Taft and brought suit against Relator in State Court.

412.   Under the OKFCA Relator is entitled to relief for such damages, including reinstatement, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained from the discrimination, including litigation costs and reasonable attorneys' fees.

## VII.   **JURY TRIAL**

413.   The allegations set forth above are hereby incorporated as if fully set forth herein.

414.   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff/Relator hereby demands trial by jury.

**WHEREFORE**, Relator, on behalf of himself, the United States, and the State of Oklahoma, prays that the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States and the State of Oklahoma have sustained because a Defendants' actions plus a civil penalty of between $5,500 and $11,000 for each violation under the FCA and between $5,000 and $10,000 under the OKFCA; that

Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be at least 15% and not more than 25% of the proceeds of the action or settlement of the claim if the United States and/or the State of Oklahoma intervenes, and not less than 25% nor more than 30% of the proceeds of the action or settlement of the claim if the United States and/or the State of Oklahoma does not intervene; that the Relator be awarded all costs and expenses incurred, including reasonable attorney's fees and costs; that Relator be awarded an amount equal to two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the retaliation, including litigation costs and reasonable attorneys' fees; and that the Court order all such other relief as the Court may deem appropriate.

*[The Remainder of this Page Intentionally Left Blank]*

Respectfully submitted,

 /s Michael Burrage

Michael Burrage, OBA #1350
Reggie Whitten, OBA #9576
**WHITTEN BURRAGE**
512 N. Broadway Avenue, Suite 300
Oklahoma City, OK  73102
405.516.7800 office  405.516.7859 fax
rwhitten@whittenburragelaw.com
mburrage@whittenburragelaw.com

Michael B. Angelovich
Texas Bar No. 00785666 *Pro Hac Vice*
Bradley W. Beskin
Texas Bar No. 24105463 *Pro Hac Vice*
**NIX, PATTERSON & ROACH, LLP**
3600 N. Capital of Texas Highway, Suite B350
Austin, TX 78746
512.328.5333 office 512.328.5335 fax
mangelovich@nixlaw.com
bbeskin@nixlaw.com

Richard E. Norman
Texas Bar No. 00788128 *Pro Hac Vice*
R. Martin Weber, Jr.
Texas Bar No. 00791895 *Pro Hac Vice*
**CROWLEY NORMAN, LLP**
3 Riverway, Suite 1775
Houston, TX 77056
713.651.1771 office  713.651.1775 fax
rnorman@crowleynorman.com
mweber@crowleynorman.com

Gaylon C. Hayes, OBA #14492
**HAYNES LAW GROUP**
6805 South Western Ave. Suite 500
Oklahoma City, OK 73139
405.616.5045 office  405.616.5062 fax
gaylon@hhhlawfirm.com
brooke@hhhlawfirm.com
*Attorney For Plaintiff/Relator*

161

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2018, I filed the attached document with the Clerk of Court. Based on the records currently on file in this case, the Clerk of Court will transmit a Notice of Electronic Filing to those registered participants of the Electronic Case Filing System.

/s Michael Burrage

Michael Burrage, OBA #1350
WHITTEN BURRAGE
512 N. Broadway Avenue, Suite 300
Oklahoma City, OK 73102
405.516.7800 office 405.516.7859 fax
mburrage@whittenburragelaw.com