## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

THE UNITED STATES OF )
AMERICA, ex rel. Wayne Allison, )
Relator, et al., )
  )
             Plaintiffs, )
  )
-vs- )    Case No. CIV-16-0569-F
  )
SOUTHWEST ORTHOPAEDIC )
SPECIALISTS, PLLC, et al., )
  )
            Defendants. )

## ORDER

### I. Introduction

This action was brought by relator Wayne Allison under the *qui tam* provisions in the Federal Civil False Claims Act, 31 U.S.C. §§3729 *et seq.* (the FCA)*,* and the Oklahoma Medicaid False Claims Act, 63 O.S. §§ 5053 *et seq.* (the OKFCA). The operative version of the complaint is the Second Amended Complaint (the SAC). Doc. no. 50.

The SAC alleges that in 2002, relator was hired by Southwest Orthopedic Specialists, PLLC (SOS) as its administrator and business manager. SAC at ¶ 2. The SAC alleges that relator acquired the information he alleges in this action during the course of that employment. *Id*.

The United States and the State of Oklahoma intervened with respect to some claims and declined to intervene in others. Since then, some of the claims, including all claims intervened in by the government, have been settled and dismissed, leaving

to be adjudicated only certain claims brought by the relator.  The substantive claims[1] that remain at this stage are relator's claims against defendants Michael Kimzey and Steve Hendley (none of which were ever intervened in by the government), as well as relator's wrongful termination claims (retaliation claims) alleged against the SOS defendants (SOS and the SOS doctors).[2]

## II.  The Motions

Currently before the court are Kimzey's (doc. no. 133) and Hendley's (doc. no. 134) motions seeking dismissal with prejudice as to all claims alleged against them by the relator.  The motions are brought under Rules 12(b)(6) and 9(b), Fed. R. Civ. P.  The motions were briefed some time ago but were stayed along with the rest of the action while the parties worked on settlement.  The stay has expired and the motions are ready to be ruled on.

The Kimzey motion and briefing papers are at doc. nos. 133, 143, 153, 163.

The Hendley motion and briefing papers are at doc.no. 134, 143, 155, 163.

Movants' briefs also incorporate parts of briefs filed by other defendants who are no longer active in the case.  Although the motions of these other defendants have been stricken as moot, the incorporated parts of their briefs have been considered.  The relator's notices at doc. nos. 195 and 196 cite authorities which post-date the completion of the briefing cycle.  Accordingly, those notices have also been considered.

For the reasons stated below, the motions will be granted with respect to counts one and six; otherwise they will be denied.

---

[1] The non-substantive claims that remain are relator's claims for his share of the proceeds of the settlement agreement and for expenses, fees and costs.

[2] At the status conference on September 17, 2020, the court confirmed with the parties that these are the only remaining claims.  Doc. no. 207.

III.  Glossary

The SAC alleges claims against a dizzying array of defendants among whom various relationships allegedly exist.  Many of these entities are no longer active parties, but they remain relevant to the claims against Kimzey and Hendley.  (For example, the conspiracy count alleges that all of the defendants conspired together to violate the FCA.)  Accordingly, this order begins with a glossary of abbreviations used in this order.  Because the court assumes the truth of the allegations at this stage, the glossary's descriptions are based on the allegations.  The second part of the glossary lists statutes that are referenced and/or quoted in the "legal framework" portion of the SAC.  When the glossary quotes a statute, it quotes the current version.

Entities, Persons and Other Abbreviations

**APO**:  Anesthesia Partners of Oklahoma, LLC (APO) was formed and owned by the SOS doctors, UAP, and Kimzey.  APO is a subsidiary of UAP and Tenet.  SAC at ¶ 32.

**DHS**:  Designated health services are certain health services payable, in whole or in part, by Medicare.  *Id*. at ¶27, n. 17 (citing 42 C.F.R. §411.351).

**HER:**   Electronic health records.   Beginning in 2011, EHR incentive programs were developed by the federal government to encourage professionals and hospitals to make meaningful use of EHR technology.   Healthcare providers received payment for participating in Medicare and Medicaid EHR incentive programs.  *Id*. at ¶ 194, n. 71.

**Integris**:  Integris Ambulatory Care Corporation is a subsidiary within the Integris healthcare system in Oklahoma and holds ownership interest in OCOM through one or more affiliated entities.  Integris holds a seat on the OCOM board and is subject to the Tenet NPA.  *Id*. at ¶ 34.

**ISMC**:  Integris South Oklahoma City Hospital Corporation does business as Integris Southwest Medical Center and is a subsidiary within the Integris healthcare system in Oklahoma.  *Id*. at ¶ 35.

**The Integris defendants**:  Integris and ISMC.  *Id*. at ¶ 48.

**Hendley**:  Steve Hendley is an executive manager and employee of USP. Hendley is the former CEO of OCOM, having left that position in 2014.  Hendley is subject to the Tenet NPA.  *Id*. at ¶ 46.[3]

**Kimzey**:  Michael Kimzey is a USP employee and is the current CEO of OCOM, having become CEO in 2014.   Kimzey holds an ownership interest in APO. From 2004 until 2014, Kimzey was CEO of SWMRI, a freestanding radiology diagnostic facility in which Doctors Cruse and Langerman had significant ownership interest along with fifty other physicians.  OCOM acquired SWMRI in 2014, made it a department of OCOM, and made Kimzey CEO of OCOM at that time.  Kimzey is subject to the Tenet NPA.  *Id*. at ¶47.

**NPA (or Tenet NPA)**:  This consent decree and non-prosecution agreement was entered into by Tenet HealthSystem Medical, Inc. and the United States Department of Justice, Criminal Division, Fraud Section, on September 30, 2016. *Id*. at ¶81.

**OCOM**:  Oklahoma Center for Orthopaedic & Multispecialty Surgery, LLC is a licensed hospital managed under contract by USP, a subsidiary of Tenet.  The single member of OCOM is SASC, an entity in which certain defendants hold beneficial ownership and/or management control.  *Id*. at ¶ 27.

---

[3] Hendley's moving brief states that the SAC inaccurately describes his job descriptions. Nevertheless, Hendley's brief recognizes that, at this stage, the court should treat the allegations as true.  Doc. no. 134, p. 12 of 37, n. 4.  (When this order cites page numbers, it cites the ecf page numbers at the top of each as-filed page.)

**The OCOM defendants**:  As the term "the OCOM defendants" is used in the SAC, it includes defendants OCOM, USP, USPI, USPH, Tenet, Integris, UAP, APO, Hendley, Kimzey, but with certain limitations.  *Id*. at ¶ 48(b).  Tenet is an OCOM defendant for the period of August 2015 to present.  *Id*. at n. 24.  Integris is an OCOM defendant with respect to the equity, employment contract, surgical scrub, sham lease, office space, and credit card schemes only.  *Id*. at n. 25.  UAP is an OCOM defendant with respect to the anesthesia company scheme only.  *Id*. at n. 26.  APO is an OCOM defendant with respect to the anesthesia company scheme only.  *Id*. at n. 27.  Most importantly for purposes of this order, Hendley is one of the OCOM defendants for the period of 2002 to present (*id*. at n. 28), and Kimzey is one of the OCOM defendants for the period of 2014 to present.  *Id*. at n. 29.

**SASC**:  Southwest Ambulatory Surgery Center, PLLC, the single member of OCOM, is an entity in which certain defendants hold beneficial ownership and/or management control.  *Id*. at ¶ 27.

**SOS**:  Southwest Orthopaedic Specialists, PLLC, is the professional limited liability group within which individual physicians practice.  *Id*. at ¶ 25.

**The SOS doctors**:  Doctors Cruse, Langerman, Jones, Adham, West, Levings, Hume, Reddick and Avant.  *Id*. at ¶ 36.

**The SOS defendants**:  SOS and the SOS doctors.  *Id*. at ¶ 48.

**SWMRI**:  Southwest Oklahoma MRI.  *Id*. at ¶ 47.  SWMRI is not a defendant.

**Tenet**:  Tenet Healthcare Corporation, through its subsidiaries, owns and operates hospitals throughout the United States and in Oklahoma.  Tenet (directly or via an affiliate or subsidiary) acquired ownership of USP, and thus acquired ownership and management control of OCOM through one or more affiliated entities.  Tenet is a publicly held company.  Tenet is subject to a NPA with the federal government, entered into on September 30, 2016, to resolve criminal investigation and litigation.  Pursuant to the NPA, Tenet and its subsidiaries, have affirmative

duties and obligations which apply to present or former officers, directors, employees, agents and consultants. *See generally*, *id*. at ¶¶ 33, 81.

**UAP**:  UAP of Oklahoma, Inc. is a subsidiary of, and is owned by, USP.  UAP is founder, owner and manager of APO.  UAP is also listed as a subsidiary of Tenet in Tenet's SEC 10-K and is subject to the terms and obligations of the Tenet NPA. *Id*. at ¶ 31.

**USP**:  USP Oklahoma, Inc. operates, under contract, as the management company for OCOM and holds an ownership interest in OCOM through one or more affiliated entities.  USP is a majority-owned subsidiary of Tenet.  USP holds a seat on the OCOM board.  *Id*. at ¶ 28.

**USPH**:  USPI Holding Company, Inc. USPH is 95% owned by Tenet. Subsidiaries of USPH include APO, USP, UAP, OCOM and USPI.  *Id*. at ¶¶ 29, 30.

**USPI**:  United Surgical Partners International, Inc.  USPI owns and operates short-stay surgical facilities.  In 2015, USPI and Tenet entered into an agreement to create the nation's largest ambulatory surgery platform.  USPI is a subsidiary of Tenet.  *Id*. at ¶ 30.

Statutes

**AKS**:  The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

The SAC characterizes the AKS as prohibiting any person or entity from soliciting, receiving, offering, or paying remuneration, in cash or in kind, directly or indirectly, to induce or reward any person for purchasing, ordering, or recommending or arranging for the purchasing or ordering of federally funded medical goods or services.  Per the SAC, violations of the AKS trigger FCA and OKFCA liability.  SAC at ¶¶ 67, 68.

Title 42 U.S.C. § 1320a-7b, at subsections (b)(1)(A) and (B), provides as follows.

(b)(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--

> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than ten years, or both.

42 U.S.C. § 1320a-7b(b)(1)(A),(B).

**Anti-retaliation statutes**:   The relator's wrongful termination (retaliation) claims are alleged only against the SOS defendants.   The retaliation claims are brought under 31 U.S.C. §3730(h) of the FCA and 63 O.S. §5053.5(E) of the OKFCA.

**FCA**:  The False Claims Act, 31 U.S.C. § 3729, *et seq.*

Title 31 U.S.C. § 3729(a)(1)(A) – (D), (G), and § 3729(b)(1)(A), (B), provide as follows.

(a)(1) [A]ny person who --

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property … or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government ...

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of that person.

* * *

(b) For purposes of this section –

(1) the terms "knowing" and "knowingly" –

(A) mean that a person, with respect to information –

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(a)(1)(A) - (D), (G), and (b)(1)(A), (B).

**OKFCA**:  The Oklahoma Medicaid False Claims Act, 63 O.S. §5053, *et seq*. Section 5053.1 (B) provides as follows.

> B.  Any person who:
>
>> 1.  Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
>>
>> 2.  Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; …
>
> is liable to the State of Oklahoma for a civil penalty consistent with the civil penalties provision of the Federal False Claims Act, 31 U.S.C. 3729(a), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990…plus three times the amount of damages which the state sustains because of the act of that person.

63 O.S. § 5053.1(B)(1),(2).

**OMPIA**:  The Oklahoma Medicaid Program Integrity Act, 56 O.S. §§1005, 1006 (referred to in the SAC as Oklahoma Kickback Prohibitions).

The SAC characterizes Oklahoma law as prohibiting kickbacks in connection with the Oklahoma Medicaid Program, making it a crime to willfully and knowingly solicit or accept a benefit, pecuniary benefit, or kickback, in connection with goods or services paid or claimed by a provider to be payable by the Oklahoma Medicaid Program.  SAC at ¶ 76.

Section 1005(A)(6) and (D) provide as follows.

> A. It shall be unlawful for any person to willfully and knowingly: …

> 6.  Solicit or accept a benefit, pecuniary benefit, or kickback in connection with goods or services paid or claimed by a provider to be payable by the Oklahoma Medicate Program....
>
> ***
>
> D.  For purposes of this section, a person shall be deemed to have known that a claim, statement, or representation was false if the person knew, or by virtue of the person's position, authority or responsibility, had reason to know, of the falsity of the claim, statement or representation.

56 O.S. § 1005 (A)(6), (D).

Section 1006(A) of the OMPIA provides that any person found to have committed any violation of paragraphs 1 through 6 of subsection A of § 1005, is deemed guilty of Medicaid fraud.  Section 1006(B)(1) makes Medicare fraud a felony where the aggregate amount of payments illegally claimed or received exceeds $2,500.00.

The SAC (at ¶ 77) invokes the additional kickback prohibitions in 63 O.S. § 1-742(A)(1), which provides as follows.

> A. 1.  Any person who intentionally or knowingly pays to or accepts anything of value from any person, firm, association of persons, partnership or corporation for securing or soliciting patients for any health care professional, health care provider or other entity providing health care services in this state, upon conviction, shall be guilty of a misdemeanor and shall be punished by a fine of not less than Five Hundred Dollars ($500.00) and not more than Two Thousand Dollars ($2,000.00).

63 O.S. § 1-742(A)(1).

**The Stark Law (or Stark)**:  42 U.S.C. § 1395nn(a)(1).

The SAC characterizes the Stark Law as prohibiting entities from submitting claims to federal healthcare programs for patient services referred by a physician

with whom the referred-to provider has an impermissible financial relationship. SAC at ¶ 57.

Section 1395nn(a) and (g) provide as follows.

> (a) Prohibition of certain referrals
>
> (1) In general
>
> Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then --
>
> > (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
> >
> > (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third-party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).
>
> * * *
>
> (g) Sanctions
>
> (1) Denial of payment
>
> No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(l) of this section.
>
> (2) Requiring refunds for certain claims
>
> If a person collects any amounts that were billed in violation of subsection (a)(1) of this section, the person shall be liable to the individual for, and shall refund on a timely basis to the individual, any amount so collected.

42 U.S.C. § 1395nn(a), (g).

The SAC alleges that Stark broadly defines "financial relationship" to include any physician ownership or investment interest in the referred-to entity, or a "compensation arrangement" between the referred-to entity and the referring physician.  The SAC alleges that "compensation arrangement" is defined broadly to mean any arrangement involving any remuneration between a physician and an entity.  The SAC alleges that "remuneration" is defined broadly to mean any remuneration, directly or indirectly, overtly or covertly, in case or in-kind.  SAC at ¶ 59, citing 42 U.S.C. § 1395nn(a)(2); §1395nn(h)(1)(A), (B); and 42 C.F.R. §411.354.

IV.  Standards

The inquiry under Rule 12(b)(6) is whether the complaint contains enough facts to state a claim for relief that is plausible on its face.  Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir., 2007), quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 547 (2007).  To survive a motion to dismiss, a plaintiff must nudge his claims across the line from conceivable to plausible.  Id. The mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims.  Ridge at Red Hawk, 493 F.3d at 1177.

In conducting its review under Rule 12(b)(6), the court assumes the truth of the plaintiff's well-pleaded factual allegations and views them in the light most favorable to the plaintiff.  Id. Pleadings that are no more than legal conclusions are not entitled to the assumption of truth; while legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  Ashcroft v. Iqbal, 556 U.S.662, 664 (2009).  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.  Id. The court will disregard mere "labels and

12

conclusions" and "[t]hreadbare recitals of the elements of a cause of action" to determine if what remains meets the standard of plausibility. <u>Twombly</u>, 550 U.S. at 555; <u>Iqbal</u>, 556 U.S. at 678.

In addition to the requirements of Rule 12(b)(6), the heightened pleading requirements of Rule 9(b) apply to the relator's claims because they allege fraudulent schemes and conduct. <u>United States v. Lemmon</u>, 614 F.3d 1163, 1171 (10th Cir. 2010). Rule 9(b) provides that a party "alleging fraud" must "state with particularity the circumstances constituting fraud...." The purpose is "to afford defendants fair notice of plaintiff's claims and the factual ground upon which they are based." <u>Lemmon</u> at 1172, citations omitted. "Thus, claims under the FCA need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *Id.*, citations omitted.[4]

Practically speaking, FCA claims comply with Rule 9(b) when they provide factual allegations regarding the who, what, when, where and how of the alleged claims. <u>United States, ex rel. Polukoff v. St. Mark's Hospital</u>, 895 F.3d 730, 745 (10th Cir. 2018). But in determining whether a plaintiff has satisfied Rule 9(b),

---

[4] Defendants rely on <u>United States v. Sikkenga v. Regence Bluecross Blueshield of Utah</u>, 472 F.3d 702 (10th Cir. 2006), for their argument that the SAC should identify a specific false claim, which the SAC fails to do. However, the court of appeals has stepped back from such a requirement. *See*, <u>United States v. Polukoff v. St. Mark's</u> Hospital, 895 F.3d 730, 745 (10th Cir. 2018), citing <u>Lemmon</u>, 614 F.3d at 1172. This has been recognized by various courts. For example, in <u>U.S. for Use and Benefit of Metal Sales Mfg. Corp. v. A.C. Dellovade, Inc.</u>, 2019 WL 4060876, *3 (W.D. Okla. August 28, 2019), Judge Cauthron cites <u>Lemmon</u> as a case "that seems to undermine <u>Sikkenga</u>." Judge Cauthron notes that <u>Lemmon</u> recalled the apparent requirements set forth in <u>Sikkenga</u> and revised them with <u>Lemmon</u> "concluding that fraud claims 'need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme.' <u>Metal Sales</u> quoting <u>Lemmon</u> at 1172. *See also*, <u>United States ex rel. Wagner v. Care Plus Home Health Care, Inc.</u>, 2017 WL 6329850, *4 (N.D. Okla. December 11, 2017) ("this court joins those courts declining to interpret <u>Sikkenga</u> as adopting a bright line rule").

courts may consider whether any pleading deficiencies resulted from the plaintiff's inability to obtain information in the defendant's exclusive control. *Id.* This reflects the principle that Rule 9(b) does not require omniscience; rather the rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim. *Id.* Furthermore, malice, intent, knowledge, and other conditions of a person's mind may be alleged generally. *Id.*

V.  The Second Amended Complaint

The SAC is 167 pages long.

Part I of the SAC introduces this action.

Part II identifies the parties.

Part III addresses jurisdiction and venue.

Part IV sets out relevant federal and state laws.

Part V alleges, at length,[5] the factual underpinnings of the relator's claims. This part of the SAC includes a description of various financial schemes (eleven schemes, to be exact) in which various defendants allegedly participated.  As discussed later in this order, some of the particulars of these schemes are summarized in a table included in the SAC.[6]

Part VI sets out fourteen counts.  Excluding counts eight, thirteen and fourteen because they are not relevant to this order,[7] the remaining counts are as follows.

> Count one alleges a violation of the Stark Law.
>
> Counts two through seven allege violations of the FCA predicated on violation of federal laws including Stark, the AKS, and the FCA's provisions regarding factually false

---

[5] SAC at ¶¶ 89-237.

[6] SAC at ¶ 16.

[7] Count eight alleges violation of the NPA and is alleged only against Tenet, which is not an active party.  Counts thirteen and fourteen are brought under the anti-retaliation statutes and are alleged only against the SOS defendants.

claims and false certification of compliance with federal healthcare laws as well as the FCA's reverse false claims provision and its conspiracy provision.

<u>Counts nine through twelve</u> allege violations of the equivalent state laws.  These counts are brought under the OKFCA and are predicated on violations of federal and state laws, including Stark, the AKS, the OMPIA and the factually false claims provision in the OKFCA.

<u>Part VII</u> requests a jury trial and prays for relief.

## VI.  <u>Discussion</u>

Kimzey and Hendley make similar (although not always identical) arguments for dismissal.  That said, the allegations pertinent to each of them vary.  Accordingly, although the court's rulings are, ultimately, the same with respect to both movants, this order addresses the motions separately.

### A.  <u>Kimzey's Motion to Dismiss</u>

<u>Count one.</u>  Kimzey argues he should be dismissed from count one because it purports to bring an action against him under the Stark Law.  Kimzey argues that black letter law establishes that there is no private cause of action under Stark.

In response, the relator states that while the United States may pursue civil penalties under Stark, the relator, as a private party, "does not assert a right to damages under Stark itself."  Doc. no. 143, p. 30 of 116.  Relator states that he merely alleges Stark violations as a predicate to his FCA claims.  *Id*.  Relator also notes that the allegations regarding Stark violations are incorporated in the other counts as predicates for those counts.  *Id*.  In other words, relator agrees that he cannot assert a direct claim under Stark, and he basically concedes that Kimzey (and Hendley) should be dismissed from count one.

The court agrees with Kimzey that count one does, in fact, assert a direct claim against Kimzey and others for violation of Stark.  As the relator has clarified that he

does not assert a direct claim against Kimzey or any other defendant under Stark, Kimzey is entitled to dismissal from count one.  Kimzey will be dismissed from count one with prejudice and without leave to amend.

<u>Counts two through five.</u>  These counts allege claims against Kimzey under the FCA.  Kimzey's principal arguments are that counts two through five fail because:

-- group pleading is insufficient to satisfy Rule 9(b);

-- the "scant" (Kimzey's word) allegations directed at Kimzey are not sufficient to state a claim;

-- the fraudulent schemes that are alleged as support of the relator's claims do not meet the particularity standards of Rule 9(b);

-- the SAC does not allege that Kimzey acted with the necessary scienter;

-- The relator's intentional destruction of evidence (spoliation) casts further doubt on the allegations specific to Kimzey; and

-- the SAC does not plead the existence and submission to the government of any specific false claim.

<u>Group Pleading</u>.  The court rejects Kimzey's group pleading argument as a basis for dismissal.

Group pleading is not disallowed *per se*.  Kimzey's main group pleading complaint appears to be that the SAC often refers to the conduct of "the OCOM defendants," a term which includes Kimzey.  That term, however, is used with care. The SAC lists the people and entities encompassed within this term.  And the SAC defines "the OCOM defendants" to include Kimzey only from 2014 to the present.[8] (Kimzey allegedly served as CEO of OCOM beginning in 2014.)  Given the care with which the term "the OCOM defendants" is defined and used in the SAC, the

---

[8] SAC at ¶ 48(b), n. 29.

court finds that this term, as well as terms such as "OCOM management" and "OCOM CEO" do not offend group pleading rules. Despite the use of such terms, the SAC gives Kimzey adequate notice of the claims against him.[9]

    <u>"Scant" Allegations</u>.   The court rejects Kimzey's characterization of the factual allegations against him as "scant." In addition to numerous allegations regarding actions of the OCOM defendants from 2014 forward, the SAC includes allegations specific to Kimzey by name.[10]  A few examples are stated below.

      -- The alleged equity scheme is one of two core schemes which the SAC describes as violating the Stark Law, the AKS, the FCA and/or the OKFCA.  SAC at ¶ 7.  The SAC alleges that Kimzey recognized the *quid pro quo* nature of providing OCOM equity in return for the volume and value of the business an SOS doctor would bring in, with Kimzey stating that "the status quo … this is how this place was built and it works pretty well." *Id*. at ¶ 119.  The SAC alleges that on one occasion, when a non-SOS doctor (Dr. Greenway) wished to sell his equity to another non-SOS physician, Dr. Cruse asked if the sale could be blocked. *Id*. at 122.  Kimzey answered, "we can absolutely block that" because the "whole point is, let's get it to SOS … that's the whole point of this drill."  *Id.* at ¶122.  The SAC alleges that at the same meeting, Kimzey acknowledged the arrangement could never be memorialized in the operating agreement and that he could not *formally* treat the SOS doctors differently than anybody else.  *Id*. at ¶ 123 (emphasis in original).

---

[9] At times the SAC refers simply to "defendants" as an undifferentiated group.  Given the detail alleged elsewhere, occasional use of the term "defendants" does not deprive Kimzey of adequate notice of the claims against him.   Moreover, it is appropriate for the SAC to refer to the "defendants" in certain instances, such as in the SAC's overview of the claims and in the part of the SAC that addresses the alleged conspiracy.

[10] Although the count, by itself, means nothing, the court's word search indicates the SAC refers to "Kimzey" 89 times.

-- With respect to the employment contract scheme—the other core scheme described in the SAC (*id.* at ¶ 7, referred to there as the employment agreement scheme)—the SAC alleges that USP recognized that this scheme threatened Tenet's compliance with the NPA, and that USP ordered Kimzey to dismantle the arrangement immediately.  *Id.* at ¶132.  According to the SAC, Kimzey "anxiously informed the SOS Doctors that the arrangement must immediately stop," and "hurriedly ordered Relator to immediately wipe Dr. Disselhorst, the OCOM-employed Physician under the scheme at the time, from the SOS system and website to hide the offense." *Id.*

-- With regard to the anesthesia company scheme, the SAC alleges that Kimzey, along with the SOS doctors and USP, formed APO "to provide *exclusive* anesthesia services at OCOM, driving additional profits to themselves." *Id.* at ¶8 (emphasis in original).  The SAC alleges that "In doing so, they created a textbook self-referring financial and kickback relationship." *Id.*  The SAC alleges that Kimzey stated to the relator that Tenet and USP perpetuated this scheme across the U.S.  *Id.* at ¶ 8.  The SAC alleges that Kimzey convinced the SOS doctors that they were "leaving money on the table" by allowing independent anesthesiologists to bill and collect for anesthesia services for surgeries performed at OCOM, and that Kimzey therefore encouraged them to create their own anesthesia company which would be the exclusive anesthesia provider to OCOM. *Id.* at 152.  The SAC alleges that the SOS doctors then authorized Kimzey to get the documents to form their own anesthesia company under USP's guidance.  *Id.*  The SAC alleges that Kimzey and the SOS doctors owned a portion of APO (*id.* at ¶ 153), and that Kimzey, although not a doctor, regularly attended the SOS doctors' meetings.  *Id.* at 154.

-- The SAC further alleges that because the SOS doctors, in coordination with Kimzey and USP, could direct OCOM to enter into an exclusive arrangement with APO, the SOS doctors knew that a surgical referral to OCOM was an anesthesia

service referral to their company, APO—a two for one deal.  *Id.*  The SAC alleges "[t]he arrangement constitutes an improper financial relationship between the SOS doctors, OCOM and UAP that facilitates unlawful self-referrals of DHS." *Id.* at 155. The SAC alleges "this venture constitutes blatant solicitation and payment of kickbacks to the SOS Doctors in return for referral of federally-insured patients to OCOM." *Id.*

Schemes Challenged Under Rule 9(b).  The court rejects Kimzey's argument that the fraudulent schemes described in the SAC are not alleged with sufficient particularity and do not give Kimzey fair notice of the schemes in which he was allegedly involved, in violation of Rule 9(b).

As previously mentioned, the SAC alleges eleven schemes and includes a table which lists the OCOM defendants as involved in seven of these schemes.  *Id.* at ¶ 16.  More specifically, this table alleges that the OCOM defendants were involved in the equity scheme, the employment contract scheme, the surgery scrub scheme, the sham lease scheme, the office space scheme, the credit card scheme and the anesthesia company scheme.  The table also identifies:  the statutes the relator contends these schemes violated, the relator's damage estimates with respect to each scheme, and the years during which the relator alleges these schemes operated.  The table gives Kimzey notice that as one of the OCOM defendants from 2014 forward, he is alleged to have participated in the seven schemes identified above.[11] Furthermore, the schemes in which Kimzey is implicated are described at length elsewhere in the SAC, including in Part I of the SAC, where the complaint is

---

[11] The table alleges the credit card scheme took place in "at least 2011."  Kimzey is only treated as an OCOM defendant from 2014 forward.  However, allegations elsewhere in the SAC explain that the credit card scheme occurred "[f]or an unknown period before <u>and after</u> June 2011."  SAC at ¶ 245 (emphasis added).

overviewed, and in Part V of the SAC where the facts relating to various schemes are alleged in detail. The SAC alleges the purpose of the schemes, the manner in which they were conducted, and the people and entities who were involved in them.[12]

Scienter. The court rejects Kimzey's argument that the SAC does not allege sufficient facts in support of scienter. (Some of the allegations already reviewed in this order are relevant to Kimzey's knowing involvement in various schemes.) Kimzey's arguments regarding scienter are rejected.

Spoliation. Kimzey's motion spends a fair amount of time arguing that the relator destroyed evidence after this action was filed. Kimzey contends that this is of particular concern given the "scant" allegations against Kimzey. The court has already found that the allegations regarding Kimzey are not scant. Regardless, Kimzey's spoliation argument is evidence-based, not pleadings-based. This argument for dismissal is rejected.

Failure to Identify a Specific False Claim. The court rejects Kimzey's argument that the FCA claims alleged in counts two through five fail because the SAC does not identify any particular false claim that was submitted to the government by Kimzey or with his help (or by anyone else). The SAC provides an adequate basis for a reasonable inference that false claims were submitted as part of the alleged schemes participated in by Kimzey. *See*, discussion at n.4, *supra*. The SAC alleges that all of the claims that were submitted to the government as a result of referrals from the SOS doctors during the period in question violated the FCA due to improper financial relationships with, and kickbacks to, the SOS doctors, so that

---

[12] The court also rejects Kimzey's argument that the SAC treats him as a participant in various schemes based solely on the fact that he allegedly served as CEO of OCOM beginning in 2014. The SAC does not rely solely on Kimzey's status as CEO to show his involvement in the relevant schemes.

all such claims were tainted and false.[13]   Furthermore, it is Kimzey and the other defendants' alleged pattern of conduct that is the basis of the claims, not anything particular to any one claim.   In the context of this case, requiring the relator to identify a particular false claim would not serve the purposes of Rule 9(b).

Count six.  Kimzey argues that count six fails on grounds exclusive to him.

Count six alleges a type of claim under the FCA known as a reverse false claim.  This type of claim is based on 31 U.S. § 3729(a)(1)(G), which provides that:

> any person who … knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government ….

The court of appeals has stated that "[t]his section was added to provide that an individual who makes a material misrepresentation to avoid paying money owed the Government would be equally liable under the Act as if he had submitted a false claim to receive money."  United States ex rel. Bahrani v. Conagra, Inc., 465 F.3d 1189, 1194-95 (10th Cir. 2006).[14]  Bahrani states that this provision is described as a reverse false claims provision because the financial obligation that is the subject of the fraud flows in the opposite of the usual direction.  Id. at 1195.  Bahrani also notes that this provision may be enforced by either the Attorney General or by a private qui tam relator.  Id.

---

[13] See, e.g., SAC at ¶ 96 ("When considered together, the Equity and Employment Contract Schemes subject all Governmental reimbursements to OCOM from 2007 to the present that resulted from SOS referrals to recovery," emphasis in original);  ¶ 191 (OCOM attests to and expressly certifies its compliance with the healthcare laws "in all claims for payment sent to federal healthcare programs");  ¶ 193 ("from 2011 at the latest, year after year, in thousands of claims for payment and required reporting to federal healthcare programs, Defendants attested to and certified their compliance with material healthcare laws");  ¶ 26 ("the SOS Doctors submitted at least 74,847 claims for payment for a subset of Medicare beneficiaries for the years from 2011-2015").

[14] Bahrani addressed an earlier version of the statute.

Kimzey argues that he should be dismissed from count six because 31 U.S.C. §3729(a)(1)(G) makes a person who makes a material misrepresentation *to avoid paying money owed* to the government liable to the same extent that a person who submits a false claim *to receive money from* the government is liable.  Kimzey argues that the SAC does not allege that he or any of the defendants had any obligation to pay funds to the government yet failed to do so (as contrasted with allegations that defendants submitted false claims to receive payment or reimbursement from the government).  Kimzey argues that without an allegation that he or any other defendant had an obligation to pay or transmit money to the government, a claim for relief is not stated against him in count six.

Count six relies on the theory that defendants knew they had received reimbursement from the government to which they were not entitled yet disregarded their duty to return that wrongfully received reimbursement.  SAC at ¶¶ 311-12. That theory of liability is foreclosed by <u>Bahrani</u>, which observes that a plaintiff may not state a reverse false claim unless the pertinent obligation attached before the defendant made or used the false record or statement.  *See*, <u>Bahrani</u>, 465 F.3d at 1195, quoting <u>American Textile Mfrs. Institute, Inc. v. The Limited, Inc.</u>, 190 F.3d 729, 736 (6th Cir. 1999).  As <u>Bahrani</u> recognizes, if the rule were otherwise, the court would be opening up every FCA claim to a reverse false claim.  *See*, <u>Bahrani</u>, citing <u>American Textile</u> for the proposition that "to apply the statute in that way would unduly broaden it."  *Id*. at 1196.

Kimzey's motion will be granted with respect to count six.  He will be dismissed from count six with prejudice, without leave to amend.

<u>Count seven</u>.  Count seven alleges a conspiracy to violate the FCA.  Kimzey argues that count seven fails because the SAC does not allege an underlying FCA violation. The court has found that the FCA claims survive at this stage, undercutting the premise of Kimzey's argument for dismissal from the conspiracy count.  Kimzey

argues that count seven also fails because it is merely conclusory and does not allege facts that show he was involved in a conspiracy. This argument is rejected. Finally, Kimzey argues that count seven violates the intra-corporate conspiracy doctrine. In response, the relator argues that among the various co-conspirators are third parties such as the individual SOS doctors, who are not alleged to have a corporate or employment relationship with Kimzey.[15] Given the presence of these parties among the alleged conspirators, the court will not rely on the intra-corporate conspiracy doctrine to dismiss Kimzey from count seven at this stage.

Counts nine through twelve. These counts allege violations of state law based on the same conduct that supports the federal claims. For generally the same reasons that the court has found the federal claims are sufficient, the state-law claims are also sufficient. In addition, the court notes Kimzey's argument that count eleven fails because the OMPIA applies only to those who "solicit or accept" kickbacks. Kimzey argues there are no allegations that Kimzey solicited or accepted a kickback or other benefit. The court rejects this argument. Count eleven incorporates the allegations that precede it and states a claim against Kimzey.[16]

Other arguments. Kimzey makes other arguments for dismissal, all of which are rejected. One of those other arguments is a limitations argument. The court notes that there is no longer any dispute among Kimzey, Hendley and the relator that a ten-year limitations period applies to the FCA claims alleged against Kimzey. *See*, doc. no. 207 (order memorializing status conference), citing Chochise Consultancy, Inc. v. United States ex rel. Hunt, ___ U.S. ___, 139 S.Ct. 1507 (2019).

---

[15] The relator makes other arguments regarding the inapplicability of the intra-corporate conspiracy doctrine which it is not necessary to address.

[16] *And see*, SAC at ¶ 382 (this paragraph is exclusive to count eleven; it includes Kimzey as one of the defendants who "knowingly solicited" remuneration in the form of distributions from APO in return for, and as reward for, patient referrals for federally-insured patients for DHS, specifically, anesthesia services).

B.  Hendley's Motion to Dismiss

Count one.  Hendley makes the same argument that Kimzey makes with respect to count one, arguing that the relator cannot assert a direct claim against a defendant under the Stark Law, a proposition the relator does not dispute.  Hendley will be dismissed from count one.  This dismissal will be with prejudice and without leave to amend.

Counts two through five, seven, and nine through twelve.  The court next addresses all remaining counts against Hendley except count six, which it leaves for last.

Group Pleading.  Many of Hendley's arguments for dismissing these counts are premised on his position that the court should ignore allegations about the conduct of "the OCOM defendants" as a term that is not specific enough and violates group pleading rules.  As already stated, the SAC is specific about which persons and entities are included within this term.  Hendley is included from 2002 to present.[17]  That treatment appears to be based on allegations that Hendley is not only the former CEO of OCOM (Hendley allegedly left that position in 2014) but also on allegations that Hendley is currently an executive manager and employee of USP. *Id.* at ¶ 46.  For reasons similar to those addressed in relation to Kimzey's motion, the allegations against Hendley are not merely conclusory and do not offend group pleading rules.

"Scant" Allegations.  The court rejects Hendley's argument that the SAC presents few allegations about his personal participation in illegal conduct or schemes.  There are numerous allegations regarding the OCOM defendants, of

---

[17] SAC, ¶ 48, n. 28.

which Hendley is one from 2002 forward.  In addition, there are allegations which are specific to Hendley by name, examples of which are stated below.[18]

--The SAC alleges that Hendley, as OCOM's CEO, was aware that the equity scheme (a core scheme) was improper.  The SAC alleges that Hendley feigned ignorance of its illegality, stating "I didn't hear that" when Dr. Cruse explained to the SOS doctors that they alone, rather than the non-SOS doctors, should have the equity of Dr. Knutson, a non-SOS physician who retired around the end of 2012.  *Id.* at ¶ 117.  The SAC alleges that in the months leading up to October 2015, Dr. Hume, an SOS Doctor at the time, announced he was considering leaving SOS to join another practice but that he had no desire to disassociate from OCOM or to stop referring patients to OCOM.  *Id.* at 121.  The SAC alleges that Hendley, along with others, secured an OCOM vote to "forcibly disassociate" Dr. Hume from OCOM and to pay Hume a discounted penalty price in redemption of his OCOM equity.  *Id.* The SAC alleges that these facts show the threat of penalty which was inherent in the SOS doctors' control over OCOM equity. *Id.*

--With respect to the credit card scheme, the SAC alleges that Hendley was OCOM's acting executive manager when, in 2011, Dr. Cruse and others conspired with the OCOM defendants to channel OCOM's purchases of surgical supplies through Dr. Cruse's personal credit card so that Dr. Cruse could earn reward points for these high-dollar purchases.  *Id.* at ¶150. The SAC alleges that Hendley "agreed to" this arrangement, and "directed" that it "be implemented through OCOM's accounting department."  *Id.*

Schemes Challenged Under Rule 9(b).  Hendley argues the SAC does not give adequate notice to Hendley about which schemes he was allegedly involved in, and

---

[18] Although the count, by itself, means nothing, the court's word search indicates that the SAC refers to "Hendley" 25 times.

that the schemes are not alleged with the particularity required by Rule 9(b).  These arguments are rejected.  The SAC adequately alleges that Hendley, as one of the OCOM defendants, was involved in seven of the eleven schemes described in the SAC.  *See*, *id.* at ¶ 16.  As set forth in the table in the SAC, the OCOM defendants were allegedly involved in the equity scheme, the employment contract scheme, the surgery scrub scheme, the sham lease scheme, the office space scheme, the credit card scheme and the anesthesia company scheme.[19]

Scienter.  Hendley argues that the SAC fails to adequately allege that Hendley knowingly facilitated the transactions in question.  He argues that the SAC fails to adequately allege that Hendley knew claims presented to federal healthcare benefit programs were derived from impermissible kickback arrangements and that Hendley nevertheless submitted or caused or helped with the submission of such claims.  The allegations are sufficient with respect to scienter, and this argument for dismissal is rejected.

Failure to Identify Specific False Claims.  Hendley argues that the SAC fails to identify a particular false claim presented to the government by Hendley or with his help (or by anyone else).  For reasons discussed in connection with Kimzey's motion, the court rejects these arguments for dismissal.  Hendley also argues that the SAC fails to identify a dollar value for false claims attributable to Hendley's participation in the alleged schemes.  This argument is also rejected because, among other reasons, the relator would not be expected to have access to this type of

---

[19] Hendley's reply brief argues that the relator's response brief "affirmatively disavows any association between Hendley and the Anesthesia Company Scheme by redefining *and excluding* Hendley from the list of Defendants purportedly involved." Doc. no. 155, p. 3 of 12 (responding to the relator's discussion of the anesthesia company scheme at doc. no. 143, pp. 74-84 of 116). The court disagrees.  The cited portion of the relator's response brief refers to "the OCOM Defendants." *See*, *e.g.*, doc. no. 143, p. 80 of 116.  And the table in the SAC clearly alleges that the OCOM defendants were involved in the anesthesia company scheme.  SAC at ¶ 16.

information for pleading purposes, as such information is presumably within other parties' control.

The Conspiracy Count.   Hendley challenges count seven, the conspiracy count, arguing that he cannot be liable for a conspiracy to submit a false claim if no false claim has been adequately alleged to exist.   This order has found that the SAC adequately alleges FCA claims against Hendley.   Accordingly, this argument for dismissal of the conspiracy count is rejected.   The court also rejects Hendley's arguments that the allegations of a conspiracy are too general and conclusory and therefore fail under Rule 9(b), as well as Hendley's argument for dismissal based on the intra-corporate conspiracy doctrine.   *See*, discussion of that doctrine, *supra*.   As pertinent to the intra-corporate conspiracy doctrine, the court also rejects Hendley's argument that the SAC alleges the SOS doctors conspired among themselves but not with Hendley, and that the SAC does not allege that Hendley benefitted from the conspiracy.[20]

State-Law Counts.   Hendley argues that because the federal claims should be dismissed, the court should decline supplemental jurisdiction over the state-law claims alleged against Hendley in counts nine through twelve.   In addition, Hendley argues that the state-law counts fail for the same reasons the federal counts fail.   The premises of these arguments have been rejected.   Hendley will not be dismissed from counts nine through twelve.

Count six.   Count six is the reverse FCA claim.   Hendley argues that the SAC fails to state a reverse FCA claim because there is no allegation that Hendley or any

---

[20]  *See*, SAC at ¶ 110 (SOS doctors' willingness to violate the law was matched by the enthusiasm of the OCOM Defendants; as OCOM's former CEO, Hendley and the OCOM board "readily complied as part of their continued ingratiation of the SOS doctors to secure the continued high volume of high-value referrals to OCOM");   ¶ 112 ("OCOM's management, under the leadership of former CEO Hendley and/or CEO Kimzey, readily followed [the SOS doctors'] directives"); ¶114 (the SOS doctors, as well as Hendley, benefitted from the equity scheme).

defendant had an obligation to pay funds to the government.  For the same reasons this order has found Kimzey is entitled to dismissal from count six, Hendley is likewise entitled to dismissal.  Hendley will be dismissed from this count, with prejudice and without leave to amend.

Other Arguments for Dismissal.  Hendley makes other arguments for dismissal, all of which are rejected.  The court notes that one of these other arguments, Hendley's limitations argument, has been resolved by agreement among Hendley, Kimzey and the relator.

## C.  Summary

In summary, the SAC's descriptions of the schemes in which Kimzey and Hendley allegedly participated comply with Rule 9(b) by providing factual allegations regarding the who, what, when, where and how of the alleged claims. Polukoff, 895 F.3d 730, 745.  As stated in the "standards" section of this order, Rule 9(b) does not require omniscience; rather, the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim.  *Id*. Furthermore, the court, at this stage, may take into consideration the relator's inability to obtain information that is within the defendant's exclusive control.  *Id*.  The allegations against Kimzey and Hendley are not so "scant" or "stray" or "general" or "conclusory" (defendants' words) that they fail the particularity standards of Rule 9 or fail to state a claim under Rule 12(b)(6).

On the other hand, counts one and six fail to state a claim against Kimzey and Hendley for reasons unrelated to the movants' other arguments. Kimzey and Hendley will be dismissed from these counts under Rule 12(b)(6).

## VII.  Conclusion

After careful consideration, Kimzey's motion to dismiss (doc. no. 133) and Hendley's motion to dismiss (doc. no. 134) are **GRANTED IN PART** and **DENIED IN PART**.

The motions are **GRANTED** to the extent that they ask the court to dismiss Kimzey and Hendley from counts one and six of the second amended complaint. Michael Kimzey and Steve Hendley are hereby **DISMISSED** from these counts under Rule 12(b)(6), Fed. R. Civ. P.  These dismissals are with prejudice and without leave to amend.

In all other respects, the motions are **DENIED**.

The claims against Kimzey and Hendley that survive this order are the relator's claims alleged in counts two, three, four, five, seven, nine, ten, eleven and twelve.

IT IS SO ORDERED this 8th day of October, 2020.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

16-0569p050.docx